# 15-2307

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
_____

UNITED STATES OF AMERICA,

*Intervenor-Plaintiff - Appellee,*

ABC, STATE OF NEW YORK, EX REL. JOHN DOE, UNITED STATES OF AMERICA, EX REL. JOHN DOE,

*Plaintiffs,*

---against---

ALEX SAAVEDRA,

*Intervenor-Defendant - Appellant,*

SHOMARI GREENE, ALAN KATZ, TAGEWATEE CHANDARPAUL, SHANDELL SANTIAGO-VELEZ, MITCHELL MCCLINTON, MONIQUE TARRY,

*Intervenor-Defendants,*

DEF, STRUCTURED EMPLOYMENT ECONOMIC DEVELOPMENT CORPORATION,

*Defendants.*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR THE DEFENDANT - APPELLANT**

BETTINA SCHEIN
565 Fifth Avenue, 7th Floor
New York, New York 10017
(212) 880-9417
*Counsel for Defendant-Appellant*

ALAN SAMUEL FUTERFAS
LAW OFFICES OF ALAN S. FUTERFAS
*565 Fifth Avenue, 7th Floor*
*New York, New York 10017*
(212) 684-8400
*Of Counsel and on the Brief*

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUES .................................................................... 1

PRELIMINARY STATEMENT ...................................................................... 2

SUMMARY OF THE ARGUMENT ................................................................ 3

STATEMENT OF FACTS ............................................................................. 4

1. Alex Saavedra and His Duties at Seedco ............................................... 4
2. The Seedco Customer Intake Process ................................................... 10
3. Job Placement Services ........................................................................ 12
4. Placements and Promotions .................................................................. 13
5. The Contract Between SBS and Seedco and its Funding ...................... 15
6. The Charney Research Verification Process ......................................... 18
7. How Seedco Received PBC Pursuant to the Contract – the Claim
   for Payment .......................................................................................... 20
8. Government Witness Evidence of Improper Placements Activities ....... 21
9. Testimony of the Whistle-Blower, William Harper ............................. 22
10. The DOI Investigation and the Report of Its Findings ........................ 24
11. The SBS Investigation into Whether any False Placements Were
    Included in the Charney Verified Placements Reports .......................... 30
12. The Defense Witnesses ........................................................................ 31
13. The Government's Theory of a "Claim" in this Case ........................... 32
14. Jury Instructions and Deliberations .................................................... 34

    a. Instructions ....................................................................................... 34
    b. Denial of the Jury's Request to Read Back Testimony ...................... 35

15. The Verdict and Judgment ................................................................... 37

POINT ONE  THE GOVERNMENT FAILED TO PRESENT
SUFFICIENT EVIDENCE THAT A  FALSE CLAIM WAS
PRESENTED FOR PAYMENT OR THAT A FALSE
RECORD MATERIAL TO A FALSE CLAIM WAS USED...................... 39

A.      Standards of Review under FRCP 50(a) ...................................... 39
B.      The Applicable False Claims Act Law.......................................... 40
C.      The Government Failed to Introduce a "Claim" into Evidence .................. 43
D.      The Government Failed to Present a Sufficient Basis to Find
        that a False Claim was Presented for Payment............................. 43
E.      The Government Failed to Introduce a False Record Material to
        a False Claim ......................................................................... 44

POINT TWO THE DISTRICT COURT ERRED BY DECLINING
TO CHARGE THE DEFENSE REQUESTS DEFINING
THE CLAIM IN THIS CASE ....................................................... 45

POINT THREE  THE DISTRICT COURT ERRED IN
CHARGING THE JURY OVER OBJECTION
REGARDING CHARNEY RESEARCH ..................................... 47

POINT FOUR  THE DISTRICT COURT ERRED BY
REFUSING THE JURY'S REQUEST FOR A READ-
BACK OF  WILLIAM HARPER AND OTHERS'
TESTIMONY ....................................................................... 49

A.      The Applicable Law .................................................................. 49
B.      The Court's Refusal to Allow the Read-Back is Reversible
        Error......................................................................................... 50

POINT FIVE  THE GOVERNMENT FAILED TO PRESENT
SUFFICIENT EVIDENCE OF FALSE CERTIFICATION
FCA  LIABILITYAND THE DISTRICT COURT ERRED
IN NOT INSTRUCTING THE JURY ON THE
APPLICABLE LAW ................................................................. 52

POINT SIX   THE DISTRICT COURT ERRED  IN ITS
         CALCULATION OF  DAMAGES AND PENALTIES............................ 55

A.    Damages .................................................................................. 55

B.    Penalties ................................................................................. 55

      i.    Number of Claims ........................................................... 55

      ii.   Penalty Amount................................................................ 56

CONCLUSION ................................................................................. 58

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994) ............................................. 46, 47

*Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004) ................................................................................... 46, 53

*BE&K Constr. Co. v. Will & Grundy Ctys. Bldg. Trades Council*, 156 F.3d 756 (7th Cir. 1998) ................................................... 46

*BMY-Combat Sys. Div. of Harsco Corp. v. U.S.*, 44 Fed. Cl. 141, 151 (1998) ........................................................................... 56

*Caceres v. Port Auth. of New York & New Jersey*, 631 F.3d 620 (2d Cir. 2011) ........................................................................ 40

*Christopher v. Cutter Labs.*, 53 F.3d 1184 (11th Cir. 1995) ........................... 46

*Donohue v. Lempke*, 2012 WL 2930204 (EDNY July 13, 2012) ..................... 50

*Girden v. Sandals Int'l*, 262 F.3d 195 (2d Cir. 2001) ..................................... 47

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999) ......................................................................... 42

*Henry v. Tracy*, 2014 WL 3558021, 11(WDNY July 17, 2014) .................... 50

*Jacques v. DiMarzio, Inc.*, 386 F.3d 192 (2d Cir. 2004) ................................ 47

*Kearins v. Panalpina, Inc.*, 570 F. App'x 9 (2d Cir. 2014).............................. 40

*Logistics Int'l v. U.S.*, 103 Fed. Cl. 252 (2012................................................ 55

*Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001)................................................. 40, 42, 53

*Phipps v. Agape Counseling & Therapeutic Svcs.*, Inc., 2015 WL

2452448, (E.D. Va. May 21, 2015) .......................................................... 41

*Rasanen v. Doe*, 723 F.3d 325 (2d Cir. 2013) .................................... 53, 54

*Singer v. Olympia Brewing Co.*, 878 F.2d 596 (2d Cir.1989). ....................... 55

*Tennyson v. Brower*, 823 F. Supp. 421 (E.D. Ky. 1993) *aff'd*, 27 F.3d 567 (6th Cir. 1994) ................................................................... 47

*U.S. ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493 (6th Cir. 2007) ....................................................................................................... 42

*U.S. ex rel. Blundell v. Dialysis Clinic, Inc.*, 2011 WL 167246 ..................... 53, 54

*U.S. ex rel. Clausen v. Lab Corp.*, 290 F.3d 1301 (11th Cir. 2002) ............... 41

*U.S. ex rel. Eisenstein v. City of New York*, 540 F.3d 94 (2d Cir. 2008) *aff'd sub nom.* ............................................................................ 55

*U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 129 S. Ct. 2230 (2009) ............................................................................. 55

*U.S. ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641 (S.D.N.Y. 2011) ...................................................................................... 41

*U.S. ex rel. Feldman v. van Gorp*, 697 F.3d 78, 95 (2d Cir. 2012) ................. 41, 42

*U.S. ex rel. Kester v. Novartis Pharms.*, 23 F. Supp. 3d 242 (SDNY 2014) ....................................................................................................... 40, 41

*U.S. ex rel. Nathan v. Takeda Pharms. North America, Inc.*, 707 F. 3d 451 (4th Cir. 2013) ........................................................................... 41

*U.S. v. Criollo*, 962 F.2d 241 (2d Cir.1992) ...................................... 49, 50

*U.S. v. Damsky*, 740 F.2d 134, 138 (2d Cir. 1984) ................................. 49

*U.S. v. De La Barra*, 447 F.2d 193, 195 (5th Cir. 1971) ............................ 48

*U.S. v. Escotto*, 121 F.3d 81, 84 (2d Cir.1997) .................................... 50

*U.S. v. Holmes,* 863 F.2d 4, 5 (2d Cir. 1988) .................................................. 49

*U.S. v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) ........................................ 47

*U.S. v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) ...................................... 47

*U.S. v. McNinch*, 356 U.S. 595, 599 (1958) ................................................. 42

*U.S. v. Medina*, 944 F.2d 60 (2d Cir. 1991) ................................................. 46

*U.S. v. Murdock*, 290 U.S. 389 (1933) ........................................................ 48

*U.S. v. N.Y. Soc. for the Relief of the Ruptured & Crippled, Maintaining the Hosp. for Special Surgery*, 2014 WL 3905742, at *9 (S.D.N.Y. Aug. 7, 2014) ............................... 53

*U.S. v. Richard*, 504 F.3d 1109 (9th Cir. 2007) ............................................ 49

*U.S. v. Rivera*, 55 F. 3d 703, 709 (1st Cir. 1995) ........................................ 42

*U.S. v. Rogan*, 517 F.3d 449 (7th Cir. 2008) ............................................... 55

*U.S. v. Tieger*, 234 F.2d 589 (3rd Cir. 1956) .............................................. 42

*U.S. v. Young*, 140 F.3d 453 (2d Cir. 1998) ................................................ 49

*U.S. v. Zan Machine Co.*, 803 F. Supp. 620 (E.D.N.Y. 1992); ....................... 55

*Vermont Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000) .................................................................... 55, 56

*Wood ex rel. U.S. v. Applied Research Assocs.*, Inc., 328 F. App'x 744 (2d Cir. 2009) ............................................................... 42

*Young v. Symmes*, 2008 WL 4748569, (D. Minn. Oct. 28, 2008) .................. 50

*Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655 (2d Cir. 2012) ................ 40

**Statutes**

31 U.S.C. § 3729 *et. al* ............................................................. Passim

Fed R. Civ. P. 50(a) .................................................................................... 39, 40

Fed R. Civ. P. 9(b) ........................................................................................ 4

## STATEMENT OF JURISDICTION

This is an appeal of a June 18, 2015 civil judgment against Defendant/Appellant Alex Saavedra after a jury trial on False Claims Act ("FCA") allegations before the Honorable Alvin K. Hellerstein of the United States District Court for the Southern District of New York (A1036).[1]  A timely Notice of Appeal was filed on July 17, 2015. (A1038) This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1294.

