# 15-2307

IN THE

# United States Court of Appeals

**FOR THE SECOND CIRCUIT**

---

UNITED STATES OF AMERICA,

*Intervenor-Plaintiff - Appellee,*

ABC, STATE OF NEW YORK, EX REL. JOHN DOE, UNITED STATES OF AMERICA, EX REL. JOHN DOE,

*Plaintiffs,*

---against---

ALEX SAAVEDRA,

*Intervenor-Defendant - Appellant,*

SHOMARI GREENE, ALAN KATZ, TAGEWATEE CHANDARPAUL, SHANDELL SANTIAGO-VELEZ, MITCHELL MCCLINTON, MONIQUE TARRY,

*Intervenor-Defendants,*

DEF, STRUCTURED EMPLOYMENT ECONOMIC DEVELOPMENT CORPORATION,

*Defendants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR THE DEFENDANT - APPELLANT**
**Volume 2 of 5**


BETTINA SCHEIN
565 Fifth Avenue, 7th Floor
New York, New York 10017
(212) 880-9417
*Counsel for Defendant-Appellant*

ALAN SAMUEL FUTERFAS
LAW OFFICES OF ALAN S. FUTERFAS
*565 Fifth Avenue, 7th Floor*
*New York, New York 10017*
(212) 684-8400
*Of Counsel and on the Brief*

**TABLE OF CONTENTS**

Page

Docket Entrees ..... A0001

Amended Complaint dated February 11, 2013 ..... A0027

Government's Initial Disclosure ..... A0065

Joint Pretrial Order ..... A0071

Excerpts from the Trial Transcript ..... A0082

Government Exhibit 13A, Excerpts from DOI report ..... A0684

Government Exhibit 22, Work Force Investment Act of 1998, Program Annual Funding Agreement and Standard Assurances and Certifications between United States Department of Labor and the New York State Department of Labor for Program Year 2008 ..... A0694

Government Exhibit 30, Initial Services Agreement between Seedco and NYC Dept. of Small Bus. Services ("SBS") for Upper Manhattan ("UM") Workforce1 Center ..... A0704

Government Exhibit 34, 4th amendment to the initial Seedco-SBS Services Agreement for UM Workforce1 Center dated April, 2007 ..... A0830

Government Exhibit 37, 5th amendment to the initial Seedco-SBS Services Agreement for UM Workforce1 Center dated April, 2008 ..... A0842

Government Exhibit 57, CIF for Amy Bursor ..... A0846

Government Exhibit 65, CIF for Dennis Garci ..... A0848

Government Exhibit 66, CIF for Melanio Polanco ..... A0850

Government Exhibit 67, CIF for Damiana Payano ..... A0852

Government Exhibit 68, Letter from Commissioner Walsh to Barbara D. Gunn, President & CEO of SEEDCO, dated March 9, 2012 ..... A0854

Defense Exhibit, D4, Official SBS Workforce1 Policy Statement issued March 15, 2011 re: Placement & Promotion Record Policy ....................................A0855

Defense Exhibit, F5, October 11, 2012 internal SBS Email regarding "SEEDCO false placements" from Charles Houston...............................................A0859

Defense Exhibit, J7, Charney contract (2009 renewal) .......................................................A0863

Defense Exhibit, K7, Charney questionnaires (3 samples)..................................................A0868

Defense Exhibit, L7, Charney placement tables (same one found in payment authorization packet ..........................................................................................A0885

Defense Exhibit, LLL, SBS Monthly UM Center Management Report for June 2010..........................................................................................................A0898

Defense Exhibit, SSS, Official SBS Workforce1 Policy Statement issued July 1, 2009 re: Placement Policy for Worksource1 .......................................................A0899

Defense Exhibit X4 Velez Depo Ex. 3: Jun 18, 2010 email from Tarry to Velez ..........................................................................................................A0904

Defense Exhibit, T6, March 25, 2010 Naheem Harris Internal SBS email re: SEEDCO payment with attached spreadsheets and other documents including payment authorization..........................................................................A0908

Defense Exhibit Z4 Velez Depo Ex. 5: Sep 16, 2010 Velez email to Roazzi re: Eataly and Placements ..........................................................................A0913

Defendant's' initial Requested Jury Charges .........................................................................A0915

Governments Requested Jury Charge ...................................................................................A0941

Defendant's Revised Requested Jury Charge.........................................................................A0960

District Court's Proposed Jury Charge ...................................................................................A0980

Defense April 23, 2015 Letter to Court Requesting the Court to Advise the Jury that they are entitled of a readback of Portions' of William Harper's Testimony ..............................................................................................A1011

Government's Response ..........................................................................................................A1012

Court's Denial of Defendant's April 23, 2015 Request .......................................................A1013

May 20, 2015 Parties Joint Submission Regarding Damages and Penalties .........................A1015

May 21, 2015 Letter from Defendant to the District Court Regarding and Enclosing as Exhibits both Parties Press Releases ....................................................A1026

Order affixing Damages, penalties and Costs .......................................................................A1031

Civil Judgment ..........................................................................................................................A1036

Notice of Appeal .......................................................................................................................A1038

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES of AMERICA,

Plaintiff,

v. 11 Civ. 6425 AKH

ALEX SAAVEDRA,

Defendant.

------------------------------x

April 16, 2015
9:40 a.m.

Before:

HON. ALVIN K. HELLERSTEIN,

District Judge
and a jury

APPEARANCES

PREET BHARARA,
United States Attorney for the
Southern District of New York
BY: CARINA HYATT SCHOENBERGER,
JENNIFER ELLEN BLAIN,
Assistant United States Attorneys

LAW OFFICES OF BETTINA SCHEIN,
Attorneys for defendant
BY: BETTINA SCHEIN, Esq.
- and -
LAW OFFICES OF ALAN S. FUTERFAS,
BY: ALAN SAMUEL FUTERFAS, Esq.
Of counsel

Also Present:
HARRY SOLOMON, Technical Support USAO
MARISA ALBERTI, Defense Paralegal & Technical Support

(Trial resumes)

(In open court; jury not present)

THE COURT: Be seated.

So we've done some digging and researching, and here's the way I think we should proceed. Then counsel will react. The statute gives a definition of the term materiality as follows:

The term material means having a natural tendency to influence or be capable of influencing the pending receipt of money or property. This is marks the same as the objective standard described by the Supreme Court in Basic versus Levenson and it is not a factual explanation as well as it is a legal explanation.

However, the fact that the commissioner decided to suspend payments on the basis of the report of the Department of Investigation is relevant. At that point the report itself is not relevant. It provides background for the commissioner's decision, and to the extent that materiality is a question of fact as well as law, it flushes out the issue of materiality.

So I rule, first, that the commissioner can testify what she did and what she communicated to SEEDCO on the basis of the Department of Investigation report. At this point the report itself is not evidence. It will be marked for identification.

In terms of what's communicated, I don't know what the

communication was between the commissioner and SEEDCO, and there may not be need for any further elaboration depending on the nature of the communication, but there may also be need to explain further why it was that payment was suspended.

I think I should have some leeway there, with a cautionary instruction to the jury that at this point we are not looking at this examination as whether it is true or not, but rather how informed the decision was of the commissioner. That sums up the ruling I propose to make with regard to the Commission's testimony.

We also researched and thought about the issue of the report itself. It is 89 pages, I understand. It seems to me that it qualifies under Federal Rule of Evidence 803 (8). 803 (8) provides as follows:

"A record or statement of a public office, if: A, it sets out (3) in a civil case factual findings from a legally authorized investigation.

I take it Ms. Sung, if that is her name, will testify as to the fact of the legality of the authorized investigation, presumably by putting into evidence the authorizing orders of the commissioner and reference from someone else. I take these terms from the law itself.

The city charter, New York City Law, Section 801, establishes a Department of Investigation, the head of which shall be the commissioner of investigation, specifies the

qualifications of the commissioner and the service of the commissioner under the mayor.

Section 803 of the New York City law describes the powers and duties of the Department of Investigation and the commissioner. It provides as follows:

The commissioner shall make any investigation directed by the mayor or the council as authorized and empowered pursuant to an opinion of the commissioner that it is in the best interests of the city. The commissioner can investigate the affairs, functions, accounts, methods, personnel or efficiency of any agency.

Subsection (c) requires the preparation of a written report or statement of findings and requires that the copy of the report or statement is to be forwarded to the requesting party, if any.

Then it goes on to give the qualifications and obligations. Jurisdiction is wide. It extends to any agency, officer or employee of the city or any person or entity doing business with the city, or any person or entity who is paid or receives money from or through the city or any agency of the city. The commissioner is to forward to the council and to the mayor a copy of all reports and standards prepared by the Corruption Prevention & Management Review Bureau upon the issuance by the commission.

I take it that will be the subject of the testimony

of -- what is the witness's name?

MS. BLAIN: Ms. Sung, your Honor.

THE COURT: Ms. Sung. That testimony will be, I think, admissible. The next question is whether the report itself will be admitted if the predicates are found according to the testimony of Ms. Sung.

In that case, there will be factual findings from a legally authorized investigation, and that will be shown, I assume, and the next criterion is that the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Has there been adequate pretrial discovery of the issue, Ms. Blain?

MS. BLAIN: Yes, your Honor. Defendant's counsel took Ms. Sung's deposition for almost the entire seven hours, and they requested and received multiple documents from DOI itself as well as SBS going into the scope and breadth and details of the investigation.

THE COURT: Is there any constraint that you needed to do or to open up, Mr. Futerfas?

MR. FUTERFAS: Your Honor --

THE COURT: Or was it Ms. --

MR. FUTERFAS: -- I will deal with the report of Ms. Sung. Ms. Schein will address the issues to Ms. Kamath.

THE COURT: What is Ms. Schein doing to do?

MR. FUTERFAS: The issues with respect to Angie Kamath, the Commissioner. With respect to Ms. Sung and the report, I let the court know the government has proposed to introduce excerpts of the report, and specifically -- I think it is being handed up to your Honor -- and specifically a conclusion that they deem, there is a conclusion there might have been 528 false placements.

The reason for that, your Honor, is because throughout the discovery, what we established was the DOI report examined various types of placements, questionable placements.

THE COURT: Yes, but they're not going to add those.

They focused on one category which is what was relied on by Ms. Kamath.

MR. FUTERFAS: That's right.

THE COURT: So we're not going to get involved in the other activities except to dismiss them.

MR. FUTERFAS: Right. The only issue before the court is the government's proposed excerpts of the report's conclusion and with respect to the 528.

THE COURT: I see brackets above various paragraphs here. Are those the brackets you want me to rule on?

MR. FUTERFAS: I think that is the application before the court, yes.

THE COURT: So let me rule on them.

First, on Page 4 describes the investigation initiated

upon receiving the referral from the New York City Department of SBS regarding an allegation of fraud by SEEDCO. I see nothing prejudicial in that. I rule that is admitted.

The next bracket is at Page 6.

MS. BLAIN: Your Honor, it is Page 5, I believe, the entire Page 5 and the very top of Page 6.

THE COURT: I see. Thank you.

Paragraph 1, this is all a description of the investigation and it is necessary because it shows compliance with the law, so the first paragraph talks about subpoenas and various requests for information, interviews, et cetera. There is nothing prejudicial about that. There is nothing untrustworthy about that. Admitted.

The second paragraph focuses on the items, the particular relevance, the contract with SEEDCO, policies and procedures of SEEDCO, SEEDCO's CIFs from February 2011 to August of 2011, the available CIFs from an earlier period of September 2010 through May of 2011, a coterminous period as produced to the department by Bill Harper who was the whistle blower.

Is Mr. Harper going to testify?

MS. BLAIN: Your Honor, Harper is an unavailable witness. He lives in Germany, so we provided excerpts of his deposition we plan to proffer into evidence.

THE COURT: Will he explain this part of why he was

able to preserve some and not others?

MS. BLAIN: Yes, your Honor. Well, he will explain how he got some, but it wasn't his job to get others. So I think it will be clear in the deposition testimony.

THE COURT: We could redact "by Bill Harper" if it is not going to be an issue.

MR. FUTERFAS: Your Honor, we asked Mr. Harper at the deposition where are the CIFs that he said he took from SEEDCO, he testified about 400 of them. He doesn't know where they are, and we asked the government to produce them, and they haven't done so.

MS. BLAIN: Your Honor, that is actually not what happened.

Mr. Harper provided the CIFs to DOI and SBS, the city agencies. The city agencies gave the government all of the CIFs for this relevant time period, and then we gave defendant's counsel all of the CIFs for this relevant time period. There is about 1500 CIFs, 10 boxes of documents, they have all of it.

THE COURT: Do you have production numbers?

MS. BLAIN: Yes, your Honor, we provided it to them multiple times.

THE COURT: Do you have production numbers you can refer to now?

MS. BLAIN: I can refer to a few of them.

MR. FUTERFAS: Your Honor, the question is that we did receive a lot of CIFs finally, but from the depositions of Mr. Harper and actually Ms. Sung, the question was where is this 528?

In other words, which of the thousands -- in fact, Ms. Sung testified at her deposition that she had 10 boxes of CIFs, and so the question became there's 500 that the DOI is saying are --

THE COURT: I don't think this goes to the reliability of the report. I don't think we're going to get into this issue. I will allow to you the possibility of redaction of the phrase, "by Bill Harper" if defendant wishes that and it is not going to make an issue of that. What do you want?

(Off-the-record discussion)

MR. FUTERFAS: I think we'll leave it in, "by Bill Harper." A lot of his testimony will be read or some portions will be read, and so it is fine.

THE COURT: Then it goes on to say, "All available resumes as produced to DOI by Bill Harper." We'll leave that in, too.

All available job placement data in DSBS electronic Workforce1 database system from January 2010 to August 8, 2011 as produced to DOI by DSBS, and that will come in.

Then it is e-mail communications, and that will come in.

No. 7 is information regarding SEEDCO's internal investigation following bill Harper's allegations against SEEDCO in April 2011 as produced to DOI by SEEDCO.

Are we going to have more evidence with regard to that internal investigation?

MS. BLAIN: No, your Honor, not unless the witnesses offer that.

THE COURT: Mr. Futerfas?

MR. FUTERFAS: Well, one moment.

(Off-the-record discussion)

THE COURT: You don't have to tell me now.

MR. FUTERFAS: Well, I guess, your Honor, the question is going to be I just don't know how much --

THE COURT: Is your answer is you don't know?

MR. FUTERFAS: I don't know because I don't know --

THE COURT: I accept the answer.

Lastly, DOI's verification of SEEDCO's reported job placements through information provided to DOI from employers and job seekers.

I think this is admissible, all admissible, and I propose to admit it. It goes to the adequacy and trustworthiness of the report.

The next paragraph reads that DOI's investigation has substantiated the allegation that SEEDCO reported false job placements to DSBS, and it follows the findings. That

introductory paragraph is admissible. The 528 false job placements is its finding and admissible --

MR. FUTERFAS: Your Honor --

THE COURT: -- along with the footnote.

MR. FUTERFAS: I am sorry, your Honor, just so the record is clear, we have a standing objection to the entire, all of this, obviously, but I don't want to --

THE COURT: Well, make your objection because I'm going to rule.

MR. FUTERFAS: We are objecting to all of it. We move to exclude it.

THE COURT: I am going into it. I am telling you it is admissible under 803 (8) subject to your showing that the information lacks trustworthiness.

MR. FUTERFAS: Your Honor, first of all --

THE COURT: That is what I said at the outset. Fine.

MS. SCHEIN: If I may?

THE COURT: I can't have both of you bouncing up and down.

MS. SCHEIN: I am sorry, your Honor. If I may?

The 528 job placements, the bullet point on Page 5 under DOI's investigation as substantiated, we object to the conclusions starting with the paragraph, the middle of Page 5, DOI's investigation has substantiated the allegations on the basis that --

THE COURT: That is the report, and if it is a matter within the order and establishment of DOI, it is a report of a government agency. If you don't show that there is a lack of trustworthiness, it will come in.

MS. SCHEIN: Your Honor, the three bullet points below that paragraph, we object to those three specific conclusions of the DOI report on the basis that Ms. Sung interviewed at least 28 or more employees. The government is not calling them. We have heard just from three individuals who worked there, and this report is based upon the interviews of employees that they're not calling.

So it is a summary conclusion based upon information, hearsay that we don't have a chance to cross-examine, hearsay statements the jury will not hear from those witnesses, and that is the basis for a large part of Ms. Sung's DOI report and certainly for those conclusions.

THE COURT: I hold these are factual findings from a legally authorized investigation as provided in Rule 803 (8)(a)(3) of the Federal Rules of Evidence. You had an opportunity during discovery to go behind the factual findings and could make arguments that the factual findings lack trustworthiness as provided in 803 (8)(b), and you have not done so. Accordingly, all of Page 5 will come in.

MR. FUTERFAS: Your Honor --

THE COURT: And that continues to the top paragraph on

Page 6.

MR. FUTERFAS: -- your Honor, can I address specifically two bullets on the bottom of 5?

THE COURT: I can't have you both. One or the other.

MR. FUTERFAS: I will take it from here. Sorry, your Honor.

THE COURT: Go ahead, Mr. Futerfas.

MR. FUTERFAS: The bottom two bullet points are very important.

THE COURT: They're all important. SEEDCO developed?

MR. FUTERFAS: I agree.

THE COURT: The finding is as follows:

"SEEDCO developed regular practices to report false placements to DSBS."

MR. FUTERFAS: That implicates directly the issue in this case. That really goes to the factual, really goes to the factual determination the jury has to make.

THE COURT: That is why it is relevant.

MR. FUTERFAS: But I don't think you can take a report to usurp entirely the jury's function.

THE COURT: It doesn't.

MR. FUTERFAS: It goes to this language which is regular practices and makes it sound like Mr. Saavedra, who is director of that facility, developed regular practices because he was the director. So it really goes beyond saying we

believe there are 528 false placements. That is a factual determination we can agree or disagree about it.

When they start saying things like that, that particular line, just really talking about one line, I think that goes further than the kinds of factual statements under the rule and really goes to the heart of what the jury's actually going to be hearing testifying about Mr. Saavedra's knowledge and intent and the elements of his state of mind.

THE COURT: There has been adequate basis from the testimony developed so far that's consistent with this finding.

It is a factual finding made after investigation, and I rule that it is admissible. It will be an extraordinary long trial if the government had to prove every particular point. If it had to, it would do so. We can save much time and effort without offending anybody's fair right to representation by allowing this report to come in, and I allow it to come in, including these findings.

Mr. Saavedra can still argue all the points he wishes to argue, and I don't at this point rule that any limitation applies. We are now on Page 16 entitled, "DOI's findings regarding false job placements," and I think the objection will be much the same as already made, and I rule this is admissible.

Next is the continuation on Page 17. It will have the same ruling of admissibility.

The same goes for the finding at the bottom of Page 85 and to 86. That is another statement here as follows:

Given that CIFs were shredded up until February of 2011, these findings are limited by the data made available to DOI and do not necessarily represent the total number of false placements during the reporting period of January 1, 2011 to August 8, 2011.

Is there any reason I should treat that finding differently or that limitation qualification as I am and finding differently from others?

MS. BLAIN: No, your Honor. It actually indicates this report is trustworthy, which I believe is the only question before the court because it indicates the report drafters knew the limitations of the dataset and were very careful in drawing definitive conclusions.

As multiple courts have found, including the Second Circuit in 2000, it let in a State Department country report in part because the report itself admitted the limitations of its own knowledge, and they found that was another indicia of trustworthiness.

THE COURT: Mr. Futerfas.

MR. FUTERFAS: Yes, your Honor, the last clause of that sentence suggests there may be other false placements that they haven't found. I don't think the jury should be permitted to speculate, and so I would object to the words, "do not

necessarily represent the total number of false placements." I don't think the jury should be permitted to speculate beyond the evidence put before them.

MS. BLAIN: Your Honor, it is not a question of speculation; it is a question of trustworthiness. That is the only issue regarding think DOI report under 803 (8)(a).

Mr. Futerfas is welcome to cross-examine Ms. Sung about that statement and make any arguments he wishes on cross-examination.

THE COURT: I propose that we redact the phrase, "and do not necessarily represent the total number of false placements." You can blacken it out.

MS. BLAIN: Yes, your Honor.

THE COURT: The rest will come in.

The finding below on Page 86 is consistent with what is said before, and I rule it is admissible as well as the finding on Page 88.

Okay, this extract, does it have a separate exhibit number?

MS. BLAIN: Yes, your Honor, this is Exhibit 13 A, and we have the redacted copy ready, which we are now redacting through Mr. Solomon's magic.

THE COURT: Is there anything else I need to rule on before we get the jury?

MR. FUTERFAS: Your Honor, there may be a portion that

we would want to -- if I may have one moment, your Honor. This is coming in?

THE COURT: When is it going to come in, Ms. Blain? When are you going to offer it?

MS. BLAIN: During Ms. Sung's testimony when we finish Ms. Kamath and have one brief witness and then Ms. Sung.

THE COURT: This afternoon?

MS. BLAIN: Or late this morning, your Honor.

MR. FUTERFAS: We'll look for it, your Honor. There may be a portion, a portion that we would want to -- actually, I will look for it. I don't want to take the government's --

THE COURT: Does the government have the transcripts of the Mitchell McClinton tapes?

MS. SCHOENBERGER: Yes, we do, your Honor. They're still being reviewed by defendant. We anticipate being able to give them to you at the lunch break.

THE COURT: Is there anything else I have to rule on before we have the jury in?

Ms. Blain?

MS. SCHOENBERGER: There is one outstanding issue which is the rulings on the Harper designations. We put in a color-coded transcript with each side's objections to the various --

THE COURT: When are we reaching that?

MS. SCHOENBERGER: We expect that Mr. Harper will

testify by deposition this afternoon. So I don't think that needs to cut into the jury time this morning, but to the extent we can get a ruling on that today, I think that will be timely.

THE COURT: I'll take a 15 longer lunch break and rule before we come back from lunch or before we go to lunch.

Anything else?

MR. FUTERFAS: Yes, your Honor. We have identified the portion of the report. If those sections are coming in of the report, we would like to admit, we might as well do it as part of one exhibit, and I can actually hand up to your Honor the page.

THE COURT: Please.

MR. FUTERFAS: The page contained at Page 87 of the DOI report.

THE COURT: Just the bracketed paragraph?

MR. FUTERFAS: Yes, your Honor.

THE COURT: Does the government have any objection?

MS. BLAIN: No, your Honor.

THE COURT: The rest of the page doesn't come in?

MR. FUTERFAS: Just the part I highlighted.

MS. BLAIN: Actually, if that paragraph is coming in, I believe it needs context, which is the second paragraph as well.

THE COURT: The second paragraph is the paragraph that is highlighted.

MS. BLAIN: Contract with monetary values aside.

THE COURT: That is the third paragraph.

MS. BLAIN: Yes, you're right, sorry, the third paragraph, your Honor.

MR. FUTERFAS: We think that is policy language. We think that is not a factual determination.

THE COURT: One minute, please.

MR. FUTERFAS: Okay.

(Pause)

THE COURT: I would propose to limit admissibility to the first two sentences of Paragraph 3. So you can redact Paragraph 1, you will redact the third sentence in the following Paragraph 3 starting with the goal of DSBS's workforce centers, and we will redact the bottom of the page, policy and procedure recommendations of the DSBS, okay, folks?

MS. BLAIN: Thank you.

MR. FUTERFAS: That is fine, your Honor. Thank you.

THE COURT: As redacted, the government will include those aspects of Page 87 in its offer.

MS. BLAIN: Thank you.

THE COURT: Anything else before me?

MS. SCHEIN: Yes, your Honor, just one other matter.

As to the testimony of Ms. Kamath and her testimony about what the agency did, including canceling the contract, we object to her testifying about that and take an exception to

the ruling because it does not go to the materiality under the --

THE COURT: What are you objecting to?

MS. SCHEIN: To her testimony about her conclusion that they --

THE COURT: You'll make your objection when -- she is testifying now -- make your objection as she testifies.

MS. SCHEIN: Very well.

THE COURT: Are you moving to strike the entire testimony?

MS. SCHEIN: No, your Honor. Just her conclusion as --

THE COURT: I don't know what you're objecting to. If you want to object, make it to a page and line of the transcript. Let's bring in the jury.

MS. SCHEIN: Very well.

(Jury present)

THE COURT: Good morning, members of the jury. Be seated. Good morning, Ms. Kamath, you remain under oath.

Members of the jury, am sorry we are 20 minutes late. We started early this morning to deal with some legal issues. We resolved them. I hope that will speed the efficiency of the trial, but it took us a little longer than we anticipated.

Ms. Kamath is on the witness stand. The direct examination is going on. Ms. Blain, please continue.

Ms. Kamath is reminded that she remains under oath.

ANGIE KAMATH, resumed.

DIRECT EXAMINATION (Continued)

BY MS. BLAIN:

Q. Good morning, Ms. Kamath.

A. Good morning.

Q. When we left off yesterday, I believe you were testifying about the relationship between SBS and SEEDCO.

A. Yes.

Q. Do you remember that?

At some point in time did SBS's relationship with SEEDCO change?

A. Yes.

Q. At what point in time?

A. So during the course of 2011, kind of going into 2012, there was a Department of Investigation investigation of the fraud claims against SEEDCO.

MS. SCHEIN: Your Honor, objection.

THE COURT: Overruled.

BY MS. BLAIN:

Q. You may continue.

A. Sure. And so at the release of the Department of Investigation report in March of 2012, there was a change in the relationship between SBS and SEEDCO.

Q. You referred to the Department of Investigation. What is

that?
A. The New York City Department of Investigation is a law enforcement entity that is tasked with investigating claims of fraud or claims against city agencies.
Q. You mentioned a report. Is that right?
A. Yes.
Q. What report did you mean?
A. There was a report of the findings of the New York City Department of Investigation on allegations of SEEDCO's fraud.
The investigation commenced in August of 2011 and ended in March of 2012. It started, and our city agency, Department of SBS, initiated the investigation two or three days after we got that first call from the New York Times reporter.
Q. When you say your department initiated the investigation, what do you mean?
A. My boss, Commissioner Rob Walsh, called up the commissioner of the New York City Department of Investigation, Rose Gilhearn, and --
MS. SCHEIN: Objection, your Honor.
THE COURT: Overruled.
A. -- and launched an investigation and asked the City Department of Investigation to start an investigation to look into these allegations of fraud.
Q. Did you read the report that DOI issued at the conclusion

of its investigation?

A. Yes, I read all 89 pages multiple times.

MR. FUTERFAS: Objection.

THE COURT: Let me tell you this, members of the jury.

We are going to be hearing information about a report of the Department of Investigations of New York City. The report itself at this point is not in evidence, but what Commissioner Kamath did on the basis of the report is in evidence, will come into evidence, and I am overruling the objections of the department on that score.

It comes into evidence to explain what she did and her conduct of what she did, what was the reason for it. So she'll be able to give you the explanation. The report may or may not come in later on depending on the foundation that is laid by other witnesses. At this point you've heard that there was a comment by her boss, then the commissioner of the Department of SBS, to the Commissioner Rose Gilhearn of the Department of Investigations, asking that -- what?

THE WITNESS: That an investigation be commenced to look into the allegations of fraud by SEEDCO on their contract that they held with the Upper Manhattan Career Centers and Bronx Workforce 1 Career Centers.

THE COURT: Okay.

BY MS. BLAIN:

Q. How did the information in the DOI report -- when I say

DOI, do you understand I am referring to the Department of Investigation?

A. Yes.

Q. How did the information in that DOI report affect your views of SEEDCO?

A. The six month or over 7 month investigation --

THE COURT: Change that. Not your views of SEEDCO. Explain what you did.

BY MS. BLAIN:

Q. What did you do next after reading the DOI report?

A. The DOI report presented their findings as fact which laid out --

MR. FUTERFAS: Objection.

A. -- in very clear form --

THE COURT: Who is objecting, Ms. Schein or Mr. Futerfas?

MS. SCHEIN: Pardon me, your Honor. I am objecting.

THE COURT: Overruled.

BY MS. BLAIN:

Q. You may continue, Ms. Kamath.

A. -- the report laid out in clear format nearly, the report laid out in clear format multiple and many ways in which the contract terms that we had been in a relationship with SEEDCO were --

MS. SCHEIN: Objection, your Honor.

THE COURT: This is relevant on the basis of explaining what Ms. Kamath did, and for that reason it is allowed, but not the truth or falsity of what is in the report. You may continue.

THE WITNESS: Thank you.

THE COURT: Do you want to start again, Jerry, please.

(Record read)

THE COURT: Continue, please.

THE WITNESS: Sorry. Let me try this one more time.

A. -- there was a contractual relationship in which our department, SBS was engaged in with SEEDCO. The report laid out in many and multiple ways clear evidence through text messages, testimony, e-mails --

MS. SCHEIN: Objection, your Honor.

A. -- taped conversations.

THE COURT: I don't want you to get into that. Did you find the report to be full and thorough?

THE WITNESS: Full and thorough.

THE COURT: Did you feel that the report called upon you to do certain things?

THE WITNESS: Absolutely.

THE COURT: What is it that you did?

A. -- based on what we read in that thorough report, it was clear to ourselves, it was clear to me as deputy commissioner --

MS. SCHEIN: Objection.

THE COURT: Overruled.

A. -- that we had a decision to make in terms of whether to continue business with SEEDCO. One of the recommendations of the report from the Department of Investigation was, indeed, to look at if the Department of SBS should sever the relationship or continue it.

BY MS. BLAIN:

Q. What decision did you make?

A. We chose to sever the relationship with SEEDCO and use one of the contract clauses to assign the contract to another qualified operator to deliver those services. As a federal set of services, we were obligated to offer and to not have a breakage in services, to offer vital job training and job placement services to all New Yorkers.

So it was very important that we were able to take that contract and take the services that were really required and mandated from the federal government, state and city agencies, to continue that and to do that by essentially handing over, "assigning" is the technical term, the contract services to another entity.

Q. Ms. Kamath, if I may direct your attention to Tab 68 in your binder.

MS. BLAIN: This has not yet been received, your Honor.

(Pause)

THE COURT: Please continue.

BY MS. BLAIN:

Q. Do you recognize this document, Ms. Kamath?

A. I do.

Q. What is this document?

A. This is a letter, dated March 9th, 2012, from Commissioner Rob Walsh, the Commissioner of the Department of Small Business Services, to Barbara Gunn, the President and CEO of SEEDCO, explaining the city's intention, the Department of SBS's intention to assign the contracts from SEEDCO to a different operator based on the --

Q. One second. I need to ask you a couple of more questions before we get there. In connection with your role as deputy commissioner of SBS, did you have any role in determining the contents of this letter?