## STATEMENT OF THE ISSUES

1.     Whether the government failed to present sufficient evidence at trial that a false claim was presented for payment or that a false record material to a false claim was used?

2.     Whether the district court erred by declining to charge the defense requests defining the claim in this case?

3.      Whether the district court erred in charging the jury over objection regarding Charney Research?

4.     Whether the district court erred by refusing the jury's request for a read-back of William Harper and others' testimony?

---

[1] All citations prefaced by "A" are to the Appendix.

5.     Whether the government failed to present sufficient evidence of false certification FCA liability and the district court erred in not instructing the jury on the applicable law?

6.     Whether the district court erred in its calculation of damages and penalties?

## PRELIMINARY STATEMENT

On May 22, 2012, the civil division of the United States Attorney's Office for the Southern District of New York (the "government") filed an intervenor complaint which alleged two FCA and three common law claims against Defendant-Appellant, Alex Saavedra ("Mr. Saavedra"), Structured Employment Economic Development Corporation ("Seedco"), and six other defendants. On February 11, 2013, the government filed an amended intervenor complaint which charged the same claims. (A0027) The government alleged that Seedco staff entered false job placements into the Worksource1 database which resulted in the receipt of additional funds from the New York City Office of Small Business Services ("SBS"). The government alleged that thousands of false placements were entered by Seedco, that corresponded to damages and penalties of tens of millions of dollars. All other defendants but Mr. Saavedra settled.

Mr. Saavedra's pretrial motions to dismiss and for summary judgment were denied. On the eve of trial, the three common law claims were dismissed. The jury

trial on the two FCA claims began on April 14, 2015 before the Honorable Alvin K. Hellerstein and lasted seven days. On April 23, 2015, the jury returned a verdict of liability on both FCA claims. The jury found thirteen false records and damages of $13,000.  On June 18, 2015, the district court entered judgment against Mr. Saavedra for $192,872.79 ($39,000 in damages, $143,000 in civil penalties, and $10,872.79 in costs). (A1036, 1039) Mr. Saavedra filed a timely notice of appeal. (A1038)

## SUMMARY OF THE ARGUMENT

This appeal concerns whether the government introduced evidence at trial of a claim within the meaning of the False Claims Act. (POINT ONE) It also addresses several serious charging errors. (POINTS TWO, THREE and FIVE) In addition, the Court refused a read-back requested by the jury of the testimony of an important defense witness – a witness who was not present at the trial. (POINT FOUR) Finally, the Court erred in calculating penalties and damages. (POINT SIX)

**STATEMENT OF FACTS**

**1. Alex Saavedra and His Duties at Seedco**

      Alex Saavedra, age 47, was born and raised in a modest home in rural New Mexico outside of Albuquerque. (A0521-22).  He has devoted his life to helping the poor transition from welfare to work, lead better lives and create stronger urban communities. He attended Stanford University on a full scholarship, majoring in urban development of economically disadvantaged neighborhoods. Upon graduation in 1989, Mr. Saavedra obtained an M.S. in Urban Planning from Columbia University on full scholarship.  His master's thesis was on affordable housing initiatives that succeeded in the South Bronx.  After graduation, he received a fellowship at the NYS Urban Development Corp. where he worked on economic initiatives for disadvantaged neighborhoods. (A0524)

      Mr. Saavedra worked for two years as assistant director of the South Bronx Overhaul Economic Development Corp.  Its mission was the revitalization of key commercial streets. Mr. Saavedra assisted local business owners to more effectively manage their businesses by, for example, finding resources for financing and implementing facade improvement.  Mr. Saavedra then worked at the Upper Manhattan Empowerment Zone in Harlem where he researched and drafted community grant initiatives. He then moved to the Afterschool Corporation

funded by the George Soros Institute, where he developed and implemented afterschool programs in public schools.  (A0524-26)

In 2001, Mr. Saavedra was recruited by Seedco founder and CEO Bill Grinker and was hired as a senior program associate.  Seedco is a not-for profit antipoverty think tank that designs innovative programs to alleviate poverty in New York and other cities.  His job was to draft antipoverty programs and grant proposals to fund them. (A0526-27) One of his first funded grant requests was to provide transportation to enable low wage employees to travel to their work at an industrial park in Sunset Park, Brooklyn not reached by bus or subway. (A0447)

In 2004, Seedco was awarded the contract to operate the Upper Manhattan One Stop[2] also known as the Workforce1 Center on 125th Street (referred to herein as the "Center" or "UMWF1") and Mr. Saavedra was appointed Center Director. To launch the UMWF1, he hired 40 new staff, implemented a two week training program about the goals, policies and operation of UMWF1 and instituted the employment programs required by the WIA. (A0527) Mr. Saavedra worked closely with local stakeholders and employers to benefit the Harlem community and instituted innovative programs to help the hundreds of job seekers who came into the Center every week.  (A0454, A0528) While some of these programs were

---

[2] The Work Investment Act ("WIA") designated One Stop centers to serve people who were looking for a job or receiving unemployment benefits. At these centers, job seekers would receive job development skills including resume drafting, interview and computer skills and referrals for jobs. (A0448)

supported by federal funds, private donors including the Robin Hood and the Ford Foundations funded other initiatives at the Center. (A0449)

Mr. Saavedra implemented initiatives that partnered with community based organizations. These included a fatherhood program, a veterans program, a benefits access program and a career advancement program. (A0452) He partnered with community stakeholders such as Columbia University, the CUNY 137th Street campus and NYC community colleges.

One example is a partnership Mr. Saavedra created with Columbia University's Young Men's Health Initiative.  This program provided health education and services to men between the ages of 13-30 who were marginalized from health care due to unemployment, prior incarceration, poverty and child custody arrears. Mr. Saavedra and a Columbia professor developed a successful partnership relationship from which the men received medical care, screening and education at Columbia, and job skills, fatherhood counseling, earned benefits and job referrals at UMWF1.   Partnerships of this kind developed by Mr. Saavedra were at the core of the anti-poverty mission of Seedco. (A0454-55)

In 2007, Mr. Saavedra was promoted to Vice President. His responsibilities became even more outwardly focused since the UMWF1 was operating successfully.  He spent most of his time as a diplomat for the Center working with Harlem community stakeholders including local politicians, the East River Plaza

developers, church leaders, local college administrators, Columbia University and community colleges and businesses owners to develop employment opportunities.

One new and successful Harlem business, the Red Rooster restaurant, utilized UMWF1 onsite recruitment efforts to find and employ all the staff required for its grand opening in December 2010. Similarly, the UMWF1 recruitment and placement department held a full week of off-site recruitment events for Eataly, a block long Italian marketplace with restaurants and wine shops. UMWF1 filled all the hiring needs of Eataly so it could open to much acclaim, on schedule in the summer of 2010. Seedco provided all of the hiring needs for the East River Plaza mall. Mr. Saavedra worked with the developers, local politicians and community based organizations ("CBO's") to ensure employment for a large number of job seekers from Harlem. (A0531)

Mr. Saavedra knew that all job placements entered into Worksource1 ("WS1") were verified by Charney Research ("Charney") because he attended meetings with SBS staff and was advised as such. He was told by SBS that Charney called everyone on the roster to verify their placement or promotion. (A0534)

In 2010, the UMWF1 provided services which resulted in placing 6, 000 people in jobs.  In the spring of 2010, Seedco was asked to submit a proposal to SBS to operate the Bronx WF1 Center.  Mr. Saavedra was given an office at

Seedco corporate headquarters to work with the proposal development team to draft the 200 page Bronx proposal. (A0536)

In addition to drafting the proposal, Mr. Saavedra searched for a new location to house the Bronx Center since it was then located in a substandard building which was in decay. (A0537, A0541) Between March and June, 2010, Rick Green, the UMWF1 Deputy Director, took over as temporary Center Director while Mr. Saavedra worked on the Bronx proposal and looked for a new location. (A0538)

In the summer of 2010, Mr. Saavedra was also assigned some of Francine Delgado's responsibilities. Ms. Delgado was Mr. Saavedra's direct report at Seedco headquarters and she had begun traveling nationally and internationally as her role grew at Seedco. It was her intention for Mr. Saavedra to take over her position. (A0458) In the summer of 2010, when Ms. Delgado went on maternity leave, Mr. Saavedra began to attend executive level meetings with Seedco CEO, Barbara Gunn and others. (A0538) When, in September 2010, Seedco was awarded the grant to operate the Bronx WF1, Mr. Saavedra was tasked with opening it on January 3, 2011. Mr. Saavedra hired 40 people to fill staff positions and transferred some UMWF1 staff to the Bronx. Mr. Saavedra immediately engaged Bronx community stakeholders such as Lehman College, Hostos

Community College, local churches, politicians and community based organizations to locate job-seekers and create employment opportunities. (A0540)

On April 5, 2011, the whistleblower, William Harper, brought to the attention of Seedco management his claim of improper placement activity. At that time, Mr. Saavedra was at the Mayo Clinic in Arizona with his father who was being treated for amyotrophic lateral sclerosis (ALS). (A0542) On April 7, 2011 he was with his father and his doctors discussing treatment. Later that day, he saw messages on his phone from headquarters. When he was able to return the call, Ms. Delgado and Seedco's general counsel told him that a whistleblower had made allegations about false placements. Prior to that call, Mr. Saavedra had no knowledge of improper placement activity at Seedco. (A0547)

When Mr. Saavedra returned from Albuquerque, he met with Seedco management to discuss the allegations and how best to address the issue. Ms. Gunn and Ms. Delgado asked Mr. Saavedra to lead a retraining initiative for all staff to ensure that they were up to date on the most current SBS policies concerning the operation of the Workforce Center including the SBS definition of a placement. (A0549)

In August 2011, a *New York Times* article appeared about the whistleblower's allegations. (A0549) Thereafter, SBS referred the matter to the NYC Department of Investigation ("DOI"). Mr. Saavedra, among other Seedco

staff, was interviewed by DOI investigators. Mr. Saavedra resigned in March 2012.[3] (A0550) He returned to live with his family in New Mexico and eventually found work in a local employment agency. (A0551)

## 2. **The Seedco Customer Intake Process**

Each week, UMWF1 provided services for hundreds of job seekers.[4] When they walked in, they attended an orientation program which informed them of the services available. (A0152) During orientation, each person filled out a Customer Information Form ("CIF") and then met with an intake specialist[5] who sent them to one of three groups. The CIF asks the customers to fill in their name, address, date of birth, social security number, work history, whether they served in the military, the reason for the visit and sign the form. (A0149-50)

Most walk-ins were sent to the Career Advisement department where they met with an advisor and were scheduled to attend one or more job skills training sessions. Classes were offered in computer skills, resume development and interviewing skills. A person could also be sent for GED classes or, if they met

---

[3] The government introduced evidence that Mr. Saavedra's salary was $103,000 in 2009, $111,000 in 2010 and $97,000 in 2011. (A0393)

[4] Job seekers came to UMWF1 through word of mouth, advertisement for specific jobs, programs or recruitment events, through referral by a community partner or city councilmen's office or through a church referral.