A. Yes.

Q. Did you receive a copy of this document when you were deputy commissioner?

A. Yes.

Q. Was it prepared in the ordinary course of SBS's business?

A. Yes.

MS. BLAIN: Your Honor, the government seeks to introduce Government Exhibit 68.

MS. SCHEIN: I object to the letter.

THE COURT: You object? Overruled.

MS. SCHEIN: A portion of it as --

THE COURT: Which paragraph?

MS. SCHEIN: The second paragraph, your Honor.

MS. BLAIN: This was the subject to a motion in limine.

THE COURT: May I please read it?

MS. BLAIN: I am sorry.

(Pause)

THE COURT: Admitted for the purpose I said before, to explain the conduct of the New York Small Business Services Department. Objection overruled.

(Continued on next page)

Q. Ms. Kamath, can you please now tell the jury what this document is.

THE COURT: Let the jury read it now.

MS. BLAIN: OK.

Q. Can you please read to the jury the first --

THE COURT: The jury can read it to themselves.

MS. BLAIN: OK. I think there's been a request to make it slightly bigger.

THE COURT: Can we get the jury read it, please, without talking.

Can the jurors read it? Do you want it blown up?

JUROR: Blown up, please.

THE COURT: Blow it up paragraph by paragraph.

The first paragraph, blow it up.

THE COURT: Stop at the first paragraph and blow up the second paragraph.

Blow up the second paragraph, please.

Blow up the third paragraph, please. If I am going too fast, let me know.

That is the fourth paragraph you have blown up.

Did you do the third paragraph?

MS. SCHOENBERGER: Yes, your Honor.

THE COURT: Has the jury read the letter?

Proceed, Ms. Blain.

BY MS. BLAIN:

Q. Ms. Kamath, at the time this letter was mailed, did you have an understanding as to why SBS discontinued its relationship with SEEDCO?

A. Yes.

Q. And what was your understanding?

A. As articulated in the second paragraph of this letter: The DOI has amply documented in great detail numerous acts of improper reporting and regular practices to report false placements to SBS in violation of contractual provisions and policies."

Q. Does this letter accurately reflect your understanding of why SBS ended its relationship with SEEDCO?

A. Yes.

MS. SCHEIN: Objection.

THE COURT: Overruled.

MS. BLAIN: Thank you.

I have concluded the direct examination, your Honor.

THE COURT: Who is doing the cross.

MR. FUTERFAS: I am, your Honor. Thank you.

CROSS EXAMINATION

BY MR. FUTERFAS:

Q. Ms. Kamath, the DOI report you mentioned issued in March 2012?

A. Yes.

Q. And subsequent to March 2012, did you and your staff at SBS

continue to determine whether or not placements deemed false by the DOI had been vetted or verified and submitted for payment to SBS?

A. As of, I believe, August 8, 2011, when we commenced the investigation through the Department of Investigation, the clear guidance from the New York City Department of Investigation was to carry on our business as usual, that as the department of small business our job was not to be conducting investigation, that was the Department of Investigation's job, and that our job was to carry on to make sure that city services to enable job seekers to come to Workforce1 career centers was being kind of upheld and managed.

So we continued our regular course of business through the time of the investigation to make sure that goals were being set, goals were being met, the way in which goals were being met and strategy that was being implemented was in accordance to what we wanted to see. But it was not our job to be investigating. It was our job to carry on our regular course of business which was to oversee performance.

MR. FUTERFAS: Your Honor, may I have my question reread to the witness.

THE COURT: "And subsequent to March 2012, did you and your staff at SBS continue to determine whether or not placements deemed false by the DOI had been vetted and verified and submitted for payment to SBS?"

Did you feel you answered the question?

THE WITNESS: I got confused. No.

THE COURT: Answer the question.

A. Subsequent to March 2012, yes, we carried on with our process to validate job placements, to determine the performance-based portion of the contract.

THE COURT: With SEEDCO or with someone else?

THE WITNESS: The SEEDCO contracts were assigned within about six weeks of March 2012, and so in order to close out that process we -- to close out the process, to close out the contracts we did what we needed to do to understand the reimbursement basis and the performance basis of that contract.

THE COURT: Well, during those six weeks, before you got someone else to replace SEEDCO, did SEEDCO continue to function under the contract?

THE WITNESS: It did in a ramped-down mode, yes.

THE COURT: What do you mean by ramped-down mode?

THE WITNESS: As a public entity, as a center of public services, we needed to maintain doors open during that time period. It was important to be able to serve the public. But it was clear that SEEDCO was on its way out and that we were working on get a viable replacement in.

So, services were still being offered, but our expectations of the level of performance were certainly tempered because of the circumstances and the time line in

which we were working.

THE COURT: Go ahead, Mr. Futerfas.

MR. FUTERFAS: Thank you, your Honor.

BY MR. FUTERFAS:

Q. I want to focus you on the placements that you and your team continued to examine after the DOI report on March 2012.

Did you and your team examine whether placements that the DOI believed were false, did your team go and examine whether those placements in fact had been verified or not verified by Charney Research for submission for payment by SBS?

A. Can you repeat the question one more time. I'm trying to understand it.

MR. FUTERFAS: Your Honor, may I have the reporter repeat it back, please.

THE COURT: "I want to focus you on the placements that your team, you and your team continued to examine after the DOI report on March 2012.

"Did you and your team examine whether placements that the DOI believed were false, did your team go and examine whether those placements in fact had been verified or not verified by Charney Research for submission for payment by SBS?"

I think you can improve the question, Mr. Futerfas.

MR. FUTERFAS: I will endeavor to do so, your Honor.

THE COURT: Sometimes when you read what you have

done, you say, "Did I really ask that?"

MR. FUTERFAS: Guidance taken, your Honor.

Q. There was a verification process that SBS had contracted with SEEDCO where a third-party, vendor Charney Research --

THE COURT: Let me try to help you.

MR. FUTERFAS: Very well.

THE COURT: Charney Research was verifying various activities as submitted by SEEDCO's claims, right?

THE WITNESS: Yes.

THE COURT: That had happened before March 2012?

THE WITNESS: Yes.

THE COURT: Did it continue after March 2012?

THE WITNESS: The agency switched, I believe, in January of 2012 the vendor through which we would do the third-party verification. We switched from, I believe, Charney Research to a company called The Work Number, which again was a third party.

THE COURT: Doing the same job as Charney?

THE WITNESS: Doing the same job, just a different organization that was doing it more cost effectively.

THE COURT: After March '12 did that other organization continue to verify claims submitted by SEEDCO?

THE WITNESS: Yes.

THE COURT: And for what period of time? Another what? Six weeks? Six months? I forget what you said.

THE WITNESS: That contract I believe is still in place to this day. So the methodology of using a third-party entity to verify placements --

THE COURT: Before the assignment?

THE WITNESS: Yes. That took place.

THE COURT: Before the assignment took hold?

THE WITNESS: Yes.

THE COURT: After the assignment some other company took the place of SEEDCO. Before the assignment SEEDCO continued to function you said for another six weeks. Did I hear you right?

THE WITNESS: Yes.

THE COURT: During that six-week period, did the third-party verifying agency continue to verify?

THE WITNESS: Yes.

THE COURT: Was SEEDCO continued to be paid on a performance basis as well as a cost basis?

THE WITNESS: The terms of the contract held, yes.

THE COURT: Go ahead.

MR. FUTERFAS: Thank you, your Honor.

THE COURT: I hope I asked your question.

MR. FUTERFAS: It's in where I'm going, your Honor. Thank you.

MR. FUTERFAS: The DOI report concluded there were a certain number of false placements, is that right?

A. Among other things, yes.

Q. OK. My question to you is, these were false placements the DOI report concluded had occurred before 2012, in the period of certainly 2011, right?

A. Yes.

Q. My question for you is, even after the DOI report which issued in March 2012, did your office endeavor to determine whether any of the placements that the DOI report believed were false, whether any of those placements had actually been verified or not verified for submission to payment to your organization for the performance-based payments?

THE COURT: You got all tangled you up, Mr. Futerfas.

MR. FUTERFAS: I will try to break it down, your Honor.

THE COURT: For the period after March 2012, you said that the third-party verification agency continued to verify?

THE WITNESS: Yes.

THE COURT: Did your agency do anything other than what the verification company did?

THE WITNESS: After the report, in order to prevent improprieties that occurred from reoccurring, we looked at the data to then be able to come up with something so that we would never have those problems happen again, where we could do everything in our power to create procedures and clarifications so that fraud wouldn't happen. In that context, we certainly

looked at the data quite intently.

MR. FUTERFAS: Your Honor, I think if we could just take a break, I must have touched a wire here.

THE COURT: A hot wire.

Does anybody have a microphone on the table?

THE DEPUTY CLERK: It is the wire.

THE COURT: It's the wire.

Q. Ms. Kamath, I am trying to ask you a simple question. The question is this: The DOI report determined or believed, stated their belief that a certain number of placements were false in 2011. Yes or no?

A. Yes.

Q. My question to you is, after that report issued, did your office try to determine whether any of those supposedly false placements were included in the number of placements submitted to your agency for payment?

A. Yes.

Q. What did your office do to determine whether those allegedly false placements had been verified or not verified by Charney Research?

A. In the period after March, as we were, again, ramping down the SEEDCO contract and figuring out payments, we were working in very close collaboration with the New York State Department of Labor, the U.S. Department of Labor, the Department of Investigation, to be able to look at the data, understand

ultimately what was to be paid for and what was not to be paid for.

THE COURT: Did you try to get any clawbacks, money that you paid out?

THE WITNESS: We did, yes.

THE COURT: Was that your question?

MR. FUTERFAS: No, it isn't, your Honor.

Q. Let me show you what will be market for identification as Defendant's Exhibit F5, or FFFFF.

Ms. Kamath, do you have Defendants' Exhibit F5 in front of you. It should appear on your screen.

A. Not yet.

Q. Do you have it now?

A. I do. Thank you.

THE COURT: The jury doesn't have it yet.

MR. FUTERFAS: No, they do not, your Honor.

Q. Is this, Defendant's Exhibit F5, an e-mail from someone named Charles Houston to a number of SBS employees, with you cc'ed?

A. Yes.

Q. Is this e-mail dated October 11, 2012?

A. Yes.

Q. Do you recognize this document as being made and sent and reviewed in the ordinary course of SBS business?

A. Yes.

MR. FUTERFAS: Your Honor, we move to admit Defendant's Exhibit F5 and publish it to the jury.

MS. BLAIN: No objection, your Honor.

THE COURT: Received. You may publish it.

(Defendant's Exhibit F5 received in evidence)

Q. So the DOI report, Ms. Kamath, issued in March 2012, right?

A. Yes.

Q. Its findings and its conclusions and everything it says are coming out in March 2012, right?

A. Correct.

Q. Here in October, seven months later, an e-mail is being sent about a certain number of placements, right?

A. Correct.

Q. Who is Charles Houston?

A. Charles Houston headed up the fiscal team. So he headed up the team that would review invoices, review expenses and work with the fiscal and finance department to determine payments.

Q. It is an e-mail to I guess Kelly Richardson and Sue Lee and someone named Xenon Walcott, right?

A. Yes.

Q. Are those three individuals SBS employees or management staff?

A. Yes.

Q. It says, "Subject: SEEDCO false placements."

And then:

"Hi, Kelly.

"Of the 425 customers listed in the DOI and have placement between January and March 201," something like that, "24 are not associated with the Charney group sent for validation."

What does that mean?

A. So typically in our roster of job placements that is sent to the third-party validator, the data would be -- because there was a call, a phone call methodology to verify placements. I think what this says is that 24 individuals were not part of the roster sent to the third party, possibly because they didn't have phone contact information. It's impossible for me to tell from this particular e-mail, but that would be my best guess.

Q. In addition to that, before the roster of placements for Charney to verify was sent to Charney, wasn't there some scrubbing that occurred, duplicates were weeded out, other kind of normal errors were taken into account so that what get sent to Charney was not the raw Worksource1 placement data?

MS. BLAIN: Objection, your Honor.

THE COURT: Overruled.

A. What was sent to Charney was the raw placement data gathered and downloaded from the Worksource1 database, minus a handful of records that were duplicate -- wouldn't need to send the same information on people twice -- and for individuals

that simply didn't have a phone number, you wouldn't send information to a calling research methodology if there wasn't a phone number.

Q. So, from the raw Worksource1 data, there was some initial culling to cull out duplicates, to cull out people who you didn't have contact information for, so what got sent to Charney was some smaller number of placements for them to verify, is that right?

A. A slightly smaller number of placements to verify, correct.

Q. So you understand this e-mail to mean, for whatever reason, out of this 424 customers identified by the DOI, 24 were never sent to Charney for validation at all, right?

A. That's what this says.

Q. Have you seen Attachment A to the contract between SBS and SEEDCO?

MS. BLAIN: Objection, your Honor.

THE COURT: Overruled.

A. I'm sorry. Is it here in one of these binders?

MR. FUTERFAS: I am just asking you.

THE COURT: It is not being tested. It is a fact question. Have you seen it? Do you know what it is?

THE WITNESS: Can you repeat the question?

THE COURT: Do you know what it is, Attachment A to the contract?

THE WITNESS: Without seeing it, I don't know offhand.

THE COURT: That's the answer.

MR. FUTERFAS: Fair enough.

Q. Do you understand that under the contract there is -- I think you testified to this yesterday as a matter of fact -- under the contract that before 2011 it was 30 percent, after 2011, 20 percent, that a portion of the contract, the payment is based, performance-based payments are based on placement performance, right?

A. Yes.

Q. Before performance-based payments can be made, the placements are sent to Charney Research for validation, right?

A. That's part of the process.

Q. So the answer is yes, they are sent to Charney Research?

THE COURT: She said yes. Keep going.

MR. FUTERFAS: OK.

Q. Going back to the e-mail, the next clause says, "401 are within the Charney group." Do you see that?

A. Yes.

Q. What did you understand that clause to mean?

A. 401 out of 425 individuals were part of the roster sent to Charney Research for validation.

Q. My question is, did your office endeavor to determine whether or not Charney validated any of the 401?

A. I believe we did.

Q. Endeavor to determine that?

A. Endeavored to understand what happened, for two reasons: To determine payment calculations and really, more importantly, to determine new policies and procedures so that this type of fraud could not happen again, understanding the problem is really particularly important. So in that context we would have looked at the DOI findings to understand what happened and what that looked like in the system to then create policies and procedures to not have those types of errors and fraud happen again.

Q. Let me ask you this: Do you understand whether or not the DOI called any customer?

A. They did. In the report there were several excerpts of conversations. The 89-page report didn't have the transcript for every conversation, but the report I think highlighted a dozen or so of those conversations as part of their investigation.

Q. So, my question is do you know whether or not the DOI in its investigation physically called all customers that were deemed to be placed by SEEDCO, each and every one?

A. The report said they called many, and enough for them to determine that there were, there was a pattern of fraud.

THE COURT: Listen to the question. Did you think they called all?

THE WITNESS: I don't believe that the report said they called all, but the report stated that they called enough

and saw a pattern of fraud consistently.
Q. Let me ask you this, the next clause says in the e-mail, "I would need additional customer info for any further determination."
Do you see that language?
A. Yes.
Q. You know that as part of its investigation DOI collected various kinds of documents, right?
A. Yes.
Q. And they collected CIFs, right?
A. Yes.
Q. You understand that. They looked at the Worksource1 database, right?
A. Correct.
Q. Your office, SBS, did you have access to the same documents that the DOI had access to?
A. Yes.
Q. But it says here that, "I would need additional customer information for any further determination with respect to these 401 that were sent to Charney." Right?
A. I don't read it that way.
Q. Well, let me ask you this: Were you trying to determine, of the 401 that got sent to Charney Research, were you trying to determine whether Charney either validated or did not validate any of those 401?

A. I read this e-mail to say that further information would be required for the 24 that were not included.

Q. Was your office looking to make a determination as to whether any of those 401 were or were not verified by Charney Research?

A. We worked really closely with the Department of Investigation, a law enforcement agency --

THE COURT: Just answer.

THE WITNESS: -- to understand.

THE COURT: Just answer.

THE WITNESS: I am not sure I understand the question.

THE COURT: Then say you don't understand the question. Don't guess at the question.

THE WITNESS: OK.

Q. I will try to ask it again. Do you see the number 401?

A. Yes.

Q. That 401 are being submitted to Charney, right? They are within the Charney group?

A. Yes.

Q. What do the words mean to you, "the 401 are within the Charney group"?

A. They are part of the roster that Department of Small Business Services sent to their third-party validator, and the third-party validator would use that methodology of random sampling.

Q. They would use their methodology, right?
A. Yes.
Q. To determine whether any of those 401 could be verified as a placement, right?
A. Correct.
Q. Now, I'm asking you this: Did your office endeavor to determine whether any of those 401 were, in fact, verified or not verified by Charney?
A. Yes.
Q. Did you make findings? Are there any findings about that?
A. The Department of Small Business Services wasn't conducting an investigation. We were working with our investigation agency to then figure out for the purposes of payment what should be included and what should be stripped out.

THE COURT: I think we are jumping around to too many different things. The phrase "401 within the Charney group" means you said they were part of the roster group submitted to Charney?

THE WITNESS: Correct.

THE COURT: Does Charney in the ordinary course of business verify each one or is statistical sampling sufficient to draw the conclusions?

THE WITNESS: Statistical sampling --

THE COURT: Let me ask the question.

THE WITNESS: I'm sorry.

THE COURT: Statistical sampling you said.

THE WITNESS: Statistical sampling.

THE COURT: Does that mean they call all or just a sufficient number from which they could draw a proper inference?

THE WITNESS: A sufficient number from which they could draw a proper inference.

THE COURT: Can we stop reading this document and go on to something else.

MR. FUTERFAS: Your Honor, I just want to get on to the critical question, a question.

BY MR. FUTERFAS:

Q. Did your office determine that Charney verified or didn't verify any number of those 401?

THE COURT: She said that in the ordinary course a sufficient number for statistical sampling, which means not every one.

MR. FUTERFAS: Your Honor, most respectfully, the question is, did Charney, out of the 401 that were submitted to Charney, did your office investigate whether Charney validated 401, validated 100, validated 50, validated all 401.

THE COURT: She's answered the question. She said they took a statistical sample. Please move on.

MR. FUTERFAS: Your Honor, the question I had, the statistical sampling goes to the validation. I am trying to

find out, did Charney validate any of the 401?

THE COURT: Do you know what validation means?

THE WITNESS: Yes.

THE COURT: What does it mean?

THE WITNESS: It means verifying the veracity, the truthfulness of if someone said they got a job.

THE COURT: Is that calling every one?

THE WITNESS: By calling a statistically significant random sample.

THE COURT: Can we go on, please.

BY MR. FUTERFAS:

Q. Did your office ever make a determination about whether Charney Research validated any of these 401 for the purposes of the payment, the compensation-based payment under the contract?

THE COURT: Do you know what that means? Do you understand the question?

THE WITNESS: It feels like it's the same question. I don't know how to answer this any differently other than we worked closely with Department of Investigation using validation --

THE COURT: Is there an objection?

MS. BLAIN: Yes, objection, your Honor.

THE COURT: Sustained.

BY MR. FUTERFAS:

Q. Let me show you Government Exhibit 34.

MR. FUTERFAS: Let me just check if it's in evidence. Excuse me.

MS. BLAIN: It is.

MR. FUTERFAS: It is, yes.

Q. Ms. Kamath, take a look at Exhibit 34. Do you recognize that document?

A. I do.

Q. What do you recognize it to be?

A. It is an amendment to the master contract between the Department of Small Business Services and SEEDCO to operate, for their upper Manhattan Workforce1 Career Center.

Q. This amendment is dated -- I know it's light, but it's dated sometime in April 2007?

A. Correct.

Q. If I could turn your attention --

MR. FUTERFAS: Before we get there, if I could have Marissa scroll down a little bit to part B.

Q. Do you see performance-based payments?

A. Yes.

Q. At this point, at this period of time in the contract, 30 percent of the payments to SEEDCO would be based on, according to the contract, outcome goals, right? Certain performance-based outcome goals?

A. Yes.

Q. Did those outcome goals include verified placements, number

of verified placements?

A. The outcome goals were job placements, and then we used our verification methodology to determine what portion was indeed obtained.

Q. OK. We'll go through this contract. So if I could go to the next page. One of the outcome goals or one of the elements that would be used to determine the payments would be -- No. 1 says total job placements, right?

A. Yes.

Q. No. 2 is general employment retention. Do you see that?

A. Yes.

Q. 3 is employer-specific retention, and 4 is employer fulfillment, right?

A. Yes.

Q. These are all different metrics that SBS would use based on the numbers to determine the amount of performance-based compensation, right?

A. Correct.

Q. Those are called -- in fact, have you heard the term performance milestones?

A. Yes.

Q. What are performance milestones?

A. These are, these four elements.

Q. So performance milestones are targets that SBS has set and that the closer that the vendor -- in this case, SEEDCO -- gets

to meeting those targets, that could increase or decrease if they don't meet those targets the amount of their performance-based compensation, right?

A. Correct.

Q. If I could go to Attachment A. Attachment A, this is part of the contract, right?

A. Correct.

Q. It says on the upper left, "Performance milestones, placements, placements made."

It says total placements made 50 percent, right?

A. Yes.

Q. What does the 50 percent mean?

A. It would be half of the total budget amount that was subject to performance.

So 30 percent of the overall budget was subject to performance, half of that 30 percent was going to be based on the performance related to placements.

Q. So then effectively 15 percent of the entire contract, right?

A. Correct.

Q. Under that it says "Retention," and there are some -- the language, A, employed after two quarters, 35 percent, 20 percent, then employed with the same employer for two quarters.

Could you describe what those clauses mean.

A. Sure. So the Workforce Investment Act, the federal

legislation that governed the centers and the contracts, had common measures that were important. So, flowing down from what the federal government expected of us, one of those measures was around employment retention, basically keeping your job, for two quarters or, i.e., six months after you left the system, after you kind of got employment.

So retention, job retention, i.e., keeping your job, was making sure that folks were still employed and the second one, 2B is employed with the same employer for two quarters or six months.

MR. FUTERFAS: Now scroll down a little bit on the page. Right there. Perfect.

Q. With respect to the total placements portion, this 50 percent portion of the performance-based compensation, it says under sub A, "DSBS shall pay contractor" -- the contractor in this case is SEEDCO, right?

A. Yes.

Q. "DSBS shall pay contractor based on the percentage of its placement target that contractor achieves each quarter."

Do you see that language?

A. Yes.

Q. What is the placement target? Is that the number of verified placements that SBS has set for SEEDCO to try to obtain?

A. The placement target is the annual goal that we would set

and negotiate with SEEDCO.

Q. OK. Then it is divided by quarters. So it's divided 25 percent by quarter?

A. We would negotiate with SEEDCO if they wanted to have an even split, 25/25/25/25, or something different, but it was an annual goal that was set and then appropriately divided amongst the quarters based on negotiation.

Q. Once that is negotiated and set, each quarter has its own placement target based on that quarter, right?

A. Correct.

Q. That placement target was a number of verified placements that SEEDCO had to obtain for the maximum amount that it was entitled to under this component of the contract, right?

A. The placement target was a realtime number that was managed to a daily, weekly, and monthly basis. The verification would happen one quarter after that -- would happen after that quarter ended to then be paid out several months later after the work of the verification was done.

I think there is a distinction to be made in terms of goals and managing performance in realtime versus the accounting and the verification that would happen with a typical three- to six-month lag before the payment would actually be made.

Q. Right. But payment is determined on verified placements, correct?

A. Correct.

MR. FUTERFAS: If we could scroll down a little bit. Just a little bit further down. Stop there. OK.

Q. Do you see in the middle of the page there is a clause, the highlighted word on the left that said "Validation"?

A. Yes.

Q. You see that. The language is in the contract: "Charney will survey all placed customers using the Worksource1 roster that includes all placed customers per quarter. Payment will be adjusted according to the percentage of responding customers who confirm the payment."

Do you see that language?

A. I do.

THE COURT: "Confirm the placement."

MR. FUTERFAS: "Placement."

Q. "Confirm the placement." This is a contract that SBS made with SEEDCO, right?

A. Yes.

Q. Were you involved in the preparation of this contract?

A. I joined the agency in 2006. The contract started in 2004. But there were many amendments along the way, so I was involved in many aspects of the amendments during the time in which I was in a management position.

Q. So with respect to the document we are looking at now, which is one of the amendments, an amendment dated April of

2007 --

A. Yes.

Q. -- were you involved in the preparation of this amendment or the negotiation of this amendment?

A. I was involved from the management team perspective. In April of 2007 I was an executive director over community partnerships. My predecessor, Scott Zucker --

THE COURT: Let's stop there. Try not to complicate the question.

THE WITNESS: Sorry. OK.

THE COURT: The question is were you involved? The answer is yes or no or I don't remember.

THE WITNESS: I was involved.

THE COURT: OK.

THE WITNESS: Yes.

THE COURT: Wait for the next question.

THE WITNESS: OK.

THE COURT: Not every answer has to completely answer every possible question.

THE WITNESS: Got it.

THE COURT: Just answer the question put to you.

THE WITNESS: OK.

Q. The first four words that are in the contract, "Charney will survey all placed customers," do you see that language?

A. I do.

Q. Does "all" have a meaning to you?

MS. BLAIN: Objection, your Honor.

MR. FUTERFAS: I didn't touch anything, your Honor.

THE COURT: I think this might be a good time for a recess. Let's take our recess.

We can take a ten-minute recess.

Close up your books and leave them on your chairs. Katie will escort you out. Don't discuss the testimony, please. Keep an open mind.

(Jury not present)

THE COURT: Let's take a break. It is a quarter past. We'll come back at 25 after.

(Recess)

THE COURT: Do you want to get the jury, please.

(Jury present)

THE COURT: Be seated, everyone. You remain under oath. Mr. Futerfas, you may continue your cross-examination.

MR. FUTERFAS: Your Honor, could I have -- there was a question pending I think when your Honor broke -- so could I have that question read back?

THE COURT: Ask it again.

MR. FUTERFAS: Okay.

BY MR. FUTERFAS:

Q. Ms. Kamath, there was a line there that says in highlighted bold, "validation"?

A. Yes.

Q. There were the words Charney survey all placed for customers?

A. Yes.

Q. Do you see that?

The question I asked you before the break was what was -- did you have an understanding of what the word "all" meant?

A. In this context, the roster that we would send to Charney, all of those job placements, all of those customers were fair game upon which Charney would use their methodology of statistical random sampling.

Q. You keep using the terms, "random sampling."

What is your understanding of, as a deputy commissioner at SBS -- withdrawn.

Who hired Charney Research?

A. There was a competitive bid process in 2006 to find an organization who would be willing to --

THE COURT: The question is, who hired them?

THE WITNESS: Who hired them? My predecessor, Scott Zucker, who at the time was --

THE COURT: The DSBS hired him?

THE WITNESS: DSBS hired them through a competitive bid process, correct.

BY MR. FUTERFAS:

Q. And DSBS hired and paid this third-party verification agency, right?

A. Correct.

Q. Do you have an understanding of what they actually did to verify placements?

A. I did.

Q. You've told us about something about a sampling, some kind of sampling. What is your understanding, as a deputy commissioner, of this sampling that Charney Research did?

THE COURT: The methodology used? What is the question?

BY MR. FUTERFAS:

Q. You used the words -- I'll rephrase it -- you used the

words, "random sampling." Did you use those words?

A. Yes.

Q. What do you understand by those words?

A. By way of example, if there are 100 individuals on a roster that Charney would receive. They would pick through those 100 candidates randomly, so they wouldn't do it in alphabetical order, they wouldn't do it in age order, they wouldn't do it in ORO order, they would do it in a random way to select the number of customers to verify until they got to a sizeable-enough sample upon which they could infer the level of placement validation.

Q. Let me see if I can break that down.

Using the sample of a hundred people on the roster, right?

A. Yes.

Q. And the roster was sent to you by SEEDCO?

A. No.

THE COURT: SEEDCO sent --

MR. FUTERFAS: Withdrawn.

THE COURT: -- its data to Charney, right?

THE WITNESS: SEEDCO input its data into Workforce1 database. SBS would download that into SEEDCO --

THE COURT: The way it went was that a document was created by Charney -- sorry -- document was created by SEEDCO, SEEDCO transmitted the information in that document to SBS, SBS

translated that into a format and sent the format and shared the information with Charney?

THE WITNESS: Correct, with a small amend, that SEEDCO would be directly putting their information to a database, but, yes, yes, in essence.

THE COURT: What is hard for us to understand is that paper doesn't have to be exchanged?

THE WITNESS: Correct.

THE COURT: People input a lot of information, and that information can be sent electronically to someone else, for use or sharing with a third party?

THE WITNESS: Correct.

BY MR. FUTERFAS:

Q. Am I mistaken, SBS had access to Work Source1, right?

A. Correct.

Q. Which is the raw database of input data placements, right?

A. Yes.

Q. You would extract placements, SBS had the ability to extract placements from that database, right?

A. Correct.

Q. Then you or SBS or someone did this little scrubbing we talked about, getting rid of duplicates and things like that, right?

A. Correct.

Q. That kind of scrubbed dataset of placements was then sent

to Charney Research, right?

A. Correct.

Q. My question is this:

You just mentioned this hypothetical, let's say Charney received a hundred placements for verification. Do you have an understanding of how many individuals of that hundred Charney would actually call or attempt to call?

A. I don't have the exact number that would reach statistical significance for any sample.

THE COURT: You have answered the question.

BY MR. FUTERFAS:

Q. Your understanding, as deputy commissioner overseeing this -- right, you were overseeing this?

A. Yes.

THE COURT: She answered the question. Move on.

BY MR. FUTERFAS:

Q. Did you have an understanding it called 10 percent --

THE COURT: She said she didn't know what was statistically significant. We don't know the exact number THAT is statistically significant.

BY MR. FUTERFAS:

Q. Did you ever learn in your role as deputy commissioner that Charney Research called every single person on the roster?

A. That was not the methodology or ever the stated work that we contracted with Charney Research to perform.

Q. My question is, did you ever learn --

THE COURT: She answered the question.

MR. FUTERFAS: Your Honor, I just want to note she --

THE COURT: In point of fact, did you know if Charney asked every single person?

THE WITNESS: Charney did not ask every single person on the roster if they were, indeed, employed. That was not the methodology we contracted them to use.

BY MR. FUTERFAS:

Q. Do you understand that they endeavored to call every single person? Do you understand that?

THE COURT: Objection sustained.

BY MR. FUTERFAS:

Q. Now, this methodology that you've talked about, do you understand that Charney Research had a questionnaire?

A. Yes.

Q. Did SBS help fashion that questionnaire with Charney Research?

A. Yes.

Q. In fashioning that questionnaire, SBS worked with Charney to determine -- withdrawn. I'll get there in a minute.

If I could turn to the middle of this document, no reconciliation. Do you see that?