[5] If the person had difficulty reading or writing or did not speak English, the intake specialist would assist the person in filling out the CIF or tell them to return on a day of the week when Spanish-only speaking programs were offered at Seedco.

certain requirements, they could obtain an individual training grant ("ITG") for tuition at a community college to obtain specific job skills. Center staff would contact them when jobs became available or telephone customers and ask if they had found a job since receiving services from the Center. If they had, this would count as a placement.

The second group of people were interview ready, had resumes in hand and had prior work experience. These also included the currently employed who were looking to find a better job or advance in their position. These people were sent to the Recruitment and Placement department where they would be matched with a job opening and sent on a job interview. Seedco Recruitment and Placement staff would also pre-screen these job candidates and send appropriate candidates to employer off-site recruitment events. If the individual was hired, this would count as a placement.

The third group consisted of very poor people who may be homeless or in need of rent money, heat or supplemental nutritional assistance to make ends meet. Many of these people had received public assistance, had never held a job before and needed financial assistance to make ends meet before they could be ready to work. These individuals were sent to the Earned Benefits department where they met with social worker interns from Columbia University who helped them complete applications to obtain benefits, including treatment if they had substance

abuse problems.  UMWF1 was the first Workforce Center to provide all of these diverse services for customers under one roof. (A0529)

### 3.  Job Placement Services

In 2010, UMWF1 helped 6,000 people obtain jobs. In the first three quarters of 2011, UMWF1 and the Bronx Center provided services to place about 7,000 people in jobs.  The UMWF1 recruitment and placement department had developed ongoing relationships with many large employers including Century 21, Fairway and other employers such as the new Aloft Hotel located in Harlem as well as the Red Rooster restaurant. These and many other recruitment events for large employers occurred in 2010 (A0107-08, A0112-A0113, A0115), including the expansive East River Plaza Development that UMWF1 was instrumental in staffing - largely with job seekers from East Harlem.  (A0425-26)

To obtain jobseekers for these job recruitment events, UMWF1 posted them on their website, emailed and called jobseekers that had visited the Center, and posted ads on the internet. (A0108) Recruitment events could take place during a day or over a series of days. Job candidates would fill out the CIF forms during the recruitment events. UMWF1 staff would pre-screen the candidates and assist the employers. (A0108-09)

Recruitment events took place onsite at UMWF1, at the employer's location, or at other offsite locations. (A0146)  Employers present at recruiting events would

sometimes hire candidates on the spot.  If not, when the candidate was hired, she or the employer would later provide the information to UMWF1. (A0147)

## 4.  Placements and Promotions

Under SBS policies, if after receiving services from the Center a customer finds a job, a placement can be recorded. A placement can also be recorded for a Center customer who obtains a different job or higher salary or more hours with their current employer. SBS policy calls this a "promotion" and it was counted toward the contractual performance goals as a placement.  (A0120, A0126-27) A "promotion" occurs, for example, when an employee earning $10 per hour at an existing job receives services from UMWF1 and then receives a raise. (A0120)

Defense Exhibit DDDD ("D4") (A0855-58) is one of the many policy statements SBS regularly provided to the Workforce1 centers to advise of SBS definitions, interpretations, policies and procedures. (A0123-24, A0129) SBS policy defines "promotion" as "an advance in either wages or hours by a job seeker customer with the same employer that occurred after consumption of service through an SBS Workforce development program. The employer can be [ ] the job seeker's employer at the time of enrollment…" (A0125) Similarly, UMWF1 had a program called "Advance at Work," which taught currently employed people the skills to request a promotion or raise in their current job.  (A119-20)

To find out whether customers who received services thereafter obtained a job or received a "promotion," Center staff would regularly conduct re-engagement calls. These were follow-up telephone calls to the individuals who visited the Centers to determine if they had found a job. (A0136, A0138-39). "Pretty much everyone" had to conduct re-engagement calls. On occasion, Workforce1 personnel were directed to attend re-engagement calling events at Seedco headquarters. (A0137) To record a job placement, WF1 staff would record it on an EIF (Employment Information Form), which asks for the customer's name, job, start date, hourly pay, employer and number of hours. (A0139, A0154) The placement was then entered into the Worksource1 ("WS1") system. (A0139, A0153-54)

WS1 is an on-line data system for all the SBS NYC Workforce Centers in which Center staff input all metrics data. The WS1 data was immediately available to SBS so it could examine activity levels in real time on a daily, weekly, monthly and quarterly basis. SBS understood on a micro-level how each Center was performing, including trends and levels of activity, and it managed WF1 performance. (A0191-92, A0195, A0198)[6]

---

[6] Government Exhibit 21 is an excel download of the data housed in WS1 with respect to the Seedco workforce centers (A0182, A0184), and included Seedco's reported job placements for the period of January 1, 2009 to June 30, 2011. (A0188)

A verbal confirmation by either the job seeker or employer was sufficient to allow staff to enter the placement into WS1. (A0117-18, A0131; A0899-903) In addition, SBS policy provided that, "…final validation of the job seekers employment status, for contractual payment purposes, is conducted by a third party organization. …Therefore, the center should not contact job seekers in the context of an administrative or compliance exercise." (A0131) UMWF1 staff was aware that Charney verified job placements. (A0133)

5. **The Contract Between SBS and Seedco and its Funding**

The Workforce Investment Act (WIA) establishes a workforce development system which includes adult programs, dislocated worker programs and youth programs, among others. It also establishes career centers where job seekers can go to access these programs. WIA funds were eventually distributed to SBS to run the career centers. SBS paid Seedco and other career center vendors. In NYC, those centers are called Workforce1. (A0172-73, A0318-20)[7]

The first contract entered into between SBS and Seedco was dated April 1, 2004. Amendments dated April 20, 2007 and thereafter extended the contract into 2011. (A0176-77; A0704-845) The contracts were non-profit/expense only,

---

[7] The annual WIA funding agreements signed by the New York State Department of Labor (NYSDOL) stated that: "Funds provided under this grant agreement must be expended in accordance with all applicable federal statues, regulations and policies, including those of the Workforce Investment Act." (A0322-24; A0694-703) The "standard assurances" are in all WIA grant agreements the DOL issues. (A0328)

reimbursement contracts. (A0179-80) Each year, SBS and Seedcco agreed upon an annual budget for the operation of UMWF1. Until 2011, Seedco received 70% of its annual cost reimbursements based on expenditures and 30% based on complex Performance Based Compensation calculations ("PBC") set forth in Attachment A to the contract. (A0180, A0262, A0269; A0835-841) In 2011, 20% of the contract was based on PBC and 80% of the reimbursement was based on expenditures. (A0180, A0262) If all performance goals were met, Seedco would receive its "Maximum Performance Payment" which would total, but not exceed, Seedco's operational budget for the UMWF1. (A0177, A079-80)

Contractual performance goals (called "milestones") included job placements, employment retention, employer's specific retention and employer fulfillment. (A0196-97, A0270, A0830-41) The PBC paid to Seedco depended on the percentage of milestone performance targets met. (A0270-71) One of the milestone targets, placement goals, were set by SBS after discussion and review of each Center's historical data. (A0180-81, A0195)

Pursuant to Attachment A, PBC  payments were based upon milestone targets in three categories: 1) Total Placements Made accounted for 50% of the PBC[8]; 2) job retention - if the individual placed is still employed after six months -

---

[8]The 50% "Total Placements Made" milestone meant that one half of the 30% PBC payments related to the number of verified job placements. In other words, 15% of the total

accounted for 35% of the PBC; and 3) employer fulfillment accounted for 15% of the PBC. (A0830-41, A0196-97, A0270-71) Annual milestone goal numbers would be divided into quarters to reach a quarterly goal for each Center. (A0180-81, A0198)

Because PBC payments for placements were based upon "achievement levels and validation threshold," at the end of each quarter, SBS would take the roster of WS1 individuals that "were claimed to have been placed in jobs" and send it to a third party firm for verification. (A0198) Attachment A provided that Charney Research, an independent verification company, would survey all customers listed on the WS1 roster to verify the placement. The contract provided:

> Charney will survey all placed customers using WS1 roster that includes all placed customers per quarter. Payment will be adjusted according to the percentage of responding customers who confirm the placement. (A0838) (Emphasis added)

The results of the Charney validation survey of all placed customers were final. (A0839) Only Charney's validation numbers – and nothing else - would be used to determine the verified placements milestone for calculating the PBC due Seedco under the contract. (A0274)

---

possible contractual amounts were based upon job placement performance until December 31, 2010 (A0271), and 10% in 2011.