A. Yes.

Q. And it says, "There will be no reconciliation between the

Charney validated data and any other data, as the table allows for natural variation in validation efforts."

Do you see that?

A. Yes.

Q. What did you understand that to mean?

A. I am trying to find plain language to describe this. Once Charney came up with their results, they could not, those results could not be contested by SEEDCO or another entity.

Q. Now, you've used the words I think that -- withdrawn.

When Charney Research called a customer, okay, did you understand the purpose of that phone call was to verify a placement?

A. Yes, it was to verify that individuals were employed.

Q. Well, not just employed, but employed after receiving services from SEEDCO, correct?

A. Correct.

Q. In fact, that methodology, to make sure it constituted a placement, was part of the questionnaire that Charney used when they called people, right?

A. Correct.

Q. In addition --

MR. FUTERFAS: If we could scroll up to the top of this page. Perfect. Stop there.

BY MR. FUTERFAS:

Q. -- the questionnaire that Charney developed in conjunction

with SBS also asked questions of the customer, the job seeker, relevant to the other metrics employed after six months and employer fulfillment. Isn't that right?

A. Correct.

MR. FUTERFAS: Now if you can scroll down the page.

(Off-the-record discussion)

BY MR. FUTERFAS:

Q. Now, once Charney determined -- in fact, under this example, we can use the example that is in the contract, the quarterly -- so we all understand what this means, on the left, on the bottom it says "Quarterly Placement Target," right?

And that is the target you've talked about, that's this quarterly target that SBS and with input by SEEDCO have agreed that's the target number of placements that they would like to achieve for the quarter, right?

A. Correct.

Q. And then the next column says "Reported Placements," right?

A. Correct.

Q. And that column or that little column there, Reported Placements, is the total number that were in Work Source1 after this little bit of scrubbing --

THE COURT: This is an example, isn't it? It is a hypothetical.

MR. FUTERFAS: Yes, your Honor, but it is in the contract.

THE COURT: It is a hypothetical in the contract?

THE WITNESS: Correct.

THE COURT: Basically it means that the same percentage by which the reported placements varied from the target, that would be the same percentage against a certain number?

THE WITNESS: Correct.

THE COURT: If 75 percent of the target is satisfied, 75 percent of the amount is satisfied?

THE WITNESS: Yes.

BY MR. FUTERFAS:

Q. So that the reported placements is a given number, and that is the number that comes off this scrubbed Work Source1 data that gets sent to Charney to verify, right?

A. Yes.

Q. The milestone amount, the third column, that is the maximum possible amount for the performance-based compensation under the contract for that quarter, correct?

A. Based off the 150. So in this example in the contract, 150 out of a total of 200, so 75 percent of the target was in this example achieved hypothetically, and so the 93,000 is -- you can scroll up -- I am not sure that will show it.

MR. FUTERFAS: Can you scroll up a little higher.

BY MR. FUTERFAS:

Q. In the contract -- let me see if I can help you,

Ms. Kamath -- in the contract you look at the milestone chart at the top?

A. Ah-huh.

Q. It says, "Total Placements Made"?

A. Right.

Q. And we have already talked about that it is total placements constitutes 50 percent of the amount of performance-based compensation, right?

A. Right.

Q. Next to that it says 374,074, right?

A. Ah-huh.

Q. That's the total yearly maximum milestone amount for total placements, for total performance-based compensation?

A. Correct.

Q. So now if we scroll down --

A. Thank you.

Q. -- now if we scroll down to the bottom of the hypothetical, the third column that says "Milestone Amount," that is 1-4, one quarter of the 374?

A. Correct.

Q. That is the maximum amount?

A. Correct.

Q. That if they hit every metric, you know, possible, that amount is how much they could get under the performance-based compensation, right?

A. Yes, ah-huh.

Q. Now, because the reported placements in the hypothetical is 150?

A. Ah-huh.

Q. The target was 200, but the data that got sent to Charney for validation is 150, right?

A. Yes.

Q. So because that's only 75 percent of the target, they take 75 percent of the milestone amount, so now the maximum possible payment is 75 percent of the 93,000?

A. Correct.

Q. And that is the number 70,139, correct?

A. Yes.

Q. And then what happens is, the next column, "Percentage Validated," Charney then validates the 150, right?

A. Correct.

Q. 150 placements?

A. Through the statistical random sampling.

Q. Ah-huh.

By the way, if Charney, if Charney, if Charney called everybody and reached 60 percent of everybody it called, would you still hold that call that a statistical random sampling?

MS. BLAIN: Objection.

THE COURT: Sustained.

BY MR. FUTERFAS:

Q. So if we go to the percentage validated that is based on its validation methods, it comes up that it validates 60 percent, right, in this hypothetical?

THE COURT: Not that it validates 60 percent. It is a 60 percent validation. Validation follows the statistical sampling. Not every person is validated.

MR. FUTERFAS: Right.

BY MR. FUTERFAS:

Q. So if in the example the reported placement was 150, if Charney validates 60 percent of the 150, then Charney's validating about --

THE COURT: You have it wrong. We have gone over this a number of times. Never mind.

It is repetitious, unnecessarily repetitious. Let's move on to another subject.

MR. FUTERFAS: Let me conclude with this, and I absolutely will, your Honor.

BY MR. FUTERFAS:

Q. The number of validated placements, the number of validated placements is relevant to the amount of money that can be claimed for payment under the performance-based compensation, true?

A. Yes, both validated and reported placements would factor into the payment received.

Q. Now, do you know, do you have an idea in 2010 how many

placements were reported by SEEDCO?

A. I don't have that number offhand.

Q. Well, without pulling out a lengthy spreadsheet, do you have a recollection it was about 6,000 reported in 2010?

A. That sounds reasonable.

Q. Now let me talk to you a little bit -- we're done with this -- Oh, one -- sorry. One last question.

Are you aware of whether any false placement was validated by Charney and submitted for payment pursuant to Attachment A we have just been looking at?

A. Based on the DOI report findings, there could have been, and I believe that they were articulated in the DOI report instances where someone who was claimed as a false placement could have, indeed, passed the Charney validation methods.

Q. The best you can do is, "could have"?

Did you ever determine definitively?

A. I can be more specific in my language. The DOI report articulated cases where the falsification was done in a way that would have passed the Charney validation methods.

Q. Did your team --

THE COURT: Which means what, payment was made on the basis of a placement that shouldn't have been claimed?

THE WITNESS: Correct.

BY MR. FUTERFAS:

Q. Is that, in fact, in Defendant's Exhibit F5 that I was

talking about earlier, the 401?

Isn't that, in fact, what your team was trying to determine whether, in fact, a single false placement was verified by Charney and submitted for payment?

A. I am sorry. I don't recall.

Q. Do you recall questioning this morning about the 401 placements that were within the Charney group? Do you remember that questioning?

A. I do.

Q. Is that -- you do? You have to answer orally.

A. Yes.

Q. Is that, in fact, what your team was actually trying to determine, whether any of the supposedly false placements were actually verified by Charney and submitted for payment? Isn't that what you were trying to actually determine?

A. From that e-mail, it was hard for me to --

THE COURT: Of your own knowledge?

THE WITNESS: Of my own knowledge?

THE COURT: If you have a knowledge.

THE WITNESS: So with Department of Investigation and Small Business Services, the way to be able to determine false placements was partly looking at the records, but also looking at individuals, Customer Information Forms which were essentially tampered with in the data entry, looking at resumes that articulated real work experience versus what was actually

tampered with and put into the system erroneously.

So Charney was the main methodology for a validation, but in the aftermath of the Department of Investigation report, we had to look at the full paper trail on what people said of their work history, what their resumes reflected and what happened to try to piece together the facts.

Q. The Charney report issued in March of 2012, correct?

MS. BLAIN: Objection.

THE COURT: Overruled.

BY MR. FUTERFAS:

Q. The Charney report -- the DOI report issued in March 2012, correct?

A. Correct.

Q. I am asking you about an e-mail that is seven months later that says 401 are within the Charney group. I am asking a simple question.

THE COURT: We have exhausted this.

BY MR. FUTERFAS:

Q. Independently of whatever was said by the DOI, independently did your group ever definitively determine that a single false placement went through to Charney verification methods and was submitted for payment after the Charney verification methods pursuant to the performance-based compensation?

A. Can you repeat the question one more time. I want to make

sure I understand it.

THE COURT: Take the DOI findings out of mind. No DOI findings.

Did you yourself -- that is, your agency itself -- come across a particular claim which passed through and which was paid but which you now believe was false?

THE WITNESS: Yes.

THE COURT: Is that your question, Mr. Futerfas? Is that your question?

MR. FUTERFAS: Yes.

THE COURT: Okay. Follow it up.

BY MR. FUTERFAS:

Q. Is there an e-mail or document or anything talking about whether or not any of these false placements was verified by Charney?

A. I assume so, but I cannot recall with specificity.

MR. FUTERFAS: May I have a moment, your Honor?

THE COURT: Yes.

(Pause)

(Off-the-record discussion)

BY MR. FUTERFAS:

Q. Ms. Kamath, during your time as deputy commissioner -- when did you, when did you begin at SBS again, if you can refresh my recollection?

A. January 2006.

Q. So from January 2006 until you left, you worked with SEEDCO and particularly Upper Manhattan Workforce on a number of matters, did you not?
A. Yes.
Q. In fact, Upper Manhattan Workforce had a number of great successes, didn't they?
A. They performed well --
MS. BLAIN: Objection.
A. -- under their contract.
THE COURT: Sustained.
Q. They performed well in --
THE COURT: Objection sustained.
BY MR. FUTERFAS:
Q. Let me ask you this.
Under the contract, under the contract there was 70 percent of the contract you testified yesterday was for operational expenses, right?
A. Yes.
Q. And the 30 percent was for these performance metrics we talked about, right?
A. Yes.
Q. And under the contract, Upper Manhattan was tasked with performing functions of getting people jobs and servicing individuals in the community, correct?
A. Correct.

Q. And so pursuant to the contract, did you work with SEEDCO with respect to their fulfilling their duties and functions in that role?
A. Yes.
Q. Do you remember, for example, did you work with Upper Manhattan with respect to, let's say, large events such as the East River Plaza, things like that?
A. Yes.
Q. Did you work with them on -- withdrawn.
In fact, were there monthly reports that you made to SEEDCO, that SBS sent to SEEDCO?
A. Yes, that we sent to SEEDCO and the entire system.
Q. In fact, that is one thing I forgot to ask you before, was that this Charney Research company was not just validating placements for SEEDCO, but, in fact, was the validator for all of the workforce centers, right?
A. Correct.
Q. Let me show you what has been marked as Defendant's LLL. Do you recognize that document?
A. I do.
Q. What do you recognize it to be?
A. A monthly center management report.
Q. That is prepared by SBS?
A. Yes.
MR. FUTERFAS: Your Honor, I move to admit Defendant's

LLL.

MS. BLAIN: No objection.

THE COURT: Received.

(Defendant Exhibit LLL received in evidence)

MR. FUTERFAS: If you could scroll down a little bit. Stop there, business development.

BY MR. FUTERFAS:

Q. So this is a report that SBS would do monthly back to your individual vendors, and in this case SEEDCO, right?

A. Correct.

Q. The report describes successes and areas of improvement and generally describes what the vendors were doing, right?

MS. BLAIN: Objection.

A. Correct.

MS. BLAIN: Objection.

THE COURT: As to the general line?

MS. BLAIN: Yes.

THE COURT: Come up, please.

(Continued on next page)

(At the sidebar)

THE COURT: What is the relevance, Mr. Futerfas?

MR. FUTERFAS: Your Honor, under the contract, the government is going to argue and has already argued in their opening -- and they argued it with this witness -- they put in the entire value of the contract. So they haven't limited their questioning and haven't limited their suggestions to the jury about the value of the contract. They said it is worth 7 million, 10 million. The performance-based compensation numbers are infinitely smaller.

THE COURT: 15 percent.

MR. FUTERFAS: The government has not done that.

THE COURT: 15 percent of $7 million is a significant number.

MS. BLAIN: Designed to elicit testimony about success of SEEDCO. This is not the witness to testify about --

THE COURT: I don't see the relevance of this. This is a waste of time. Objection sustained.

(Continued on next page)

(In open court)

THE COURT: Objection sustained to this line of

MR. FUTERFAS: Let me ask you this.

THE COURT: Take down the exhibit.

BY MR. FUTERFAS:

Q. Let me ask you this question.

In the various functions that SEEDCO had to fulfill to the community, those were part of the responsibilities, if you know, of Mr. Saavedra, right?

A. As center manager, yes.

Q. So as center director, he was responsible for fulfilling the terms of the contract with respect to providing services to, employment services to the community. Is that right?

A. Yes.

Q. Have you ever heard of a position within SEEDCO called the SOC?

A. Yes.

Q. What is the SOC?

A. Strategic operations coordinator.

Q. What are the duties and responsibilities of a strategic operations coordinator?

A. Broadly speaking, they would be a liaison on technology issues. They would be a main liaison with the Department of Small Business Services on any and all issues related to Work Source1. This is records, whether that included data

integrity, training issues.

We would work with center SOC strategic operations coordinators to help to enhance the database, to make it more useable and helpful and functional so that line staff could be helped by the program, and generally speaking they were meant to help facilitate efficient, orderly operations and service delivery in the centers.

The centers would have on a weekly basis a flow of upwards of a thousand people, and so just managing individuals from Point A to Point B in a large operation like that would take an operations coordinator.

MR. FUTERFAS: If I have a moment, your Honor? I am trying to streamline this.

(Pause)

BY MR. FUTERFAS:

Q. Have you heard the term "sectors" with respect to the duties and responsibilities at the Workforce Center?

A. Yes.

Q. What are sectors?

A. They're categories and groupings of jobs and employers within different industries, so the food service sector, the hotel sector, the transportation sector, the health care sector.

Q. Did SBS have metrics for the different types of information you could get about these sectors?

Is my question too broad?

A. Yes.

Q. When you were looking at, when SBS was looking at a sector, let's say the retail sector, what are the kinds of information that you were looking to understand about odd job employment opportunities in that sector?

A. The purpose of the centers and the purpose of understanding sectors was to find open job opportunities in sectors in New York City, to understand the number of those jobs, the quality of the jobs, the wages of the jobs, to then be able to help that business fill those jobs with job seekers.

And so the metrics associated often with understanding sectors and open jobs, where the number of jobs, the pay rates of those jobs, the hours, hourly requirements of those jobs and the experience requirements of those jobs in order to recruit individuals to place them into those jobs.

Q. Did you have, did SBS have targets or metrics that it wanted its workforce centers to meet with respect to those sectors?

A. Yes, it did.

Q. Let me show you -- when they were under the contract, I think you have testified there were the 70 percent that was the operating expense reimbursement, did you receive monthly budgets or financial statements from SEEDCO to obtain those funds?

A. We would engage in an annual budget-setting process, and then based upon approved budgets that were done on an annual basis, we would receive invoices from each center -- SEEDCO, in this case -- to be reimbursed.

Sometimes organizations would do it monthly. Again that was their own cash flow. Sometimes they would do it every two months, sometimes they would submit invoices quarterly.

(Discussion off the record)

BY MR. FUTERFAS:

Q. Let me show you what has been marked for identification as J8.

MR. FUTERFAS: It might be easier, with your Honor's permission, if I could hand a hard copy to her. It might be easier for the witness. Thank your Honor.

(Pause)

BY MR. FUTERFAS:

Q. If you could either look through the hard copies that are in front of you or we could just scroll through the exhibit on the computer for you, do you recognize, just take a look at them and see if you recognize those documents?

A. I do.

Q. What do you recognize them to be?

A. These are the invoices, the expense documentation associated general ledger accounts.

THE COURT: The 70 percent of the contract?

THE WITNESS: For expenses made.

THE COURT: Come up, please.

(Continued on next page)

(At the sidebar)

THE COURT: Does the government contend the fraud took place with regard to the expense reimbursements?

MS. BLAIN: Yes, your Honor.

THE COURT: Thank you.

MS. BLAIN: Just to be clear, what I mean by that is if SBS had known about the fraud related to the 30 percent performance-based payments, they would have canceled the contract and so none of the money would have gone out, but there was no fraud, no fraudulent claims based on any cost reimbursement request. I don't understand the --

THE COURT: I don't know why it is relevant.

MR. FUTERFAS: Your Honor, the fundamental issue is what is the claim for payment and the claim --

THE COURT: The claim, the false claim is alleged with regard to the performance part, and not the expense part.

MS. BLAIN: That's right.

MR. FUTERFAS: If the government is stipulating to that?

THE COURT: She just said it.

MR. FUTERFAS: Okay.

(Continued on next page)

(In open court)

THE COURT: The objection is sustained. The document will not come into evidence.

Ladies and gentlemen, I sustained the objection because we're not dealing in this case with the 70 percent portion of the contract that reimburses the contractor for expenses. We're focused only on the questions having to do with the performance criteria which began as a 30 percent portion of the consideration paid by SBS and later came down to 20 percent and only a portion of those having to do with placements.

So I am confining the evidence. You have enough to do with those issues. We don't have to take in other parts of the contract as well.

MR. FUTERFAS: Thank your Honor. If I may show for identification purposes only --

THE COURT: Sometimes when we're finished, you should be finished.

MR. FUTERFAS: I think after this I will be done, your Honor.

Let me show you Defendant's Exhibit T6, six T's for identification.

THE COURT: Give me that number again.

MR. FUTERFAS: T, like Tom, 6.

BY MR. FUTERFAS:

Q. Let me -- showing you T6 for identification, do you recognize -- take a look at this. If you want to take a look at the hard copy if you can.

THE COURT: She can see this.

THE WITNESS: Fine, thank you.

BY MR. FUTERFAS:

Q. Take a look at that and let me me know when you've had a chance to review it.

A. (Pause) Yes.

Q. What do you recognize this set of documents to be?

A. This would be an authorization with back-up that our quality assurance team would have worked with our fiscal team. Jeanette Castro was the individual at the very end of the process that would release payment.

Q. What kind of payments are we talking about in this document?

A. This would be for the 30 percent portion of the budget that was subject to the performance-based payments.

MR. FUTERFAS: Your Honor, I move to admit Defense Exhibit T6.

MS. BLAIN: No objection.

THE COURT: Received.

(Defendant Exhibit T6 received in evidence)

THE COURT: What do you want us to know about this document, Mr. Futerfas?

MR. FUTERFAS: I am sorry?

THE COURT: It is a thick document.

THE WITNESS: Yes.

MR. FUTERFAS: There are spreadsheets that go with it, but we only introduced five pages. We have only introduced a five-page document.

BY MR. FUTERFAS:

Q. Very briefly, Ms. Kamath, this is a cover.

The first page is a covered e-mail for an authorization for payment outcome and it includes the Charney placement report. Is that right?

A. That is what it says, yes.

Q. In that sense, who is Naheem Harris?

A. He worked on our quality assurance staff.

Q. You are one of the recipients of this e-mail, correct?

A. Yes.

MR. FUTERFAS: If we can go to the next page. Then it goes on to the third page.

MS. ALBERTI: Yes.

(Off-the-record discussion)

BY MR. FUTERFAS:

Q. Anyway, what is reflected on the -- well, let me make it, let me cut to the chase here.

In the first column, the total placements column at the top, the horizontal column --

A. Ah-huh.

Q. -- is that reflective of the contractual terms in Attachment A that we saw before?

Do you remember the contractual terms?

A. Yes.

Q. That had different, different values?

A. Ah-huh.

Q. That are calculated?

A. Yes.

Q. And then on the far right of that, the top column, horizontal column, it says Charney results. Do you see that?

A. Yes.

Q. Then there is a calculation done to determine the amount of the performance-based payment, right?

A. Yes.

Q. And then the other columns, horizontal columns below the one in the middle of the page, the one in the bottom of the page, those are for the other metrics that we talked about which were employee fulfillment, employee retention, right?

Do you remember those?

A. Yes.

MR. FUTERFAS: And then finally if we can go to the Jeanette Castro memorandum.

(Off-the-record discussion)

THE COURT: What do you want us to know about this

document, Mr. Futerfas?

MR. FUTERFAS: This document, this is --

BY MR. FUTERFAS:

Q. What is this memorandum?

A. This is a memo authorizing --

MS. BLAIN: I don't know that this has been received into evidence.

THE COURT: He just moved it into evidence, and you didn't have any objection.

MS. BLAIN: Not this document. This is a separate document.

MS. ALBERTI: It is a group of documents. I have them in separate files.

THE COURT: Let's not have this.

MR. FUTERFAS: Let's not discuss it before the jury.

THE COURT: Come up.

MS. BLAIN: The witness was shown only one page of this document.

THE COURT: Come up.

(Continued on next page)

(At the sidebar)

THE COURT: Ms. Schein, I need a binder of exhibits.

MR. FUTERFAS: Can I describe the document?

MS. BLAIN: She has only seen one page of it and there were attachments.

THE COURT: Hold on a minute, will you please!

The offer was made of the memorandum and attachments. There is an authorization and attachments. I am not going to hold you if you didn't realize that when you received it.

Do you object to this document, the whole document?

MS. BLAIN: This, yes, she needs to show she has personal knowledge of this memo. She didn't see this before she said -- only saw the first e-mail.

THE COURT: Is this a natural attachment to the document?

MR. FUTERFAS: Yes. It is a whole group of documents that come together that constitute the authorization to pay the performance-based payment.

MS. BLAIN: She may be able to testify about it, your Honor.

THE COURT: Stop it!

What is the relevance of this?

MR. FUTERFAS: This is the authorization for payment documentation from the performance-based payments. This shows the actual calculation of the performance-based payments and

the authorization for it.

THE COURT: What do you want to bring out? On March 24, 2010 there was authorization to pay $195,000?

MR. FUTERFAS: I want to prove this process. This is the heart of this case. This is --

THE COURT: Stop the heart of the case. It is irrelevant, but I'll let you do it. Objection overruled.

(Continued on next page)

(In open court)

MR. FUTERFAS: Your Honor, may we proceed?

THE COURT: Yes, you may proceed.

BY MR. FUTERFAS:

Q. So you were describing this memorandum, Ms. Kamath.

THE COURT: It is an authorization to pay money for the performance part of the budget. Is that right?

THE WITNESS: Correct.

THE COURT: In March 2010. Is that right?

THE WITNESS: Correct.

THE COURT: In the amount of $195,000, approximately?

THE WITNESS: I can't see it, but I presume.

THE COURT: Slow down.

THE WITNESS: Yes.

BY MR. FUTERFAS:

Q. And then on the next page --

THE COURT: Anything more we need?

MR. FUTERFAS: Yes, your Honor, the last part of that exhibit.

BY MR. FUTERFAS:

Q. Attached to that authorization would be the report from Charney Research, correct?

A. Correct.

Q. You recognize this document, right?

A. Ah-huh, yes.

Q. If this would all come together, there would be a Charney Research report?

THE COURT: You said over and over again each claim was subject to a validation process by Charney Research, right?

THE WITNESS: Correct.

THE COURT: Okay.

MR. FUTERFAS: That was calculated and a memorandum was put together.

THE COURT: We are not going to repeat it. You have it. Let's move on.

BY MR. FUTERFAS:

Q. All I want to ask is, for each, each of the performance-based compensation requests for money, it would be through this same series of documentation, so I don't have to show you every single quarter?

A. Correct.

MR. FUTERFAS: Your Honor, I have nothing further.

THE COURT: Redirect.

MS. BLAIN: Very briefly.

REDIRECT EXAMINATION

BY MS. BLAIN:

Q. Ms. Kamath, Mr. Futerfas asked you questions about the Charney Research random sampling methodology, did he not?

A. Yes.

Q. You remember those questions?

A. I do.

Q. Did you ever discuss Charney's random sampling methodology with anybody at SEEDCO?

A. Yes.

Q. On how many occasions?

A. Multiple occasions in group settings and then in individual settings with SEEDCO management. I vividly recall the creation of a memo that we crafted for all of our vendors to discuss, to articulate the methodology in 2006 and 2007. There was a memo that clearly described the validation techniques because there were a lot of questions around it.

It was very important for the organizations to understand exactly how they were being held accountable. Vendors had a clear understanding of the questions that were asked of job seekers when they received that call, and it was very clear to all operators of the system, including SEEDCO, what that methodology was.

Q. Are you familiar with Alex Saavedra?

A. I am.

Q. Do you recall if he was at any of those meetings?

A. I do.

Q. On how many occasions do you recall that?

A. We met quarterly every year for the duration of the contract as a small kind of SEEDCO/SBS only team, and then similarly we would meet on a quarterly basis with kind of

groups. So I believe that the methodology came up in my seven years at SBS five, six times.

Q. Do you recall if Mr. Saavedra was at any of the meetings in those five or six times?

A. He was.

Q. I am sorry?

A. He was.

MS. BLAIN: Thank you.

THE COURT: Thank you very much, Ms. Kamath. You are excused.

(Witness excused)

THE COURT: Next witness.

MS. SCHOENBERGER: Your Honor, the government calls Ernesto Lirag.

THE COURT: Come up here, sir.

ERNESTO LIRAG,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. SCHOENBERGER:

Q. Good afternoon, Mr. Lirag. Are you employed?

A. Good afternoon. Yes, I am.

Q. Where do you work?

A. I work at the U.S. Department of Labor, Employment & Training Administration at the regional office in Boston.

Q. What region does the regional office cover?

A. The regional office in Boston covers the six New England states of Vermont, New Hampshire, Maine, Massachusetts, Connecticut and also New York, New Jersey, Puerto Rico and the Virgin Islands.

Q. How long have you worked at the U.S. Department of Labor?

A. I've been working with the U.S. Department of Labor since 2000 for almost -- that would make it around 14, 15 years.

Q. Is the U.S. Department of Labor a federal agency?

A. Yes, it is.

Q. What does the Employment & Training Administration do?

A. The Employment & Training Administration oversees federal workforce programs and development, so we oversee the issuance of federal grants to various agencies, which may include states, local governments and nonprofits.

(Continued on next page)

Q. What is a grant?

A. A grant is an agreement between the federal government and an entity. Primarily, the purpose of the grant is to serve the public.

Q. Does a grant differ from a contract?

A. Yes, it does. If the federal government enters into a contract, the main beneficiary of the services or the products is the federal government; as opposed to a grant, the beneficiary of the services and products would be the public.

Q. What is your title at Department of Labor?

A. I am the division chief for the Division of Financial Management and Administrative Services.

Q. Does your job include responsibilities related to grants?

A. Yes, it does.

Q. What types of responsibilities?

A. As a division chief I oversee a team of professionals who conducts performance reviews on grantees. In addition to that, we also provide technical assistance to help grantees perform the objectives of the grant.

Q. How long have you held the position of division chief?

A. I have been division chief for approximately six years.

Q. When did you first become the division chief?

A. 2008.

Q. Does the United States Department of Labor have a particular mission?

A. Yes, it does.
Q. What is that mission?
A. The U.S. Department of Labor's mission is to promote and help U.S. workers.
Q. You mentioned before workforce programs?
A. Yes.
Q. What are workforce programs?
A. Workforce programs are designed to provide services to job seekers to help them find unsubsidized jobs through training and various services, and also those programs also provide supportive services in case they need those services in order to find those jobs.
Q. In your role as division chief, do you administrate grants that are related to workforce programs?
A. Yes.
Q. What types of grants?
A. We have a menu of grants that we oversee, one of which is the Workforce Investment Act grant. We also oversee the Wagner-Peyser Act grants, Trade Adjustment Assistance Act grants and various other workforce program grants.
Q. Focusing on the Workforce Investment Act grant, can you please describe for the jury what the Workforce Investment Act is.
A. Certainly. The Workforce Investment Act establishes and authorizes the establishment of a workforce development system.

The workforce development system includes the very important programs, which is the adult program, the dislocated worker program, and the youth program. The Workforce Investment Act also establishes the career centers, which are the locations or the places job seekers go in order to access these various programs.

Q. What is the purpose of Workforce Investment Act grants?

A. The purpose of the Workforce Investment Act grant is to provide federal funds to states which are passed on to the locals, and to deliver those job training services to job seekers, and also to fund the various career centers, which are also called one-stops.

Q. Do one-stops go by any other names to your knowledge?

A. Yes, it does. There are various branding terminologies used for one-stops. They are also called career centers, and I believe here in New York City they go by the term Workforce1 Career Center.

Q. In your job as division chief at the Department of Labor, have you become familiar with which states received the Workforce Investment Act grant?

A. Yes.

Q. How have you become familiar with that?

A. We routinely ask the primary agency who helps administer these grants, where we issue guidance through training and employment and guidance letters and on an annual basis, we

issue training and employment guidance letters which provide the various amounts states receive to operate their Workforce Investment Act grants and programs.

Q. In 2009, 2010 and 2011, did New York State receive federal funds through a Workforce Investment Act grant?

A. Yes, they did.

Q. What were those funds for?

A. Again, those were to operate the various career centers and also to provide adults, dislocated workers, and youth programs to fund those services in order to help job seekers.

Q. Do career centers relate to any particular of the three programs that you have mentioned?

A. Yes. For New York City primarily it's the adults and dislocated worker programs, services that are accessed through those career centers.

Q. In your role as division chief, did you develop an understanding of what New York State did with its funds under the Workforce Investment Act grant.

A. Yes, I did.

Q. What did it do with those funds?

A. Basically, the state passed on those funds to the 33 local areas that comprise New York State, which includes New York City.

Q. Does your department keep track of what New York City does with the grants that it receives through the Workforce

Investment Act?

A. Yes, we do.

Q. What is your understanding of what New York City does with the funds that it received in 2009 through 2011?

A. New York City, the funds they received they passed -- the federal funds are passed on to a local New York City agency called SBS, and they, SBS, in turn, establishes the career centers throughout New York City.

Q. Does SBS refer to department of Small Business Services?

A. Yes, it does.

Q. In your job, did you become familiar with a company called SEEDCO?

A. Yes, I did.

Q. How did you become familiar with that company?

A. Sometime in 2010 or thereabouts, we received information of some allegation of incorrect reporting, and when we learned of that, we followed our agency's procedures, which is to file an incident report with the Office of Inspector General, and our DOL national office in Washington, D.C.

THE COURT: That's the federal level?

THE WITNESS: At the federal level, yes, sir.

Q. Just backing up a step, why would a report about SEEDCO go to your office?

A. Any allegations of fraud, waste, or abuse that are reported to us, we follow that procedure regardless of where those

allegations are coming from. It could be an article, it could be a phone call. Whether it's credible or not, we always file an incident report.

THE COURT: Why is the federal government interested in an allegation of fraud by a private company against New York City?

THE WITNESS: Because we want to ensure that all federal funds are expended according to its purpose.