## 6. __The Charney Research Verification Process__

Craig Charney received a doctorate in political science from Yale University and a diploma in advanced statistical work. Charney was formed in 1997 and conducts polls and measures outcomes for government social programs, researches problems in the field of conflict resolution, and provides market research for private companies. (A0493) SBS hired Charney in 2005 to verify placements and other performance metrics for all of the Workforce1 Centers in New York City. (A0495) SBS would send Charney a roster of individuals from all NYC Workforce1 centers that were in WS1 as having been placed. (A0499) [9]

Charney would call all the individuals on the roster, confirm their identity, and then asked them to respond to a detailed questionnaire. (A0497-98). SBS was heavily involved in creating the questionnaire since it was specifically designed to verify, using SBS policy and contractual definitions, placements, promotions, retention statistics and other metrics SBS used to determine the PBC payments to Seedco and the other Centers. (A0278, A0282-83, A0496; A0868-84) Mr. Charney knew that the reports he prepared were used by SBS to calculate the PBC payments. (A0505-06) SBS and Charney modified the questionnaires during the six-year contract period (2005-2011) when a metric changed. Mr. Charney testified

---

[9] SBS would scrub the WS1 data to delete people who had no telephone number before sending the roster to Charney. To verify the placement information for PBC payments, Charney telephoned those on the roster and asked them to answer a detailed questionnaire. (A0199)

"[w]hat we were measuring is whether they had gotten jobs, kept jobs and gotten raises." (A0502)

To reach those on the roster, Charney engaged a calling facility that specialized in questionnaires and placed calls at night and on weekends.  If the person on the roster did not answer, the caller would dial again at other times - up to twelve times - in order to reach the person, "since we were dealing with a population that often was absent from home." (A0500).

Charney created a report of the placement verification results and sent it to SBS.  The report contained the verified outcome tallies for the number of individuals who obtained jobs, obtained a salary raise or other metrics after receiving services. (A0497, A0500)

When roster numbers were too low to use a random sampling method to obtain a 5% error margin, Charney called everyone. (A0506) When the number of reported placements was sufficiently large, a statistically significant sample would be called to obtain a 5% or less error margin. (A0507-10) [10] Mr. Charney defined the margin of error: "…there is a 95 percent confidence level in these things.  If you were to repeat the survey 20 times, 19 times it would be within plus-minus 5

_____

[10] The government stipulated that, "there was no fraud, no fraudulent claims based on any cost reimbursement request."  (A0302) Accordingly, it stipulated that, "the false claim is alleged with regard to the performance part, and not the expense part," of the contract (*id.*), i.e., the placements verified to 95% accuracy by Charney.  The Court instructed the jury that the case is therefore  "focused only on the questions having to do with the performance criteria which began as a 30% portion of the consideration paid by SBS and later came down to 20% and only a portion of those having to do with placement." (A0303)

percent of the Bronx figures, plus-minus 5 percent of the Brooklyn figures and so forth……" (A0509-10) (Emphasis added) [11] SBS witness Angie Kamath agreed with this assessment of the accuracy of the verification process. (A0200-02)

## 7. How Seedco Received PBC Pursuant to the Contract – the Claim for Payment

Ms. Kamath recognized Defendant's Exhibit T6 as the documentation that the SBS quality assurance team, working with the SBS fiscal team, would compile and present "that would release payment" of the PBC to Seedco. (A0304; A0908-12) Exhibit T6 includes a March 2010 cover email from Naheem Harris of SBS quality assurance "for an authorization for payment outcome;" the Authorizing Memorandum for PBC payments to Seedco; and the "backup documentation" – the Charney verified placement report. (A0305) The third page of the document, a chart, is reflective of the contractual terms contained in Attachment A. (A0306) PBC calculations are shown; all the metrics are provided; and, in accordance with the contract, the PBC payment is calculated. (*Id.*)

Over objection, the Court ruled that Def. Exh. T6 "is irrelevant, but I'll let you do it." (A0308-11) The Court then brought out that Exhibit T6 was "an

---

[11] The government tried to show that Charney's methodology resulted in merely an educated guess as to the total number of verified placements. However, Mr. Charney made clear that his method of statistical analysis and the reliability of a computerized random sampling from a large population was not an educated guess. "We drew a statistically-educated sample to be projected on the population with reliability….a 5% error margin." (A0519)

authorization to pay money for the performance part of the budget" in March 2010; that it attached the Charney verification report; and that all T6 documents would be submitted "together." Ms. Kamath agreed that "<u>each claim was subject to validation process by Charney Research</u>." *Id*. (Emphasis added)

## 8.  Government Witness Evidence of Improper Placements Activities

Alan Katz was hired by Seedco on August 31, 2009. Mr. Katz testified that he did instruct members of his team to enter false placements, but not in explicit terms. (A0101, A0143-44) Mr. Katz never had a discussion with Alex Saavedra about improper placement practices at Seedco before April 2011. (A0141) In April 2011, when Mr. Katz and others learned of the whistle blower's allegations (A0141), Mr. Saavedra told Alan Katz "whatever is going on in that center needs to stop," referring to UMWF1. (A0148)

Ms. Bryant said that Alan Katz instructed her to enter incorrect job start dates to make it appear in WS1 that the customer's job was obtained after receiving services from UMWF1. (A0155, A0158) Ms. Bryant claimed that she changed the start date "maybe 50% of the time" (A0156), and that false placements were discussed in all-staff and team meetings. (A0159)

Ms. Nesmith worked at UMWF1 as an administrative assistant to Mr. Saavedra, and was demoted then fired due to low work performance. (A0162-63,

A0169) Ms. Nesmith recalled that for customers who did have a job before they attended a job fair, Mr. Saavedra instructed her to record the information and enter it into the system. (A0165) She also recalled that Mr. Saavedra stated that it was important to know the job start date because if the individual was employed prior to that quarter, the individual could not be counted as a placement for that quarter. (A0164-65) Ms. Nesmith vaguely recalled SBS policy statements having to do with the calculation of a certain number of days (120 or 180) with regard to the entry of placements. (A0166-67)[12]

During the charge conference, the Court ruled that government witnesses' testimony was "not sufficient" and there was "a failure of proof" of false claims in 2009 and 2010, (A0604-05), and limited the jury's consideration to 2011. (*See* A606-07)

## 9. Testimony of the Whistle-Blower, William Harper

The testimony of Mr. Harper, who was out of the jurisdiction, was read to the jury at trial. On April 5, 2010, William Harper was hired by UMWF1 as its Strategic Operations Coordinator ("SOC").  As SOC, he was responsible for the daily functioning of the WS1 data system; he instituted all SBS policy changes in

---

[12] Defense Exhibit D4 in evidence, page 3, is an SBS policy statement which states that a) "all placements/ promotions should be entered no more than 180 days after the job seekers job start date;" and that b) the "job start date should be 180 days or less from the last service" provided by the Center. *Id.*

WS1 and trained Center staff on SBS policies; he was responsible for coordinating with SBS regarding operations of the Center and reported metrics including job placements to SBS; and was the resident expert on the WS1 system. (A0394-95, A0478). As SOC, Mr. Harper reviewed all data entered in WS1 for accuracy and was also responsible for data cleaning of WS1 on a quarterly basis. (A0478) He sat directly outside Mr. Saavedra's office. (A0474)

Mr. Harper was integrally involved in reviewing and reporting placement metrics to SBS. He never suspected that any false job placement data was entered into WS1.  Mr. Harper received performance reports from SBS before the performance metrics meetings with SBS. (A0476) Mr. Saavedra would rely on Mr. Harper to provide him with WS1 data prior to meetings with SBS on placements, other metrics and budget information. (A0477) On January 1, 2011, Mr. Harper was promoted to Deputy Director of UMWF1.

In 2010 and 2011 Mr. Harper attended the Friday morning all-staff meetings and the weekly leadership meetings for four teams - intake, career advancement, recruitment and placement, and the SBS contract team. (A0468-70)

Mr. Harper never once heard anyone direct or suggest that staff enter improper placements into WS1 at all-staff meetings, at the weekly team leadership meetings, or at any other time. (A0470) Mr. Harper received the all-staff emails at UMWF1. At no time did he ever see an email which suggested the entry of false or

improper placements. *Id.* Nor did he ever suspect that someone was asking or referring in emails to the entry of false or improper placements. *Id*.

Mr. Harper knew Mr. Saavedra's duties in the office, and knew when he was out, because his desk was located in front of Mr. Saavedra's office and next to Mr. Saavedra's assistant's desk. Mr. Harper had no knowledge that Mr. Saavedra knew anything about false placements being entered into WS1. (A0470-71, A0474)

Mr. Harper first learned of improper placements when, in late January 2011 he was at UMWF1 and "began looking at employment information forms that had been filled out and ensuring that they had been put into the system properly." (A0466) Mr. Harper found several CIFs in Irwin Tradyman's desk. He compared those to the "computer" and thought that certain CIFS were improperly entered. (A0467) By March or April 2011, Mr. Harper had concluded that there was improper placement activity. He brought it to the attention of Seedco's counsel on April 5, 2011. *Id*.