Q. Was it your understanding that the company SEEDCO received federal funds?

A. Yes.

Q. How did they receive federal funds?

A. It was my understanding that they are one of the Workforce1 center operators, that SBS has an agreement with SEEDCO to operate at least a couple of Workforce1 career centers within New York City.

Q. Do you have an understanding of how SEEDCO was paid?

A. Um --

Q. I will withdraw the question. Do you have an understanding of who paid SEEDCO to operate Workforce1 centers?

A. My understanding is that SBS paid SEEDCO.

Q. What was your understanding of where the funds came from --

A. Oh, OK.

Q. -- in order to pay SEEDCO?

A. Basically, the grant funds from WIA that was issued to the

New York Department of Labor -- to the New York State Department of Labor was then passed on to New York City. Specifically in New York City, it is SBS that is the primary agency who received those WIA grant funds.

Q. What did the state of New York have to do in order to receive the grant money that it would pass down to localities and their divisions?

A. On an annual basis, the governor or his designee, his or her designee, would need to sign a funding agreement with the U.S. Department of Labor.

Q. Mr. Lirag, can you take a look at the binder in front of you. I believe it's binder No. 1.

A. OK.

Q. Tab No. 22.

A. Number?

THE COURT: Repeat the number.

MS. SCHOENBERGER: 22.

A. OK.

Q. What is this document, Mr. Lirag?

A. This is the annual funding agreement which I mentioned that the New York State Department of Labor would need to sign in order to receive WIA grant funds.

Q. Have you become familiar with this document in your role as division chief at the Department of Labor?

A. Yes, I am.

MS. SCHOENBERGER: Your Honor, the government offers Exhibit 22 into evidence.

THE COURT: The defendants?

MS. SCHEIN: No objection, your Honor.

THE COURT: Received.

(Government's Exhibit 22 received in evidence)

Q. Mr. Lirag, what time period does this funding agreement cover?

A. This is program year 2008. So the time period that this particular funding agreement covers, July 1, 2008 until June 10, 2009.

Q. What does "program year" mean?

A. Program year is the time period for which the funding agreement is valid. Basically it coincides with the Department of Education's time period. So it is a full year that starts in July and ends in June.

Q. Can you please take a look at the paragraph numbered three in this agreement.

MS. SCHOENBERGER: Mr. Solomon, if you could expand that.

Q. Can you please read the first two lines of this provision to the jury.

A. Yes. "Applicable authority. Funds provided under this grant agreement must be expended in accordance with all applicable federal statutes, regulations and policies,

including those of the Workforce Investment Act."

Q. What does must be "expended in accordance with" mean?

A. It means that every service or product paid for by the federal funds that are issued under this funding agreement must be in compliance with all federal statutes, regulations, and policies that are issued in accordance with this plan.

Q. In your role as division chief, did you consider this to be an important provision of the grant?

A. Yes, I do.

Q. Why was it important?

A. Because our division oversees, again, the 10 jurisdictions of Region 1, and it is our role to ensure compliance with the regulations. The way we do that is by conducting reviews, on-site reviews to the various jurisdictions or grantees.

THE COURT: Can I see counsel for one moment off the record.

(Discussion at sidebar off the record)

BY MS. SCHOENBERGER:

Q. Mr. Lirag, can you take a look at the documents behind tabs 23, 24, and 25 in your binder.

A. Yes.

THE COURT: These are annual extensions?

MS. SCHOENBERGER: Shall I ask the witness?

Q. Do you recognize the documents that have been marked as Government's Exhibits 23, 24 and 25?

A. Yes, I do.

Q. What are these documents?

A. These are the annual funding agreements for program years 2009 and 2010.

MS. SCHOENBERGER: Your Honor, the government offers Exhibits 23 through 25 into evidence.

MS. SCHEIN: No objection, your Honor.

THE COURT: Received.

(Government's Exhibits 23, 24, and 25 received in evidence)

THE COURT: So that these do the same thing for the years 2009/2010, 2010/2011, 2011/2012?

THE WITNESS: Yes, your Honor.

THE COURT: Finished?

MS. SCHOENBERGER: Yes.

Q. Do each of these agreements contain the same provision regarding the expenditure of funds?

A. Yes, they do.

Q. Can you give an example of an expenditure that would be in accordance with the Workforce Investment Act?

THE COURT: I think we've got it.

MS. SCHOENBERGER: Yes, your Honor.

THE COURT: Any cross-examination. Did you need more?

MS. SCHOENBERGER: If you would like to break, your Honor, it's only a few more minutes, but I would like to get it

in.

THE COURT: Go ahead.

Q. If you would provide an example of, perhaps just to streamline, an example of an expenditure that would not be in accordance with the Workforce Investment Act.

A. An expenditure that would not further grant goals, any products or services used to purchase, for example, liquor, lobbying activities, those type of services or products are not available under this grant.

Q. Are there any consequences for making expenditures that are not in accordance with program goals?

A. Yes.

Q. What would those consequences be?

MR. FUTERFAS: I am going to object, your Honor.

THE COURT: Sustained.

Q. You mentioned that at some point your office issued an incident report related to allegations that you learned about SEEDCO, is that correct?

A. That's correct.

Q. Why was that done?

MS. SCHEIN: Objection, your Honor.

THE COURT: Overruled.

A. Because, again, according to, in following our office procedures, any allegations of fraud, waste, or abuse, a report must be filed so that appropriate agency or organization would

conduct an investigation or any other further actions required if those are deemed to be valid allegations.

Q. Do you recall generally what the allegations were that you filed an incident report about?

A. Yes.

Q. What was your understanding?

A. My recollection is that --

MS. SCHEIN: Objection, your Honor.

THE COURT: I will allow it for the limited purpose of explaining the activity of the United States Department of Labor.

You may answer.

THE WITNESS: Thank you, your Honor.

A. My understanding is that there were allegations of false reporting of employment numbers, data.

Q. Did allegations of false reporting matter to you as division chief in the Department of Labor?

A. Yes, it does.

Q. Why?

A. Because it doesn't further the objective of our program or our agency to help job seekers find jobs.

Q. Could there be consequences for such false reporting?

A. Yes.

Q. What could those consequences be?

A. Services provided could be potentially be disallowed if

those services were not for the purpose of helping job seekers find jobs.

Q. And the final question: What does it mean to disallow costs?

A. Disallow costs is when the federal government asks, establishes a debt with an organization, and they must --

MS. SCHEIN: Your Honor, objection.

THE COURT: Overruled.

A. And they must pay those funds back to the federal government.

MS. SCHOENBERGER: Thank you, Mr. Lirag.

THE WITNESS: You're welcome.

THE COURT: In other words, if the city doesn't do anything with regard to this allegation that's reported, what happens? What's the consequence?

THE WITNESS: The consequence is the agency as the Department of Labor may choose to conduct our own investigation and, therefore, disallow those costs ourselves.

THE COURT: You mean take back the grant money you gave to the state?

THE WITNESS: That is correct.

THE COURT: Thank you. Cross-examination.

CROSS EXAMINATION

BY MS. SCHEIN:

Q. Good afternoon, Mr. Lirag.

A. Good afternoon.

Q. In these grant agreements that the government has shown you, Government Exhibit 22, these agreements contain certain standard assurances, is that correct?

A. That's correct.

Q. Those standard assurances on certain occasions are contained in all the grant agreements that the U.S. Department of Labor issues, is that correct?

A. That's correct.

Q. SBS, the New York City Department of Small Business, was that a vendor partner that the Department of Labor designated?

A. No.

Q. What was the New York City Small Business Services?

A. My understanding of the New York City Small Business Services is a city agency which administrates our job training programs as well as other small business programs the city receives funds for.

Q. If you know, under the Work Investment Act, would the New York City SBS have been designated as to operate as a subrecipient to operate and oversee the career center?

A. SBS being part of New York City, which is a local area, so they are a subrecipient of the Workforce Investment Act grant funds, yes.

Q. When the Department of Labor, as you testified, finds out about some allegation or hears about it, there are a number of

remedies that you can choose based upon an allegation, correct?
A. Our procedure is to file an incident report with the federal Department of Labor Office of Inspector General. It's the Office of Inspector General who decides what to do with that incident.
Q. One of the things you can do is reevaluate whether the grantee can be a future participant in Work Investment Act programs, is that correct?
A. To my knowledge, the Office of Inspector General does not --
Q. That's not --
THE COURT: Don't interrupt the witness.
Q. I'm sorry. Go ahead.
A. My understanding is that the Office of Inspector General does not make that determination.
Q. But does your office make a determination about whether there will be future participation of a vendor in Work Investment Act programs?
A. I do not know the answer to that question.
MS. SCHEIN: OK. Thank you very much, Mr. Lirag.
THE WITNESS: You're welcome.
MS. SCHEIN: I have no further questions, your Honor.
THE COURT: Thank you.
MS. SCHOENBERGER: No redirect.
THE COURT: You're excused. Thank you very much.

AFTERNOON SESSION

2:30 pm

(Trial resumes)

(In open court; jury not present)

THE COURT: Who is the next witness?

MS. BLAIN: Your Honor, the government calls Chanterelle Sung. She is waiting in the hallway.

THE COURT: Bring her in.

(Jury present)

THE COURT: Good afternoon. Please be seated. The next witness is Ms. Chanterelle Sung. She will now be sworn as soon as we're all ready and paying attention.

CHANTERELLE SUNG,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. BLAIN:

Q. Good afternoon, Ms. Sung.

A. Good afternoon.

Q. Can you please tell the jury your name.

A. Yes, it is Chanterelle Sung.

Q. Ms. Sung, are you currently employed?

A. Yes.

Q. Where are you currently employed?

A. I am employed with the New York State Governor's Office of

Storm Recovery.

Q. What is the New York State Governor's Office Storm Recovery?

A. It is a program established by the Governor of New York to administer approximately $5 billion of federal funding from the U.S. Department of Housing & Urban Development after Hurricane Sandy as well as Irene storms, Irene and Lee.

Q. What is your position within the Office of Storm Recovery?

A. I am the director of monitoring and compliance.

Q. Where did you work before that?

A. Prior to that, I was an Inspector General with the New York City Department of Investigations.

Q. May I use the term DOI to refer to the New York City Department of Investigation?

A. Yes.

Q. When did you work at DOI?

A. I worked there from July of 2011 until February 2014.

Q. Again what was your title at DOI?

A. Inspector General.

Q. Did that title remain the same throughout your tenure at DOI?

A. Yes, it did.

Q. What were your duties and responsibilities in connection with being an Inspector General?

A. It was a managerial position. I oversaw a squad of

approximately 20 or so investigators as well as attorneys and administrative assistants along with two other co-inspector generals, and the way the agency was structured at that time, each squad oversaw a cluster of various city agencies.

The squad I was part of oversaw about 9 or 10 or so city agencies mostly having to do with social services, and included in that was the Department of SBS.

Q. Is that also referred to as SBS?
A. Yes.
Q. Where did you work before joining DOI?
A. Prior to that, I was an Assistant District Attorney with the New York County District Attorney's Office.
Q. What prosecuting unit were you assigned to at the D.A.'s Office?
A. At the D.A.'s Office, I was in the trial division and I was assigned to Trial Bureau 70.
Q. How long did you work at the D.A.'s Office?
A. Approximately seven years.
Q. Where did you go to law school?
A. Boston College Law School.
Q. Where did you go to college?
A. I went to Princeton University undergrad.
Q. Are you familiar with a company called SEEDCO?
A. Yes.
Q. How did you become familiar with a company called SEEDCO?

A. So I became familiar with SEEDCO when I was employed at DOI as an Inspector General, and we had received a referral from the Department of SBS sometime around the fall, I believe it was August of 2011, regarding alleged false placement practices at that non-profit organization, and at that point I was requested by my supervisors to begin an investigation into those allegations.

Q. Who were your supervisors at the time?

A. At the time I believe it was an associate commissioner Mustafa, the chief of investigations, John Kantor, and the commissioner himself at the time, Rose Gilhearn.

Q. What was your role in connection with that investigation?

A. So my role was to oversee the investigation, but in addition, because the allegations were significant and there was early on evidence of corroboration of those allegations, the matter was taken seriously and, in addition, the investigation needed to be conducted pretty quickly. So I was asked to be personally involved in the investigation itself.

Q. So did others beside yourself participate in this investigation?

A. Yes. There were, I would say, two main investigators under me, and then in addition, we conducted numerous interviews and a review of a high volume of documents, and so at various times we brought in other investigators to help.

Q. Did you report to anybody in connection with this

investigation?

A. Yes. I remember pretty much daily I reported to John Kantor, the chief of investigations, and frequently to the commissioner herself.

THE COURT: How do you spell Kantor?

THE WITNESS: It is K A N T 0 R.

BY MS. BLAIN:

Q. What was the focus of this investigation?

A. So the main allegation was that a number of placements being reported by SEEDCO had been falsified, in that past jobs and current jobs of individuals were being used or claimed as placements, meaning that SEEDCO had assisted these individuals in obtaining these jobs but, in fact, they had already obtained those jobs before ever coming to SEEDCO or to workforce center.

Q. What did you do as a general matter to investigate these allegations?

A. So early on we had requested data on the jobs that were being claimed as placements to SBS, and so we reviewed from SBS, they had provided what is called Work Source1 database. They provided a copy of that to us. That database contained all of the placements that were claimed by SEEDCO for a given time period.

We began reviewing that data, and from there identified employees at SEEDCO who were associated with those job placements, and in that way we identified who might be

relevant witnesses. Then we went out and conducted interviews either in the field or back at the office, at the agency.

Q. You mentioned the Work Source1 database. What did you understand that to be?

A. My understanding at the time was that database was the system of record for job placement data that was being reported by SEEDCO to SBS, and it was mutually accessible by both DOI -- I am sorry -- SBS employees and SEEDCO employees.

Q. In connection with this investigation, did you hear the term CIF?

A. Yes.

Q. What did you understand a CIF to be?

A. CIF was Customer Information Form.

Q. Did you and your team review CIFs in connection with this investigation?

A. Yes.

Q. Did you or your team examine any information from Work Source1 in connection with this investigation?

A. Yes, we did.

Q. As a result of your investigation, did you reach any conclusions?

A. Yes.

Q. Are those conclusions reflected in any document?

A. They're reflected in a report that was publicly issued and contains the findings of our investigation.

Q. Who drafted that document?

A. I was the primary drafter and had worked closely with John Kantor and the commissioner at that time, Commissioner Gilhearn, who edited it and reviewed basically every line.

Q. Did you draft this report at or near the time you conducted the investigation?

A. Yes.

Q. Does the report lay out methods by which your team reached its conclusions?

A. Yes.

Q. Are you aware of whether DOI has any legal authorization to conduct investigations?

A. Yes, it does. So DOI is a law enforcement agency that exists under the Mayor of the City of New York, and its powers are obtained through the New York City Charter specifically which grants the agency jurisdiction over any matters involving the city, city agencies, city employees or any entities that do business with the city, so contractors and employees, employees of contractors as well, wherever there is city money.

Q. Are you aware whether the investigation into SEEDCO was conducted pursuant to that legal authorization?

A. Yes, it was.

Q. Are you aware whether the report you drafted was made pursuant to that legal authorization?

A. Yes, it was. I believe actually the charter requires DOI

to issue either written or oral statement of findings at the conclusion of its investigations that are substantiated.

Q. Are creating reports like these reflecting an investigation's conclusions part of DOI's regular activities?

A. Yes.

Q. Was a report kept as part of DOI's regular activities?

A. Yes.

MS. BLAIN: Your Honor, we offer Exhibit 13 A which is the redacted portion of the report into evidence.

THE COURT: Subject to the defendant's objections which I have overruled in a hearing early today, the document is admitted into evidence and may be publicized to the jury.

(Government Exhibit 13 A received in evidence)

THE COURT: What is the exhibit number?

MS. BLAIN: 13 A.

THE COURT: Yes, Mr. Futerfas?

MR. FUTERFAS: That is the smaller portion?

THE COURT: It is the excerpted report.

MR. FUTERFAS: Very well. Thank your Honor.

THE COURT: The report has numbers of discussions and findings that go beyond the issues in this case. I have limited admissibility to issues in this case.

BY MS. BLAIN:

Q. Ms. Sung, do you see a document in front of you yet?

A. Not yet -- yes, I do.

Q. Do you recognize this document?
A. Yes.
Q. What is it?
A. This is the DOI report that was drafted pursuant to the investigation into the allegations of SEEDCO's Workforce1.
Q. Ms. Sung, let's focus on Page 5 of the report, please.

THE COURT: One minute, please.

(Pause)

THE COURT: Is it 13 A or 21 A?

MS. BLAIN: 13 A, your Honor.

MR. SOLOMON: We mislabeled it originally but changed the name during the upload. The upload still has the wrong number.

THE COURT: The document in evidence will be 13 A?

MS. BLAIN: Yes, your Honor.

BY MS. BLAIN:
Q. So again focusing on Page 5 of the report, can you please --

THE COURT: Why don't you start from the beginning and let the jury see the document.

MS. BLAIN: Sure. Mr. Solomon, if you can please turn to Page 1 of this report.

BY MS. BLAIN:
Q. Is this the report that you prepared in connection with your investigation into SEEDCO?

A. Yes.

MS. BLAIN: And now, Mr. Solomon, if you can turn to Page 5.

THE COURT: Please change that exhibit reference so it is 13 A.

MR. SOLOMON: I cannot do that at the moment.

THE COURT: Later on.

MR. SOLOMON: Absolutely.

(Pause)

BY MS. BLAIN:

Q. Please focus on the bottom and read to the jury the first of the three bullet points.

THE COURT: Before you go onto that, let's pay attention to the process as well. Let the witness do the process that was performed.

MS. BLAIN: Sure.

BY MS. BLAIN:

Q. Ms. Sung and Mr. Solomon, if we can then start with Page 4 of this document. Can you read to the jury that first sentence.

A. It states, "On August 8th, 2011, the New York City Department of Investigation (DOI) initiated an investigation after receiving a referral on the same date from the New York City Department of Small Business Services DSBS regarding an allegation of fraud by the Structured Employment Economic

Development Corporation, SEEDCO."

Q. Does it accurately reflect why New York City Department of Investigation began investigating SEEDCO?

A. Yes, it is.

Q. If we can turn to Page 5, please at the top, and the first paragraph. Can you please read to --

THE COURT: The jury can read for itself.

MS. BLAIN: Okay.

THE COURT: That's basically what you did to carry out your investigation, right?

THE WITNESS: Yes.

THE COURT: Let's turn to the second larger paragraph.

That gives more details of the nature of the investigation and the methods you used, does it not?

THE WITNESS: Yes, that's correct.

THE COURT: Then at the end you make findings, do you not?

THE WITNESS: Yes.

THE COURT: Go ahead, Ms. Blain.

BY MS. BLAIN:

Q. If we can direct your attention then to the bottom of this page starting with DOI's investigation has, the whole bottom of the page. Thank you.

Does this reflect your findings in connection with this investigation?

A. Yes.

Q. What were your findings?

THE COURT: The jury can read it. Go on piece-by-piece. Explain the scope of the investigation from January 1, 2011 and August 8, 2011, a period of 8 months.

THE WITNESS: The --

THE COURT: Seven months.

THE WITNESS: -- sure. August 8, 2011 was the date I believe of the referral from SBS, and so that is how we determined a cutoff period. The January date was, if I recall correctly, was the earliest date that the Customer Information Forms, the CIFs, were available; and, therefore, able to be obtained from SBS.

Prior to that date, SEEDCO was permitted to shred the CIF information forms, the Customer Information Forms.

BY MS. BLAIN:

Q. What did you and your team do to substantiate the finding of the first bullet point of this page?

A. So to substantiate actually the first bullet point and all three, we had, as I mentioned, we interviewed a number of employees at SEEDCO. We reviewed data in the Work Source1 database job placement data, that is.

We also reviewed a number of -- and actually all available CIFs. We also reviewed job seeker's resumes that were available to us. We interviewed employees from SBS.

Q. What did you conclude after reviewing those documents and interviewing those witnesses?
A. We were able -- we, in fact, were able to substantiate a number of false job placements that SEEDCO had reported to SBS.

We were also able to determine the manner in which some of these placements were falsified, in that certain employees had taken prior jobs or current jobs of individuals and reported those as SEEDCO job placements.
Q. Is that the process by which you used to conclude that this document says approximately 528 false job placements?
A. Yes.

MS. BLAIN: If we can please turn to the top of the next page, Mr. Solomon. I'll let the jury read this bullet point.

(Pause)

BY MS. BLAIN:
Q. Does that bullet point also actually represent one of the findings of this report?
A. Yes.

MS. BLAIN: If we can next turn to the next page in evidence, which is Page 16. Would you highlight the first two paragraphs, Mr. Solomon.

THE COURT: The dark spots are extraneous. Don't pay any attention to them.

Incidentally, let me tell you this about what it is.

It is a government report, but it doesn't mean that you have to give it more credibility than you would give any other piece of evidence. Like everything else in the trial, you are the judges. You don't take anybody else's word for anything except the law. When I give you the law, you have to take my word for it. Anybody else having to do with the facts, you decide those for yourself.

You decide whatever extent and credibility you give to this document, not more, not less, and the fact that the city did it doesn't mean anything more or less than anybody else. Please understand that is your decision.

BY MS. BLAIN:

Q. Ms. sung, does this paragraph actually summarize the method by which you used to substantiate false placements as well?

A. Yes.

MS. BLAIN: Now if we can focus on under A 1 in the bottom of this document. I will give the jury a moment to read that paragraph.

(Pause)

BY MS. BLAIN:

Q. Ms. Sung, how did you conclude that during the reporting period of January 1, 2011 to August 8,2011, SEEDCO operated in Upper Manhattan and Bronx Workforce centers reported a approximately 528 false job placements to the SBS?

A. Again this was determined by reviewing the job placement

data in Work Source1 and actually comparing it to the available Customer Information Forms that we had which the job seekers would fill out at the time that they entered the workforce center.

They would list on those forms any past or current jobs that they were employed at and then we would compare that information that they reported to the jobs that were reported in Work Source1 by SEEDCO to SBS.

That's where we were able to determine that employees at SEEDCO were taking either past or current jobs of those individuals and then claiming them as SEEDCO-assisted jobs or claiming that SEEDCO had assisted these individuals in obtaining those jobs when, in fact, they hadn't.

We then also conducted a number of interviews of -- and I might not have mentioned this before, but in addition to interviewing SBS employees and SEEDCO employees, we interviewed job seekers as well. Once we obtained information to corroborate what we were seeing on the documents, that's how we made the determination that allegations were substantiated.

Q. You mentioned that you based these findings in part on information that job seekers provided on the form. Is that right?

A. Yes.

Q. What was that form called, do you remember?

A. Yes, that is the CIF.

Q. If I can please direct your attention, Ms. Sung, to Tab 57 in the binder in front of you.

MS. BLAIN: Your Honor, this exhibit has been admitted into evidence, so may I publish it to the jury? It is Exhibit 57.

THE COURT: It is in evidence?

MS. BLAIN: Yes.

THE COURT: Yes, you may.

(Pause)

BY MS. BLAIN:

Q. Do you have the right binder in front of you?

A. Yes.

THE COURT: You can come up and help.

THE WITNESS: Yes, I have the matching document in the screen.

BY MS. BLAIN:

Q. What is this document?

A. This is a Customer Information Form that's been filled out by a job seeker.

Q. Would you turn to Page 2 of this document, please. Does this document provide the date on which the job seeker filled out this form?

A. Yes, it does. Next to the signature of the job seeker, it is January 24th, 2011.

Q. Is this one of the CIFs that your team looked at in

investigating SEEDCO?

A. I don't have a specific recollection of this actual document. However, given the date that it was signed, I do recall that we reviewed all available CIFs during the time period of January 2011 to August of 2011.

Q. Can you please direct your attention to the first page of this document. Who was this customer?

A. The name is Amy Bursor.

Q. On the second page, please, what does this document provide about where she is working at this time -- well, withdrawn.

What does this document provide regarding Ms. Bursor's employment status?

A. It states that she is currently employed.

Q. Where does the CIF say she is working at that time?

A. It looks like Broadway East as a bartender.

THE COURT: What box number?

THE WITNESS: I am referring to information in box 5 D at the top.

MS. BLAIN: Maybe, Mr. Solomon, if we can highlight box D.

(Pause)

BY MS. BLAIN:

Q. When does the CIF say that she started working as a bartender at Broadway East?

A. It says September 2009.

Q. Again looking at the bottom of this document, Mr. Solomon, what is the date on the bottom of this document signify?

A. So this should have been the date that the job seeker first came to SEEDCO, first came to the Work Source1 Center or Workforce1 Center.

Q. Do you know who enters information into Work Source1?

A. Yes, SEEDCO does.

Q. Not the job seeker?

A. No.

Q. I believe you testified that you looked at the information in Work Source1. Is that right?

A. Yes.

Q. Did you look at the live database of Work Source1 or download of information from that database?

A. My understanding is that what we received was the downloaded version from that database. We didn't have access to the live database.

MS. BLAIN: Mr. Solomon, if we can please show the witness, just the witness, Exhibit 21, please.

(Pause)

BY MS. BLAIN:

Q. Do you recognize this document, Ms. Sung?

A. Yes.

Q. What is this document?

A. This looks like a copy of the data in the Work Source1

database.

Q. You used this document in the course of your investigation into SEEDCO?

A. Yes.

MS. BLAIN: Your Honor, this document has previously been received. May we publish it to the jury?

THE COURT: Yes.

BY MS. BLAIN:

Q. I will direct your attention, please to the Excel Spreadsheet, Row 368. What does Row 368 represent?

A. So this is an entry in the Work Source1 database for the job seeker Amy Bursor, and we had requested from SBS the data, the placement data, and what we had received was placement data, so this was a placement that was entered into the Work Source1.

Q. If you can focus on the column job title. What does that provide under job title for this row?

A. It states, "bartender."

Q. Do you have an understanding as to what that meant?

A. Yes.

Q. What did that mean?

A. That that is the job that Amy Bursor obtained with the assistant of SEEDCO.

Q. If you can focus on the column employer. What does that say for this row?

A. It says, "Broadway East."
Q. Do you have an understanding as to what that meant?
A. Yes.
Q. What did that mean?
A. That this was the job that SEEDCO assisted Amy Bursor in obtaining and this is the employer.
Q. If you could focus on the column job start date, what does that date provide?
A. January 26, 2011.
Q. What does that signify?
A. That that is the date that Amy Bursor started working at Broadway East.
Q. Now if we can please focus on Exhibit 57 again, the CIF.
THE COURT: Is there any way you can split the screen?
MS. BLAIN: That is what we're going to do, your Honor.
(Pause)
MS. BLAIN: And Page 2 of the CIF, please, Mr. Solomon.
BY MS. BLAIN:
Q. What does the CIF provide about when Ms. Bursor started working as a bartender at Broadway East?
A. It starts she started there September of 2009.
Q. What does the Work Source1 entry say about when she started working as a bartender at Broadway East?

A. January 26, 2011.

Q. Is the information between --

THE COURT: What does the next column mean, "Placement data entry date"?

THE WITNESS: So my understanding of that column is that indicates the date the SEEDCO employee would have entered that placement data into Work Source1.

THE COURT: So, in other words, on January 28, 2011, someone at SEEDCO reported for Amy Bursor that she began working for Broadway East as a bartender on January 26, 2011, when the document that Amy Bursor filled out showed that her start date was September-something 2009, and that she was currently employed when she filled out this CIF for SEEDCO?

THE WITNESS: Yes.

BY MS. BLAIN:

Q. Is the information in Work Source1 regarding Ms. Bursor's start date at East Broadway different than the --

THE COURT: I think we just did that.

Q. If I could direct your attention, please, Ms. Sung to Exhibit 65 in your binder. What is this document, Ms. Sung?

A. This is another CIF.

MS. BLAIN: Your Honor, this has also been received so may we publish Exhibit 65 to the jury?

THE COURT: You may.

MS. BLAIN: Thank you.

(Pause)

BY MS. BLAIN:

Q. Who is this customer on this CIF?

A. The name is Dennis Garci, G A R C I.

THE COURT: Spell that for the reporter, please.

THE WITNESS: Yes, the full name is spelled D E N N I S, last name G A R C I.

MS. BLAIN: Please if you could take a look at the second page of the CIF.

THE COURT: This is exhibit what?

MS. BLAIN: 65, your Honor.

BY MS. BLAIN:

Q. What does this document provide about Dennis Garci's employment status?

A. It states that at the time that this form was filled out, which was February 4th, 2011, he was currently employed at Garcia Floor Covering as a floor installer-sales rep.

Q. Does it say when he began his job with Garcia Floor Covering?

A. Yes.

Q. When did he begin his job with Garcia Floor Covering?

A. June 2, 2000.

Q. If I could direct your attention back to the Excel Spreadsheet and to Line 944. Do you recognize what this row refers to?

A. Yes.

Q. What does this row refer to?

A. It refers to the placement, job placement reported by SEEDCO for Dennis Garci.

Q. Look at the job title column. What does that provide about Dennis Garci's job?

A. It states that he's a floor installer.

Q. If you could look, please, at the employer, what does Work Source1 spreadsheet reflect is Mr. Garci's employer?

A. Garcia Floor Covering.

Q. If you go to the next column and look at job start date, what is that date?

A. It is February 17th, 2011.

Q. What does that date reflect?

A. That is the reported start date that Dennis Garci began working at Garcia Floor Covering.

MS. BLAIN: If we can try to split the screen. Thank you, Mr. Solomon.

BY MS. BLAIN:

Q. What does does the CIF provide that Mr. Garci started working at Garcia Floor Covering?

A. The CIF states that he started on June 2nd, 2000.

Q. And again is that different than the information in the spreadsheet?

THE COURT: I think we have seen that. We don't need

the witness's conclusion.

BY MS. BLAIN:

Q. One more, Ms. Sung, if you can turn to Exhibit 66 in the binder before you.

MS. BLAIN: This has also been received into evidence, your Honor, so may we publish?

THE COURT: You may.

MS. BLAIN: Thank you.

BY MS. BLAIN:

Q. Ms. Sung, what is this document?

A. This is another CIF.

Q. Who is the customer on this document?

A. It is Melanie Polanco.

MS. BLAIN: Would you turn to the second page of this document, Mr. Solomon.

BY MS. BLAIN:

Q. What does this document provide about her employment status?

A. It indicates that at the time she filled out the form on January 22nd, 2011, she was currently employed at Almontel as an IT technician.

THE COURT: As of what date, from what date?

THE WITNESS: As of --

THE COURT: Not as of. From when?

THE WITNESS: It looks like September 2011, I think.