## 10.  The DOI Investigation and the Report of Its Findings

In or about August 2011, a New York City Department of Investigation (DOI) inquiry was commenced which ended in March 2012 with the issuance of a report ("the DOI report"). (A0241-42) Based on the DOI report, SBS ended its

relationship with Seedco and assigned its two Workforce1 centers to another operator. (A0246)[13]

Ms. Sung was an inspector general in a supervisory position at the DOI from July 2011 until February 2014. (A0331-32) She oversaw the DOI investigation and was the primary drafter of the DOI report which, in redacted form, was introduced as Government Exhibit 13A. (A0333, A0336-37; A0684-93) The DOI investigation examined an eight-month period from January 1, 2011 to August 8, 2011. The January 1, 2011 start date was selected because it was the earliest date in which CIF forms were available. (A0341) Prior to that date, SBS required that CIF forms be shredded. (A0341) As part of its investigation, DOI interviewed between 20 and 30 employees at Seedco, between four (4) and fifteen (15) job seekers, SBS employees, examined data in WS1, examined "10 banker boxes full of CIF's", and less than 50 resumes.[14] (A0341, A0376-78, A0387)

The DOI report concluded that a number of placements were falsified because "certain employees had taken prior jobs or current jobs of individuals and reported those as SEECDO job placements." (A0342, A0344) The DOI also concluded that there were approximately 528 false job placements entered into

---

[13] Over objection, the letter notifying Seedco of SBS's intention to cancel the contract and utilize another vendor was introduced into evidence as Government Exhibit 68 and read to the jury. (A0247-49)

[14] Resumes were properly used at the Workforce1 center all the time. Job seekers were requested to provide a resume as part of the Workforce1 service and orientation process. (A0376-77)

WS1, a determination largely made by comparing CIF forms (which had the date the job seekers entered the Center), with the WS1 placement data. *Id.*

Out of the "10 banker boxes full of CIF's" - literally thousands examined - Ms. Sung testified about four CIFs the government introduced in evidence. Government Exhibit 57 is a CIF form for Amy Bursor dated January 24, 2011. Ms. Bursor records that she began working as a bartender at Broadway East in September 2009 (A0345-46); the Worksource1 data records a job placement from Ms. Bursor at Broadway East as a Bartender with a job start date of January 26, 2011. (A0348-49) Government Exhibit 65 is a CIF for Dennis Garci dated February 4, 2011. The CIF records Mr. Garci as currently employed at Garcia Floor Covering as an installer and sales representative beginning June 2, 2000. (A0351); the Worksource1 data records the employment of Mr. Garci at Garcia Floor Covering with a job start date of February 17, 2011. (A0352)

Government Exhibit 66 is a CIF for customer Melanie Polanco stating current employment at Almontel as an IT Technician. (A0353-54) Because of a lack of clarity in the handwriting, the Court found the CIF to be "a confusing document" and directed the government to move to another CIF. (A0357) Government Exhibit 67 is a CIF for Damiana Payano indicating employment as an assistant for Allied Barton from August 2007 to April 2009. (A0360) The

Worksource1 data records that her employer is Allied Barton with a job start date of March 22, 2011. (A0361)

Examination of the DOI report (at page 17) established that of the 528 placements claimed to be improper by DOI during the period January 1, 2011 to August 8, 2011, 436 were reported from the UMWF1 on 125th street. (A0372) During that same period, the UMWF1 claimed 3,245 placements. (A0373) Thus, the DOI report claimed that approximately 12% of the UMWF1 placements during that period were improper. (A0373)

For the same period, the Bronx Workforce1 center recorded 3,824 placements. Of those, the DOI claimed that 92 were improper – approximately 2%. *Id.* Ms. Sung acknowledged that on January 1, 2011, Mr. Saavedra moved from the UMWF1 and became the Director of the new Bronx center. *Id.* Mr. Saavedra oversaw the Bronx Workforce1 center during the entire period examined by the DOI.

Even though the principle basis for the DOI conclusions was a comparison of the CIF forms with the WS1 data, Ms. Sung acknowledged that DOI did not have a CIF associated with each of the 528 placements. (A0375) Attempts to inquire as to whether the DOI possessed any of the CIF's related to the alleged 528 improper placements, or even a portion of them, were foreclosed by the Court. (A0374-76) No evidence was introduced at trial about the DOI's 528 alleged false

placements – the customers were not identified and no CIFs or WS1 information about them was introduced.

As important, the DOI's investigation failed to take into account that "promotions" could be counted as placements, and failed to examine the materials with that understanding. Ms. Sung recalled a policy "as to whether promotions could be counted as placements," but stated, "I remember there came a point where they were not allowed to be counted as placements." (A0390) And while Ms. Sung was aware of "some discussion regarding whether a promotion could be counted as a placement," she did not recall whether the policy was in effect during the time frame the DOI was examining. (A0379)[15]

Accordingly, turning to Government Exhibit 57, Ms. Sung acknowledged that if, after visiting Seedco, Ms. Bursor obtained a salary increase or began working 20 hours a week that could qualify as a "promotion". (A0379) But she did not recall if she took that policy into account in determining whether or not an improper placement was entered. (A0379) Ms. Sung also acknowledged that any such salary or hours increase would not be indicated on the CIF. (A0380) Ms. Sung did not know whether the Amy Bursor placement was one of the 528

---

[15] It certainly was. Defense Exhibit 4D, an SBS policy statement, was distributed on March 15, 2011, right in the middle of the examination period. The "promotion" policy and definition was a standard SBS definition in place for years (*see supra* at 13), and there was no evidence presented to the contrary.

identified in the DOI report (A0379), and did not know whether Ms. Bursor was telephoned by DOI. (A0379)

With respect to the Dennis Garci CIF, Government Exhibit 65, the wage and hour information is blank. (A0388) Ms. Sung had no information about what, if anything, the DOI did to determine whether the WS1 placement information included increased hours or wages and thus constituted a "promotion." (A0388-89) Thus, there was no way to determine whether the Garci documents constituted a false placement.

With respect to Ms. Payano's CIF, Government Exhibit 57, the WS1 data indicates an hourly wage of $15.38 per hour - a salary significantly greater than that reported on the CIF. (A0389) Ms. Sung had no recollection of whether the DOI contacted Ms. Payano to determine whether she had been rehired by the company at a higher wage after receiving services from Seedco. *Id.* Accordingly, it was impossible to determine that the Payano documents constituted a false placement. [16]

The DOI did not, and could not, conclude that a single false placement was included in the Charney verified placement reports attached to the Authorization

---

[16] The analysis above reveals a flawed investigative methodology arising out of a misunderstanding of the SBS placement/"promotion" definition and shows that, as we argued at trial, the DOI conclusion of 528 false placements was fatally flawed. And, because Charney telephoned every job seeker, or a statistically significant sample of the job seekers, with a detailed questionnaire designed with the assistance of SBS and designed with questions intended to address SBS placement and "promotion" definitions, it was a highly accurate method to determine whether a proper placement was entered into WS1.  (*See supra* at 18)

Memorandum presented for payment of Seedco's PBC. And it could not conclude that one extra dollar was submitted for payment or paid by SBS as a result of an improper placement. (A0692)

## 11. The SBS Investigation into Whether any False Placements Were Included in the Charney Verified Placements Reports

After the DOI report issued in March 2012, SBS tried to determine whether: 1) any of the placements claimed false by DOI were included in the roster submitted for verification by Charney; and 2) whether those allegedly improper placements were verified by Charney and included in its report. (A0257, A0262-63, A0264-66) An SBS internal email dated October 11, 2012 concerned these questions. (A0258-59; A0859-62) Charles Houston, who leads the SBS fiscal team, wrote in an email "of the 425 customers listed in the DOI and have placement between January and March 2011…24 are not associated with the Charney group sent for validation." (A0259-60; A0859-62) Ms. Kamath agreed that this email meant that 24 of the "425" DOI reported improper placements were not on the roster sent to Charney for verification. (A0260-61) Next he stated, "401 are within the Charney group. I would need additional info for any further determination." Ms. Kamath testified that she understood that clause to mean that 401 were sent to Charney research for validation (A0262, A0266), and that her office tried to determine whether Charney validated any of them (A0262), but did not arrive at an answer. (*See* A0264-68)

## 12. __The Defense Witnesses__

Francine Delgado was a Seedco vice president and devoted her career to anti-poverty work in the not-for-profit sector. Ms. Delgado began working for Seedco as a program assistant and grew her division to 20 programs. (A0444-47) Ms. Delgado worked with Mr. Saavedra at Seedco headquarters until 2004 when he was promoted to Director of the UMWF1. (A0448) Ms. Delgado was promoted to oversee all NYC Seedco programs and to supervise the Seedco programs elsewhere. Ms. Delgado was Mr. Saavedra's direct supervisor. (A0450-51) Ms. Delgado never heard of false placement activity until she learned of the whistleblower's allegations.

George Mills served in the U.S. Navy for 24 years as a chief petty officer, missile officer and chief weapons technician on submarines. (A0411) After retiring from the military, he worked at a non-profit assisting unemployed and homeless veterans. (A0410) Mr. Mills joined Seedco in November 2010 to help implement Seedco's new veteran's program. (A0411-14) During his work at Seedco, he never heard anyone tell staff at the Friday all-staff meetings, or at any other time, to enter improper placement information into WS1.  (A0415)

Newton James was hired by Mr. Saavedra in 2004. He worked as a computer instructor (A0463) He was promoted to coordinate the Fatherhood program which helped job seekers obtain work, reduce arrears on child support and educated men

on good fatherhood and savings practices. He attended all-staff Friday meetings and Monday afternoon manager meetings. At no time did he ever hear anyone instruct staff to enter improper job placements into Worksource1. (A0464)

Shandell Velez began working at Seedco in August, 2000 and managed CBO partnership programs (A0416-18), tuition grants for specific training programs (A0419-20), and off site recruitment events. (A0422-24)

Ms. Velez attended daily and weekly staff meetings, SBS quarterly meetings and weekly Friday all-staff meetings. Ms. Velez never heard anyone tell staff to enter an improper placement or use any "code" for doing so. (A0427) To the contrary, Ms. Velez would caution her assistant to "take expert care when entering data." (A0429) Prior to the whistle-blower in 2011, she had no knowledge of false placements. (A0442) Ms. Velez was a defendant in this complaint and settled the action. In order to do so, she admitted "unintentional" involvement, accepting responsibility because she "oversaw the staff." (A0441-42)

## 13. The Government's Theory of a "Claim" in this Case

In its Amended Complaint and initial disclosures, the government alleged that the placement entries into WS1 were the "claims" under the FCA. It alleged there were thousands of such "claims" stating that damages were "likely to total tens of millions of dollars," and that penalties per violation would be "an amount likely to total millions of dollars." (A0065-70) Throughout trial, the government

maintained its positon "that the claims are the Workforce1 data entries, and that is 528. That's been the position all along. The false claims equals what is in the database. . . .the data is the request." (A0217, A0602, A0605)

In support of an apparent certification theory, the government called Ernesto Lirag who testified that there were standard assurances contained in the WIA grant agreements from the USDOL. (*See* A0326) And it introduced evidence, over objection, that on March 9, 2012, after the DOI report issued, SBS notified Seedco that it would not "continue doing business with Seedco" and would transfer the UMWF1 and Bronx Centers to another vendor. (A0246-47, A0854)