BY MS. BLAIN:

Q. Does this date -- the CIF provides that the person is currently working. Is that right?

A. Yes.

Q. And currently working at Almontel, right?

A. Yes.

Q. So does that mean this person will have this job at Almontel before going into SEEDCO, referring according to this form?

A. Yes.

Q. What date did this person go into SEEDCO, according to this form?

A. January 22nd, 2011.

Q. Now if I could direct your attention, please, to Row 2039 in the spreadsheet.

THE COURT: I don't think it is the 22nd. I think it is January 12. The person makes a 2 and a 1 very hard to distinguish.

THE WITNESS: Yeah, I can't actually tell, yeah.

THE COURT: It is January --

THE WITNESS: Now it looks like February 22nd, 2011.

BY MS. BLAIN:

Q. Is it safe to say this was filled out in 2011?

A. Yes.

Q. And in the first or second month of 2011?

A. Yes.

Q. Now if we can please turn to Row 2039. What does this row represent?

A. This represents the reported placement for Melanie Polanco by SEEDCO to SBS.

Q. What does this document reflect as to her job title?

A. IT technician.

THE COURT: The same, is that the same as the CIF?

THE WITNESS: Yes.

BY MS. BLAIN:

Q. What does this document reflect as to her employer?

A. It states that her employer is Almontel Corporation.

THE COURT: The same as the CIF?

THE WITNESS: The same as the CIF.

BY MS. BLAIN:

Q. Finally, what does this document reflect about this person's job start date?

A. It says February 22nd, 2011.

MS. BLAIN: Can you split back to the CIF.

BY MS. BLAIN:

Q. Again is that before or after this person started Almontel as provided in the CIF?

A. I am having a hard time reading the job start date. It looks like September 2079, but --

THE COURT: It is not 2079. I don't know that we have

the capability here of reading that.

BY MS. BLAIN:

Q. Ms. Sung, is it safe to say this person filled out a form at some point in early 2011 providing that she currently works as an IT technician at Almontel?

A. Yes.

Q. And the Work Source1 database provides that person started working at Almontel after filling out this form. Is that safe to say?

THE COURT: Come up, please.

(Continued on next page)

(At sidebar)

THE COURT: I think this is a confusing document because unless it is very carefully presented, it is impossible to read, for us to read the start date.

MS. BLAIN: Okay. Is it clear that the -- sorry.

THE COURT: And it is impossible to get a good reading of the signature date on the CIF. All we have is a date of transposition, and you can't make the point of current employment.

MS. BLAIN: That is fine. I will move on.

(Continued on next page)

(In open court)

THE COURT: Members of the jury, with regard to this document, I rule it is not possible for us with any degree of reliability to read the dates on the CIF, Exhibit 66, so we are not going to work on those dates.

The only thing that you can see in terms of the difference is the reference to current employment, but with the uncertainty of the date, I think we should exclude this document altogether from your consideration, please, and as if it never was produced. We really can't use this with any degree of reliability.

MR. FUTERFAS: Your Honor, may I?

I do object to excluding the document. It is actually going to be part of my cross-examination, your Honor.

(Continued on next page)

(In open court)

THE COURT: The document itself will not be excluded, and it may come into further discussion and examination, but the date is not reliable because it is not legible.

BY MS. BLAIN:

Q. I have just one more of this exercise, Ms. Sung, and we'll stop. If you can please turn to Exhibit 67 in your binder.

MS. BLAIN: Again, your Honor, this has already been received. So may we publish?

THE COURT: Yes, you may.

(Pause)

BY MS. BLAIN:

Q. What is this CIF?

THE COURT: Let's wait until it is put up.

Q. What does this document provide as the customer?

THE COURT: Let's get the screen clear. What do we have up here, Mr. Solomon?

MR. SOLOMON: Exhibit 67, your Honor.

THE COURT: Okay.

BY MS. BLAIN:

Q. Who is this job seeker?

THE COURT: Blow up the top box, please.

(Pause)

THE COURT: This is for Damiana Payano?

THE WITNESS: Payano.

THE COURT: Living on Jerome Avenue in the Bronx.

MS. BLAIN: Go to Page 2, please Mr, Solomon.

THE COURT: Before you go on Page 2 -- now move on to Page 2.

BY MS. BLAIN:

Q. What does this document provide about Ms. Payano's work status?

A. Yes. This CIF indicates that Damiana Payano was employed as a front desk assistant for Allied Barton from August 2007 until April 2009.

Q. If I can please --

THE COURT: One minute, please.

(Pause)

THE COURT: The start date is August what?

THE WITNESS: I took that to mean a zero, so I just said August 2007.

THE COURT: Okay. She continued in that job, job end date until April 2009?

THE WITNESS: Yes.

THE COURT: So almost two years?

THE WITNESS: Yes.

MS. BLAIN: Now if we can refer back, please, to the Excel Spreadsheet.

THE COURT: That is Workforce1?

MS. BLAIN: Correct, your Honor.

MR. SOLOMON: One moment.

(Pause)

MS. BLAIN: And to line 1307. Sorry. It is actually 1970, I think.

BY MS. BLAIN:

Q. Ms. Sung, what does this row represent?

A. This represents the placement SEEDCO to SBS for Damiana Payano.

Q. What does this document provide as her job title?

A. Receptionist.

Q. What does Work Source1 data provide as her employer?

A. Allied Barton.

Q. Is that the same employer as on the CIF?

A. Yes.

Q. What does this document provide about her job start date?

A. The job start date is March 22nd, 2011.

Q. Go back to the CIF. Is that job date different than the dates that appear on the CIF?

A. Yes, it is.

MS. BLAIN: You can take that down. Thank you, Mr. Solomon.

(Pause)

MS. BLAIN: Can you please turn again back to the DOI report and Page 17 and focus on the paragraph under the bullet points at the top of the page, the paragraph under that. I am

sorry. I'll give the jury a moment to read that.

(Pause)

BY MS. BLAIN:

Q. What did you mean when you wrote, "These findings are limited by the data made available to DOI"?

MS. BLAIN: You can close that down, Mr. Solomon.

BY MS. BLAIN:

Q. What did you understand that to mean?

A. Yes, so we did not have all of the available CIFs up until February of 2011 due to the fact that they were permitted, SEEDCO was permitted to shred them up until that date.

We did have Work Source1 data prior to that, but that we wouldn't have been able to do the comparison analysis similar to the one we just did here because the corresponding CIF wasn't available prior to February.

MS. BLAIN: If you can turn to Page 5 of the report, and the third bullet point on that page, highlight that. I'll give the jury a moment.

(Pause)

BY MS. BLAIN:

Q. How did you determine that as you write here, "Multiple SEEDCO employees processed, directed and/or had knowledge of the reporting of false placements to DSBS"?

A. This was a combination of data and information that was contained within the Work Source1 database that indicated who

the SEEDCO employees were that were entering data into Work Source1 as well as interviews that we conducted of SEEDCO employees and e-mails.

I may have mentioned we reviewed hundreds of e-mails that we had subpoenaed from SEEDCO as well.

Q. When you reviewed SEEDCO employees, did that include Alex Saavedra?

A. Do you mean e-mails from him?

Q. Sorry. When you interviewed SEEDCO employees, did that include Alex Saavedra?

A. Yes, it did.

Q. Did you personally interview Alex Saavedra?

A. Yes, with two other investigators.

Q. Do you remember whether he gave an explanation for why a job seeker's past or current employment information could legitimately be reported as a SEEDCO placement?

MR. FUTERFAS: I object, your Honor. I am going to object.

THE COURT: Are you going to, or you do object?

MR. FUTERFAS: I am.

THE COURT: Sidebar.

(Continued on next page)

(In open court)

BY MS. BLAIN:

Q. When you entered viewed Mr. Saavedra in connection with this investigation, did you ask him about some of these false placements you had found?

A. Yes.

Q. Do you recall what some of his answers were to you?

A. Well, I remember that we asked about one pattern we were noticing which was that on a number of CIFs, the date of the CIF came before the start date, the job, the reported start date of the job. I am sorry. Came after.

I believe to the best of my recollection, he had said that that could be legitimate because there was a delay often in SEEDCO personnel actually having those CIFs filled out by job seekers, and the policy that I recall from SBS was that the CIF is supposed to be filled out the first time that the job seeker entered the workforce center but, in fact, I think he was saying that sometimes job seekers would obtain a job and then after that fact they would go back and have the job seeker fill that CIF out and date it at that point in time.

Q. Did that explanation affect any of the conclusions that your team came to regarding specifically these 528 false placements that you talked about?

A. So we had concluded that there were 528 false placements, and that was determined conclusively.

We had also reported that there were a number of questionable placements and used the term "questionable" to distinguish between those that we couldn't conclusively state were false for reasons such as the one that I recall Mr. Saavedra had told us versus the ones that we were conclusively able to determine were false.

THE COURT: Can I go back to the question that you put to Mr. Saavedra. You observed to him a pattern that on a number of CIFs, the date of the CIF came before the start date, the date that the applicant filled out the CIF was before that person started employment?

THE WITNESS: Yes. I corrected myself. I meant after.

THE COURT: Reformulate, restate the question put to Mr. Saavedra.

THE WITNESS: I recall that we had asked why the date on the CIF came after the job seeker's start date.

THE COURT: The date the person filled out the CIF came after the person was already working?

THE WITNESS: Yes.

THE COURT: What did he say?

THE WITNESS: What I remember him saying was that there was a backlog of CIFs and that -- again, this is the best of my recollection -- and, therefore, it was quite possibly SEEDCO assisted a job seeker in obtaining a job, but had never

yet had them fill out the CIF until after they were already employed.

THE COURT: There are two columns on one of the documents we just saw, Ms. Blain. One was the date the document was filled out. The other one was the date the work was planning to be started. Can you show that to the jury.

MS. BLAIN: Sure. That is a slightly different formulation, but if you can show Exhibit 21.

(Pause)

BY MS. BLAIN:

Q. I believe on the last two columns here, under Column Y and Column AB, and tell us again what is in Column Y? What do those dates represent?

THE COURT: Let's wait for the document.

THE COURT: Go to July with Amy Bursor. Column AB is placement date, entry date. What does that pertain to on the CIF?

THE WITNESS: Ah --

THE COURT: Or does it pertain to the CIF?

THE WITNESS: It does not. My recollection is that the placement data entry date is simply the date that the SEEDCO employee entered that information into Work Source1. It does not correspond to any dates on the CIF.

THE COURT: Thank you.

BY MS. BLAIN:

Q. So did the explanation Mr. Saavedra gave you about this process satisfy you as to why the date provided by job seekers on the CIF can be different than the information stored into Work Source1?

MR. FUTERFAS: Objection.

THE COURT: Objection sustained.

BY MS. BLAIN:

Q. Did his explanation satisfy you?

MR. FUTERFAS: Objection.

THE COURT: Objection sustained.

MS. BLAIN: Thank you, Ms. Sung.

THE COURT: Are you finished questioning?

MS. BLAIN: Yes.

THE COURT: Cross-examination.

Is the jury okay or do you want a break? You want to take a break? Close up your books and leave them on your chair. We'll go to 5:00 today, if that is okay? Don't discuss the case. Keep an open mind.

(Jury excused)

THE COURT: When you get off the stand, don't talk to anyone.

THE WITNESS: Okay.

THE COURT: We'll take 10 and come back at 3:40.

(Recess)

(Continued on next page)

THE COURT: How many more days do you have?

MS. BLAIN: We have three more witnesses.

THE COURT: Finish Monday?

MS. BLAIN: I think, yes. We are not calling one witness on the list.

THE COURT: That is OK. I allow that.

(Witness resumed)

(Jury present)

THE COURT: Ms. Sung, you remain under oath.

Cross-examination by Mr. Futerfas.

CROSS EXAMINATION

BY MR. FUTERFAS:

Q. Ms. Sung, good afternoon.

A. Good afternoon.

Q. You stated that you conducted various interviews. Do you remember testifying to that in connection with your investigation?

A. Yes.

Q. You interviewed individuals at SEEDCO?

A. Yes.

Q. Without telling me what anyone said, just approximately, what number of individuals did you interview at SEEDCO?

THE COURT: Keep your voice up, please.

MR. FUTERFAS: Sure.

A. I would have to refresh my memory with the DOI report.

THE COURT: More than 30?

THE WITNESS: Yes. Just to clarify, I personally did not conduct all of them, but the investigative team --

THE COURT: Put it this way. Those interviews you conducted or that were conducted under your supervision, without distinguishing between those, approximately how many.

A. Was your question just SEEDCO employees, or in total?

Q. SEEDCO employees.

A. So it wouldn't have been as high as 30, approximately over 10.

THE COURT: OK.

Q. And you said that some CIFs people for a given time are unavailable because they may have been shredded. Do you remember that testimony?

A. Yes.

Q. I think you said that SEEDCO was permitted to shred CIFs?

A. Yes.

Q. Do you remember saying that?

A. Yes.

THE COURT: What do you mean by that?

THE WITNESS: We had learned during the course of our investigation that SBS had permitted SEEDCO to shred CIFs because they contained confidential information from individual job seekers. I believe it related to -- again, this is to the best of my recollection -- I believe it related to some

Department of Labor requirement.

Q. My question for you is, in the course of your investigation --

THE COURT: Keep your voice up, please.

MR. FUTERFAS: Yes, your Honor.

Q. Did you learn in the course of your investigation that SBS didn't permit SEEDCO to shred, they required all of the Workforces to shred by SBS policy?

A. I cannot recall if it was a requirement versus they allowed them to do it.

THE COURT: There is no issue about the shredding, is there?

MR. FUTERFAS: I want --

THE COURT: Ms. Blain?

MS. BLAIN: No, your Honor.

THE COURT: There is no issue.

Members of the jury, there is no issue about shredding. It is not anything having to do with this case that there was shredding. There are other reasons and innocent reasons.

Q. In connection with your interviews of the individuals at SEEDCO, you discussed very briefly an interview you had with Mr. Saavedra, right?

A. Yes.

Q. That interview was a voluntary interview?

A. Yes.

Q. That interview lasted an entire day, did it not?

A. I don't recall it being an entire day. I remember it was several hours.

Q. Let me ask you this: Anything you wished to ask was answered, right?

THE COURT: Did he refuse to answer any questions?

THE WITNESS: I can't recall that. I remember asking -- we asked questions that were not responsive, where the answers were not responsive to the question.

Q. So he gave you an answer, but you didn't consider the answer responsive to your question?

A. Correct.

Q. Is that what you are saying?

A. Yes.

Q. Aside from that, anything you asked, he sat there and he gave a voluntary interview for hours with you and your team, right?

A. Yes.

Q. Did you endeavor to interview Alan Katz?

A. Yes, we did.

Q. Alan Katz took the Fifth Amendment, right?

A. Yes.

Q. And refused to answer questions, right?

A. Yes.

Q. Now, I just want to briefly turn to -- I am not sure of the exhibit number. It's the exhibit that was just before the jury. I will find out the number.

MR. FUTERFAS: 13.

Your Honor, since we don't have an electronic of that exhibit, since it was just created, can I ask the government to post 13A.

THE COURT: Yes. Mr. Solomon.

MR. SOLOMON: Publish to the jury?

THE COURT: It is in evidence.

MR. FUTERFAS: Thank you.

Q. With permission, and with Mr. Solomon's assistance, if you could go to page 17 of that document. I direct your attention, Ms. Sung, to the top two short paragraphs, or bullet points there. Do you see those, Ms. Sung?

A. Yes.

MR. FUTERFAS: Thank you, Mr. Solomon.

Q. The number 528 that you have told us about, in this section of the report you break that out between the two centers, Upper Manhattan and the Bronx, right?

A. Correct, yes.

Q. What you say was, based on your investigation, 436 of the 528 were reported from the Upper Manhattan Workforce Center during the period January 1, 2011 to August 8, 2011, correct?

A. Yes.

Q. That is 436 out of 3,245 placements recorded, right?
A. Yes.
Q. About 10 or 12 percent, something like that, right?
A. I haven't done the math.
Q. OK. It is a little more than 10 percent of 3,200, right?
MS. BLAIN: Objection.
THE COURT: 12 percent.
MR. FUTERFAS: Very well.
Q. The next one underneath that says in the Bronx during that same time period the number of placements that your office believes is false placement is 92 out of 3,824, right?
A. Yes.
Q. That's about 2 percent?
A. Again, I haven't done the math.
THE COURT: It's about 2 percent. You can do the math quickly.
MR. FUTERFAS: That is all I needed.
THE COURT: Round the numbers up to a hundred.
Q. You understand, Ms. Sung, that in January 1, 2011, Mr. Saavedra moved over and became the director of the Bronx center and ran the Bronx center. You understand that, right?
A. I remember there came a time when he did. I don't recall the month or the year at this point.
Q. Your testimony concerned some CIFs that we've seen, right? These CIFs that the government has put into evidence and that

we've just viewed for the last 20 or 30 minutes, they have handwriting on them, right?
A. Yes.
Q. Do you understand that that handwriting is the handwriting of the job seeker?
A. Yes.
Q. So those CIFs are being filled out by someone who is possibly looking for a job, right?
A. Yes.
Q. Do you know if they are being filled out at 125th street or at an offsite recruiting event?
A. Are there specific ones that you are referring to?
Q. I am just saying the ones we looked at --
THE COURT: Generally speaking, when you look at a CIF, can you tell where it was filled out?
THE WITNESS: You can't tell from the CIF itself.
Q. But you understand there were things called offsite recruiting events, right?
A. Yes.
Q. So it's possible that one of the CIFs was filled out at an offsite recruiting event --
THE COURT: She said she can't tell. Let's move on.
MR. FUTERFAS: Fair enough.
THE COURT: Then why do you ask, if it's fair enough?
MR. FUTERFAS: Sorry, your Honor?

THE COURT: Never mind.

Q. You mentioned the number 528. Do you have 528 CIFs which correspond to this number 528 that is in your report?

THE COURT: You mean does she have it now?

MR. FUTERFAS: Yes.

THE COURT: Do you have it now? You don't have anything now, do you?

THE WITNESS: I don't have anything. I am no longer working at DOI.

Q. Before you left DOI --

A. Yes.

THE COURT: I think the question you want to ask is did you review 528 applications that you considered false, or did that number come about in a different way?

THE WITNESS: So we did a comparison between the Worksource1 data entries and the available CIFs that were provided to us.

THE COURT: So for the seven-month period where you worked you found 528 that were discrepant?

THE WITNESS: Correct. But I cannot say for sure whether we had a CIF associated with each of those placements, because I do know that we were also looking at résumés of job seekers that were provided to us by Bill Harper, which had revealed, again, that current jobs were being used as placements, being reported as placements.

THE COURT: So some you compared to the CIFs and found discrepant, and some you saw discrepancies from documents other than the CIF?

THE WITNESS: Yes.

THE COURT: But always within the same time period of January to August?

THE WITNESS: Yes.

Q. I guess my question is very simple: The answer is you do not have for the 528 that your office believes --

THE COURT: She's answered the question. Don't restate the answer. She's answered the question.

MR. FUTERFAS: All right, your Honor.

Q. How many CIFs did your office review?

A. I don't have the exact number. I remember we reviewed 10 banker boxes full of CIFs, approximately ten boxes.

Q. In terms of number of résumés, you just mentioned résumés, it was a relatively small group of résumés, wasn't it?

A. Yes. Much fewer than the number of CIFs that we reviewed.

Q. Did you have 50 résumés?

A. I don't recall the number.

Q. Could it be less than 50?

A. Possibly less than 50.

Q. You understood through your investigation that résumés could be used improperly or properly depending on how they were used, right?

A. What --

Q. I will rephrase the question. By Upper Manhattan Workforce was there a proper use for résumés?

A. Yes.

Q. You were looking at the few résumés that you had to determine whether they were being used improperly, is that fair?

A. Yes.

THE COURT: What does it mean a proper use of résumés? Do you know what that means?

THE WITNESS: Yes. I believe what counsel is asking is --

THE COURT: Don't do that.

THE WITNESS: Don't? OK.

THE COURT: If you can't understand the question, say it. Do you know what a proper use of a résumé is?

THE WITNESS: Yes.

THE COURT: What is it?

THE WITNESS: Job seekers were requested to provide their résumé as part of the job assistance process that was being provided to them by SEEDCO to help them in obtaining a new job.

BY MR. FUTERFAS:

Q. Ms. Sung, how many job seekers did the DOI interview in the course of its investigation?

A. Again, I don't recall. Referring to the DOI report, I remember there are at least four job seeker interviews discussed within that report, but we interviewed more than that.

Q. Did you interview less than 20?

A. I can't recall.

Q. Less than 10?

MS. BLAIN: Objection.

A. I don't recall.

THE COURT: Overruled.

MR. FUTERFAS: OK.

A. Can I add one other thing. You had earlier asked me how many SEEDCO employees we interviewed?

Q. Yes.

A. I just wanted to make it clear that it was more than ten.

Q. It was closer to 20 you think?

A. It may have been, yes.

Q. Do you think it could have been between 20 and 30?

A. Possibly.

MR. FUTERFAS: May I have a moment, your Honor.

(Defense counsel conferred)

BY MR. FUTERFAS:

Q. If I could direct you now, Ms. Sung, to some of the CIFs that were just displayed for you before. I think we would start with Government Exhibit 57. We will do it in the order

the government did.

THE COURT: That is the one for Amy Bursor.

MR. FUTERFAS: Yes.

Q. If you could turn to the second page of that CIF, where she identifies her occupation as a bartender. Do you see that?

A. Yes.

Q. There is a wage and salary place. Do you see an indication for a wage and salary?

A. Yes.

Q. Then it says per hour, per week or month or year. Then next to that it says how many hours per week. Do you see that?

A. Yes.

Q. Do you have an understanding that if Ms. Bursor -- who identifies on her form is making $4.50 per hour working ten hours a week -- comes to SEEDCO and after visiting SEEDCO and getting services from SEEDCO gets a job or gets 20 hours a week or gets an increase in salary, that could count as a type of placement?

A. At the time of the investigation, I remember there was some discussion regarding whether a promotion could be counted as a placement. I don't recall the policy that was in effect at the time.

Q. Let me ask you this: I don't know if it's necessary to call up the Worksource1 photo, but could you tell either from this CIF or the Worksource1 whether someone had gotten an

increase in either salary or hours worked?

A. At what point in time?

Q. In other words --

THE COURT: At any point in time.

A. You mean after being serviced by SEEDCO?

Q. Yes.

A. That would not be indicated in the CIF.

MR. FUTERFAS: Right.

THE COURT: So you couldn't tell?

THE WITNESS: I could not tell.

Q. Well, you couldn't tell from the CIF?

A. Right.

Q. But is there a way, if you looked at the Worksource1, that maybe you could tell?

A. I believe so.

THE COURT: Let's put it up. 21.

Q. OK. On the screen in front of us, if we take Ms. Bursor, the hourly wage indicated is on Worksource1 is 4.65, which is just incrementally greater than the $4.50 reported on the CIF, right?

A. Yes.

Q. Is there any indication on the Worksource1 whether her hours increased or did not increase if we scroll to the right?

MS. BLAIN: Objection.

THE COURT: Overruled.

A. There is no indication in the data that is in front of me currently.

Q. The data in front of you currently is the Worksource1 that you relied upon in conducting your investigation, correct?

MS. BLAIN: Your Honor, I'm sorry. May I have a sidebar very briefly.

THE COURT: Yes.

(Continued on next page)

(In open court)

THE COURT: So the judge has told the lawyers that he is a little bit confused. They have promised to enlighten me.

MR. FUTERFAS: Both sides.

We will do our very best to do that.

THE COURT: I know that. Somehow I don't feel reassured.

Q. Ms. Sung let me ask you this: Just for the purposes of determining whether a placement is accurate or not in terms of the records that you reviewed, one of the things that you would look at, is it fair, is comparing whether not only the person has the same job, but do they have the same salary and they have the same number of hours, worked the same number of hours?

A. Yes.

Q. It may be that on the spreadsheet you are looking at, the Worksource1 system was a very large --

THE COURT: Come on. Let's get to the question. What do you want to ask?

There are two lines here with Amy Bursor. Can you explain those? They have the same people ID number.

THE WITNESS: Yes.

So I recall the people ID number was like --

THE COURT: Talk to the jury so they can hear you.

THE WITNESS: The people ID number was like an identifying number for an individual.

This would indicate that this is the same Amy Bursor entered twice, so two placements were reported for her.

THE COURT: At one placement she was getting $4.65 an hour and the second placement at $15 an hour?

THE WITNESS: Yes.

THE COURT: And she moved from Broadway East to Bar Italia?

THE WITNESS: Yes.

THE COURT: Are there dates associated with each of these two?

THE WITNESS: Yes.

THE COURT: So what's the significance of the dates?

THE WITNESS: Start date for the Broadway East job was January 26, 2011, and then it looks like she was reported as having then gotten a subsequent job on March 10, 2011 at Bar Italia.

THE COURT: You testified before on direct to a discrepancy in the start date reported on the Workforce1, this particular document, and the CIF as to the Broadway East job. You had no testimony about the Bar Italia job, right?

THE WITNESS: Right.

THE COURT: Was there also supposed to have been a discrepancy, if you know, with the Bar Italia job?

THE WITNESS: That I don't know. I recall during our investigation we did note multiple, duplicate entries where the

same exact entry was made, the same exact place of employment. This was not one of them, because it's two different places of employment. So I don't believe this is one that we would have counted as a duplicate.

MR. FUTERFAS: May I ask a question, your Honor?

THE COURT: Go ahead.

BY MR. FUTERFAS:

Q. Just going back briefly to the CIF, Government Exhibit 57, do you recall, Ms. Bursor on her CIF notes that she's working ten hours per week, right?

A. Yes.

Q. Do you have an understanding that, to be a placement, a person has to work a minimum of 20 hours per week?

A. I don't recall that. It's possible that that was the policy. I do remember there having to be a minimum for something to be counted or considered a placement. By SBS definition I believe that there was a requirement for a minimum salary and minimum number of hours per week.

Q. You just don't recall if the minimum was 20 or some other number?

A. I can't recall.

Q. If, for example, the Worksource1 system records a placement a few days later of 20 hours per week, even if it does that, it's possible that whoever entered that still may have entered that falsely, right?

MS. BLAIN: Objection.

THE COURT: Sustained. It's hypothetical.

Q. Very well. To determine reliably whether or not Ms. Bursor came in, filled out a CIF, and then subsequently got an increase in salary or hours or something like that, you would call the job seeker and ask them if, in fact, they received an increase in wages or hours, isn't that right?

MS. BLAIN: Objection.

THE COURT: Sustained.

You were looking for discrepancies, weren't you?

THE WITNESS: Yes.

THE COURT: That's how you based your findings, on discrepancies?

THE WITNESS: Yes.

THE COURT: Discrepancies between the CIF and the Worksource1 in most cases?

THE WITNESS: Yes.

THE COURT: And in various cases discrepancies between various other kinds of documents and the Worksource1?

THE WITNESS: That's correct.

THE COURT: That's how you based your findings?

THE WITNESS: In addition to that, we also obtained testimony, statements from witnesses, and also reviewed e-mail communications by SEEDCO employees. In other words, the source of the information or our evidence came from multiple places.

THE COURT: Got you. OK.

BY MR. FUTERFAS:

Q. But you have testified that there are 528 placements that you think were problematic or wrong, right?

A. Yes.

Q. So this Amy Bursor, is she one of them? This person we are looking at right now, is this one of the 528?

A. Sitting here right now, I would have to make an inference to answer that question.

Q. You don't recall?

A. I don't recall. I know that we reviewed all of the available CIFs from a given time period and that this was one of them, given that it was dated within that time period.

Q. My question for you is this: His Honor just raised the issue of you were looking for discrepancies, right?

A. Yes.

Q. All I'm asking you is, if you find a discrepancy in the documentation, to resolve the discrepancy and figured out in fact the placement was false or not false, did you pick up and call the job seeker and ask the job seeker whether or not in fact they got a raise or got more hours or got more employment?

MS. BLAIN: Objection.

THE COURT: Overruled.

A. We called job seekers as part of our investigation. I can't say whether we called this particular job seeker.

Q. And the number of job seekers you called was about what? Four or five?
A. I believe I stated more than that earlier. I stated that there were approximately four that were outlined in the DOI report, if I remember correctly, and that we had interviewed more than that.
Q. How many more did you interview besides when you called?
A. I can't remember that. I believe it would be in my earlier testimony.
Q. Was it less than five?
A. No, it was more than five.
Q. Maybe ten?
MS. BLAIN: Objection.
THE COURT: Overruled.
A. It could be approximately -- I don't remember what I said probably like ten minutes ago. It would be in the transcript.
THE COURT: What is your best recollection? Ten?
THE WITNESS: Probably more than ten.
THE COURT: Fifteen?
Some order of magnitude below 25?
THE WITNESS: Probably.
THE COURT: OK.
BY MR. FUTERFAS:
Q. If we could turn to Government Exhibit 65, which is the CIF of Dennis Garci.

MR. FUTERFAS: Your Honor, could we have a one-second sidebar. I am asking the government to do it because the copies we have are not redacted. That is the issue. If government doesn't mind doing the exhibits, I'm happy to use them. But that's the reason.

THE COURT: Do it.

MR. FUTERFAS: Thank you.

MR. SOLOMON: Was that 65?

THE COURT: I thought we cleared that up.

Q. We can go to the second page. On the second page for Mr. Garci we see actually on this form that the wage and hours and all that is blank, right?

A. Yes.

Q. Ms. Sung, in the course of your investigation, did you come to learn or understand that many of these job seekers maybe they don't speak English that well or have varying degrees of education, things like that?

MS. BLAIN: Objection.

THE COURT: Sustained.

Q. With respect to the CIFs and the filling out of the CIF, this is not filled in, right, you acknowledge that, on Government Exhibit 65, wages and the hours worked.?

THE COURT: What is this?

Q. Do you recall what, if anything, you did with respect to this CIF to determine whether the Worksource1 placement

information constituted greater hours or greater wages or anything like that?
A. On this specific one?
Q. Yes.
A. I can't recall.

MR. FUTERFAS: Now if we could turn to Government Exhibit 67.

Q. Directing your attention, Ms. Sung, to the second page of Government Exhibit 67, here it appears that Mrs. Payano reports working at a salary of $12 an hour at 40 hours per week. Do you see that?
A. Yes.
Q. If we could, again, with the appreciation of Mr. Solomon, if he could call up the Worksource1 No. 1970. On Worksource1 it indicates an hourly wage of $15.38 per hour.

Do you see that?

A. Yes.
Q. And do you have any recollection of whether your investigators contacted Mrs. Payano to determine whether she was rehired by the company at that wage?
A. Specifically as to this job seeker, I don't recall.

MR. FUTERFAS: I think that is all I have with the government exhibits.

Thank you, Mr. Solomon.

Your Honor, I have nothing further. Thank you.