After four days of evidence, the Court stated; "I am not interpreting [the claim] it that way . . . . There is a difference between a record and a claim. The claim is a request. If the custom under the contract is to ask for payment quarterly, then that is the request and that's the claim." (A0605) The government agreed to abide by that ruling. (A0605) Nonetheless, the Court allowed the government to argue its view of the "claim" in the case that "the request for payment is the submission of data," recognizing that "Ms. Schein is going to say that the claim request for payment was that which Charney verified." (A0589) The Court also stated that, "I don't think it is necessary for [the government] to decide whether the claim is the overall request for payment containing all these statements or each of the statements." *Id*. After additional colloquy, the Court made final its ruling that

the claims were the quarterly Authorization Memoranda requests for PBC payments, "<u>so we are down to three</u>" claims total in the case. (A0606-07) (emphasis added) The Court said that the definition of the claim was an issue of law for him to decide. (A0585)

In summation, the government argued that the DOI alleged 528 false placement entries were "false statements or records." (A0629) It sought damages in an amount up to $540,409.97, which represented the total amount of PBC linked to the placement metric for 2011(A0628-29), even though there was no proof that a single false placement went into the PBC computations of payment in 2011. The government also used the Walsh letter (A0854), and Mr. Lirag's testimony about the contracts' standard assurances. (A0619)

## 14. <u>Jury Instructions and Deliberations</u>

### a. <u>Instructions</u>

The parties hand delivered proposed requests to charge on April 8, 2015, one week before trial.[17] Those requests included a request to charge on the theory of false certification. (A0915-940) The defense submitted revised requests to charge on April 21, 2015 which, in bold, highlighted the defense's requested charge on the "claim" in this case. It also included a revised certification charge. (*See* A567,

---

[17] Both sides filed their own proposed charges as directed in the Judge's Local Rule 3(B)(ii). The government did not file their proposed instructions via ECF. They are included in Appellant's Appendix.

A0960-79) After argument on the requests, and over counsel's specific objection, the Court did not give the requested charge on the "claim." (A0584) It also did not charge the jury on the law governing certification.

The parties did not request an instruction regarding Charney. The Court proposed an instruction regarding Charney (A0980-1010), to which the defense vigorously objected. (A0585) Over objection, the Court instructed the jury:

> There was testimony in the case that the New York City Department of Small Business Services contracted with Charney Research to verify the job placement data submitted by SEEDCO. The fact that a third-party verification service was utilized does not by the mere fact of its use change the issues that you have to decide regarding Mr. Saavedra's liability. The question is if he knowingly presented or caused to be presented one or more false claims for payment to the Department of Small Business Services with funds that ultimately came from the United States. (A0617-18)

## b.  Denial of the Jury's Request to Read back Testimony

The Court instructed the jury that during deliberations it could request trial transcripts (or a read back) and exhibits.  Relying upon the instruction, defense counsel in summation highlighted certain exhibits and testimony and repeatedly pressed the jury to examine exhibits and ask for read-backs during deliberations. *See* A0641 ("you can . . . ask for any exhibit in the jury room, any exhibit or testimony, you can ask for testimony, you can ask for read-backs"); *see also* T. A0655-56, A0659, A0661.

After commencing deliberations, the jury requested defense and government exhibits and the testimony of witnesses Chanterelle Sung and Bill Harper, as well as the cross-examination of Alex Saavedra. (A0673, A0676) Overnight, all requested testimony and exhibits were prepared by the parties and readied for submission to the jury. In the morning, the jury was provided with the requested exhibits, but the Court declined to provide the testimony. (A0676) Defense counsel's objection was overruled. (A0679)

The Court advised the jury that it was sending in all the exhibits but not providing the testimony requested:

> You also asked for the testimony of DOI Sung, the testimony of Harper, the cross-examination of Mr. Saavedra's testimony. I am not going to give you those. The purpose of the trial is to give you all this evidence. If there is something specific that you can't recall or that you're debating about, let me know what that specific item is and we'll send that back to you. We are not sending back globs of testimony, okay? Thanks very much. Continue your deliberations.

(A0679-80)

While the jury continued to deliberate, the defense sent a letter to the Court requesting:

> [T]hat the Court advised the jury that they are entitled to a read back of specific portions of Mr. Harper's testimony (or any other witness). We request the Court instruct the jury that they may request to have portions of the trial transcript be made available to them. (Court Exhibit 5 at pp. 30, 32) Given the jury's request for Mr. Harper's testimony, that Mr. Harper was not a live witness, and the reliance on Mr. Harper's critical testimony in this case with respect to the knowledge element in the case and in the

> defense summation, Mr. Harper's testimony is <u>particularly</u> <u>important</u> in this case and, we believe, why the jury asked for a read back.

(A1011) (Emphasis added)

The government objected to the defense request. (AA1012) The Court denied the defense application. (A0681, AA1013-14)

## 15. <u>The Verdict and Judgment</u>

The jury found Mr. Saavedra liable on Claims One and Two. It awarded the government $13,000 in damages. It also found 13 false records. After the verdict, the U.S. Attorney's Office issued a press release. The release, in the defense view, inaccurately portrayed the evidence and greatly prejudiced Mr. Saavedra. In response, the defense issued a measured press release. (*See* A1030)

The parties submitted a joint letter regarding the appropriate damages and penalties. The defense argued that there should be no damages assessed because the government had already recovered over $1.75 million from Seedco and other settling defendants for common damages. (A1020-21). The defense also argued that since there was no false claim proven or offered into evidence by the government, there could be no penalty assessed. (A1021-22). In the alternative, the defense suggested that because the Court's instructions directed that the jury could find liability under Claim One if it found at least one false claim, then one "per

claim" penalty at the lowest end of the range - $5,500 - was arguably applicable. *Id.*

The government argued that the Court should triple the amount found by the jury and assess $39,000 in damages as per the provisions of U.S.C. § 3729(a)(l). (A1015). The government sought costs of approximately $11,000. (A1019-20) The government sought the maximum of $11,000 for each "claim" and then argued that 528 job placements were false, and that each placement corresponded to a "claim" within the meaning of the FCA. (A1017-19) The government's position that a false placement was a "claim" directly contradicted its position in summation ("false statements or records") (A0629), and the Court's prior rulings on the question. (A0552-53, A0602, A0605-07, A0618)

On June 16, 2015, the district court imposed judgment against Mr. Saavedra in the amount of $39,000 treble in damages, $143,000 in civil penalties, and $10,872.29 in costs, totaling $192,872.29.

The district court found that the high end amount - $11,000 - was appropriate because testimony showed "falsification of records was a deliberate method of doing business," and because Mr. Saavedra's press release suggested that he did not accept responsibility which "also confirms that a penalty of $11,000 for each of the violations is appropriate in this case." (A1033-34). The Court

imposed a total penalty of $143,000.[18] *See Id.* The Court rejected Mr. Saavedra's argument that the costs and penalties should also be offset by the amount which had already been paid by the settling defendants. (A1034)

Judgment was entered against Mr. Saavedra on June 18, 2015. (A1036-37) Mr. Saavedra filed a timely notice of appeal of the judgment on July 17, 2015. (A1038)

## POINT ONE

### THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE THAT A FALSE CLAIM WAS PRESENTED FOR PAYMENT OR THAT A FALSE RECORD MATERIAL TO A FALSE CLAIM WAS USED

### A.    Standards of Review under FRCP 50(a)

After the government rested, the defense moved for judgment as a matter of law pursuant to Fed R. Civ. P. 50(a). The defense argued that the government's evidence was insufficient to establish that a false claim had been submitted for payment or that a false record material to a false claim had been used or relied upon. (A0431-40) The Court denied the motion. *Id.*

---

[18] As we argue in POINT SIX, *infra*, the Court improperly used the number of false records found by the jury (13), instead of false claims, as the basis for multiplying the $11,000 penalty. 13 x $11,000 = $143,000. During the trial, the Court ruled that each quarterly request for PBC payments was a "claim" and initially deduced that there were 3 claims in 2011 and 4 claims each in 2009 and 2010 (A0601) However, it found that the government's testimonial evidence of false claims in 2009 and 2010 was insufficient to prove false claims in those years. (A0604) The Court then made clear that the claims at issue were the quarterly requests for PBC payments in 2011, "so we are down to three" claims total in the case. (A0606-07)

Under Rule 50(a), a district court may grant judgment as a matter of law against a party if, "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party." *Kearins v. Panalpina, Inc.*, 570 F. App'x 9, 11 (2d Cir. 2014) *citing* Fed.R.Civ.P. 50(a); *Caceres v. Port Auth. of New York & New Jersey*, 631 F.3d 620, 622 (2d Cir. 2011). This Court reviews *de novo* a district court's denial of a judgment as a matter of law. *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012).

## B.  The Applicable False Claims Act Law

The False Claims Act ("FCA") creates liability for "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval[.]"  31 U.S.C. § 3729(a)(1)(A).  A defendant violates § 3729 (a)(1)(A) by making a claim to the government that is false or fraudulent and, knowing of its falsity, seeks payment from the federal treasury.  *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001).

Under § 3729 (a)(1)(B), liability lies for "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  In order to establish liability under § 3729 (a)(1)(B), "the plaintiff  must show (1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *U.S. ex rel. Kester v. Novartis Pharms.*, 23 F. Supp. 3d 242, 252

(SDNY 2014). Section 3729 (a)(1)(B) "establishes a 'double falsity' requirement" there must be "both (i) a false record or statement, and (ii) a false claim." *U.S. ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 655-56 (S.D.N.Y. 2011).

"Materiality" for the purposes of 31 U.S.C. § 3729(a)(1)(B) is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C.A. § 3729(b)(4). The "proven falsehoods" must have a "'natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'" *U.S. ex rel. Feldman v. van Gorp*, 697 F.3d 78, 95 (2d Cir. 2012).