THE COURT: Thank you.

Redirect?

MS. BLAIN: Yes. Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. BLAIN:

Q. Good afternoon, Ms. Sung. Just a few questions.

In the course of your investigation did you determine that false wage data was also input into Worksource1?

A. I recall that was something that we looked at wage data. We also had discussions with SBS as to what could be counted as a placement. And, again, as I had mentioned on cross-examination, there was a policy as to whether or not promotions could be counted as placements.

THE COURT: You have to speak louder.

A. I recall there was an SBS policy that spoke to whether promotions could be counted as placements or not. I remember there came a point where they were not allowed to be counted as placements. But I do not believe that we had, if we reported or determined that a placement was false, it was not because of wage information. It was because of the employer information.

Q. You need to call a job seeker in order to determine that a discrepancy between a job start date and Worksource1 and a job start date in the CIF was actually a discrepancy?

A. We didn't call every single job seeker. There were some that were so obviously -- where the discrepancy was so obvious

that we didn't actually then call that job seeker associated with that placement. But we did -- as I had mentioned, the interviewer called a number of job seekers. I can't remember how many. But the purpose of that was to confirm that our analysis was in fact correct, or our conclusion that the placement was false.

MS. BLAIN: Thank you, Ms. Sung.

MR. FUTERFAS: Nothing further, your Honor.

THE COURT: Thank you.

You are excused.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: Next witness?

MS. BLAIN: Your Honor, the government calls Ron Kirk.

MR. MILLMAN: Your Honor, I'm counsel to Mr. Kirk.

Is it OK -- thank you.

THE COURT: Identify yourself for the record.

MR. MILLMAN: For the record my name is Claude Millman.

THE COURT: Introduce yourself to the jury and smile nicely.

MR. MILLMAN: My name is Claude Millman. I'm counsel to the witness.

RONALD KIRK,

called as a witness by the Plaintiff,

(Government's Exhibit 73 received in evidence)

THE COURT: It's broken down from Manhattan and the Bronx for 2011, and just for Manhattan in 2009 and 2010.

It is about three and a half million dollars in 2009, $3.8 million in 2010, $5.4 million in 2011, and in total $12,800,000 in total for the three years.

MS. BLAIN: May we publish it to the jury?

THE COURT: The jury is already viewing it as I read it.

No? You don't have it?

Please publish it.

Q. Those are the numbers that the Court just read, correct, Mr. Kirk?

A. Yes.

THE COURT: Leave it up for the jury to read.

When they're finished with it, then we will move on to another subject.

OK. Move on to another subject.

MS. BLAIN: I am marking Government's Exhibit 74 for identification.

Q. Mr. Kirk, can you please tell the Court what this document is.

A. This Mr. Saavedra's monthly salary for 2009, 2010, and 2011. It shows the total salary for each month and the amount that was charged to the Workforce1 Center contracts.

MS. BLAIN: Your Honor, the government moves Exhibit 74 into evidence.

THE COURT: Any objection?

MS. SCHEIN: No objection, your Honor.

THE COURT: Received.

(Government's Exhibit 74 received in evidence)

BY MS. BLAIN:

Q. Mr. Kirk, what does it say for the 2009 total?

A. The total was approximately $103,000.

Q. And what does it say for the 2010 total?

A. Approximately $111,000.

Q. And what does it say for the 2011 total?

A. Approximately $97,000.

MS. BLAIN: Thank you, Mr. Kirk.

I have no further questions, your Honor.

THE COURT: This Exhibit was 74?

MS. BLAIN: Yes, your Honor.

THE COURT: Was Mr. Saavedra's salary tied to any performance levels of the company? Do you know?

THE WITNESS: I don't, your Honor.

THE COURT: You just took the numbers off the books, that's it? That is the extent of your knowledge?

THE WITNESS: Yes, sir.

THE COURT: Cross-examination.

MS. SCHEIN: Thank you.

he is the witness who is not the witness. He will just read the transcript as we will read the transcript, and Ms. Blain will ask the questions and he will give the answers. And I may rule on objections. That is the exciting thing that we will do for the next 15 minutes.

MS. BLAIN: Please turn to page 266. I am going to start on line 18, 266:

"Q. On what date did you start working at SEEDCO?

MR. PELLEGRINO: Sorry?

MS. BLAIN: It's line 18.

MR. PELLEGRINO: Oh.

"A. April 5, 2010.

"Q. What was your position on that date?

"A. Strategic operations coordinator for the Upper Manhattan Workforce.

"Q. And how long did you hold that title?

"A. Until December 31, 2010.

"Q. And what were your duties and responsibilities in connection with being a strategic operations coordinator?

"A. I was responsible for the day-to-day functioning of the Workforce Worksource1 system, which is the data system for the center. I was responsible for initiating change initiatives that SBS would put out regarding the changes in policy, new programs, new features in their systems, things of that nature, training and being up to date. I was responsible for reporting

metrics. I was responsible for becoming subject matter expert around the Worksource1 system and around the way the different teams in Workforce1 interact with each other. And I was responsible for coordinating with the City on operations issues.

"Q. What was your next title after strategic operations coordinator?

"A. I was the deputy director of the upper Manhattan Workforce1 career center.

"Q. On what date did you become deputy director?

"A. January 1, 2011.

"Q. Where was that located?

"A. At Upper Manhattan on 125th Street in Harlem.

"Q. That is also where you were the strategic operations coordinator as well, correct?

"A. Yes.

"Q. And what were your duties and responsibilities in connection with being deputy director?

"A. I was responsible for the day-to-day running of the center. I directly supervised, I think, four department staff and was responsible for insuring that the center ran properly and correctly, and that all of the teams interacted with each other. At that point I was also responsible for helping the new strategic operations coordinator to come up on speed on all of her duties.

"Q. And who was that person?

"A. Lisa Frantzen, F-r-a-n-t-z-e-n.

"Q. And when you were a deputy director to whom did you directly report?

"A. Rick Green.

"Q. And to whom, if you know, did Rick Green directly report?

"A. Alex Saavedra.

"Q. Did anybody directly report to you?

"A. Yes.

"Q. Who were they?

"A. The head of the intake department, Felicia Brezba; the head of the single-stop contracts, I do not remember her name; the head of the fatherhood contracts, it was another contract, I don't remember his name right now; and intake, somebody else. Maybe that was it. Newton that was his name. I liked him a lot, too. Yeah.

"Q. Now, please turn to page 271.

Mr. Harper, I'm handing you what's been marked as Government's Exhibit 45?"

THE COURT: Line 23.

MS. BLAIN: Thank you, your Honor. Line 23.

"Q. Mr. Harper, I'm handing you what's been marked as Government's Exhibit 45.

"Do you recognize this document?

"A. Yes.

"Q. Do you recognize this type of document?

"A. Yes.

"Q. What type of document is this?

"A. This is the customer information form, also known as a CIF.

"Q. Do you recall ever seeing this particular document before?

"A. Yes.

"Q. In what context have you seen this particular document before?"

MS. SCHEIN: Objection, your Honor.

THE COURT: Overruled.

"A. This is one of the CIFs that I utilized to prove the fraud that I thought was taking place in upper Manhattan."

THE COURT: What Mr. Harper wants to prove or not to prove is not binding on you. Mr. Harper has been identified as the whistleblower, so he made various kinds of conclusions and assumptions based on what was before him, but what he found is not your business. This is just to explain how it came about and to note any additional pieces of evidence by way of discrepancies. But you have to make your own findings and evaluations. You can't rely on Mr. Harper one way or the other. Not for him for what he says; not against him for what he says.

Proceed. Are you moving off of Exhibit 45?

MS. BLAIN: No, your Honor. I thought you wanted me to offer all of these at the end. I can offer these now.

THE COURT: Objection?

MR. FUTERFAS: No, your Honor.

THE COURT: Received. Publish it.

(Government's Exhibit 45 received in evidence)

THE COURT: Publish it. Can the jury see it.

MS. BLAIN: There are a few pages to this exhibit, your Honor, so can I show the jury the pages?

THE COURT: You can go one by one.

MS. BLAIN: The next page, Mr. Solomon.

THE COURT: Let's look together.

His name is Arturo Diaz. Other personal details we don't need to note.

Let's turn to page 2.

Arturo Diaz says his occupation is an instructor, and he set down his wage and salary. He says he started his job, the start date is September 1996. And it gives his employer's name. He doesn't have a job end date.

He describes his job as teaching engineering, building-related subjects.

This document was filled out January 20, 2010. There is an overwriting at the end, but I think it's 2010.

So we see here that the start date in September 1996 was approximately thirteen and a half years before anybody filled out this form. OK.

MS. BLAIN: Next page, please, Mr. Solomon.

THE COURT: This is page 3.

What do you want the jury to note here? We don't need the Social Security number. There is nothing here.

MS. BLAIN: Next page, Mr. Solomon.

THE COURT: There's nothing here.

MS. BLAIN: The next page, Mr. Solomon.

The next page, Mr. Solomon.

THE COURT: There is nothing in the rest of the document, is there?

MS. BLAIN: This is the page that's relevant, your Honor.

THE COURT: OK.

So what it has here is his job data entry date of February 4, 2011, and the job start date as December 8, 2010, which is the same date, is it, as he filled it out? A different date? What was the date he filled it out?

MS. BLAIN: He stopped having this job I believe in 2009, according to the CIF.

THE COURT: Let's look.

MS. BLAIN: Sorry, 1996.

THE COURT: January 20, 2010.

Thank you. Let's gee on.

"Q. Mr. Harper, I'm handing you what's been marked as Government Exhibits 46, 47, 48, and 49. If you could look at Government's 46, please?

"A. OK. I need to correct myself on government --

MR. PELLEGRINO: Is it 45?

MS. BLAIN: 45.

"Q. Sure.

"A. So the first two pages of this is a customer information form. The remaining pages are printouts and screen shots from Worksource1.

"Q. And did you gather these screen shots?

THE COURT: Let us understand this.

The first two pages are the CIF, and the remaining pages come from Worksource1, which has been identified as a document that's created by SBS and shared with Charney, right?

MS. BLAIN: And SEEDCO, your Honor.

THE COURT: And SEEDCO, right. OK.

"Q. And did you gather these screen shots from the Workforce1 as well?

"A. I did.

"Q. And how did you come to gather this CIF and the screen shot?

"A. The CIF was one of the CIFs that I located in Irwin Traydman's desk and in file cabinets. And the screen shots are from where I looked them up in Worksource1 and then printed the page.

"Q. Do you recall on what date you located the CIF on Irwin Traydman's desk?

"A. I do not.
"Q. Do you recall in what year you located the CIF on Irwin Traydman's desk?
"A. I did it twice in 2011.
"Q. And do you recall what month that was?
"A. The first time would have been in or -- late March, early April, before I went and met with Francine Delgado. The second time would have been in June of 2011, before I left.
"Q. And do you recall, looking at Government's Exhibit 45, if this is a CIF that you pulled the first time you went to his desk or the second time?
"A. I am unsure if I pulled it the first time. I know that I pulled it the second time.
"Q. Why are you sure that you pulled it the second time?
"A. Because when I pulled it, the only CIFs that I provided to the government are ones that I pulled the second time. I provided all the CIFs for the first time and provided those to SEEDCO.
"Q. If you now turn to Government's Exhibit 46.
"Do you recognize this particular type of document?
"A. Yes.
"Q. What is it?
"A. The first two pages are a CIF form, customer information form. The remaining pages are screen shots from Worksource1.
"Q. And do you recognize this particular CIF and Worksource1

screen shots?

"A. Yes.

"Q. What are they?

"A. They are the ones -- they are ones that I received, I pulled from Irwin Traydman's desk or file cabinets and then pulled the CIF, the job seeker profile information, and provided it to the government.

"Q. Thank you. Turning your attention to government's 47, do you recognize this particular type of document?

"A. Yes.

"Q. What is this particular type of document?

"A. Customer information form, the first two pages. The remaining are screen shots from Worksource1.

"Q. And do you recognize this particular CIF and screen shot?

"A. Yes.

"Q. How do you recognize this?

"A. It is from the -- where I pulled them from Irwin Traydman's desk and then pulled the individual screen shots and provided them to the government.

"Q. Turning your attention to Government's 48, again, do you recognize this type of document?

"A. Yes.

"Q. What type of document is this?

"A. The first two pages are customer information forms, and the last pages are screen shots from Worksource1 regarding this

customer.

"Q. And do you recognize this particular CIF and screen shot?

"A. Yes.

"Q. Why do you recognize this?

"A. I think it's one that I pulled from Irwin Traydman's desk and file cabinet, and then I pulled the screen shots and provided to the government.

"Q. Turn finally to government's 49. Do you recognize this type of document?

"A. Yes.

"Q. What type of document is this?

"A. This is a customer information form.

"Q. And the last four pages?

"A. The last four pages are screen shots from Worksource1.

"Q. Do you recognize this particular CIF and screen shoots?

"A. Yes.

"Q. What is this?

"A. This is one that I pulled from Irwin Traydman's desk and file cabinet and then pulled the screen shots and provided to the government.

"Q. In connection with your duties and responsibilities at SEEDCO either as a strategic operations coordinator or deputy director, did you have reason to look at customer information forms?

"A. Yes.

"Q. And in connection with your duties and responsibilities as strategic operations coordinator and deputy director, did you have occasion to look at the Workforce1's database?
"A. Yes."

MS. BLAIN: Thank you.

Your Honor, the government moves to introduce Government's Exhibits 46, 47, 48 and 49.

THE COURT: Objection?

MS. SCHEIN: No objection, your Honor.

THE COURT: Received.

(Government's Exhibits 46, 47, 48 and 49 received in evidence)

THE COURT: Members of the jury, it's 5 o'clock. If you want to spend another ten minutes, we can go over these documents now, or we can save it for Monday morning. My suggestion is that you should be satisfied with today's work, and we will do it Monday morning. If you want to do it now, we can do it now. If you have burning curiosity and you are not going to sleep the next few nights, we will do it now.

Shall we wait?

JURORS: Yes.

THE COURT: I want you to promise me something: No discussions of the case with anybody. No talking to each other than about the case. Just put it out of your mind. Have a really great weekend. Relax. The weather, I hope will be

nice. If it's not nice, relax anyhow. We'll see you Monday at 10 o'clock.

(Continued on next page)

INDEX OF EXAMINATION


Examination of: Page

ANGIE KAMATH

Direct By Ms. Blain . . . . . . . . . . . . . . 306

Cross By Mr. Futerfas . . . . . . . . . . . . . 315

Redirect By Ms. Blain . . . . . . . . . . . . . 376

ERNESTO LIRAG

Direct By Ms. Schoenberger . . . . . . . . . . . 378

Cross By Ms. Schein . . . . . . . . . . . . . . 392

CHANTERELLE SUNG

Direct By Ms. Blain . . . . . . . . . . . . . . 412

Cross By Mr. Futerfas . . . . . . . . . . . . . 452

Redirect By Ms. Blain . . . . . . . . . . . . . 477

RONALD KIRK

Direct By Ms. Blain . . . . . . . . . . . . . . 479

Cross By Ms. Schein . . . . . . . . . . . . . . 488


GOVERNMENT EXHIBITS


Exhibit No. Received

22 . . . . . . . . . . . . . . . . . . . . 387

23, 24, and 25 . . . . . . . . . . . . . . 389

13 A . . . . . . . . . . . . . . . . . . . 419

73 . . . . . . . . . . . . . . . . . . . . 486

74 . . . . . . . . . . . . . . . . . . . . 487

45 . . . . . . . . . . . . . . . . . . . . 499

46, 47, 48 and 49 . . . . . . . . . . . . . . 505

DEFENDANT EXHIBITS

Exhibit No. Received

F5 . . . . . . . . . . . . . . . . . . . . 324

LLL . . . . . . . . . . . . . . . . . . . . 360

T6 . . . . . . . . . . . . . . . . . . . . 369

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES of AMERICA,

Plaintiff,

v. 11 Civ. 6425 AKH

ALEX SAAVEDRA,

Defendant.

------------------------------x

April 20, 2015
9:30 a.m.

Before:

HON. ALVIN K. HELLERSTEIN,

District Judge
and a jury

APPEARANCES

PREET BHARARA,
United States Attorney for the
Southern District of New York
BY: CARINA HYATT SCHOENBERGER,
JENNIFER ELLEN BLAIN,
Assistant United States Attorneys

LAW OFFICES OF BETTINA SCHEIN,
Attorneys for defendant
BY: BETTINA SCHEIN, Esq.
- and -
LAW OFFICES OF ALAN S. FUTERFAS,
BY: ALAN SAMUEL FUTERFAS, Esq.
Of counsel

Also Present:
HARRY SOLOMON, Technical Support USAO
MARISA ALBERTI, Defense Paralegal & Technical Support

(At the sidebar)

THE COURT: I want to ask you, Mr. Futerfas or Ms. Schein, to postpone the making of motions until the lunch break so we can put on another witness before the jury.

When you do make the motions, that will be made as if they were made right, now so you are not waiving anything. Is that satisfactory?

MS. SCHEIN: Yes, your Honor.

THE COURT: Thank you. Who is your first witness?

MS. SCHEIN: Mr. Mills. We have shortened our case.

THE COURT: How long do you think you will be?

MS. SCHEIN: We'll certainly complete by tomorrow morning.

(Continued on next page)

(In open court)

THE COURT: The defense will now put on its case, and you, members of the jury, should pay as much attention to the defense case as to the plaintiff's case. The case is not finished until you hear all of the evidence and the summations and the court's instructions, and you are to keep an open mind until then. Ms. Schein.

MS. SCHEIN: Thank you, your Honor. The defense calls as our first witness Mr. George mills.

GEORGE EDWARD MILLS,

called as a witness by the Defendant,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. SCHEIN:

Q. Good morning, Mr. Mills. Could you tell us a little bit about your background.

A. I'm a retired Navy veteran of 24 years. Now I work in the non-profit organization helping veterans get jobs and homeless veterans off the streets.

THE COURT: Mr. Mills, move in front of the microphone and speak loudly.

THE WITNESS: I am a 24-year Navy veteran. I am retired and now I work with veterans getting them jobs and getting them off the streets.

BY MS. SCHEIN:

Q. Mr. Mills, when you were serving our country, what was your role?
A. I was a leading chief petty officer, missle technician on submarines, and I helped run the weapons department on submarines.
Q. How long did you work in that position?
A. The last seven years of my career of 24.
Q. Did you train people as well in the service?
A. I trained individuals and I also counseled individuals on how to increase their pay grade or become an officer.
Q. How many individuals did you supervise and train during the course of your work in the military?
A. That's too numerous to count. When I was on the submarine, it was a department of 50, and my last duty station when I was in charge of training for the entire missle technician grade, that is approximately 400 missle technicians.
Q. 400? Thank you, Mr. Mills.
Did there come a time when you -- how did you learn about SEEDCO Upper Manhattan Workforce?
A. I was an enrolled student at Brooklyn College and helped out near their office, and one of the things I used to do is go to job fairs around the city to gather information up for veterans and bring it back to the college so we can distribute it. While we were at job fair, BMCC, I met SEEDCO. I was also looking for a job at this time.

Q. May I stop you there. You mentioned BMCC what is?
A. Borough of Manhattan Community College.
Q. You were attending a job fair at that time?
A. I was attending a job fair to pick up information for fellow veterans at Brooklyn College to bring it back to them.
Q. What happened at the job fair?
A. After gathering up information, I noticed there was a table for SEEDCO. I went over and asked what did they do, and they told me it was to help individuals find jobs, and I said I was a veteran. They said we are looking for veterans, and I gave my resume to them. They told me they'd call me back.
Q. What was the time-frame of this job fair at BMCC?
A. I believe it was late November, early December of 2010.
Q. Do you recall who you met at the job fair at the SEEDCO -- withdrawn. Was there a table or a booth set up?
A. There was a I table and there was two individuals there. I don't remember who the male was, but the female that I met was Shandell Velez. She was sitting there.
Q. Do you recall any conversation that occurred?
A. Just the explanation what they do and I was looking for work and I handed over my resume and also that they were interested because I was a veteran, I had training background, and they were thinking about starting a new veterans program.
Q. What happened next?
A. I was called for an interview up at the Upper Manhattan

location on West 125th Street in Harlem.

Q. Who did you meet when you -- did you go to the interview at the Upper Manhattan Workforce Center?

A. Yes, I was interviewed by Shandell Velez and Mr. Bill Harper.

Q. What happened next?

A. I guess I passed the interview. I got called two days later, and I reported to work in January of 2011.

Q. So you were hired in January of 2011?

A. Yes, ma'am.

Q. And what was the job for which you were hired?

A. I was hired as a career advisor.

Q. What was your responsibilities as a career advisor?

A. Responsibility was seeing individuals that came into the workforce opportunities offices and help with resumes, interview, mentoring, how to do better on an interview and also help establish the veterans' initiative program to help veterans as they came into the office.

Q. Could you tell us a little bit more about what those job responsibilities entailed, each one, please.

A. Each one? Sitting down with the individual and going over their resume. If they had a resume, try to -- being in the military, you have a certain skill-set. When you come back into the civilian world, it is a completely different skill-set.

Veterans don't know how to transfer that military skill-set to civilian, and I would help them achieve that translation and put it into the resume to make it more presentable to prospective employers.

Q. What other responsibilities did you have after you advised an individual about their resume and how to translate the services in the military into the civilian aspect?

A. Mentor them on interviewing. It is different to interview in the military than it is in the civilian world, so we tried to tell them the do's and don'ts. Clothing, perfume, what to wear and how to respond to questions and also being a veteran, I would help out the fellow veterans trying to locate benefits that they weren't aware of.

Q. Was there an office at the Upper Manhattan Workforce Center that you could send them to concerning benefits?

A. There was no veterans benefit office at 125th Street. All we had was an earned benefits program, which was the civilian side, public assistance. I would send them either to the VA, veterans administration, or Disabled American Veterans to apply for their military benefits.

Q. Do you know Alex Saavedra?

A. Yes, I do.

Q. How do you know Mr. Saavedra?

A. I know Alex. He was in charge of the Bronx Workforce 1 opportunity office. We seen each other during staff meetings

and also we had a couple of conversations about veterans initiative, how to expand it and make it better.

Q. Did you know that Mr. Saavedra presented a veterans initiative to the city council?

A. I was aware he presented something to the city council, but I was not part of the meeting so I don't know what was discussed with the city council.

Q. What meetings did you attend while you worked at the Upper Manhattan Workforce Center?

A. The weekly staff meetings.

Q. When were they held?

A. Usually they were held on a Friday morning.

Q. Did you ever enter any CIFs when you worked at the Upper Manhattan Workforce Center?

A. I never entered a CIF.

Q. That wasn't part of your job responsibilities?

A. No.

Q. Did you ever hear anyone at the weekly staff meetings on Friday tell any staff members to enter improper placement information into the Work Source1?

A. No.

Q. Did you ever, at those all-staff meetings, did you ever hear anyone tell staff to enter as a placement the job someone had when they walked into Upper Manhattan Workforce Center?

A. No.

Ms. Shandell Velez.

SHANDELL VELEZ,

called as a witness by the Defendant,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. SCHEIN:

Q. Good morning, Ms. Velez.

Could you please tell us a little bit about your background, your work experience before coming to SEEDCO.

A. Sure. Before SEEDCO, I worked for a non-profit in Pennsylvania, Colonial Intermediate Unit. It was a program for special needs children. I was an administrative assistant there.

THE COURT: Speak up, please.

BY MS. SCHEIN:

Q. Did there come a time --

THE COURT: Ms. Schein, if you speak louder, the witness will speak louder.

MS. SCHEIN: Thank your Honor.

BY MS. SCHEIN:

Q. -- did there come a time you began working at SEEDCO?

A. Yes, I started working at SEEDCO in August of 2000.

Q. When you began working at SEEDCO, where were the offices located?

A. The offices were located at 915 Broadway.

Q. Did you remain at SEEDCO's offices at that time?
A. Yes, I did.
Q. What were your responsibilities then?
A. At that time I was actually working with our community partners, providing them with technical assistance, providing their new staff with training, guiding them in the management of their programs at their cites.
Q. Can you tell us what are or what were the community partners with whom you worked.
A. We had quite a few. Off the top of my head we had Northern Manhattan Improvement Corporation which we called NMIC.
Q. What was that?
A. That was one of our community partners. They're a non-profit organization in Washington Heights.
Q. Can you name some others, please.
A. Sure. At the time we had Citizens Advice Bureau. They were located in THE Bronx. We had St. Nicholas, which was in Williamsburg, Brooklyn. We had Henry Street Settlement, Pious, which was in Northern Bronx. We had a variety of them, I think anywhere from eight to as many as 16 at one point under the fair Alliance.
Q. What was the nature of the relationship with the community, SEEDCO and the community partners?
A. The funds were funneled through us to them. We were the intermediary. We had the primary contract with HRA, but we

subcontracted with our community partners, so they would provide the actual service to the customer, but would provide them with technical assistance and we would take on the burden of doing the administrative portion of the programs.

Q. What services did they provide -- withdrawn.

Who were the customers?

A. The customers varied. The bulk of them were welfare-to-work customers, customers who were either -- I believe at that time it was solely customers who were receiving public assistance, but we also serviced individuals who had substance abuse issues, single fathers, and I believe we also -- I don't know what the other one was, it was a smaller portion. It could have been the homeless, but we had a variety of customers, but the bulk were welfare-to-work customers.

Q. What were the services that were provided or offered for this individuals, these people?

A. They varied. The bulk of our service was job readiness, providing resume workshops, interviewing workshops, and then connecting them with with employment opportunities.

Q. Did there come a time that you received a promotion?

A. When?

Q. Well, what was your title or position at that time when you worked with the community-based organizations at SEEDCO as the intermediary?

A. The whole time I was at SEEDCO, I was part of the Earned

and one with a recruiter that very day. And we would provide direct feedback to our community partners on how they did on that prescreening interview with our recruiter?

Q. Would that session be called an orientation?

A. For the community partners, we kind of interchanged the terminology. It was either orientation or fast-track session.

Q. Would they fill out a CIF when they came to the Workforce Center?

A. Yes.

Q. When you did orientations at the community-based organizations, did the individuals whom you met there fill out CIFs at the community-based organization?

A. Yes.

Q. Those CIFs then you would bring back to the Workforce Center?

A. Yes.

Q. What is an individual training grant?

A. An individual training grant, it was a program within Workforce1 that was funded through SBS, and that program was for a select group of individuals. They had to apply for it. For example, if an individual was a nurse's assistant and they had an opportunity to become a nurse, but they needed additional training, they could come to our center, apply for an ITG, take that training, and then they could get that new opportunity as a result of that training. So the ITG was an

opportunity for job seekers to learn a new skill set or increase the ones that they already had.
Q. When a job seeker came to the Upper Manhattan Workforce Center, how did they know to go there?
A. A lot of it was word of mouth. We did advertise. Some of them were referred by their community partners. Some of them were referred by city councilmen, local delegates, things like that. I think a lot of it was word of mouth, though, for the walk-ins.
Q. You mentioned local council members. Would they be referred to as community stakeholders?
A. Yes.
Q. What is a community stakeholder?
A. Local representatives of that community, of Harlem, upper Manhattan, the communities local to our physical location in Workforce1.
Q. When an individual walked into the Workforce Center and they were not there sent through a fast track which you just told us about, what would happen? What would the steps be when they entered?
A. They would be scheduled for an orientation. We would hold orientation -- if I remember, it was at least twice a day Monday through Thursday. And we did have special orientations for non-English speakers, I think once or twice a week.
Q. What would happen next?

A. They would attend one of those orientations. At that orientation they get a presentation of who we are, the services we offer, sort of what the flow is going to be from this point on once they become a registered customer.

Q. Where would they be sent next?

A. They would meet with an assessment specialist, who would review their customer information form with them, and they were asked a series of questions to determine how job ready they were.

Q. What would happen next?

A. It depends. It depends if they had a résumé. It depends if they had a résumé but it was outdated. It depended on their skill set and their work experience. We had different channels for the customers.

Q. What was the flow of customers in 2009 when you first began working at the Upper Manhattan Workforce Center?

A. I'm not too familiar. I wasn't too familiar with it at that time because in that first year that I was there, I was sort of rebuilding the program because it was without a coordinator for so long that I was mostly out in the field reestablishing our relationships with the community partners, reengaging them and developing new ones. So that first year I can't say for sure what the customer flow was.

Q. In 2010 would you say that many people came through the door?

A. Yes.
Q. Can you give us an estimate?
A. It was in the hundreds per week.
Q. Were you involved with any of the large-scale recruitment events in 2010?
A. I don't know the exact year in terms of involvement if they needed more assistance. I think the one I remember the most, I believe it was T.J. Maxx where they came on site. I think they were there for an entire week. And I assisted the lead account manager with client flow coming in, making sure they were registered if they weren't already with us in our system, meeting with the recruiters, meeting with the employer on site and kind of just helping out with the flow.
Q. So were these on-site recruitment events?
A. Yes.
Q. Did you or other staff members prescreen the candidates who came in?
A. Yes.
Q. Are you familiar with the large recruitment event for staffing Eataly, the marketplace and restaurant?
A. Yes.
Q. In your work at the Workforce Center, were there times when there was a backlog of CIFs?
A. Yes.
Q. Was that the result of a large-scale recruitment event?

A. Yes, it was.

Q. I show you what's been marked Defense Exhibit Z4.

Do you recognize that?

A. Is it the e-mail?

Q. The e-mail marked Defense Exhibit Z4?

A. Yes.

Q. Is this an e-mail that you sent in the ordinary course of your business at SEEDCO?

A. I'm sorry. Can I read it?

Q. Sure. Please, take your time.

A. I can't see the bottom portion of it.

MS. SCHEIN: May I hand up a copy?

THE COURT: Yes. Here's the bottom.

MS. BLAIN: It's showing up.

THE WITNESS: OK.

THE COURT: Is there a question?

MS. SCHEIN: Your Honor, I move to admit this e-mail.

THE COURT: Have you authenticated the document?

Q. Is this an e-mail that you wrote in the ordinary course of your business at Upper Manhattan Workforce?

A. Yes, I did.

MS. SCHEIN: We move to admit it, your Honor.

MS. BLAIN: No objection.

THE COURT: Received. You may publish to the jury.

(Defendant's Exhibit Z4 received in evidence)

MS. SCHEIN: Thank you.

Q. Ms. Velez, what is this e-mail referring to? What is this about?

A. This was referring to the interview recruitment. Because the recruitment was such a large scale, we were seeing hundreds, if not over a thousand potential customers. We were prescreening customers for the employer. And what my challenge was with Mr. Roazzi is that he would do the work, but he would not document it. I kept trying to tell him, unless you document it, it doesn't exist. In your mind you did it and you did do it, but if you can't document it for SBS we can't count it.