"[L]iability under the Act attaches only to a claim actually presented to the government for payment[.]" *See U.S. ex rel. Nathan v. Takeda Pharms. North America, Inc.*, 707 F. 3d 451 (4th Cir. 2013). "[S]ubmission of a false claim is the . . . *sine qua non* of a False Claims Act violation," *U.S. ex. rel. Clausen v. Lab. Corp.* 290 F.3d 1301, 1311 (11ith Cir. 2002), and an essential element to a cause of action under both sections (a)(1)(A) and (a)(1)(B). *Phipps v. Agape Counseling & Therapeutic Svcs., Inc.*, 2015 WL 2452448, *5 (E.D. Va. May 21, 2015); *see U.S. ex rel. Kester v. Novartis*, 23 F. Supp. 3d. 242, 252-53 (S.D.N.Y. 2014) ("plaintiffs asserting subsection (a)(1)(B) claims must likewise plead the 'claim' submission element with particularity[.]")

The statute defines a "claim" as a **"**request or demand . . . for money or property[.]" 31 U.S.C. § 3729(b)(2). A claim against the government "'normally connotes a demand for money or for some transfer of public property.'" *U.S. v. McNinch*, 356 U.S. 595, 599 (1958) *quoting U.S. v. Tieger*, 234 F.2d 589, 591 (3rd Cir. 1956). A paradigmatic example of a false claim "is a false invoice or bill for goods or services." *U.S. v. Rivera*, 55 F. 3d 703, 709 (1st Cir. 1995). "Claims" can also come in other forms so long as they are requests or demands for money or property. *See, e.g., U.S. ex rel. Feldman v. Van Gorp*, 697 F. 3d 78 (grant applications); *Mikes v. Straus*, 274 F.3d 687 (claims for Medicare reimbursement). Without a demand or request for government funds, there is no "claim". *See* 31 U.S.C. § 3729(b)(2); *see also Harrison v. Westinghouse Savannah River Co*., 176 F.3d 776, 785 (4th Cir. 1999) ("the False Claims Act at least requires the presence of a claim - a call upon the government fisc - for liability to attach.")

Complaints that allege fraudulent schemes but fail to plead a "claim" with particularity are properly dismissed under Fed R. Civ. P. 9(b). *See U.S. ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 504 (6th Cir. 2007) ("[P]leading an actual false claim with particularity is an indispensable element of a complaint.."); *Clausen*, 290 F.3d at 1312, n. 21 (11th Cir. 2002) ("Nowhere in the blur of facts and documents . . . can one find any allegation, stated with particularity, of a false claim actually being submitted to the Government."); *Wood ex rel. U.S. v. Applied*

*Research Assocs., Inc.*, 328 F. App'x 744, 750 (2d Cir. 2009) (Summary Order) (the pleading did not "give a single example of when a purportedly false claim was presented for payment by a particular defendant at a specific time.")

## C.    The Government Failed to Introduce a "Claim" into Evidence

Until its summation, the government's position was that each allegedly false job placement entered into WS1 constituted a false "claim" within the meaning of the FCA. (A0217, A0570, A0602, A0605) During trial, the Court found that this position was untenable and that the only cognizable "claim" in the case was, as asserted by the defense, the quarterly Authorization Memorandum for PBC payments to Seedco under the contract. *See* (A0908-12, A0302-06, A0307-11)

The government did not introduce a single one of them into evidence, much less one for the only period relevant to the jury's consideration, the first three quarters of 2011. *See* A0605-06. Thus, the government placed no claim into evidence for 2011, much less a false claim. This failure of proof mandates reversal.

## D.    The Government Failed to Present a Sufficient Basis to Find that a False Claim was Presented for Payment

Having failed to introduce a "claim" within the meaning of the FCA, the government *a fortiori* introduced no false "claim". Moreover, by the close of the government's case, there was no evidence that any of the 2011 quarterly Authorization Memoranda for PBC payments to Seedco (which attached the Charney verification reports as "backup documentation") (*see* A0908-12),

contained false placement information. To the contrary, SBS witness Angie Kamath testified that the Charney verification method had "statistical significance that holds up to the highest forms of being able to with confiden[ce] use that random sample…to be able to say with 95, 99 percent confidence" the accuracy of the Charney verified placements report. (A0200-02)

Ms. Kamath's testimony was corroborated by Mr. Charney's testimony that there was a 95% degree of certainty that only verified placements were included in the Charney verification report to SBS. (A509-10) In sum, the government introduced no evidence that a single false job placement was contained in the 2011 Charney verification reports relied on by SBS to make PBC payments to Seedco.

**E.     The Government Failed to Introduce a False Record Material to a False Claim**

First, there could be no record material to a false claim because there was no false claim introduced at trial. Second, the "records," "material" to the "claim" in this case were the: (1) the SBS "outcomes and validation spreadsheet"; and (2) the Charney reports attached to the Authorization Memorandum. *See* Def. Exh. T6. There was no proof that any of these records in 2011 (none of which the government put in evidence), contained any false information. And there is no other document in this case, "having a natural tendency to influence, or be capable of influencing, the payment or receipt" of the PBC payments to Seedco since the contract made crystal clear that <u>only</u> Charney verified placement reports would be

used, exclusively, to determine the PBC.

## POINT TWO

## THE DISTRICT COURT ERRED
## BY DECLINING TO CHARGE THE DEFENSE
## REQUESTS DEFINING THE CLAIM IN THIS CASE

The parties hand delivered proposed requests to charge on April 8, 2015, one week before trial. The defense submitted revised requests to charge on April 21, 2015, the day before the charge conference. The Court acknowledged receiving the revised requests. (A0567) The revised defense requests included the defense view of the "claim" in this case, highlighted in bold. (A0963-64) The Court ultimately agreed with the defense and ruled that the "claim" in the case was the quarterly Authorization Memorandum. (S*ee* A0908-12, A0605-06) The government said, "if that's the court's ruling," it would abide by it. (A0605) The Court told counsel that whatever the jury found, it would reduce the number of claims to three. (A0606) In the context of a portion of the charge discussion, the Court stated that the definition of a claim "is an issue of law for me." (A0585) However the government argued other versions of the "claim" to the jury.

The revised requests, put in bold type, highlighted precisely what the Court had already found and ruled. Counsel specifically asked the judge to charge these instructions in order to avoid jury confusion on both the facts and the law

governing the claims in this case. The Court denied the request. (A0584) Counsel further argued, "as to this issue, it is taking away the jury's function of determining what is claimed for payment." (A0585) The Court again said that what the claim in the case is, is "an issue of law" (A0585), but allowed the government to argue different versions of a "claim" to the jury – which it did.[19] (*See* A0665) This state of affairs was hopelessly confusing to the jury. The Court had a duty to instruct the jury on the claim in this case or, at the very least, what the defense theory of the claim was. Accordingly, the Court erroneously denied the defense requests to charge. (T. 822-24) *See Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 180 (2d Cir. 2004); *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994); *see also BE &K Const. Co. v. Will & Grundy Ctys. Bldg. Trades Council*, 156 F.3d 756, 767 (7th Cir. 1998), as amended (Nov. 23, 1998); *Christopher v. Cutter Labs.*, 53 F.3d 1184, 1195 (11th Cir. 1995); *U.S. v. Medina*, 944 F.2d 60, 64 (2d Cir. 1991).

---

[19] One of those was its contract theory, which it presented in summation. This theory was presented with no legal instructions from the Court and was unsupported by the evidence. *See* POINT FIVE *infra*.

**THE DISTRICT COURT ERRED IN CHARGING
THE JURY OVER OBJECTION
REGARDING CHARNEY RESEARCH**

"This Court 'review[s] a district court's jury instruction *de novo* to determine whether the jury was misled about the correct legal standard or was otherwise inadequately informed of controlling law. A new trial is required if, considering the instruction as a whole, the cited errors were not harmless, but in fact prejudiced the objecting party.'" *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 200 (2d Cir. 2004) *quoting Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001). A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law. *See Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994).

The district court must avoid usurping the role of the jury. *See U.S. v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). It is the jury's task to choose among competing inferences that can be drawn from the evidence. *See U.S. v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). While it is "within the discretion of federal judges to make impartial comments on the evidence . . . such comments [can] not usurp the province of the jury." *Tennyson v. Brower*, 823 F. Supp. 421, 423 (E.D. Ky. 1993) *aff'd*, 27 F.3d 567 (6th Cir. 1994). When a comment is in the nature of a legal conclusion, and the jury could have construed it as an instruction on the law

which it was bound to follow, the court impermissibly usurps the jury's function. *See U.S. v. De La Barra*, 447 F.2d 193, 195 (5th Cir. 1971). Comments by the trial judge may so usurp the jury's role as fact-finder to be incurable and to constitute reversible error. *U.S. v. Murdock*, 290 U.S. 389 (1933).

Neither party requested a jury charge concerning Charney Research. The Court proposed one and the defense objected. A0988-89, 0585. Despite that objection, the Court nonetheless charged the jury that:

> There was testimony in the case that the New York City Department of Small Business Services contracted with Charney Research to verify the job placement data submitted by SEEDCO. The fact that a third-party verification service was utilized does not by the mere fact of its use change the issues that you have to decide regarding Mr. Saavedra's liability. The question is if he knowingly presented or caused to be presented one or more false claims for payment to the Department of Small Business Services with funds that ultimately came from the United States. (A0671-72)

This instruction erroneously usurped the jury's role. It diminished ("mere fact") the import of this evidence and usurped the jury's consideration of whether there was a false claim proved in this case. Certainly, the jury could well find that the Charney evidence <u>does</u> "change the issues" in a material, factual way, about whether the government proved a false claim in the case. The instruction effectively directed the jury to pay no mind to the Charney evidence. The instruction was confusing, usurped the jury's consideration of the Charney

evidence and was error. Where the jury's verdict reflects a close and difficult decision on liability, the error was prejudicial and is grounds for reversal.