Q. What do you mean by "document it"?

A. When we made placement, they had to fill out an EIF, an employment information form. It required specific information in regards to the position. I don't remember -- I think he had a spreadsheet that had insufficient information for us to complete an EIF form.

Q. Where would he have gotten that spreadsheet from?

A. The employer.

Q. And is the employer at Eataly on site at the large marketplace?

A. Correct.

Q. Did you know what information was on the spreadsheet?

A. I don't recall off the top of my head.

Q. Do you recall other large recruitment events which you worked on in 2010.

A. We had so many employers, I couldn't tell you. I know we had Fairway. We had the East River Plaza, but I don't remember off the top of my head if that was 2010.

Q. What was the East River Plaza?

A. It was the new development there. Several large businesses were going to be occupying it. I believe Costco was one of them. I don't remember if it was T.J. Maxx or Target, but it was large retailers that were going to occupy it.

Q. Do you know whether there were community stakeholders involved in that project?

A. Yes, there was.

Q. Did SEEDCO prescreen candidates and assist with employment needs of these large stores?

A. Yes, we did.

Q. Do you know approximately how many people SEEDCO helped place in jobs at the East River development project?

A. It was a large number. I would say over a couple hundred maybe. I don't remember the exact amount, but I know it was a large number.

Q. Were you involved with your role with the community-based organizations and the community stakeholders with the Red Rooster recruitment event?

A. I don't remember the details of the Red Rooster. I

remember that they were one of our business customers.

Q. What are reengagement calls?

A. Reengagement calls are outreach to our customers. We would on a regular basis reach out to our customers either by phone, e-mail, or in person to inquire on how they are doing in their job search. If we referred them to an employer, we would follow up with them: How did that interview go? Did you get the position? Are you still job searching? If you are, why don't you come in. We have X, Y, Z positions possibly available to you.

Q. Did you know what SBS's policy was as to what could be considered a placement?

A. I had a general idea, yes.

Q. And what was it?

A. It had to be a minimum of 20 hours per week. It had to be at least minimum wage. There was an exception to the minimum wage if it was, for instance, a waitressing or server position. We needed the employer name, the position name, and the job start date had to be after the customer was a customer with us.

Q. Did you attend meetings while you were working at the Upper Manhattan Workforce Center?

A. Yes.

Q. Could you tell us what meetings you attended.

A. There was a lot of meetings. We had weekly coordinator meetings, daily, weekly staff meetings. We had meetings with

SBS on a quarterly basis.

Q. The weekly all-staff meetings, when were those held?

A. Every Friday.

Q. Did you attend those meetings?

A. Yes, I did.

Q. Did Mr. Saavedra attend those meetings?

A. Yes, he did.

Q. Often?

A. Yes.

Q. During those meetings, did you ever hear anyone who was leading those meetings tell staff to enter false placements?

A. No.

Q. Did you ever hear anyone at that meeting or any other meeting you attended during the week tell staff or people in attendance at that meeting to enter as a placement the job someone had when they came to the Workforce Center before receiving any services?

A. No.

Q. Did you ever hear of any code word used by Alan Katz, such as orientation?

A. No.

MS. BLAIN: Objection.

THE COURT: Sustained.

Q. What did you understand orientation to mean?

A. It was our daily orientation where we would present or

services to customers, where they would come in, they would get the presentation, they would fill out the CIF form and meet with an assessment specialist.

Q. In your work at Upper Manhattan, did you ever come across CIFs where there were mistakes in their entry in the Worksource system?

A. Yes.

MS. BLAIN: Objection.

THE COURT: Overruled.

THE COURT: What's the answer?

THE WITNESS: Yes.

THE COURT: What do you mean by mistakes?

THE WITNESS: They would invert their names. I had an outreach specialist who sometimes would invert the -- put the first name in the last name field and the last name in the first name field. Typos.

Q. Ms. Velez, I show you what's been marked Defense Exhibit X4. If I could direct your attention to the second page. It is an e-mail from you to Mr. Christopher Velasco. Is this an e-mail that you wrote in the ordinary course of your work at Upper Manhattan Workforce Center?

A. Yes. If I was aware of it and it involved my staff, yes.

Q. Do you recognize this e-mail as one that you wrote?

A. Yes.

MS. SCHEIN: Your Honor, I move to admit.

MS. BLAIN: No objection.

THE COURT: Received. You may publish.

(Defendant's Exhibit X4 received in evidence)

MS. SCHEIN: Thank you.

Q. What is this e-mail about?

A. Chris Velasco was my outreach specialist. He did data entry for the community partnership program at that time. And I believe this is one of the cases where his data entry did not match the CIF.

I think this particular one was where he inverted the customer's name. So later on when we needed to search the customer. We couldn't find them based on the information we had. It took a lot of troubleshooting.

Q. When you wrote to him in this e-mail, when you say, "Please take expert care when entering data as failure to do so causes unnecessary delay and stress," what are you referring to?

A. So, for instance, if we had a placement for this customer, we have to enter that placement into the system, but if we can't find the customer in the system because he entered it incorrect, then we lose out on a placement.

Q. Was part of your work making sure, troubleshooting when these problems arose?

A. Only for him because he was my direct report.

Q. Do you recall a meeting between you and Alex Saavedra and a Mitchell McClinton?

for the witness, Shandell Velez.

THE COURT: Do you have anything you want to tell me?

MS. GUERON: No, your Honor. These are questions that were asked at deposition. She is adequately prepared.

THE COURT: OK. If you want to sit up here, you may.

MS. GUERON: Thank you, your Honor.

THE COURT: Anything else on Ms. Velez?

MS. SCHEIN: No, your Honor. Thank you.

MS. BLAIN: Thank you.

THE COURT: Or any other witness?

MS. BLAIN: Not at this time, your Honor.

MS. SCHEIN: No, your Honor.

THE COURT: May I hold this document, Consent Decrease and Order of Settlement and Dismissal of Ms. Shandell Santiago Velez?

MS. BLAIN: Yes. It is also on the docket sheet of this case, but, yes, you can keep that copy, of course, your Honor.

THE COURT: Are we going do mark it for identification.

MS. BLAIN: Yes, your Honor, I will mark it as Government's Exhibit 16 for identification.

THE COURT: Can we do the motions?

MS. SCHOENBERGER: Yes, your Honor.

THE COURT: Defense? These are motions at the end of

the plaintiff's case.

MR. FUTERFAS: Your Honor, at this time, there are two remaining charges, and at this time we would move --

THE COURT: You mean allegations?

MR. FUTERFAS: Allegations. At this time we would move to dismiss each of them, your Honor, on the grounds that the government under any view of the evidence --

THE COURT: The government did not what?

MR. FUTERFAS: They did not prove and cannot prove under a reasonable view of the evidence the allegations they have made to support the charges.

THE COURT: There is a sufficient basis for the jury to find that the government can prove its claims.

MR. FUTERFAS: That's correct, your Honor.

THE COURT: By a preponderance of the evidence.

MR. FUTERFAS: That's correct.

THE COURT: Do you want to give me any reasons?

MR. FUTERFAS: Sure, your Honor.

There are basically two issues for the jury. One issue is whether there was a false claim, within the meaning, definitions of the False Claims Act.

I think given the government's admission of last -- I am not going to call it an admission. The government's stipulation of last Thursday afternoon, where they agreed that any false claim would be a false claim submitted for the

purposes of the performance-based compensation, the 30 percent of the contract in 2010 and then 20 percent of the contract in 2011, on each of those, half of which is related to placements. The only documentation that supports a claim that could arguably be a claim is documentation that we actually entered into evidence. It is the evidence of SBS's authorization, what is called an authorization package for lack of a better term, where SBS received the validated report of placements from Charney. SBS took that, they did their own analysis, plugging it into the contractual numbers in Government Exhibit 34, which is Attachment A to the contract. Based on that, they came up with a number for payment.

The evidence is that there was a third-party verification process. The evidence is further -- and I know we are not done with the defense case because we are going to hear from Mr. Charney tomorrow -- but even on the government's case, and I know that is where the line is drawn with respect to these motions, I asked Angie Kamath for half an hour whether she ever determined whether a single, single false claim made it through. I did not get an answer from her one way or the other, even though I took 35, 40 minutes.

(Continued on next page)

(In open court; jury not present)

THE COURT: What is your definition of a claim?

MR. FUTERFAS: My definition is a claim under the False Claims Act. It is in our requests to charge.

THE COURT: Does it have to be in writing?

MR. FUTERFAS: The government is alleging these are in writing.

THE COURT: Does it have to be in writing?

MR. FUTERFAS: Yes, and the government has submitted thus.

THE COURT: If you submit data, the assemblage of which makes out a claim, are you submitting a claim?

MR. FUTERFAS: Your Honor, the raw data, the testimony is unequivocal at this point in the trial, the raw data was not what was submitted for payment. What was submitted for payment, and the testimony from the --

THE COURT: It was the beginning of a process of submission. The testimony, as I remember it, is that the data was submitted in a form by SEEDCO, which is accessible by SEEDCO, by the SBS, and by Charney as a verifying agency, and upon the verification by Charney of accuracy, the claim is complete and reviewed then for payment by SBS.

In due course if it found regular, it is paid, which to my mind indicates the submission of the data is the prerequisite for the obtaining of money and it is an exchange

of information for money. That makes a claim.

MR. FUTERFAS: Your Honor, the testimony of the government's witnesses was not actually consistent with that.

The testimony of the government's witnesses are that data was entered in the Work Source program, that is the raw data. That data for a particular quarter was then drawn and scrubbed for duplicates and other common errors in the data.

THE COURT: By SEEDCO?

MR. FUTERFAS: By SBS, actually by SBS.

THE COURT: I think SEEDCO testified that they did the scrubbing.

MR. FUTERFAS: They did some. It is funny, I think Bill Harper will testify this afternoon maybe.

THE COURT: We're testing the government's case. So far we have testimony presented by the government that SEEDCO did its scrubbing, but it wouldn't make any difference if someone else -- "scrubbing" is an ambiguous word. What it means is the data was looked at in terms of its own appearance to see if there were obvious redundancies or other defects in the submissions.

If there were, they were identified and deleted from the submission. The submission is the claim.

MR. FUTERFAS: Exactly. So what happens -- exactly, your Honor -- what happens, Ms. Kamath, I am reminded by co-counsel, said SBS did the scrubbing. I think SEEDCO may

have done some as well. That is what Mr. Harper testified to, but that is not in evidence yet.

Ms. Kamath testified SBS did it. The point is that new, that second or --

THE COURT: "Scrubbing" is your word. It is not a technical word. I don't think it has any good meaning.

MR. FUTERFAS: Fair enough.

Whatever that subset of data is where discrepancies or obvious errors have been removed, that subset of data, SBS now, pursuant to the contract, that is now the data that gets verified, and pursuant to the contract -- the contract that the government earns -- pursuant to the contract, not a dime is paid unless a claim, unless a placement is verified.

THE COURT: You're saying the verification by Charney is the claim and not the submission of the data which Charney verified?

MR. FUTERFAS: Yes, your Honor.

THE COURT: What is the government's position?

MS. SCHOENBERGER: The language of the False Claims Act is that the claim has to be presented to the government, and there is no language that the government has to pay on any particular claim.

There has been an abundance of evidence that the way in which SEEDCO reported the placements that it should be paid for was by entering that information into Work Source1 where it

was directly accessed by SBS. That doesn't seem to be in dispute. That was the one way in which SEEDCO communicated to SBS.

THE COURT: Is there any law that restricts a claim that is submitted in that form?

MS. SCHOENBERGER: Restricts it, no, your Honor, not that I know of.

THE COURT: I deny the motion in that respect.

What is the other part of the motion, Mr. Futerfas?

MR. FUTERFAS: For the purpose of these motions, your Honor, can we deem -- we have briefed a lot of this, the definition of false claim in our motions in limine and summary judgment.

THE COURT: How do you think I know about it.

MR. FUTERFAS: Exactly. I am just incorporating that, I guess, by reference. The other part, obviously, is -- there are two other parts. One is that at least four allegations, number one, Claim 1, Claim 1 -- I am trying to put my civil lawyer hat on here. It is not easy.

THE COURT: You're doing all right.

MR. FUTERFAS: With respect to claim 1, there has to have been money that it actually exchanged. We acknowledge in our submissions to your Honor claim 2 is a little more general, but Claim 1 certainly money has to be exchanged for the false claim. It actually has to occur.

What the government has not proved specifically, specifically through Angie Kamath who did not identify -- in fact, what she said was fascinating and that is why I spent all the time on the e-mail. Even after the DOI report, which was March of 2011, what SBS then tried to do is determine whether any of those discrepancies identified by DOI actually were reviewed by Charney and either verified or not verified.

That is to where I couldn't get --

THE COURT: Supposing, Mr. Futerfas, the government gets onto the mistake or the fraud and doesn't pay. So all we have is an intent to submit a false claim to get money. Is that sufficient?

MR. FUTERFAS: It might be sufficient for a Claim 2. It might be because Claim 2 --

THE COURT: You're saying a false claim is not a false claim until there is actually payment?

MR. FUTERFAS: Excuse me.

(Off-the-record discussion)

MR. FUTERFAS: I am reminded by co-counsel even Claim 2 it has to be material to submission of a claim.

THE COURT: Suppose it is material? And materiality is not in our definition. It must exceed the threshold of placements and mistakes or frauds were inflating the number of placements, that is the government's theory. I am not buying it. I am just restating it. I am hearing you say that you

can't have a false claim unless the government actually bites and pays?

MR. FUTERFAS: On Claim 1, the government has to bite and claim, bite and pay. On Claim 2, it still has to be material to a claim.

THE COURT: Let's say it is material.

MR. FUTERFAS: There still is the Charney validation process.

THE COURT: The same thing again. What is the government's argument on this?

MS. SCHOENBERGER: Your Honor, I am not sure this is a materially different argument than the first one.

THE COURT: I am not, either. It is the same argument. I deny that aspect of the argument as well.

What about the material proposition that Mr. Saavedra must know?

MR. FUTERFAS: Knowledge is defined in three different ways. It can be actual knowledge. It can be reckless notice or it can be deliberate indifference. On the other two, actual knowledge --

THE COURT: The government contends there is knowledge as proved by what?

MS. SCHOENBERGER: Your Honor, by a number of things.

First and foremost is Kimberly Nesmith's testimony she was directly instructed by the defendant to enter placements

for jobs that had started before people received SEEDCO's services, and there are e-mails we have shown that were sent to Mr. Saavedra, among others, that specifically referenced the types of practices that resulted in false claims. One, we there was actual knowledge.

THE COURT: And caused to be submitted is also proved that way?

MS. SCHOENBERGER: Yes.

THE COURT: I think that is sufficient evidence to make out a prima facie case, and I deny the motion.

There is no evidence, is there, that what Mr. Saavedra's motive was?

MS. SCHOENBERGER: Your Honor, I think that there is.

I think some of the e-mails we saw from Mr. Saavedra regarding the importance of meeting placements numbers and putting pressure on staff to meet them --

THE COURT: What was in it for him?

MS. SCHOENBERGER: I think his job depended on it. Under the False Claims Act, there is not a requirement for a motive, your Honor.

THE COURT: I didn't say that. I asked if there was a motive. The motion is denied. We'll enjoy our rest of our break.

MS. SCHOENBERGER: Your Honor, for the record, can the government reserve its motion pursuant to Rule 50 (a) until the

close of the defense case?

THE COURT: What is your motion?

MS. SCHOENBERGER: That the government is entitled to judgment as a matter of law based on the evidence presented in the case.

THE COURT: That motion is denied.

MS. SCHOENBERGER: Thank your Honor.

THE COURT: We are involved with a jury trial.

MS. SCHEIN: Just a scheduling matter. We anticipate concluding our defense by tomorrow before lunch or right after lunch. In terms of the charge conference and submissions to follow?

THE COURT: Give me a moment.

MS. SCHEIN: Thank you.

(Pause)

THE COURT: I am not going to start tomorrow until 11:00 o'clock. I have a doctor's appointment in the morning. So you figure you'll finish before lunchtime?

MS. SCHEIN: No, your Honor. In that case, it will be after lunch, but I think surely by the end of the day we will have completed our defense.

THE COURT: I don't know that we'll be ready with our proposed charges. I hope we will. If we will, we will. I can't tell you the schedule beyond that. If we can get our charge together, we'll have a charging conference tomorrow

THE WITNESS: Yes.

THE COURT: Namely, June 2011 through March 7th, 2012, was that the period when you were director or deputy director of the Upper Manhattan Workforce 1 Career Center or SEEDCO?

THE WITNESS: Yes.

THE COURT: In that period of time did you, as for that period of time, did you, "Admit, acknowledge and accept responsibility for your involvement in SEEDCO's submission of reports to the City of New York"?

THE WITNESS: Yes.

THE COURT: Did those reports and your involvement falsely represent that job candidates have been placed in jobs by or with the assistance of SEEDCO?

THE WITNESS: I am sorry. Can you repeat the question.

THE COURT: Did you admit your involvement in falsely representing on behalf of SEEDCO that job candidates had been placed in jobs by or with the assistance of SEEDCO?

THE WITNESS: Yes.

THE COURT: Was that false representation?

THE WITNESS: I am sorry?

THE COURT: Were you involved in a false representation in the matter I read out?

THE WITNESS: Unintentionally, yes.

THE COURT: Go ahead.

BY MS. SCHEIN:

Q. Ms. Velez, what was your involvement or tell us how you were involved.

A. I managed the Upper Manhattan Workforce 1 during that period, so I oversaw the staff.

Q. Ms. Velez, you know a whistleblower came forward in April of 2011. Do you recall that?

A. Yes.

Q. Until the whistleblower came forward in 2011, were you aware of improper placement practices at the Upper Manhattan Workforce Center?

A. No.

Q. Or the Bronx Workforce center?

A. No.

MS. SCHEIN: Thank you. No further questions your Honor.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MS. BLAIN:

Q. Ms. Velez, you worked at SEEDCO from the years 2000 to 2012, right?

A. Correct.

Q. In 2009, your job title was community partner coordinator, right?

A. Correct.

THE COURT: You're excused.

(Witness excused)

THE COURT: Next witness.

MS. SCHEIN: Your Honor, the next witness the defense calls is Francine Delgado.

FRANCINE DELGADO,

called as a witness by the Defendant,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. SCHEIN:

Q. Good afternoon, Ms. Delgado.

A. Hello.

Q. Could you please tell us briefly about your background, where you went to college and that sort of thing?

A. Sure. I grew up here in New York City and I went to college upstate at Hamilton College. I began working back in New York City soon after college.

Q. What was your first job, Ms. Delgado?

A. I worked first as a development assistant for an organization called Credit Where Credit is Due in Washington Heights.

Q. What did you do there?

A. I started out as a fundraiser. It is a non-profit organization that created a low income credit union for folks who had not formally been attached to the banking system. So

we worked in the community to educate and to ultimately create a banking institution for people who might not have been able to access traditional banks.

Q. What was the next job you held?

A. Soon after that -- I mean I was promoted a couple of times there and went on to work for an organization called the White House Project, and the White House Project is an organization that was created to increase women's participation in both civic and political process.

Q. What was your next job?

A. I then started going to graduate school and concurrently started working at SEEDCO.

Q. What was your first position at SEEDCO?

A. I started as a program associate at SEEDCO.

(Continued on next page)

Q. What were your responsibilities as a program assistant?
A. As an associate, I was first responsible for a portion of a child care access program that was designed to help women who were transitioning from welfare to work to create child care opportunities, what we called backup child care. So when they couldn't get to work because their child care arrangements fell through, we were able to offer backup child care options.
Q. What was your next position at SEEDCO?
A. I grew from a program associate to a senior program associate, initially on the same child care program just assuming greater responsibility for that particular program.
Q. And what year was this, approximately?
A. Early 2000s, probably -- when I became a senior associate. Probably around 2003.
Q. Where were SEEDCO's offices located?
A. 915 Broadway.
Q. What was the next position you were promoted to at SEEDCO?
A. I then moved into a program manager position.
Q. What were your responsibilities as a program manager?
A. I -- I'm sorry. Actually, while I was a senior associate, I also took on larger responsibilities for some of the welfare-to-work programs that we were working on, so I assumed responsibility for working with several of the community-based organizations that SEEDCO partnered with to implement welfare-to-work programming, job skills training, and

programming at three of these CBOs -- CBOs meaning community-based organizations.

Q. Which were these three CBOs?

A. At the time it was probably the Citizen's Advice Bureau in the South Bronx, St. Nick's Local Preservation Corporation, which has changed its name, but was in Brooklyn at the time, and northern Manhattan Improvement Corporation, which was in Washington Heights.

When I became a program manager, I assumed greater responsibility for that program and began to oversee the entire network, which at the time was nine community-based organizations. Please don't ask me to name them all.

Q. I won't. Were they all located within New York City?

A. Yes.

Q. Were you promoted after that to another position at SEEDCO?

A. I was. When I was a senior -- when I was a program manager, part of my responsibilities was to work with other organizations to grow that particular network of community organizations. So, as that network began to grow, I then was promoted to a senior manager.

Q. What were your responsibilities as a senior manager?

A. So I took on greater staff. We expanded that network so we went from first nine organizations to twelve organizations and then to about fifteen organizations and then from fifteen we went to about twenty organizations.

Q. Were these organizations community-based organizations?
A. Yes. So they were subcontracting with SEEDCO for services.
Q. What does that mean? Subcontracting?
A. We essentially bid on large-scale welfare-to-work programs or WIA programs, Workforce Investment Act programs, for funding either through the city, state or the federal government. As we won contracts, we would then take pieces of those contracts and then send that money to community organizations that we vetted and provided technical assistance to for them to ultimately implement the programs that we were designing.
Q. At that time how many people were you supervising at SEEDCO's offices?
A. As a senior manager, I probably had a staff of seven or eight at that point.
Q. Did there come a time when you met Alex Saavedra?
A. Yes. I knew Alex Saavedra from the day that I started at SEEDCO.
Q. Did you work with him when you first started at SEEDCO, alongside or --
A. When I first started at SEEDCO we worked on separate programs. Alex was working on a program in Brooklyn that was also a very special program that was geared towards helping people get to work. So it was a reverse commute program in Sunset Park.

It was like a van program. We used to say that he was

driving the van, so I knew him from the beginning.

Q. At the time when you were managing these programs, you said they were up to, I believe, 20 programs that you were managing. At that point in time, what was Mr. Saavedra's job at SEEDCO?

A. At some point when we assumed responsibilities for the one stop in Harlem on 125th Street, alex was promoted and took on a position as the director. So he then moved from 915 Broadway and was working at Harlem throughout the time that I was working at 915 Broadway.

Q. When you say the one stop, what does that refer to?

A. The Workforce1 Center.

Q. Why is it called a one stop?

A. The federal term for the program is one stop. So the first Work Investment Act legislation originally called for these physical centers where that could serve as a one stop for folks to access not only their unemployment benefits but also information and job training and skills development towards getting new jobs and other resources.

Q. When Mr. Saavedra was promoted to the directorship of the upper Manhattan one stop center, do you know about what time that was, about what year that might have been?

A. It had to be 2003, maybe even a little bit earlier than that. It was probably 2003 or 2004.

Q. You remained at the SEEDCO corporate offices.

A. Yes.

Q. Were you promoted after your job managing the 20 different programs?
A. Yes. So I continued to work with our then senior vice president to design programs. I was ultimately promoted to vice president for what we called community-based initiatives. At that time I was overseeing any kind of programming that went through community-based organizations of SEEDCO in New York City specifically.
Q. Were there additional responsibilities when you were promoted to this new position?
A. Yes. So, increased staff, increased budget responsibility, increased program oversight, and I also began to work with our team in Memphis, Tennessee, to replicate our programming, which we then implemented in Memphis as well.
Q. Who funded SEEDCO?
A. SEEDCO received funding from all different organizations, from the federal government, from various state agencies, various local agencies here in this city as well as the other cities where we did work. We also received private funding from several large foundations, including the Ford Foundation, the Annie E. Casey Foundation, and then a whole range of many foundations.
Q. Was SBS one of the funders?
A. Yes. We received resources through the Department of Small Business Services to operate not only the Workforce1 career

centers, but also to operate the Small Business Solutions centers, which at the time we started with two and then ultimately that grew to three. Then we also received other workforce investment monies from the Department of Small Business Services, which also -- those resources were from the former Department of Employment. Those agencies got merged when Mayor Bloomberg first took office. So we had money to serve former incarcerated individuals as well as resources to serve individuals with limited English proficiency.

Q. What was the Business Solutions Center that you mentioned.

A. Yes.

THE COURT: Keep your voice up, please.

MS. SCHEIN: Thank you, I will.

A. The Business Centers were, again, sort of like these one-stop shops where individuals who were either operating small businesses or interested in developing small businesses could receive information, support, and light-touch technical assistance to help either grow or start their businesses.

Q. Did there come a time when you became Mr. Saavedra's supervisor or direct report?

A. Yes. When I became -- when I was promoted to senior vice president for New York City programming.

Q. And when was that time frame, please.

A. It had to be middle of 2009.

Q. Did Mr. Saavedra report directly to you?

A. He did.
Q. What were Mr. Saavedra's responsibilities and duties at that time?
A. Initially it was to continue to oversee and serve as the center director for the Upper Manhattan Career Center. And when I first became senior vice president, we had already begun the initial sort of planning and strategic planning to respond to a bid for or request for proposals for an additional career center. We knew that we wanted to move into the Bronx, so he was tasked with kind of owning that process so to speak.
Q. Before that, when you were his direct report and he was the director of the Upper Manhattan Workforce Center, just in general terms, or specific, what was the purview of his responsibilities?
A. As a center director, his responsibility was really to be sort of the face of the center so to speak. So that involved interacting with public stakeholders, with employers, with managing a staff of probably, I think he may have had six or seven direct reports himself, all managers and folks who oversaw sort of the various components of the programs.

He also oversaw -- it is a little bit complicated, so I apologize -- everything that SEEDCO did through its network of community-based organizations. SEEDCO also ran those special initiatives through the career centers as well, so we had a fatherhood program, we had a veteran's program, we had a

benefits access program, a career advancement program. So all of those programs had some kind of manifestation of that program or implementation of that program at the one stop. So he was also responsible for being the face in the community for those programs as well.

Q. You mentioned public stakeholders. What are they?

A. Local --

Q. Who are they?

A. Local council members, you know, the Harlem community in particular is a very, has very strong religious institutions, so interacting with kind of key stakeholders in the community, religious institutions, the local schools, the trade schools, anywhere where there could be people who were potential job seekers who were either looking for employment or needed employment, also interacting with hiring managers, HR staff, business owners, again, just stakeholders in those communities anywhere where there was potential for job opportunities.

He was also the primary point of contact for our funder, the government, Small Business Services. So he was also responsible to attend any meetings or be present for anything that they wanted him to be present for.

Q. Was one of his other responsibilities also to formulate the budget for the Workforce Center with the SEEDCO CFO?

A. Absolutely. A big part of his job was to ensure that there was proper, you know, budgeting, budget expenditures, and to

work very closely with our finance team to make sure that we were adequately expending the funds.

Q. In your supervision of Mr. Saavedra, did you direct him to go and have more outwardly focused activity in terms of working with the community stakeholders and others in the community to bring opportunities?

MS. BLAIN: Objection, your Honor.

THE COURT: Overruled.

A. Yes. That was definitely an expectation of mine as well as an important part of the work that SEEDCO did. We were in the workforce centers for a specific reason. The organization was an antipoverty organization.

So we wanted to build the right types of relationships with people. The Workforce1 centers did not have a good reputation, especially in Harlem. So it was critical for us that we, in order for us to be successful in our work, to really build those relationships, and it was necessary that the center director be the person who was sort of owning that responsibility.

Q. You are talking about the time prior to SEEDCO obtaining the contract to run the Workforce Center in Harlem?

A. Yes. Unfortunately when we took over those centers, that particular center had not had a strong track record of delivering results or services in that particular neighborhood.

Q. Once SEEDCO took it over, did the reputation of the

Workforce Center at upper Manhattan begin to improve?

MS. BLAIN: Objection.

THE COURT: I will allow it.

A. So, it did over time with a lot of hard work and a lot of good results that we delivered.

Q. Did you direct Mr. Saavedra and did he develop opportunities with community stakeholders such as Columbia University and other universities as well as CUNY campuses and the city community colleges?

A. Yes. Alex actually played a central role --

THE COURT: Mr. Saavedra.

A. -- in developing those types of relationships with Columbia University in particular, with CUNY, with City College on 137th Street, with a number of the community colleges that even expanded beyond upper Manhattan.

THE COURT: Would you use last names, please.

A. I'm sorry.

Q. Could you give us an example of one of those relationships that was developed by Mr. Saavedra?

A. So Mr. Saavedra had developed a relationship -- one that sort of really is fresh in my mind is the one that he developed over the fatherhood program with Columbia University's young men's health initiative, which was this really unique public health initiative that Columbia had created really to provide education and information to young men or just generally men

who may have sort of been marginalized or were sitting outside of kind of our health care system.

Mr. Saavedra was able to really develop a relationship there so that we could provide additional resources to those men who were coming in for orientations and were coming into this special clinic that had been created at Columbia about the resources that we had, particularly around our fatherhood program.

It was a really nice match because we found that a lot of the individuals who were coming into the Columbia program were the types of individuals that we needed to serve who were noncustodial parents, who were in many cases structurally unemployed, who maybe had had histories of incarceration, and, you know, who were dealing with large child custody arrears and who were just trying to get back on their feet.

It proved to be a really strong relationship not only for us but in terms of being able to put folks through our programming, but also for Columbia, because it just kind of created this really great cross-referral relationship that proved successful for all of us.

Q. Did you work together with Mr. Saavedra on a veteran's initiative program?

MS. BLAIN: Objection.

THE COURT: I think we have enough background. Answer this one question and let's go to what is before the jury.

MS. SCHEIN: Thank you, your Honor.

THE COURT: You can answer the question.

A. I did. Mr. Saavedra and I worked on a veterans' initiative that --

THE COURT: OK. You have answered the question.

Q. Do you know if Mr. Saavedra met regularly with SBS, individuals from SBS?

A. I do know that.

THE COURT: Rephrase the question.

Q. Do you know if Mr. Saavedra met regularly with individuals from SBS?

THE COURT: Met what?

MS. SCHEIN: Met regularly on a consistent basis, or how would you characterize how often or seldom Mr. Saavedra met with people from SBS?

A. Mr. Saavedra, based on my understanding --

THE COURT: Just on your observations.

THE WITNESS: My observation was that he at least on a weekly basis was interacting with at least one individual from SBS, and also a big part of his job was to ensure that the managers who worked as direct reports to him were meeting regularly with their counterparts on a weekly basis with members from SBS. SBS was on site --

THE COURT: You have answered the question.