## POINT FOUR

### THE DISTRICT COURT ERRED BY REFUSING THE JURY'S REQUEST FOR A READ-BACK OF WILLIAM HARPER AND OTHERS' TESTIMONY

## A. The Applicable Law

This Court has "clearly indicated" its "preference for providing juries with read backs of testimony when requested during their deliberations." *U.S. v. Criollo,* 962 F.2d 241, 243-44 (2d Cir.1992). "[G]enerally the better course of action is for a district court to allow the reading of testimony requested by the jury." *U.S. v. Holmes,* 863 F.2d 4, 5 (2d Cir. 1988). The important premise for this preference is that read backs "aid the jury in accurately and completely fulfilling their assigned role." *See U.S. v. Richard*, 504 F.3d 1109, 1120 (9th Cir. 2007), *citing U.S. v. Criollo*, 962 F.2d at 243-44. In contrast, "urging a jury to try to remember testimony before asking for a readback . . . does not seem to be particularly wise policy." *U.S. v. Damsky*, 740 F.2d 134, 138 (2d Cir. 1984). In deciding whether to allow a read-back, the district court's responsibility is to strike a balance between "promot[ing] the interest in informed jury decision-making" and "not unduly delaying court proceedings." *See U.S. v. Young*, 140 F.3d 453, 456 (2d Cir. 1998);

*U.S. v. Escotto,* 121 F.3d 81, 84 (2d Cir.1997). Consideration of these factors typically favors providing the read-back. *See Henry v. Tracy*, 2014 WL 3558021, *11 (W.D.N.Y July 17, 2014)*.

The trial court's discretion to determine whether or not to allow the read-backs, "is abused, and a new trial may be required, where the district court categorically denies the request without considering how it affects the case." *Young v. Symmes*, 2008 WL 4748569, at *11 (D. Minn. Oct. 28, 2008), *citing U.S. v. Criollo*, 962 F.2d at 244; *see Donohue v. Lempke*, 2012 WL 2930204, at *18 (EDNY July 13, 2012)

## B. <u>The Court's Refusal to Allow the Read-Back is Reversible Error</u>

The jury requested the read-back at the end of their first session of deliberation, before they adjourned. Overnight, the parties gathered the testimony and exhibits. There was no delay to the deliberations. Mr. Harper's testimony consisted of 36 pages – approximately one hour of reading.

Mr. Harper's testimony was crucial. Because of his central role in the data operations at Seedco and his physical proximity to Mr. Saavedra (A0394-95, A0473-74), Mr. Harper had a unique vantage point and had no knowledge that Mr. Saavedra had any role in or knowledge of false placement activity. Further, he put the lie to government witness claims that improper placements were suggested or discussed in all-staff or other meetings. (A0468) He soundly disputed the claim

that emails within Seedco would have alerted Mr. Saavedra (who received 100 emails per day, *see* A0541), to improper placement activity. *Id.* His testimony was wholly corroborative of Mr. Saavedra's trial testimony that he had no knowledge of false placements being made. Coming from the Whistle-Blower, this was uniquely powerful and extraordinarily compelling evidence relied on heavily in summation.

Mr. Harper was not a live witness at trial. His testimony was read to the jury by a paralegal at the end of the day.

Given the central importance of his testimony to the jury's consideration of liability, and the very close nature of the verdict, there is no question that his testimony was essential for the jury to re-hear – which is why they asked for it. The trial court clearly abused its discretion in refusing to permit the jury to hear the testimony of Mr. Harper. A new trial is required.[20]

---

[20] The Jury also requested to hear from Ms. Sung, the drafter of the DOI report. Her direct and cross examination was also very material, and helpful, to the defense and should have been read.

## POINT FIVE

### THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE OF FALSE CERTIFICATION FCA LIABILITYAND THE DISTRICT COURT ERRED IN NOT INSTRUCTING THE JURY ON THE APPLICABLE LAW

The government's proof of certification liability was insufficient to go to the jury pursuant to Fed R. Civ. P. 50(a). Whether Seedco "could be potentially disallowed" (T. 391) from participation in future WIA Workforce grants; and the fact that SBS ultimately decided not to allow Seedco to participate in the Workforce program going forward (*see* A0854), does not constitute a violation of the FCA. The proof was that the contracts contained "standard assurances contained in all grant agreements." (A0322-33, A0328) A condition of continued future participation in a government program is not a violation of the FCA where no express certification exists. Since the government presented no evidence of a contract clause which specifically conditioned payment on not entering false placements, there was no evidence to support the certification theory the government essentially presented to the jury. The Court erred in permitting this theory to be advanced to the jury because there was insufficient evidence to support it. *See* FRCP Rule 50(a).

The Court compounded the error by not instructing the jury on the applicable law. A failure "to instruct the jury on the basis of clearly established and crucially relevant law," which deprives the jury of adequate legal guidance on

fundamental issues, constitutes plain error as it "fatally subvert[s] the trials integrity." *See Rasanen v. Doe*, 723 F.3d 325, 334-35 (2d Cir. 2013). This Court, "will reverse a judgment because of an error in the jury instructions if the charge given was incorrect and did not sufficiently cover the essential issues." *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 176 (2d Cir. 2004).

This Court has explained that, "a false certification of compliance with a statute or regulation cannot serve as the basis for a *qui tam* action under the FCA unless payment is conditioned on the certification." *Mikes v. Straus*, 273 F.3d at 698. This District recently summarized the important case of *Mikes v. Straus* on the law of certification:

> The FCA makes it unlawful to falsely certify legal compliance if such compliance is a condition for government payment. *Mikes v. Straus*, 274 F.3d 687, 698 (2d Cir. 2001). An actionable false legal certification may be express or implied. Id. at 698–700. … "An expressly false claim is, as the term suggests, a claim that falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." *Id.* at 698. By contrast, "[a]n implied false certification claim is based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." *Id.* at 699.

*U.S. v. N.Y. Soc. for the Relief of the Ruptured & Crippled, Maintaining the Hosp. for Special Surgery*, 2014 WL 3905742, at *9 (S.D.N.Y. Aug. 7, 2014); *see U.S. ex rel. Blundell v. Dialysis Clinic, Inc.*, 2011 WL 167246, *13 - *18 (N.D.N.Y. Jan.

19, 2011) (the district court found that the language in the regulations "clearly establishes a condition of participation, not prerequisites to receiving reimbursement from the government.")

The defense submitted a detailed charge on false certification liability and the defenses thereto. (A0919-20, A0965-68) The district court gave no instruction on the law of false certification liability. In summation, the government asked the jury to find liability based on what was clearly an implied certification theory. *See* A0618-19.

But the proof at trial showed that the contracts contained "standard assurances" such that false WS1 entries might only affect future participation in WIA grants. *See Blundell*, 2011 WL 167246 at *18. No matter - the jury had absolutely no legal guidance on the subject. The gravity of this failure is substantial. *See Rasanen v. Doe*, 723 F.3d at 334-35. The error requires reversal because it is plain and "fatally subverted the trial's integrity."

# POINT SIX

## THE DISTRICT COURT ERRED IN ITS CALCULATION OF DAMAGES AND PENALTIES

### A. Damages

The government received more than $1,725,000 from Seedco and other co-defendants in this case through settlements. The law on damages is clear. When the plaintiff has settled with co-defendants, the non-settling co-defendant is entitled to a credit of the settlement amounts received as long as the settlement represents common damages. *See U.S. v. Zan Machine Co.*, 803 F. Supp. 620, 623 (E.D.N.Y. 1992); *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir.1989). Since the jury found total damages proven by the government to be $13,000 ($39,000 trebled), Seedco and other defendants' settlements of over $1,725,000 more than covers the damages assessed against Mr. Saavedra.

### B. Penalties

#### i.    Number of Claims

FCA penalties are assessed per false claim. *See U.S. ex rel. Eisenstein v. City of New York*, 540 F.3d 94, 96 (2d Cir. 2008) *aff'd sub nom. U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 129 S. Ct. 2230 (2009) (penalty of up to $10,000 per claim); *Logistics Int'l v. U.S.*, 103 Fed. Cl. 252, 259 (2012) (penalty of $5,500–$11,000 is per claim); *U.S. v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (The [FCA] provides for a per-claim penalty); *Vermont Agency of*

*Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 768-69 (2000) ("a civil penalty of up to $10,000 per claim."). The government agreed that "civil penalties is based on the number of false claims." (A0217)

Here, the Court had no number of false claims as a multiplier to arrive at a total penalty. And, under its rulings, the most "claims" the Court said it would find is three. (A604-05) However, it inexplicably substituted the number of "records" the jury found (13), for the number of "claims," and used the penalty multiplier of $11,000 to find the total penalty amount of $143,000. This finding is clear error.

### ii. **Penalty Amount**

The Court improperly adopted the government's argument that the highest penalty amount - $11,000 - should be imposed because the press release drafted by the defense "flouts the actual conclusions of the jury[.]" This was error. The defense was surprised to learn, given the verdict, that on Friday morning, April 24, 2015, the SDNY had issued a press release. The SDNY release was misleading and inflammatory and highly prejudicial to Mr. Saavedra. Defense counsel had an obligation to correct the public record and did so in a measured release which accurately set forth what the jury found.

In finding the highest penalty, the lower court relied on a single case, *BMY-Combat Sys. Div. of Harsco Corp. v. U.S.*, 44 Fed. Cl. 141, 151 (1998). In fact, the

*BMY* court never made a determination on the penalty amount and the case was later voluntarily dismissed. *See* Fed. Claims Ct. Dkt. 90-cv-252, June 22, 2009.

More importantly, by failing to take into account the circumstances of the press release, and ignoring Mr. Saavedra's lifetime of work on behalf of the less fortunate, the lower court abused its discretion in imposing the highest penalty amount.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that the judgment should be reversed and vacated and the amended complaint should be dismissed. In the alternative, the judgment should be reversed and the case remanded for a new trial.

Dated: New York, New York
        December 11, 2015

Respectfully submitted,
THE LAW OFFICES OF BETTINA SCHEIN

_____
Bettina Schein
565 Fifth Avenue, 7th Fl.
New York, New York 10017
(212) 880-9417

        and

THE LAW OFFICES OF
ALAN S. FUTERFAS
565 Fifth Avenue, 7th Fl.
New York, New York 10017
(212) 684-8400
*Attorneys for Appellant*
*Alex Saavedra*


Bettina Schein
Alan S. Futerfas
Matthew C. McCann
*On the brief*

Certificate of Compliance with Rule 32(a)

This brief complies with the type –volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,360 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief as been prepared in a proportionally spaced typeface using Microsoft Word 2010 and font Times New Roman 14 pt.

_____
Bettina Schein
Attorney for Defendant – Appellant
Alex Saavedra


December 11, 2015