Q. You mentioned that Mr. Saavedra's counterparts met

target.

THE COURT: And you were at 164?

THE WITNESS: Sure.

THE COURT: And this was the middle of the month?

THE WITNESS: Yes.

THE COURT: Did it seem that you would make the target?

THE WITNESS: It's plausible that we would have. We always had to capture information after the fact.

THE COURT: What do you mean "after the fact"?

THE WITNESS: Well, we would do a lot of work on the front end to place individuals, and then a lot of work on the back end to follow up with them to ensure that they were placed in the job to capture the placement information as required for our database entries. So there was a lot of calling, and it didn't happen realtime.

So we would have made these placements in November or even maybe December, November, and then we would have had to spend the entire month of January capturing the information.

Q. Ms. Delgado, this e-mail was sent, was two and a half weeks after opening the Bronx Workforce Center, correct? January 19, 2011?

A. Yes.

Q. Did there come a time when you directed Mr. Saavedra to take over some of your responsibilities?

A. Yes. I had actually begun traveling nationally as well as internationally. So my role was changing and growing, and it was my intention to groom Mr. Saavedra to take on my position. So he was doing a lot of double duty.

Q. And did there come a time --

THE COURT: You were superior to Mr. Saavedra?

THE WITNESS: He was my direct report, yes.

THE COURT: There came a time when he was going to take over your role?

THE WITNESS: That was the expectation.

THE COURT: About what time of the year was that?

THE WITNESS: It was probably around this time.

THE COURT: "This time" being?

THE WITNESS: Yes, the beginning of 2011. We wanted him to get the Bronx center up and running, spend some time grooming the woman who was going to be his deputy director at that center so she could become center director.

THE COURT: Under him?

THE WITNESS: Under him.

THE COURT: Did there come a time when that change was made?

THE WITNESS: We didn't get to make that change.

Q. Did there come a time that you became aware that there was a whistleblower in the Upper Manhattan Workforce Center?

A. We had someone who brought forth an allegation and invoked

whistleblower policy.

Q. When was that?

A. It was sometime maybe March or April of 2011. I am not sure exactly when.

Q. Prior to that time, had you heard of any allegations of wrongdoing at either the Upper Manhattan Workforce Center or the Bronx Workforce Center?

A. No.

Q. Did there come a time after you learned these whistleblower allegations that you and Mr. Saavedra had a meeting with the CEO, Barbara Gunn?

A. Yes.

Q. At that meeting, do you recall whether Mr. Saavedra told Ms. Gunn that she should notify SBS right away about those allegations?

MS. BLAIN: Objection.

THE COURT: Sustained.

Q. What happened at that meeting?

MS. BLAIN: Objection.

THE COURT: Who called the meeting?

THE WITNESS: Myself. I called the meeting.

THE COURT: Whose office?

THE WITNESS: Our CEO, Barbara Gunn.

THE COURT: When?

THE WITNESS: Soon after talking to Bill Harper, the

Q. You were still friends. In fact, you described that relationship in 2010 as a dear friendship, isn't that right?
A. I would say so.
Q. And you even socialized with Mr. Saavedra outside of work in 2010, right?
A. Occasionally.
Q. And you were also friends in 2011, right?
A. Yes.
Q. You spent a lot of time together in 2011, right?
A. We were working very long hours. I don't think it was a social relationship in 2011.
Q. In 2011 it was not a social relationship?
A. I really don't remember it being very social in 2011.
Q. So your testimony today is that you were not friends with Mr. Saavedra in 2011?
A. We were still friends, but I don't think we had the opportunity to be very social in 2011.
Q. All right. You have testified that you expected at some point Mr. Saavedra to take over your role as vice president, right?
A. As senior vice president, yes.
Q. And you have testified that that didn't happen, right?
A. It didn't.
Q. That's because SEEDCO asked you to resign, right?
A. SEEDCO didn't ask me to resign.

Q. You resigned in March 2012, correct?
A. I actually resigned in 2012, yes.
Q. And you have read the Department of Investigation report, right?
A. Yes.
Q. You are familiar with that report?
A. I read it once. Yes.
Q. You know that it came out in March 2012, right?
A. That's probably right.
MS. BLAIN: No further questions, your Honor.
THE COURT: Thank you.
THE WITNESS: OK.
MS. SCHEIN: Your Honor, just a brief redirect?
THE COURT: OK.
MS. SCHEIN: Thank you.

REDIRECT EXAMINATION

BY MS. SCHEIN:

Q. Ms. Delgado, you worked very hard and devoted your career to SEEDCO, a good part of it, correct?
A. I did.
Q. Did Mr. Saavedra do the same?
MS. BLAIN: Objection.
THE COURT: Sustained.
Q. As Mr. Saavedra's supervisor and direct report, did you have an understanding that Mr. Saavedra also worked very hard

and devoted a large part of his career to SEEDCO?

THE COURT: I will allow the question. You can answer.

A. I think -- Alex was a very dedicated employee, as were most of the people that we worked with. We were all very committed.

MS. SCHEIN: Thank you, Ms. Delgado.

THE COURT: You are excused Ms. Delgado.

MS. BLAIN: Brief recross, your Honor? One question.

THE COURT: One question.

MS. BLAIN: Thank you.

THE COURT: It was a big mistake on my part. It never ends with one question.

MS. BLAIN: I will try, your Honor.

RECROSS EXAMINATION

BY MS. BLAIN:

Q. Ms. Delgado before testifying today, you met with attorneys for Mr. Saavedra, didn't you?

A. Yes.

MS. BLAIN: Thank you.

THE COURT: OK. You are excused.

(Witness excused)

THE COURT: Next witness.

MS. SCHEIN: Your Honor, may we have a moment? We are just seeing if our next witness is here.

THE COURT: I'm sorry?

(Jury present)

THE COURT: Our next witness is Newton Craig James. As soon as we're ready here, he will be sworn.

NEWTON CRAIG JAMES,

called as a witness by the Defendant,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. SCHEIN:

Q. Good afternoon, Mr. James.

A. Good afternoon.

Q. Could you tell us about your work background, please.

A. I have a history in customer service, history in job -- I'm sorry. A history in customer service, career development, and computer, Microsoft Office to be exact.

Q. Did there come a time that you began working at SEEDCO?

A. Yes.

Q. How did it come about that you were hired at SEEDCO?

A. Back in 2004 I believe it is, my fiance, who is now my wife, worked in the human resources department at SEEDCO, and I was at the time unemployed with little work experience in the U.S. And she recommended that I apply for the job, and I did.

Q. And where did the interview take place?

A. The interview took place at 915 Broadway at SEEDCO's headquarters.

Q. Who interviewed you?

Was he present?
A. Hardly ever.
Q. Do you know Shandell Velez?
A. Yes.
Q. Was she present at any of these meetings?
A. Yes.
Q. And at any of the weekly all-staff meetings which you attended -- first of all, did you attend those meetings on a regular basis?
A. Yes.
Q. At any of those meetings, did you ever hear instruction from anyone to enter false placements?
A. No.
Q. Did you ever hear instruction from anyone leading the meeting to enter as a placement the job someone had when they came to the Workforce Center before receiving any services?

THE COURT: What time period are you talking about?

MS. SCHEIN: At any time --

Q. Between 2009 and 2011.
A. No.
Q. Did you hear that instruction at any time at an all-staff meeting?

THE COURT: Let's take it to March 2012. Have you heard of any?

THE WITNESS: No.

name down here.

What is your name?

THE WITNESS: It's Melissa Alberti.

THE COURT: Are you an actress?

THE WITNESS: I am not an actress.

THE COURT: OK. Mr. Futerfas.

MR. FUTERFAS: So the record is clear, your Honor, at this point we're reading from prior testimony, page 10. I think, your Honor, for the record, we will announce which pages and lines.

THE COURT: Excellent idea.

MR. FUTERFAS: Page 10, line 9.

Ms. Alberti, are you there?

MS. ALBERTI: Yes.

THE COURT: She's right in front of you.

MR. FUTERFAS: All right.

THE COURT: Have you seen an ophthalmologist recently?

MR. FUTERFAS: I need reading glasses, Judge. Thank you.

THE COURT: This is distance. You are in trouble. You don't use reading glasses for distance.

MR. FUTERFAS: No, I don't. OK. Page 10, line 9:

"Q. All right. So do you recall that you began working at SEEDCO about April 5, 2010?

"A. Yes."

MR. FUTERFAS: Next page. Page 16, line 4:

"Q. OK. Now, in or around the third week of January, as you said, of 2011, you first learned of these improper placements, how? From finding the CIFs in Irwin Traydman's desk?

"A. Around the third week of January I noticed that we were not meeting our placement targets, and in the same degree that we were before, so I began looking at employment information forms that had been filled out and ensuring that they had been put into the system properly."

THE COURT: What page are we on?

MR. FUTERFAS: Page 16. We are now at line 16.

THE COURT: OK.

"Q. All right. At some point in that process, how did you come to suspect -- let's say early on -- that there was improper placement activity going on?

"A. I began finding some, as I began checking data -- so, my job before being deputy director of the center, I was the strategic operations coordinator, so I was responsible for the data once it was put into the system.

"So, I began pulling the data sheets to see if things were being put in incorrectly, because that might be a reason why we wouldn't be meeting our target as effectively as we had been before.

"Q. And at some point did you actually find a bunch of CIFs that Irwin Traydman had collected?

"A. I find several. Irwin kept all of the EIFs that he put into the system and the CIFs that were in his desk or on his desk.

"Q. OK?

"A. So I was looking through those and started looking those up into the computer. I would find I would say several, between 10 and 20 of the ones that I had looked through that were improperly entered.

"Q. And at some point -- but at some point you concluded, you came to a conclusion that there was improper placement entry going on certainly in Upper Manhattan Workforce Center, right?

"A. At some point in this entire process, yes. That was the conclusion I came to.

"Q. OK. And you came to that conclusion in February, March, April of 2011, somewhere in that time frame?

"A. Yes.

"Q. Enough so --

"A. Somewhere in that time frame, yes.

"Q. Enough so that you decided to bring this matter to the attention of SEEDCO counsel Sol Malach. Do you remember that?

"A. Yes.

"Q. And do you recall bringing it to his attention on or about April 5, 2011?

"A. Yes.

"Q. Now, before you started to learn of this improper

placement activity -- which we established you started to learn it late January, and then your knowledge grew, is that fair?

"A. Yes.

"Q. As you explored the issue in greater detail?

"A. Yes.

"Q. Before that time you had regular meetings with staff, right, regular staff meetings at Upper Manhattan?

"A. Yes. I was regularly involved in staff meetings.

"Q. And e-mail traffic and things like that, right?

"A. Yes.

"Q. So when you start -- let's go back. When you start on April 5, 2010 you start there, you learn that there's Friday staff meetings at Upper Manhattan?

"A. Yes."

MR. FUTERFAS: Page 20, line 12:

"Q. OK. So when you start working there, you learn that there were these regular Friday staff meetings, right?

"A. Yes.

"Q. And then there are other smaller group meetings that occurred during the week on some kind of regular basis?

"A. Yes.

"Q. Tell us about those.

"A. There is a leadership team meeting that occurred once a week, and individual teams would also have meetings.

"Q. And who would be present at the Friday staff meetings?

"A. All staff.

"Q. And that includes everyone, from the clerk minding the front desk or manning the front desk to people of your level, managerial level?

"A. Yes.

"Q. And tell us about the meetings, the other meetings. Who would be involved in those smaller meetings during the week?

"A. The individual team meetings would be individual teams. So, depending on where they belonged, it could be intake, career, and then recruitment and placement are typically -- and then, yeah, teams for the SBS contracts. And then there are some other teams that brought other contracts there. And then the leadership team would be all of the managers over all of those units.

"Q. Which of those meetings of these different types of meetings you described would you participate in or at least attend?

"A. I was required to attend the weekly leadership meetings and then the all-staff meeting if you are in the office."

MR. FUTERFAS: Page 22, line 2.

Continuing:

"Q. And the other meetings would you attend if you were there or if someone called you in? How would that work day to day?

"A. If there was a reason for me to go, or if I was asked to go, then I would go. I didn't belong to any of those teams.

"Q. All right. In any of those meetings, did you ever hear of anyone direct or suggest or anything of that nature that staff enter improper placements into Worksource1?

"A. No, not to my knowledge.

"Q. And in any of those meetings did you ever hear someone suggest doing something wrong or doing something false or creating a document?

"A. No, not to my knowledge."

MR. FUTERFAS: Page 26, line 10:

"Q. Certainly, this e-mail traffic would concern placement activity, is that correct?

"A. Yes."

MR. FUTERFAS: Page 28, line 11:

"Q. In fact, in none of this e-mail traffic did you ever understand that someone was suggesting the entry of false or improper placements, isn't that right?

"A. Not at the time.

"Q. And at the time you were working before January or February 2011, when you began to do this exploration of improper placements, before then, did you even suspect that someone was asking you via e-mail to do something wrong or to enter false placements?

"A. No."

MR. FUTERFAS: Next is page 33, line 10:

"Q. Is it true that you have no information that Mr. Saavedra

knew anything about improper placements? Isn't that right?

"A. Yes.

"Q. Meaning it is true you have no such information, isn't that correct?

"A. Yes."

MR. FUTERFAS: Next reading is page 37, line 23:

"Q. Is that true, that you are not personally aware of an instruction given by anyone at SEEDCO to create false placements?

"A. Yes."

MR. FUTERFAS: Page 38, line 20:

"Q. Do you have an understanding of what Mr. Saavedra was doing, his duties and responsibilities were out of the office?

"A. No.

"Q. OK. Did you have any understanding of his duties and responsibilities?

"A. Yes.

"Q. OK. Tell us what you thought his duties and responsibilities were.

"A. He was the center director, responsible for overseeing -- ultimately responsible for the center, which involved a contract from the Department of Small Business Services as well as a contract from Single Stop USA, yes.

"Q. And what is Single Stop USA?

"A. Single Stop USA is a nonprofit that provided funding to

SEEDCO to run -- to staff a couple of people at the center who would screen people for public benefits and provide those kinds of services.

"Q. OK. And with respect to these meetings that you've described, the Friday meetings and some of the other meetings, would it be fair to say that sometimes Mr. Saavedra would attend them and sometimes he would not attend them?

"A. Yes.

"Q. And let me just -- do you remember when you began there in April of 2010 that there was an endeavor to re-fund the Harlem center?

"A. Yes.

"Q. And what is an RFP?

"A. Request for proposal.

"Q. All right. So how did you understand SEEDCO responded to that RFP?

"A. SEEDCO created a proposal.

"Q. Did you have -- did you ever see that proposal?

"A. Yes.

"Q. And could you just describe its size, dimension, complexity. Tell us about it.

"A. It was long. It followed a rubric from which the city put it. SEEDCO submitted two, one for the Upper Manhattan Workforce1 Career Center and one for the Bronx Career Center."

MR. FUTERFAS: Page 41, line 11:

"Q. Did you assist in any way in putting this proposal together?

"A. I did.

"Q. And what did you do to assist that proposal?

"A. I would -- I did several things. I recall coordinating, getting letters of support from community members ensuring that the people he we asked from that we actually got them back. Yes.

"Q. And did Mr. Saavedra spend some of his time on putting that proposal together?

"A. Mr. Saavedra was also on that team, yes.

"Q. And what did you understand his duties and responsibilities to be putting that proposal together as part of the team?

"A. He was an important part of the team, yeah.

"Q. OK. And was he out -- do you know, when he was out of the office, was one of the things he was doing was going to get support for the proposal and making sure that people had backed, who had backed Upper Manhattan before would continue to back them this go-round?

"A. I do recall several, between two and three occasions when there was -- where he was and what he was doing.

"Q. And how do you know that? Because he told you? Or how would you know that when he was out of the office that is what he was doing?

"A. I sat in front of his office and next to his assistant.
"Q. That's where you were physically located?
"A. Yes.
"Q. So Mr. Saavedra had an office and you literally sat outside?
"A. Yes."

Page 46, line 9:

"Q. By the way, you mentioned a team for these proposals.
"How many people were on the teams?
"A. A minimum of 10.
"Q. For each proposal, 10 people from the Bronx?
"A. No.
"Q. 10 total?
"A. Yes.
"Q. So, 10 people were working on the proposals in 2010 while you were there to continue workforce in Harlem and to get the contract for the Bronx?
A. Yes."

Page 47, line 14:

"Q. To your knowledge, what did SEEDCO have to do from the time they were awarded the contract in September 2010 to open the Bronx center just a few months later by January 2011?
"A. They had to hire staff and create, at any rate, a partnership with the Department of Labor who was staffed there, and then do all the things that required, you know, to staff a

center, so supplies, order supplies, things of that nature, create systems."

Page 48, line 18:

"Q. There was a very significant effort to open the Bronx and get that up and running in just a number of months?

"A. Yes.

"Q. And how many people --

MS. ALBERTI: I seem to be missing a page.

THE COURT: You are missing a page?

MS. ALBERTI: I'm missing page 49.

MR. FUTERFAS: I am as well, your Honor.

THE COURT: There is no highlighting.

MR. FUTERFAS: Maybe it's not. OK.

THE COURT: Do you want to read 49?

The next highlight I have is the top of 50.

MR. FUTERFAS: Oh, OK. I have the top of 50.

"A. Upper Manhattan had between 50 and 60 staff members. So to open a new center I would assume it would be a similar number."

MR. FUTERFAS: The next reading is page 55, line 14:

"Q. OK. So the SBS people would come to Harlem and have a meeting with you and others about performance?

"A. Yes.

"Q. After those meetings, would you get some memorandum from SBS talking about performance or how Upper Manhattan Workforce

is doing?

"A. Typically, those kinds of data came from before the meeting.

"Q. So you would get the memorandum or you would get the e-mail, right?

"A. Performance reports.

"Q. Performance report. And then after the performance report, you would have a meeting about the information on the performance report?

"A. Yes.

"Q. Who would be present at those meetings?

"A. Myself, Rick Green, Alex Saavedra, occasionally Francine Delgado, Angie Kamath, a lady named Jackie from SBS who was in charge of recruitment and placement, and then occasionally other individuals from SBS who were pertinent to the discussion."

MR. FUTERFAS: Next reading is page 57, line 21:

"Q. So, just directing you to -- this is an e-mail. In the middle it says from William Harper at UMOS. Do you see that in the middle of Exhibit 2?

"A. Yes.

"Q. And what does that indication UMOS mean on the e-mail?

"A. That is a SEEDCO identifier. It stands for Upper Manhattan One Stop.

"Q. And it is dated June 16. And in the middle you are

writing to Mr. Saavedra: 'Thank you. I am trying to make sure it's all correct and that's what that's taking so long. I don't want to send you into talks with the wrong information.'

"Before Mr. Saavedra met with SBS, would he come to you and ask you for the latest data, be it on placements or some other metric, so that he had the most up-to-date information before he met with SBS?

"A. Occasionally.

"Q. And aside from Mr. Saavedra's meetings with SBS, were there any other times when he would come to you and say, I need information on some subject because I am having a meeting with somebody else, and you would collect that information for him?

"A. Yes.

"Q. Like what kinds of information would you provide to Mr. Saavedra in advance of meetings? Give me some kinds of examples.

"A. There could be some budget information that would be important, and then just data from the Worksource1 system.

"Q. What kind of data was held on the Worksource1?

"A. All client-specific data.

"Q. What does that include?

"A. Identifying information, client résumés, client job history, client job placements, and client service attainments.

"Q. Now, you've used the term, you've used the acronym SOC. And you said that stands for what?

"A. Strategic operations coordinator".

MR. FUTERFAS: Now at the top of page 60, line 2:

"Q. What were your duties and responsibilities as strategic operations coordinator?

"A. I was responsible for coordinating with SBS regarding operations of the center. So, any policy changes that they had would typically go through the SOC as well as data cleaning on a quarterly basis. That's where their own system would flag what it considered to be double placement or things of that nature, and any kind of change initiatives that the Department of Small Business Services initiated, I was technically responsible for initiating at the agent at the center level."

MR. FUTERFAS: Ms. Alberti, can I ask you to just slow down a little bit for the court reporter.

MS. ALBERTI: Yes.

"Q. Do you recognize the term 'contractual metrics'?

"A. Yes.

"Q. And what does that mean to you?

"A. SBS had a contract with SEEDCO that had metrics that they are contractually obligated to --

"Q. To meet?

"A. To meet, yes.

"Q. And do you have -- are you familiar with the term 'noncontractual metrics'?

"A. Yes.

"Q. What does that mean to you?

"A. SBS also on a regular basis created metrics that were not contractually -- we were not contractually obligated to meet.

"Q. And were these sometimes -- well, I don't want to characterize them for you. Were these sometimes difficult metrics, or did they take a lot of time to research or to fulfill?

"A. There were metrics that they created that required an extensive amount of staff time to both achieve and then also track the attendance.

"Q. All right. When you say extensive amount of staff time, who would be involved in tracking those metrics and getting that information to SBS?

"A. It depends.

"Q. All right. Because it depends on the type of metric?

"A. Yes.

"Q. OK. So can you give us what kinds of metrics do you understand were the noncontractual metrics?

"A. There were metrics assigned to different units regarding the work that they were individually responsible for that to the best of my recollection were not contractual metrics.

"Q. OK. What units were those?

"A. The career readiness units had a metrics regarding certain things. The intake system team had metrics regarding certain items, and the recruitment placement team had metrics.

"Q. And who did you report to" --

THE COURT: Approach, please.

(Continued on next page)

(In open court)

THE COURT: Let's go.

MR. FUTERFAS: I think we left off at page 62, line 14, Ms. Alberti.

MS. ALBERTI: I think I had finished but I can read that last line.

"A. And the recruitment placement team had metrics.
"Q. And who did you report to?
"A. Rick Green."

MR. FUTERFAS: The next page is page 81, line 4:

"Q. At the top in Rick Green's e-mail there is something that says 'one stop.'

"What is one stop?

"A. One stop is a data term that used to describe Workforce Investment Act funded job centers.
"Q. And is there something -- is one stop -- the purpose of one stop is to have a lot of different kinds of services over one roof?
"A. That is one of the purposes, yes.
"Q. And what kinds of services are those that one stop would provide?
"A. Job services, linkages to public benefits, and then other kinds of services, unemployment services, things of that nature."

THE COURT: There is a lot of duplication. By this

time in the case I don't know that we need all this information.

MR. FUTERFAS: Your Honor, I already last night cut a number of pages. If your Honor gives me a few minutes, I may be able to cut some more.

THE COURT: How could I do that? While you are standing there?

MR. FUTERFAS: Give me 30 seconds and maybe I can do that right now.

THE COURT: Even more. You promise that each five minutes results in one fewer question?

MR. FUTERFAS: I might be able to do it quickly, your Honor. Your Honor, I can move forward. I have already cut some.

THE COURT: Good. What page? 153?

MR. FUTERFAS: Not quite, but we're getting there.

Page 91, line 7:

"Q. All right. Now, Advance At Work, these are people who are already working?

"A. The purpose of the program is addressed to people who are already working. Is that it?

"Q. OK. I'm going to ask that question --

"A. I'm sorry.

"Q. That's OK. The purpose of the program is addressed to people who are already working, is that it?

"A. Yes.

"Q. All right. And so the purpose of the program is to try to get them to advance at work, to get a promotion of some kind or an increase in salary?

A. That is one of the goals, yes."

MR. FUTERFAS: Page 131, line 13:

"Q. Let me ask you this: If it looked like Workforce1 Upper Manhattan Workforce1 was behind on its targets, SBS targets, would there be communications to staff to work harder to try to get to meet the placement targets?"

THE COURT: This is just the kind of question that we have had repeatedly.

MR. FUTERFAS: Your Honor, I need it from this witness.

"A. Yes.

"Q. Have you seen those communications?

"A. I don't recall individual communications, but, yes.

"Q. In fact, were there sometimes events held either on a Saturday or in an evening when people would try to work, people would try to meet the placement targets set by SBS?

"A. There were events held on Saturdays and some evenings where we would make phone calls to former clients to see if they had gained employment or if that is to be counted as a placement.

"Q. And what were those calls called?

"A. Placement calls.

"Q. Did you ever hear of the term reengagement calls?

"A. Yes.

"Q. Were they also called reengagement calls?

"A. Yes.

"Q. Was that a method by which upper Manhattan would try to meet the SBS placement targets?

"A. Yes."

MR. FUTERFAS: Your Honor, for the record, I am skipping four or five pages which I planned to read.

The next page is page 137, line 2:

"Q. And SEEDCO you understand was a nonprofit?

"A. Yes.

"Q. Was there discussion at Upper Manhattan Workforce1 about trying to fill jobs with people who had difficulty otherwise obtaining jobs?

"A. Yes."

MR. FUTERFAS: Let me consult with my cocounsel, your Honor, if I may.

(Defense counsel conferred)

MR. FUTERFAS: I am going to cut quite a bit, your Honor. Just a small section of what we planned to read.

Page 148, Ms. Alberti, line 24.

MS. ALBERTI: OK.

"Q. What is a recruitment event?"

THE COURT: Oh, come on.

"A. Several times" --

THE COURT: How many times have we had this? Every witness has testified to this.

MR. FUTERFAS: All right. Your Honor, I will skip that.

Ms. Alberti, we'll go to page 151, line 4. Are you with me?

MS. ALBERTI: Yes.

"Q. OK. And when they showed up to target, would there be any -- who would be there from Workforce1 to meet the individuals, interview them, do things like that?

"A. Members of the recruitment and placement team this.

"Q. Would they collect CIFs at those events?

"A. That is the policy. Yes."

MR. FUTERFAS: Page 165, line 18.

"Q. So the call center would call, would make reengagement calls?

"A. Yes.

"Q. And in the course of those reengagement calls, if they would get correct information which could qualify as a placement, you all wanted to capture the placement?

"A. Yes."

MR. FUTERFAS: Page 168, line 16:

"Q. Do you have a sense, without looking at any data, just

sitting here at the moment, a sense of how many job placements Upper Manhattan accomplished in 2009?

"A. It always increased. 1500 a quarter was that quarter that from the first quarter of 2011 was 1500. So I think that it would be safe to say between 4 and 5,000.

"Q. Per year?

"A. In that final year. It always increased so I'm not really sure.

"Q. OK.

"A. I suppose I should say I don't know. There we go."

MR. FUTERFAS: Page 169, line 6:

"Q. Do you recall someone asking you for a number of clients served at Upper Manhattan One Source since 2004?

"A. Yes, I think for the RFPs, yeah.

"Q. And were you able to come up with a number?

"A. I believe so but within a certain context.

"Q. Uh-huh.

"A. The Worksource1 system, it was not always in place from the start of that contract to the end of that contract.

"Q. OK. Was the number more than 30,000?

"A. Yes."

MR. FUTERFAS: If I may have a moment, your Honor, we may be skipping some more reading.

Ms. Alberti, if we go to page 217, line 14.

MS. ALBERTI: OK.

"Q. OK. And I am just looking at the first page of the e-mail. Denise Blockay sends an e-mail to individuals."

THE COURT: Don't we need an exhibit?

MR. FUTERFAS: We don't for this. It's contained within the reading, your Honor.

"Q. I don't think you were on that one -- Congratulating individuals for making 50 percent of target. Do you see that?

"A. Yes.

"Q. Then above that, Mr. Green replies to a number of people, including yourself, 'Please prioritize placement phone calls. Every manager coordinator needs to stress to their team the importance in us keeping pace with Queens and Bronx in terms of percentage of goal to date and total placements.'

"Do you see that?

"A. Yes.

"Q. And what's going on here is just basically a motivation, motivational statement by Mr. Green for people to keep on their teams to make -- to making these placement phone calls, is that how you view this?

"A. Yes."

Q. OK. And this was, in your experience with" --

THE COURT: This is so repetitive. It doesn't really -- go ahead. Finish reading.

MR. FUTERFAS: Thank you, your Honor.

"Q. In your experience with your year at SEEDCO, is it fair to

say that this is one of dozens if not hundreds of similar e-mails that went back and forth about the importance of reengagement?

"A. Yes. It was a common topic."

MR. FUTERFAS: Your Honor, we have nothing further in the reading.

THE COURT: Thank you.

MR. FUTERFAS: May we approach for a moment, your Honor?

THE COURT: Anything from the government?

MS. BLAIN: No, your Honor. Thank you.

THE COURT: Approach.

(Continued on next page)

INDEX OF EXAMINATION

Examination of: Page

MITCHELL McCLINTON

Direct By Ms. Schoenberger . . . . . . . . . . . 527

Cross By Mr. Futerfas . . . . . . . . . . . . . 541

Redirect By Ms. Schoenberger . . . . . . . . . . 561

GEORGE EDWARD MILLS

Direct By Ms. Schein . . . . . . . . . . . . . . 569

Cross By Ms. Schoenberger . . . . . . . . . . . 575

SHANDELL VELEZ

Direct By Ms. Schein . . . . . . . . . . . . . . 576

Cross By Ms. Blain . . . . . . . . . . . . . . . 625

FRANCINE DELGADO

Direct By Ms. Schein . . . . . . . . . . . . . . 628

Cross By Ms. Blain . . . . . . . . . . . . . . . 653

Redirect By Ms. Schein . . . . . . . . . . . . . 656

Recross By Ms. Blain . . . . . . . . . . . . . . 657

NEWTON CRAIG JAMES

Direct By Ms. Schein . . . . . . . . . . . . . . 665

Cross By Ms. Blain . . . . . . . . . . . . . . . 670

GOVERNMENT EXHIBITS

Exhibit No. Received

11 . . . . . . . . . . . . . . . . . . . . 535

DEFENDANT EXHIBITS

Exhibit No. Received

Z4 . . . . . . . . . . . . . . . . . . . . 593

X4 . . . . . . . . . . . . . . . . . . . . 599

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES of AMERICA,

Plaintiff,

v. 11 Civ. 6425 AKH

ALEX SAAVEDRA,

Defendant.

------------------------------x

April 21, 2015
11:15 a.m.

Before:

HON. ALVIN K. HELLERSTEIN,

District Judge
and a jury

APPEARANCES

PREET BHARARA,
United States Attorney for the
Southern District of New York
BY: CARINA HYATT SCHOENBERGER,
JENNIFER ELLEN BLAIN,
Assistant United States Attorneys

LAW OFFICES OF BETTINA SCHEIN,
Attorneys for defendant
BY: BETTINA SCHEIN, Esq.
- and -
LAW OFFICES OF ALAN S. FUTERFAS,
BY: ALAN SAMUEL FUTERFAS, Esq.
Of counsel

Also Present:
HARRY SOLOMON, Technical Support USAO
MARISA ALBERTI, Defense Paralegal & Technical Support