# 15-2307

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
————————————

UNITED STATES OF AMERICA,

*Intervenor-Plaintiff - Appellee,*

ABC, STATE OF NEW YORK, EX REL. JOHN DOE, UNITED STATES OF AMERICA, EX REL. JOHN DOE,

*Plaintiffs,*

---against---

ALEX SAAVEDRA,

*Intervenor-Defendant - Appellant,*

SHOMARI GREENE, ALAN KATZ, TAGEWATEE CHANDARPAUL, SHANDELL SANTIAGO-VELEZ, MITCHELL MCCLINTON, MONIQUE TARRY,

*Intervenor-Defendants,*

DEF, STRUCTURED EMPLOYMENT ECONOMIC DEVELOPMENT CORPORATION,

*Defendants.*
————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
————————————

**APPENDIX FOR THE DEFENDANT - APPELLANT**
**Volume 3 of 5**

BETTINA SCHEIN
565 Fifth Avenue, 7th Floor
New York, New York 10017
(212) 880-9417
*Counsel for Defendant-Appellant*

ALAN SAMUEL FUTERFAS
LAW OFFICES OF ALAN S. FUTERFAS
*565 Fifth Avenue, 7th Floor*
*New York, New York 10017*
(212) 684-8400
*Of Counsel and on the Brief*

# TABLE OF CONTENTS

Page

Docket Entrees ............................................................................................... A0001

Amended Complaint dated February 11, 2013 .............................................. A0027

Government's Initial Disclosure .................................................................... A0065

Joint Pretrial Order ........................................................................................ A0071

Excerpts from the Trial Transcript ................................................................ A0082

Government Exhibit 13A, Excerpts from DOI report .................................... A0684

Government Exhibit 22, Work Force Investment Act of 1998, Program
    Annual Funding Agreement and Standard Assurances and
    Certifications between United States Department of Labor and the
    New York State Department of Labor for Program Year 2008 ................. A0694

Government Exhibit 30, Initial Services Agreement between Seedco and NYC
    Dept. of Small Bus. Services ("SBS") for Upper Manhattan ("UM")
    Workforce1 Center .................................................................................. A0704

Government Exhibit 34, 4th amendment to the initial Seedco-SBS Services
    Agreement for UM Workforce1 Center dated April, 2007 ....................... A0830

Government Exhibit 37, 5th amendment to the initial Seedco-SBS Services
    Agreement for UM Workforce1 Center dated April, 2008 ....................... A0842

Government Exhibit 57, CIF for Amy Bursor ................................................ A0846

Government Exhibit 65, CIF for Dennis Garci ............................................. A0848

Government Exhibit 66, CIF for Melanio Polanco ........................................ A0850

Government Exhibit 67, CIF for Damiana Payano ........................................ A0852

Government Exhibit 68, Letter from Commissioner Walsh to Barbara D.
    Gunn, President & CEO of SEEDCO, dated March 9, 2012 ................... A0854

Defense Exhibit, D4, Official SBS Workforce1 Policy Statement issued
    March 15, 2011 re: Placement & Promotion Record Policy ....................................A0855

Defense Exhibit, F5, October 11, 2012 internal SBS Email regarding
    "SEEDCO false placements" from Charles Houston..................................................A0859

Defense Exhibit, J7, Charney contract (2009 renewal) ..........................................A0863

Defense Exhibit, K7, Charney questionnaires (3 samples).....................................A0868

Defense Exhibit, L7, Charney placement tables (same one found in payment
    authorization packet ............................................................................................A0885

Defense Exhibit, LLL, SBS Monthly UM Center Management Report for June
    2010..........................................................................................................................A0898

Defense Exhibit, SSS, Official SBS Workforce1 Policy Statement issued July
    1, 2009 re: Placement Policy for Worksource1 .......................................................A0899

Defense Exhibit X4 Velez Depo Ex. 3:  Jun 18, 2010 email from Tarry to
    Velez .........................................................................................................................A0904

Defense Exhibit, T6, March 25, 2010 Naheem Harris Internal SBS email re:
    SEEDCO payment with attached spreadsheets and other documents
    including payment authorization..............................................................................A0908

Defense Exhibit Z4 Velez Depo Ex. 5:  Sep 16, 2010 Velez email to Roazzi
    re: Eataly and Placements .......................................................................................A0913

Defendant's' initial Requested Jury Charges........................................................A0915

Governments Requested Jury Charge....................................................................A0941

Defendant's Revised Requested Jury Charge.........................................................A0960

District Court's Proposed Jury Charge..................................................................A0980

Defense April 23, 2015 Letter to Court Requesting the Court to Advise the
    Jury that they are entitled of a readback of Portions' of William
    Harper's Testimony ..................................................................................................A1011

Government's Response ...........................................................................................A1012

Court's Denial of Defendant's April 23, 2015 Request .........................................A1013

May 20, 2015 Parties Joint Submission Regarding Damages and Penalties ........................A1015

May 21, 2015 Letter from Defendant to the District Court Regarding and
    Enclosing as Exhibits both Parties Press Releases ....................................................A1026

Order affixing Damages, penalties and Costs ......................................................................A1031

Civil Judgment.....................................................................................................................A1036

Notice of Appeal..................................................................................................................A1038

F4LJUSA1                          Charney – direct

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES of AMERICA,

 4                    Plaintiff,

 5          v.                                11 Civ. 6425 AKH

 6   ALEX SAAVEDRA,

 7                    Defendant.

 8   ------------------------------x

 9                                           April 21, 2015
                                             11:15 a.m.
10
     Before:
11
                     HON. ALVIN K. HELLERSTEIN,
12
                                             District Judge
13                                              and a jury

14

15                        APPEARANCES

16   PREET BHARARA,
          United States Attorney for the
17        Southern District of New York
     BY:  CARINA HYATT SCHOENBERGER,
18        JENNIFER ELLEN BLAIN,
          Assistant United States Attorneys
19
     LAW OFFICES OF BETTINA SCHEIN,
20        Attorneys for defendant
     BY:  BETTINA SCHEIN, Esq.
21        – and –
     LAW OFFICES OF ALAN S. FUTERFAS,
22   BY:  ALAN SAMUEL FUTERFAS, Esq.
                    Of counsel
23

24   Also Present:
          HARRY SOLOMON, Technical Support USAO
25        MARISA ALBERTI, Defense Paralegal & Technical Support

F4LJUSA1                          Charney - direct

```
 1              (Trial resumes)

 2              (In open court; jury not present)

 3              THE COURT:  Good morning.

 4              Who are we starting with today, Ms. Schein?

 5              MS. SCHEIN:  Our first witness is Craig Charney of

 6  Charney Research.  May I have him come in?

 7              THE CLERK:  You have five minutes, Judge.

 8              THE COURT:  Okay.  Be seated.  Have him come in.

 9              (Pause)

10              (Jury present)

11              THE COURT:  Good morning, ladies and gentlemen.

12              THE JURY:  Good morning.

13              THE COURT:  We have our first witness, Mr. Charney.

14              Ms. Schein.

15              MS. SCHEIN:  Your Honor, if I may?

16              THE COURT:  Be seated, everybody.  Step up,

17  Mr. Charney.

18   CRAIG R. CHARNEY,

19        called as a witness by the Defendant,

20        having been duly sworn, testified as follows:

21  DIRECT EXAMINATION

22  BY MS. SCHEIN:

23  Q.  Good morning, Mr. Charney.  Could you please tell us about

24  your educational background.

25  A.  Yes.  I studied political science at Brandeis University,
```

F4LJUSA1                    Charney - direct

 1    where I received my bachelors degree.  I did a masters at

 2    Oxford in U.K. in politics.  I studied sociology of development

 3    and received a diploma at the Sorbonne in France, and I did my

 4    doctorate in political science at Yale.  I also did a diploma

 5    in advance statistical work at the Human Science Research

 6    Council at Pretoria, South Africa.

 7    Q.  When did you start your business -- first of all, you have

 8    a business Charney Research?

 9    A.  Yes.

10    Q.  When did you open that business?

11    A.  March of 1997.

12    Q.  What services does your business provide for your

13    customers?

14    A.  We're a survey research firm; that is, we do polls, focus

15    groups and the like.

16    Q.  What, when a client comes to your company, what are they

17    seeking?

18    A.  It varies with the client.

19    Q.  Could you give us a for instance.

20    A.  In some cases, it is people who are working on government

21    programs or social programs and they --

22                THE COURT:  Keep your voice up, Mr. Charney.

23                THE WITNESS:  Sorry?

24                THE COURT:  Keep your voice up.

25                THE WITNESS:  Thank you.

F4LJUSA1                        Charney - direct

 1              THE COURT:  Ms. Schein, you lead by keeping your voice

 2      up.

 3              MS. SCHEIN:  Thank your Honor.

 4              THE WITNESS:  Let me move a little closer.  There is a

 5      book here, by the way.  Is this for me or what?

 6              THE COURT:  Close it up, please.  Can we take the

 7      books away.  We don't need them, do we?

 8              MS. BLAIN:  No, your Honor.

 9              THE COURT:  Take them away.

10              THE WITNESS:  Where were we?

11              THE COURT:  We're fumbling, that is where we are.

12              (Pause)

13              THE COURT:  Why do people use you, Mr. Charney?

14              THE WITNESS:  In some cases, it is to measure things,

15      as in the case of government and social programs.

16              In some cases, it is to develop advertising or

17      marketing.

18              In some cases, it is to understand the problems with

19      security or conflict resolution.  It depends with the client.

20      Q.  How many people work at your company?

21      A.  Currently?

22      Q.  Currently?

23      A.  About 20.

24      Q.  Are you involved in each of the projects your company takes

25      on?

1    A.   Yes.

2    Q.   How did it come about that your company was hired by New

3    York City SBS?

4    A.   There was a request for proposals sent out by SBS.   We

5    submitted a proposal and we won.

6    Q.   When did your company first enter into a contract with New

7    York City SBS?

8    A.   There were two contracts.   The first was in 2005, and I

9    think the second was in 2007 or so.

10   Q.   Was there a subsequent renewal contract in 2009?

11   A.   There was an extension of the existing contract.

12          MS. SCHEIN:   May I show the witness what has been

13   marked Defense Exhibit J-7.

14          THE COURT:   Sure.

15   BY MS. SCHEIN:

16   Q.   Do you see it on the screen in front of you?

17   A.   No, there is nothing on the screen, Ms. Schein.

18          (Pause)

19   Q.   Mr. Charney, is that the renewal contract, dated September

20   2, 2009?

21   A.   Yes.

22          MS. SCHEIN:   I move to admit Defense Exhibit J-7.

23          MS. BLAIN:   No objection.

24          THE COURT:   Received.

25          (Defendant Exhibit J-7 received in evidence)

1    BY MS. SCHEIN:

2    Q.   What was your company initially hired to do by SBS?

3    A.   We were hired to do surveys of people who had left

4    workforce training programs run by SBS and to find out whether

5    they had jobs the quarter after they left, whether they had

6    kept those jobs or had other jobs three quarters after leaving,

7    and whether they'd gotten raises.

8    Q.   What was the method your company used to achieve that

9    information?

10   A.   We did a poll or survey of people who had left the program.

11   Q.   Was this survey conducted through a questionnaire that your

12   company prepared?

13   A.   Yes.

14           MS. SCHEIN:  We can take this down.  I show the

15   witness what has been marked Defendant's Exhibit K-7.

16           THE COURT:  Have you shown this document to the jury

17   that you just offered into evidence?

18           MR. FUTERFAS:  Yes.

19           MS. SCHEIN:  Yes.

20           MR. FUTERFAS:  Defendant's Exhibit J-7 is in evidence.

21           MS. SCHEIN:  Now I may show the witness what has been

22   marked Defendant's Exhibit K-7.

23   BY MS. SCHEIN:

24   Q.   Mr. Charney, do you see on the screen in front of you

25   Defendant's Exhibit K-7, and is that one of the questionnaires

F4LJUSA1                    Charney - direct

1   that your company prepared?

2   A.  Yes.

3   Q.  Within that exhibit is a questionnaire prepared for the

4   time-frame March through June 2009?

5   A.  Yes.

6   Q.  Also contained in that exhibit is the Charney Research

7   questionnaire from October through December 2010?

8   A.  Yes.

9   Q.  And there is also another example of -- withdrawn.

10          There is also another questionnaire, Charney Research

11  questionnaire, from the time-frame May through June 2011?

12  A.  Yes.

13          MS. SCHEIN:  Your Honor, I move to admit Defendant's

14  K-7.

15          MS. BLAIN:  No objection.

16          THE COURT:  Received.

17          (Defendant Exhibit K-7 received in evidence)

18          THE COURT:  One exhibit through all of these?

19          MS. SCHEIN:  Yes, it is all the questionnaires for

20  different time periods.

21  BY MS. SCHEIN:

22  Q.  Mr. Charney, if you could look at K-7, the questionnaire.

23          Was this questionnaire designed along with individuals

24  from SBS?

25  A.  We had input and feedback from SBS.  We were responsible

F4LJUSA1                          Charney - direct

1   for the design, but they vetted and amended it.

2   Q.  Did you meet with individuals from SBS with regard to this

3   questionnaire?

4   A.  Yes.

5   Q.  Did you meet with an individual named Angie Kamath?

6   A.  Honestly, I don't remember.

7   Q.  Do you remember any of the people from SBS with whom you

8   met?

9   A.  Melissa Wavelett at one point and Scott Zucker are the

10  names that come to mind.  There were quite a few of them.

11  Q.  Were there quite a few meetings concerning the

12  questionnaires?

13  A.  Over the length of the project, yes.  It ran for several

14  years.

15  Q.  How many years did it run?

16  A.  From 2005, the initial contract, through 2011.

17  Q.  What were the meetings for with SBS?  What was the purpose

18  of the meetings?

19  A.  Some of them were questionnaire design or modification.

20  There were several questionnaires used for different surveys

21  during the contract.  Some of them were touching base and

22  performance feedback.

23  Q.  How did you receive -- well, withdrawn.

24          Did the people at your company receive a list of names

25  of people to call?

1    A.  Yes.

2    Q.  How was that received, that list?

3    A.  It was received in computer-readable form.  I actually

4    cannot recall now whether we received it or whether for privacy

5    reasons it was sent directly to the calling house.  I am not

6    sure.

7    Q.  Do you know who prepared that roster of names or how it was

8    prepared?

9    A.  Yes.  It came out of SBS.  It was people who had exited or

10   left their training services.  It was sorted by the different

11   workforce centers that they had studied at.

12   Q.  The services that your company provided pursuant to your

13   contract with SBS, were those services to obtain this

14   information provided for all the workforce centers in the New

15   York City area?

16   A.  I am sorry, Ms. Schein.  I didn't understand that question.

17   Could you clarify.

18   Q.  The questionnaires and the services that you provided

19   pursuant to your contract with SBS, was it for one workforce

20   center or for a number of workforce centers?

21   A.  No.  It was for several, I think five or six initially, and

22   the number grew a bit over the life of the contract.

23   Q.  Do you know whether one of the workforce centers was the

24   Upper Manhattan Workforce Center?

25   A.  I think so, yes.

1  Q.  Did your company provide these services for the Bronx

2  Workforce center?

3  A.  I think so, but I haven't got the list memorized.

4  Q.  Do you know Alex Saavedra?

5  A.  No.

6  Q.  Do you know Francine Delgado?

7  A.  No.

8  Q.  Is one of the measures pursuant to this questionnaire that

9  your company was to obtain whether a person who had left, who

10  had received services and left the workforce center received a

11  promotion or raise?

12  A.  During the initial part of the project, yes.  At a certain

13  point SBS dropped that requirement, and then we no longer asked

14  that.

15  Q.  What method did your company use to obtain results?

16  A.  Telephone interviews, and since we were dealing with the

17  population often absent from home, we would call back up to

18  twelve times in order to try to reach the person.

19  Q.  Did the people who made the telephone calls from your

20  company, did they call during business hours Monday through

21  Friday or at other times?

22  A.  First they weren't from my company.  We contracted with

23  calling houses who specialize in doing this work professionally

24  to do it.

25          Second, no, they did not do it just during business

1    hours.  In fact, we worked specifically with firms that call on

2    nights and weekends because we knew that was when the people we

3    needed to reach were likeliest to be at home.  This is before

4    the days of cell phones.

5    Q.  Did the people who made the calls, did they call all the

6    people on the roster that you received?

7              THE COURT:  Go back to how a roster is developed.

8              MS. SCHEIN:  Thank your Honor.

9    BY MS. SCHEIN:

10   Q.  How was the roster developed?

11             THE COURT:  What is a roster?

12             THE WITNESS:  A roster is simply the term used for the

13   list of people that was provided who had exited the program.

14             THE COURT:  What do you mean, exit the program?

15             THE WITNESS:  Completed receiving services from the

16   workforce centers.

17             THE COURT:  You mean people who got a job?

18             THE WITNESS:  No.  They were no longer receiving

19   services from the centers.

20             THE COURT:  Because the services were successful or

21   because the services were unsuccessful?

22             THE WITNESS:  As far as I know, neither of those was a

23   criterion.  People completed whatever services they were

24   receiving and they left the program.

25             THE COURT:  The services were to get jobs for people,

1    weren't they?

2         THE WITNESS:  Your Honor, I am not the best-placed

3    person to answer that question since we did not work for

4    SEEDCO.  As I understand, they were services intended to assist

5    people in getting jobs.

6         THE COURT:  So what were you were measuring?

7         THE WITNESS:  What we were measuring is whether they

8    had gotten jobs, kept jobs and gotten raises.

9         THE COURT:  Who was the field that you inquired this

10   of?

11        THE WITNESS:  The field was drawn from the people who

12   ha had exited the programs; that is to say, no longer receiving

13   services from the workforce centers.

14        THE COURT:  Who provided the information to you?

15        THE WITNESS:  The workforce centers provided the

16   information.  At this point I am not sure if they provided it

17   directly to us or if for privacy reasons they provided it to

18   the calling house only.

19        THE COURT:  When you say the "workforce," is that the

20   private company or the SBS?

21        THE WITNESS:  I believe it was SBS that provided the

22   list of people who had exited the services.

23        THE COURT:  Did you understand that the list was a

24   universal list; that is, a hundred percent of all people who

25   had been given services or was it of a lesser number.

1          THE WITNESS:  It was all people who had exited the

2    services.

3          THE COURT:  All people?

4          THE WITNESS:  Yes.

5          THE COURT:  A hundred percent?

6          THE WITNESS:  Yes.

7          THE COURT:  Resume.

8          MS. SCHEIN:  Thank your Honor.

9    BY MS. SCHEIN:

10   Q.  Do you know whether the services that your company provided

11   were required pursuant to the Work Investment Act?

12   A.  I don't know that.

13   Q.  Was part of the work that you provided for SBS was to

14   calculate validation spreadsheets?

15   A.  Well, we did two things related to jobs.  One was to see if

16   people had them.  The second was to see if the employer that

17   they named was the same one who was provided on the roster or

18   list that we received.

19   Q.  Was part of the work your company did was to provide

20   computer algorithms to calculate the results from these

21   surveys?

22   A.  Yes, that was particularly true for the wage gain which was

23   pretty complicated.  The rest was pretty straightforward.

24   Q.  Now I show you what has been marked Defendant's Exhibit

25   L-7.  Do you recognize that document, Mr. Charney?

F4LJUSA1                          Charney – direct

1    A.   Yes.

2    Q.   What is that?

3    A.   It's one of the summary documents we would have provided to

4    SBS that gave the results of the survey in a particular

5    quarter; in this case, the first quarter of 2009 for all

6    vendors and then across the different workforce centers.

7    Q.   Did your company prepare this Charney Research report

8    table?

9    A.   Yes.

10           MS. SCHEIN:  Your Honor, I move to admit it into

11   evidence.

12           MS. BLAIN:  Your Honor, I have only seen the first

13   page of this document.  I think there are 13 pages.

14           MS. SCHEIN:  May I hand it up?

15           THE COURT:  Yes.  Do you have a physical copy?

16           MS. SCHEIN:  Yes.

17           THE COURT:  You're offering the entire document, Ms.

18   Schein?

19           MS. SCHEIN:  Yes, your Honor, I am.  It is a series of

20   Charney Research report tables.

21           MS. BLAIN:  No objection.

22           THE COURT:  Received.

23           (Defendant Exhibit L-7 received in evidence)

24           THE COURT:  How are you going to publish it,

25   page-by-page?

1               MS. SCHEIN:  The first page.

2               THE COURT:  Okay.

3    BY MS. SCHEIN:

4    Q.  Mr. Charney, could you tell us what this report table is

5    for.

6    A.  Which table, Ms. Schein?  There are a bunch.

7    Q.  The first page of the Charney Research report table.

8    A.  You mean the very first table?

9    Q.  Yes, for the time-frame April through May 2009.

10   A.  All right.  This table refers to job placements made; that

11   is to say, people who were employed in the first quarter after

12   they had left the services of the center.  It provides the

13   percentage, the first column, which is all vendors, is across

14   all the different centers.

15               The remainder is each of the individual centers, the

16   Bronx center, Brooklyn center and so forth.

17   Q.  Was this report provided to SBS?

18   A.  Yes.

19   Q.  Do you know whether this report was used by SBS to

20   calculate performance milestones?

21   A.  I do not know that for a fact, but I understand that the

22   reason for conducting our surveys was to do so.  I didn't

23   personally confirm that they did it, however.

24   Q.  Do you know whether the results from your surveys were used

25   for performance-based compensation?

```
 1              MS. BLAIN:  Objection.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  As I say, I know they were supposed to

 4     be, but I can't tell you for a fact that they were.

 5     BY MS. SCHEIN:

 6     Q.  It is your understanding?

 7     A.  Yes.

 8              THE COURT:  That they were supposed to be?

 9              THE WITNESS:  Yes.

10     BY MS. SCHEIN:

11     Q.  Is it your understanding because you heard that --

12              THE COURT:  Ms. Schein, you've got it.  Let's go on.

13              MS. SCHEIN:  Thank your Honor.

14     BY MS. SCHEIN:

15     Q.  Now, you testified that the calling, the folks who did the

16     calling at your company, that they called everyone on the

17     roster?

18     A.  In the early stages, yes; and for the smaller samples, yes.

19     Q.  Do you know what percentage of people they reached?

20     A.  Yes.  It varied quite a lot, but it was somewhere between a

21     low of 40 percent, a high of about 80 percent, and typically

22     around 60 percent.

23     Q.  Based upon that variation of response rates you just told

24     us about, how would you characterize the accuracy of your

25     results across the entire population?
```

 1                MS. BLAIN:  Objection.

 2                THE COURT:  Sustained.  You haven't got a foundation

 3       for the question.

 4       BY MS. SCHEIN:

 5       Q.  You testified that the response rate varied.  Could you

 6       give us the variation in the response rates, the number of

 7       people who your company reached?

 8       A.  Sure.  Could I use the table that is up as an example?

 9       That would be the easiest way to do it.

10       Q.  Please do.

11       A.  What you can see is on this survey which was conducted when

12       the population served by the centers had grown and the numbers

13       had grown, there were a potential population to be reached of

14       4800, a sample we reached of about 1600.

15                THE COURT:  Where do you see this?

16                THE WITNESS:  Your Honor, it is the first row and the

17       second row, the population and the sample.  We are looking at

18       the all-vendors column.

19                THE COURT:  I see 4,812?

20                THE WITNESS:  Yes, that's right.  That was the

21       population; that is to say, all the people who entered it from

22       all the vendors.

23                THE COURT:  You used the term, "exited."  That means

24       left?

25                THE WITNESS:  That no longer received services, that

                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

F4LJUSA1                           Charney – direct

1   is the way the term we were given by SBS.

2                THE COURT:  Exited?

3                THE WITNESS:  Yes.

4                THE COURT:  It suggests someone who gets up and

5    leaves.  That doesn't seem what we're talking about.

6                THE WITNESS:  We were using the terminology of our

7    clients.  SBS called them exiters, and so did we.

8                THE COURT:  Okay.  We have 4,812 who exited for what

9    period of time, the first quarter?

10               THE WITNESS:  Yes.

11               THE COURT:  What year?

12               THE WITNESS:  2009.

13               THE COURT:  And exited from where?

14               THE WITNESS:  The services provided by the different

15   vendors that you see next to it.

16               THE COURT:  All vendors, all workforce?

17               THE WITNESS:  Yes.

18               THE COURT:  Go ahead.

19               THE WITNESS:  Then the sample beneath that, the ones

20   who had actually been reached, 1604.

21               THE COURT:  Roughly 25 percent?

22               THE WITNESS:  33 percent, actually, as you can see

23   from the bottom row, which is the response rate in each case.

24               Do you see that, your Honor?

25               THE COURT:  Yes.

 1          THE WITNESS:  Then the in-between percentage employed,

 2   one quarter after placement, the percentage who were employed

 3   one quarter after exiting, and across all the vendors was 81

 4   percent.

 5          Then for each vendor you can see population; that is,

 6   the people who left the services of that vendor, the sample

 7   end, the proportion that we reached, the proportion were

 8   employed which you see varies from a high of 86 percent of the

 9   Brooklyn center to a low of 79 percent -- sorry -- 77 percent

10   at the Manhattan center, and then you have the error margin in

11   each case.

12          The error margin varies because the population sizes

13   and the response rates varied.  To put it simply, the larger

14   the response rate, the smaller the error margin.  The smaller

15   the population, the larger the error margin, the two factors we

16   had to consider.

17   BY MS. SCHEIN:

18   Q.  Mr. Charney, you testified just now about the error margin.

19   A.  Yes.

20   Q.  From this error margin, how do you characterize the

21   accuracy of your results?

22          THE COURT:  What is an error margin?

23          THE WITNESS:  The error margin that you see there is a

24   number, a plus-minus number within which your results would

25   expect to be.  19 times out of 20, that is to say, there is a

 1    95 percent confidence level in these things.  If you were to

 2    repeat the survey 20 times, 19 times it would be within

 3    plus-minus 2 percent of the total for all vendors, plus-minus 5

 4    percent of the Bronx figures, plus-minus 5 percent of the

 5    Brooklyn figures and so forth.

 6            THE COURT:  Okay.

 7    BY MS. SCHEIN:

 8    Q.  So that as you just explained, so that error margin would

 9    apply to the entire population?

10    A.  The 2 percent applies to the entire population.  The other

11    figures apply to the individual centers.

12            MS. SCHEIN:  Thank you, Mr. Charney.  I have no

13    further questions.

14            MS. BLAIN:  May I inquire?

15            THE COURT:  Yes.

16    CROSS-EXAMINATION

17    BY MS. BLAIN:

18    Q.  Good morning, Mr. Charney.

19            Your firm received a list from SBS, correct, as you

20    just testified?

21    A.  There was a list sent out from SBS.  As I said, I cannot

22    recall whether it was sent directly to us or whether it was

23    sent to the calling house.

24    Q.  Okay.  But that list contained a list of names, right?

25    A.  Names, phone numbers and information regarding the people

1    who had exited the services.

2    Q.  You understood that those names were people for whom a

3    Workforce1 Center claimed to have "exited the program," right?

4    A.  Yes.

5    Q.  By "exiting the program," that included getting jobs,

6    right?

7    A.  I don't know --

8              MR. FUTERFAS:  Objection.

9    A.  -- I don't know that that included getting jobs.  As far as

10   we know, it was simply they no longer received services from

11   the program.

12   BY MS. BLAIN:

13   Q.  You don't know exactly how SBS created that list of names,

14   right?

15   A.  No.  We assume it was simply the roster of people who no

16   longer received services and they previously received services.

17   Q.  But you have no knowledge about how, if SBS provided you a

18   list of every single person that the Workforce1 Center claimed

19   to have exited the service or a subset, correct?  You're

20   assuming?

21   A.  No.  As we understand it, we were given a list of all the

22   people who had exited the programs.

23   Q.  But again you testified that you're not sure what "exited

24   the program" means precisely, right?

25             MS. SCHEIN:  Objection, your Honor.

1            THE COURT:  Overruled.

2   A.  As I understand it, "exited" means that they no longer

3   received services from the Workforce1.

4   BY MS. BLAIN:

5   Q.  When your first got that list of names from SBS --

6   withdrawn.

7            You didn't work at SBS, right?

8   A.  No.

9   Q.  You didn't personally pull the list of names from some

10  information to provide to Charney Research, right?

11  A.  No.  They have a database of some sort from which they

12  provided it.

13  Q.  You weren't the person who downloaded that list and

14  provided it to Charney Research, your company, right?

15  A.  No.

16  Q.  When your firm got that list of names, your team decided

17  which people on that list to call, right?

18  A.  No.

19  Q.  Who decided which names of that list to call?

20  A.  Nobody decided.

21  Q.  How did you go about calling the people on that list?

22  A.  Okay.  In the case where the lists were so small that in

23  order to get an adequate error margin within the goals of the

24  program, 5 percent, you had to call everyone.  We called

25  everyone.  Once the program grew a bit, we made random

1   selections.  "Random" means the selections were made by

2   computer on a random basis.  No person was deciding whether or

3   not the individuals should be called.

4          MS. BLAIN:  Fair enough.

5          THE COURT:  Let me understand.  When you started in

6   2009, you called everybody or you instructed the calling

7   service to call everybody?

8          THE WITNESS:  We called everybody, and we continued to

9   do so when the populations coming out of the centers were very

10   small because as you can see --

11          THE COURT:  "Very small," meaning what?

12          THE WITNESS:  Small numbers of people, a hundred or

13   200 as opposed to, say, 800 or a thousand.  When we had very

14   small numbers, we needed to call everyone to get the error

15   margin we were seeking for SBS.

16          THE COURT:  You saw the chart for quarterly, about

17   4200 people?

18          THE WITNESS:  As the population grew, we didn't need

19   to call everyone.  In some cases we had to call everyone at a

20   small center, whereas we did not have to call everyone at a

21   large center.

22          THE COURT:  Who determined the question whether you

23   call everybody or just somebody?

24          THE WITNESS:  That was determined mathematically.  It

25   depended upon whether or not we could achieve a 5 percent error

1    margin without calling everybody.

2            THE COURT:  What threshold did you receive a 5 percent

3    reliability factor or error margin?

4            THE WITNESS:  Your Honor, it depends on a number of

5    statistical factors.  I would have to discuss them at

6    considerable length and I might need to refer to other terms.

7            THE COURT:  On an order of magnitude -- you used about

8    500 people?

9            THE WITNESS:  In the low hundreds, you need to call

10   everyone.  In the higher hundreds, you generally would not.

11           THE COURT:  Over a thousand, you would call a random

12   sample?

13           THE WITNESS:  Yes, that is generally the case.

14           THE COURT:  Of that random sample, how many would --

15           THE WITNESS:  Sorry?

16           THE COURT:  -- how many would be called to achieve a

17   random sample of 5 percent error rate?

18           THE WITNESS:  The random sample is not a number, but a

19   method.  It says everybody in the population has an equal

20   chance of being chosen.  If you are calling everybody, everyone

21   has an equal chance of being chosen.  If not, you make a random

22   selection from the list.  A random selection means by a

23   procedure that gives everyone on the list an equal chance of

24   being chosen.

25           THE COURT:  But you have to pull out a number of names

1    to call?

2              THE WITNESS:  No person does that.  We would have that

3    done by computer on the basis of a random number algorithm or

4    chart.  They're random number procedures.

5              THE COURT:  That is what I am trying to find out is

6    what order of magnitude of number has to be called.

7              How many people have to be called to get a 5 percent

8    reliability factor?

9              THE WITNESS:  It depends on the size of the universe,

10   the population being surveyed.  If the number is in the low

11   hundreds, it would be most people, and we need to call them

12   all.

13             THE COURT:  We are dealing with a population that

14   seems to be in the area of several thousand.

15             THE WITNESS:  Your Honor, the population across the

16   centers needed to be called -- sorry.  Let me rephrase that.

17             The entire population across the various centers came

18   to several thousand.  However, we were asked to provide results

19   for each of the individual centers, and they only had several

20   hundred participants in each, and those numbers varied from the

21   low hundreds to the higher hundreds.

22             THE COURT:  That meant there were some you would call

23   everybody?

24             THE WITNESS:  Yes.

25             THE COURT:  And there was some you would call a random

1   selection?

2           THE WITNESS:  Yes.

3           THE COURT:  We don't know what the number of the

4   random selection is?

5           THE WITNESS:  To do that, we compare the number of

6   participants by the response rate because we had some idea of

7   what our response rates were and, C, if the -- we need to call

8   everyone to achieve that target of 5 percent error margin.  If

9   so, we did.  If not, then we made random selections.

10          THE COURT:  Go ahead.

11  BY MS. BLAIN:

12  Q.  Let's focus on the population number if it was small.  In

13  the cases when the list of names was small, your firm would

14  attempt to call everybody, right?

15  A.  Yes.

16  Q.  But even when your firm attempted to call everybody, your

17  firm didn't actually talk to everybody, right?

18  A.  Yes, we got 40 to 80 percent, generally around 60.

19          THE COURT:  You said you didn't call.  The calling

20  center called?

21          THE WITNESS:  Sorry.  Correct, pardon me, the calling

22  centers.

23  BY MS. BLAIN:

24  Q.  The calling center didn't actually talk to everybody it

25  called, correct?

1    A.  Yes, they reached 40 to 80 percent, typically around 60.

2            THE COURT:  Who gave the instruction to call everybody

3    or a random sample?

4            THE WITNESS:  My firm did.  We would set quotas how

5    many people needed to be reached if it wasn't a hundred

6    percent.

7    BY MS. BLAIN:

8    Q.  In those circumstances where your firm received a list of

9    names that was larger, your firm instructed the call center to

10   call a portion of those names, right?

11   A.  Correct, a randomly-chosen portion.

12   Q.  To the best of your understanding, that call center didn't

13   actually talk to every single person in that smaller sample,

14   right?

15   A.  Sorry.  You lost me on that one.

16   Q.  In the circumstances where the number of names was large --

17   A.  Yes.

18   Q.  -- the calling center didn't actually talk to every single

19   person they called, right?

20   A.  Yes.  There was no need to get a representative sample.

21   Q.  Let's look at Defendant's L-7 if we can.  Can you pull up

22   L-7, please.

23           MR. SOLOMON:  We only have it to J 7.

24           (Off-the-record discussion)

25           THE COURT:  Ms. Alberti, would you put it up.

F4LJUSA1                          Charney - cross

```
 1          MS. ALBERTI:  Yes, it is coming.
 2   BY MS. BLAIN:
 3   Q.  If we can please turn to Page 7 of this exhibit.  This top
 4   table represents a list of survey results from your firm,
 5   right?
 6   A.  Yes.
 7   Q.  You have testified that you understood that the Manhattan
 8   Workforce1 Center to be the Upper Manhattan Workforce Center,
 9   correct?
10   A.  Yes.
11   Q.  If we can look at the column headed "Manhattan," which is
12   three from the furthest right?
13   A.  Yes.
14   Q.  And that says that the population was 1,123, right?
15   A.  Yes.
16   Q.  And that's the number of names your firm received from SBS,
17   right?
18   A.  That we are the calling center, yes.
19   Q.  Under that it says Sample No. 286.  Is that right?
20   A.  Yes.
21   Q.  So you testified that that number means the calling center
22   actually talked to 286, right?
23   A.  Yes.
24   Q.  So the calling center didn't talk to all 1,123 people,
25   right?
```

1    A.  No.  They talked to a randomly chosen 286.

2    Q.  Right, and that base they talked to, enough people in your

3    firm could make an educated guess based on what the rest of the

4    people would say, right?

5    A.  No, we were not making an educated guess.  We drew a

6    statistically-educated sample to be projected on the population

7    with reliability.

8              THE COURT:  Let me see this.  If you determined that a

9    5 percent reliability factor or error margin means that you

10   call 286 people to find out what 1,123 people did, you could do

11   that?

12             THE WITNESS:  Yes.

13             THE COURT:  As long as it is randomly selected?

14             THE WITNESS:  Yes, that is the key.

15             THE COURT:  If you select randomly 286 people out

16   of -- let's assume we have this wheel and there is 1,123 names

17   in here, the question is how many names do you have to pull out

18   randomly to get a 5 percent reliability factor for the whole?

19             In other words, plus or minus 5 percent if I pull out

20   286 names, I know what 1, 123 names would say.

21             THE WITNESS:  For that the answer is 286.

22             THE COURT:  Yes.  That is why we can say if we

23   question 286 people, we'll know what 1,123 in this entire pool

24   did?

25             THE WITNESS:  It is the same principle of where we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4LJUSA1                        Charney - cross

1    randomly draw a thousand Americans and say this is how a

2    hundred million Americans will vote for president if it is

3    random.

4              THE COURT:  We know it always works perfectly!

5              THE WITNESS:  Exactly!

6    BY MS. BLAIN:

7    Q.  Right.  Mr. Charney, it is true then that when the calling

8    center received this 1,123 list of names, the calling system

9    actually talked to only 286 people, right?

10   A.  Yes.

11             MS. BLAIN:  Thank you.  No further questions,

12             THE COURT:  Any more, Ms. Schein?

13             MS. SCHEIN:  No further questions, your Honor.

14             THE COURT:  Thank you.

15             (Witness excused)

16             THE COURT:  Next witness.

17             MR. FUTERFAS:  Thank your Honor.  The defense calls

18   Mr. Saavedra.

19             THE COURT:  Mr. Saavedra, please step up.

20    ALEX SAAVEDRA,

21        called as a witness by the Defendant,

22        having been duly sworn, testified as follows:

23   DIRECT EXAMINATION

24             THE COURT:  Is Alex your full name or given name?

25             THE WITNESS:  It is my name.  I use it.  I use

1   them by restaurant establishments, hotel establishments, et

2   cetera, and it would be a list of what the name of the company

3   was, how many employees they had, who the prime contact person

4   was, the phone number, so that that would be a really, really

5   good way for us to immediately engage with prospective

6   employers.

7   Q.  Was Dun & Bradstreet a resource that was available to you

8   and Mr. McClinton?

9   A.  Yes, it was.

10  Q.  During the conversation there was a statement about a chart

11  that had been sent to SBS.  Do you remember that?

12  A.  Yes.

13  Q.  What chart were you to two referring to?

14  A.  It was a copy of that roster or spreadsheet of those

15  employers, sorted by sector, that would really mark off, has

16  this employer been called?  How many times has been employer

17  been called?  And what was the result?  Did the employer

18  express a need for hiring?

19  Q.  You just said that how many times an employer were called.

20       Were metrics kept at Upper Manhattan where every time

21  you called an employer, that would actually be noted?

22  A.  Yes.

23  Q.  Mr. Saavedra, where were you born?

24  A.  In Albuquerque, New Mexico.

25  Q.  How old are you?

1    A.  47.

2    Q.  Where did you go to grade school?

3    A.  I went to public school in Albuquerque, Kit Carson

4    Elementary and Ernie Pyle Middle School.

5    Q.  Did you eventually go to college?

6    A.  Yes.

7    Q.  Where did you go to college?

8    A.  I went to Stanford University.

9    Q.  Did you go on scholarship?

10   A.  Yes.

11   Q.  What did you study at Stamford?

12   A.  I majored and my focus was on course of study known as

13   urban studies.

14   Q.  What is urban studies?

15   A.  It is a course and a program that really focuses on the

16   development issues of urban communities and cities.

17   Q.  When did you graduate from Stamford?

18   A.  In 1989.

19   Q.  Did you do graduate work?

20   A.  Yes.

21   Q.  Where was your graduate work?

22   A.  I came to New York City and attended the masters of science

23   program at Columbia University.

24   Q.  Was that also on scholarship?

25   A.  Yes.

1   Q.   What did you study at Columbia?

2   A.   I major and received a master of science in urban planning.

3   Q.   What is urban planning?

4   A.   It is a public policy focused course of study that really

5   focuses a lot on a lot of endemic needs that impact urban areas

6   in very large cities such as New York.

7   Q.   Did you have any specialization during your masters

8   program?

9   A.   Yes.

10  Q.   What was that?

11  A.   I focused on the challenges that face disadvantaged

12  communities, a lot of economic development challenges of places

13  like the South Bronx and Harlem, the need for affordable

14  housing, a lot of the forces of poverty and how they might be

15  able to be addressed and improved.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1    Q.  Did you do a master's thesis?

2    A.  Yes.

3    Q.  What was it on?

4    A.  I was focusing on affordable housing initiatives that had

5    been successful in the South Bronx.

6    Q.  Did you graduate Columbia University?

7    A.  Yes, I did.

8    Q.  Where did you go from there?

9    A.  I received a fellowship with the New York State Urban

10   Development Corporation.  It was a one-year fellowship designed

11   to help people interested in community development and economic

12   development of disadvantaged neighborhoods to actually work on

13   New York State economic development initiatives targeted at

14   those neighborhoods.

15   Q.  How long were you there?

16   A.  A year.

17   Q.  What did you do after that?

18   A.  I actually got a job with an organization in the South

19   Bronx -- long name -- it's known as the South Bronx Overhaul

20   Economic Development Corporation the acronym everybody knows it

21   as SoBRO.

22   Q.  What was SoBRO?

23   A.  It was a community-based nonprofit that focused on a lot of

24   the needs, the economic and development needs of areas in the

25   South Bronx, roughly below 161st Street.

F4lnusa2                          Saavedra - direct

1   Q.  What were your duties and responsibilities at SoBRO?

2   A.  I was hired as the assistant director for commercial

3   revitalization.  In that role I worked on helping merchants and

4   business owners in key commercial corridors, East 138th Street,

5   East 149th Street, Third Avenue, East 162st Street, in a range

6   of initiatives designed to help them run their businesses

7   better, helping them connect to resources for financing,

8   helping them to implement facade improvement with the goal of

9   really helping them.

10  Q.  How long were you at SoBRO?

11  A.  I was there for probably close to two years.

12  Q.  And where did you go after that?

13  A.  I received a job at another organization with a long name,

14  the Upper Manhattan Empowerment Zone Development Corporation,

15  known as UMEZ.

16  Q.  Where was that located?

17  A.  On 125th Street in Harlem.

18  Q.  What were your duties and responsibilities there?

19  A.  I was a program associate focused on a lot of the community

20  grant initiatives that the empowerment zone was focusing on in

21  Harlem.

22  Q.  How long were you at this employment?

23  A.  I was there close to five years.

24  Q.  Tell me about after that.  Where did you go?

25  A.  I had a short work opportunity at an organization called

1    the Afterschool Corporation.

2    Q.  What was that?

3    A.  I was a senior program development associate.  And the

4    Afterschool Corporation was an organization that uses private

5    philanthropic dollars, primarily from the Open Society

6    Institute or the George Soros Institute.  Actually its goal was

7    to help partner with government funds through the Department of

8    Education to implement afterschool programs in New York City

9    public schools.

10   Q.  How long were you with that program?

11   A.  I was there under a year.

12   Q.  What was your next employment?

13   A.  I was recruited by the founder and then CEO and president

14   of SEEDCO Bill Grinker.

15   Q.  Approximately when was that?

16   A.  That was the summer of 2001.

17   Q.  And what position did you take in 2001 at SEEDCO?

18   A.  I was a senior program associate in the program design and

19   development team.

20   Q.  What were your duties and responsibilities?

21   A.  To actually look and articulate proposals targeted towards

22   disadvantaged communities in New York City and in other parts

23   of the country SEEDCO focused on, with the goal and the aim was

24   to leverage resources to create innovative programs to help

25   alleviate poverty.

F4lnusa2                         Saavedra – direct

1    Q.   How long were you in that role at SEEDCO?

2    A.   In that role, probably from about 2001 to around 2004.

3    Q.   Is SEEDCO a nonprofit organization?

4    A.   Yes, it is.

5    Q.   In 2004 did your duties change at SEEDCO?

6    A.   Yes, they did.

7    Q.   How so?

8    A.   I was asked by Mr. Grinker if I would be interested in

9    taking over the role as center director of the newly acquired

10   Upper Manhattan One Stop or Workforce1 Career Center.

11   Q.   Did you accept that position?

12   A.   Yes, I did.

13   Q.   So in or about 2004 you became director of the Upper

14   Manhattan Workforce1 Center?

15   A.   Yes, I did.

16   Q.   And at that time what were your duties and

17   responsibilities?

18   A.   The initial duties were to launch the center.  We had

19   inherited it from a prior company, prior vendor, and we had to

20   really quickly get the program to launch and continue serving

21   job seekers.  We had to hire about 40 staff.

22   Q.   And were there operations to implement?

23   A.   Yes.

24   Q.   Was that part of your duties and responsibilities?

25   A.   Yes, it was.

1    Q.  Can you just briefly describe that.

2    A.  We had to hire the appropriate teams to serve job seekers

3    coming in and looking for employment.  We had to ensure that

4    the services, because we were serving high numbers of job

5    seekers walking into the center every day, in the hundreds per

6    week, and really make sure that we could actually meet them at

7    the place of employment they needed the most, the support they

8    needed.

9    Q.  What kind of training was done for the staff at that time?

10   A.  We implemented a full two-week onboard staff training.  We

11   did that at that time at SEEDCO's corporate headquarters.  We

12   had all new staff, or at least new staff to SEEDCO, and we had

13   to really have them understand thoroughly why we were in

14   operation, what our goals were to accomplish, and then, within

15   that, train them, and being very clear about the policies and

16   directives and the way they had to do their jobs.

17   Q.  Did you have the training sessions at SEEDCO corporate?

18   A.  Yes.

19   Q.  What is the location of the SEEDCO corporate offices?

20   A.  915 Broadway at the corner of 21st Street and Broadway.

21   Q.  As your directorship of Upper Manhattan Workforce

22   continued, did your duties and responsibilities change?

23   A.  They did.

24   Q.  Do you remember something called a triage strategy?

25   A.  Yes.

F4lnusa2                        Saavedra – direct

1   Q.  What is that?

2   A.  Because we had very many job seekers coming in on any day

3   and really their goal was, I need a job or I'm currently

4   working, I need a better job, we had to really better serve

5   them as quickly as possible.

6           So, if you looked at three types of job seekers, one

7   person may come in, and that person has a résumé, and speak

8   about that résumé and, therefore, someone who could really be

9   sent out to an interview very quickly.

10          But on the other end of that spectrum, you might have

11  a job seeker -- and this was pretty much good a number of the

12  folks coming into our center at that time.  This might be

13  somebody who:  I'm not ready for work.  I've never had a

14  résumé.  I don't know how to articulate my skill set.  And, by

15  the way, you know, I need better, more support on that.

16          Well, that person would need to get support in getting

17  a résumé together, maybe getting vocational training to improve

18  their prospects.

19          Then there was another group of people that were

20  also -- these are very needy people.  Maybe they are homeless,

21  maybe they have housing subsidies, maybe they need housing

22  subsidies.  So their life situation is so erratic at this point

23  that really their ability to look for a job is compromised.

24          That's why we worked at getting those people connected

25  to any range of benefits for which they could apply and

1   receive.

2   Q.  Was the goal that if they received certain benefits they

3   could then be better equipped to spend time getting a job?

4           MS. SCHOENBERGER:  Objection.

5           THE COURT:  Overruled.

6   A.  Yes.

7   Q.  How much of your time in these first few years as director

8   of the center were you actually physically at the center?

9   A.  Could you repeat the question.

10          MR. FUTERFAS:  Sure.

11          THE COURT:  How much time did you spend at the center?

12  A.  In those first years you are saying?

13  Q.  Yes.

14  A.  I spent a good amount of my time really to make sure that

15  the center operated efficiently.  And I had a deputy director

16  at that time, Catherine Kim, and we worked very closely

17  together to be sure that the staff was appropriately utilized

18  to provide the best, most efficient service to those job

19  seekers.  We are really in fact developing that triage process.

20          THE COURT:  What year are you up to, Mr. Futerfas?

21          MR. FUTERFAS:  I am at 2007.

22          THE COURT:  How about jumping another two years.

23          Let's get into 2009.

24          MR. FUTERFAS:  We will, your Honor.

25          THE COURT:  Now.

```
 1              MR. FUTERFAS:  What happens in 2007 is relevant.
 2              THE COURT:  Now.  I think we're ready for it.  We have
 3     had enough background.
 4     Q.  Were you at some point promoted to vice president of SEEDCO
 5     corporate?
 6     A.  Yes, I was.
 7     Q.  Was that role in addition to your role as director of the
 8     center?
 9     A.  Yes.
10     Q.  What were your duties and responsibilities in that role?
11     A.  I had been promoted to vice president at SEEDCO, retaining
12     my center director title, and my goal, my focus had changed.
13     It had been asked by the president of SEEDCO at that point
14     Diane Baillargeon, to now become a more externally focused
15     person, a senior-level person, a diplomat for the center
16     engaged with working with the Harlem community.
17     Q.  Did the time that you spent in the center versus outside
18     the center change in that process?
19     A.  Yes.  Almost reversed.  I was pretty much 80 to 90 percent
20     of my time was externally focused, meeting with community
21     stakeholders, partners of the center, and less so on the
22     center, which is already efficiently operating internally.
23     Q.  Have you ever heard of something called an orientation?
24     A.  Yes.
25     Q.  What is your understanding of an orientation?
```

1   A.  An orientation is when a job seeker walks into the center,

2   meets a greeter at the front desk, and it's determined that

3   that person has not been engaged at the workforce center, any

4   other work center in New York City.  So they go into an

5   orientation where the services I just described we developed at

6   the center are articulated to them so they know what they can

7   receive when they are engaged with that center.

8   Q.  That orientation, are people moved into a room at 125th

9   Street to receive that orientation?

10  A.  Yes.  The orientation is roughly held with about 40 job

11  seekers.

12  Q.  Are they shown the slide presentation?

13  A.  They sure are.

14  Q.  Who prepared the slide presentation?

15  A.  It was a presentation prepared by SBS.  It was a standard

16  orientation that SBS designed because it had to be used in

17  every center throughout New York City.

18  Q.  In the course of your answer you said something about

19  determining whether the individual had been engaged or had seen

20  other workforce centers.  Do you remember saying that?

21  A.  Yes.

22  Q.  In your experience did individuals sometimes go to a number

23  of different workforce centers?

24  A.  Definitely, yes.

25          THE COURT:  What year are we up to?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4lnusa2                         Saavedra - direct

1    Q.  And it's not the only Workforce Center under the umbrella

2    of SBS, right?

3    A.  Correct.

4    Q.  We saw a chart with your salary at Upper Manhattan

5    Workforce.  Do you remember that?

6    A.  Yes, I do.

7    Q.  It was introduced into evidence?

8    A.  Yes, I do.

9    Q.  That was about $103,000, something like that?

10   A.  Correct.

11          MS. SCHOENBERGER:  Objection to form.

12          THE COURT:  If this is relevant let's put the whole

13   chart out and not guess at the numbers.

14   Q.  It is a different question, your Honor.

15          THE COURT:  Then don't ask a question that is not

16   relevant.

17          Are we interested in this or not?

18          MR. FUTERFAS:  Your Honor, I have one last question,

19   but I don't need the chart to do it.

20          THE COURT:  This testimony is objected to.  The best

21   evidence rule is the number that is on the chart.

22   Q.  Let me ask you this, Mr. Saavedra, notwithstanding the

23   chart, ignoring the chart, did you have an understanding of

24   what other center directors were earning in the metropolitan

25   area?

F4lnusa2                      Saavedra - direct

1                MS. SCHOENBERGER:  Objection.

2                THE COURT:  Sustained.

3   Q.  Did you have an understanding about whether you made more

4   or less than those --

5                THE COURT:  Mr. Futerfas, do you think this is the

6   same question that you asked and I sustained an objection to or

7   a different question?

8                MR. FUTERFAS:  I will move on, your Honor.

9                THE COURT:  I would be grateful.

10  Q.  By the way, have you heard in the course of your tenure as

11  center director of a company called Charney Research?

12  A.  Yes.

13  Q.  What was your understanding of what Charney Research was

14  tasked to do?

15  A.  My understanding, as I had been frequently reported by SBS

16  to vendors, including us, at SEEDCO, was that at the end of

17  every quarter, names of people who had been claimed as

18  placements or promotions would be taken out of Worksource1 and

19  delivered to Charney Research for them to call and verify that

20  in fact they did have those jobs that they were placed or

21  promoted.

22  Q.  Did you have an understanding about whether or not that

23  process involved calling a sample or everyone?

24  A.  Everyone.

25  Q.  Who told you that?

1    A.  Various folks.  People at SBS, including Angie Kamath,

2    other people other than her -- prior, Melissa Wavelet, Shanna

3    Gumaer, Scott Zucker.

4    Q.  Have you ever seen the contract between Charney Research

5    and SBS?

6    A.  No.

7    Q.  Have you ever seen a questionnaire that Charney Research

8    distributed or utilized in its process?

9    A.  Not until today.

10   Q.  You heard testimony earlier this morning about individuals

11   exiting the program.  Do you remember that testimony?

12   A.  Yes, I do.

13   Q.  But could people get multiple placements in the course of a

14   quarter or the course of a year?

15        MS. SCHOENBERGER:  Objection.

16        THE COURT:  Objection sustained.

17   Q.  What was your understanding about exiting the program?

18   A.  Exit was a term that was used in the early years, 2004,

19   through 2006, and it meant somebody had met and received

20   services and received a placement, they were exited; or they

21   could not be reached after coming into the center.  They were

22   exited.  That terminology was dropped after 2006.

23   Q.  I want to turn your attention to about 2010.  Did your

24   duties and responsibilities change in 2010?

25   A.  They did.

F4lnusa2                        Saavedra – direct

1    Q.   And in what manner?

2    A.   In 2010 SEEDCO was preparing to apply to SBS for a renewal

3    of the center in Harlem as well as to hopefully secure

4    operations of one additional center.  We were going for the

5    Bronx, but we also wanted to -- and prepared a proposal to

6    perhaps operate the Brooklyn center.

7    Q.   What was the extent of your time that you spent on these

8    proposals?

9    A.   95 percent to 98 percent of my time was working on those

10   proposals.

11   Q.   Was the assignment a large assignment?

12   A.   It was a huge undertaking, yes.

13   Q.   Why was that?

14   A.   Because these are very complex operations.  We actually

15   worked -- I led a small task force working with SEEDCO's

16   corporate proposal development team.  These are people who are

17   really great researchers and writers, but they did not have the

18   day-to-day context of daily operations at a career center.  So

19   I had to provide that as well as provide relevant

20   experience-based data that would inform the proposal

21   development process.

22   Q.   Did you get an office at 915 Broadway?

23   A.   I was equipped with a temporary office with a desk and

24   phone, yes.

25   Q.   And how long would your -- well, would you spend all your

1    time, part of your time there?  What do you recall?

2    A.  Up to 95, 98 percent.  Especially as we were going through

3    the research and the articulation.

4    Q.  How large were each of these proposals?

5    A.  They were very large, about 200-plus pages.

6    Q.  Were they designed for each of these different areas.  Were

7    they specific?

8    A.  There were some core elements that pertained to just the

9    core operations at each center, standardized at each center.

10   But then there were specific areas, specific particularly in

11   the area of employment prospects in each of those boroughs,

12   Brooklyn, Bronx, and Manhattan.

13   Q.  Did you have to travel to work on these proposals

14   specifically to the Bronx?

15   A.  Yes.  Because part of the proposals were that we wanted to

16   have -- the Bronx center at that time, the physical location

17   was really, really substandard.  We knew that SBS didn't like

18   it.  We thought if we operated that center, it would be very,

19   not the best place to operate the facility.  So we were looking

20   at real estate options.  We were looking at different possible

21   places that were more central in the Bronx.

22   Q.  Was that actually part of your, hopefully what would make

23   your proposal attractive that you were doing that?

24   A.  I was.  We worked with a real estate agent to look at

25   different potential locations to move that center.

F4lnusa2                        Saavedra - direct

1   Q.   During this period how many times would you say per week

2   you were in the Bronx and looking at real estate?

3   A.   At least three times per week.

4   Q.   What period of time are we talking about now in 2010?

5   A.   This is really around, between March to when the proposal

6   was due in June I believe.

7   Q.   Was anyone taking care or temporarily replacing you in

8   effect as center director in Upper Manhattan at this time?

9   A.   Yes.

10   Q.   Who was that?

11   A.   That was my deputy director in Harlem at that time, Rick

12   Green.

13   Q.   Do you know a person named Francine Delgado?

14   A.   Yes.

15   Q.   At some point in the summer of 2010 while were you doing

16   these things, did you take on some of her responsibilities?

17   A.   I did.

18   Q.   Why was that?

19   A.   She had gone on maternity leave midway through the proposal

20   development process.

21   Q.   Did that in any way increase your duties and

22   responsibilities?

23   A.   I had to take on some of her roles within New York City

24   because I was somebody who was as knowledgeable about SEEDCO's

25   workforce programs as she was, so there would be meetings that

F4lnusa2                         Saavedra - direct

1   we had to attend, I had to represent SEEDCO on her behalf on

2   those.  I had to really provide more regular executive-level

3   attendance at meetings with Barbara Gunn, who was the CEO of

4   SEEDCO.

5   Q.  At some point did you learn about whether or not any of

6   these proposals would be accepted?

7   A.  Yes.

8   Q.  And when was that?

9   A.  I think it was sometime in September of 2010.

10          MR. FUTERFAS:  If we could publish Government Exhibit

11   2.  Do you recognize this e-mail.  It is in evidence as

12   Government Exhibit 2, Mr. Saavedra?

13   A.  Yes.

14   Q.  What is the date of the e-mail?

15   A.  April 28, 2010.

16   Q.  You see in the first two lines there, what are you

17   communicating to staff at Workforce1?

18   A.  We are well into the planning process for developing these

19   three proposals to SBS.

20   Q.  And then you are indicating that much of your time would be

21   out of the office?

22   A.  Yes.

23   Q.  Then in the next paragraph, the last sentence, you say you

24   are trying to figure out a complicated way to work something

25   out in the proposals and you are distracted, which can be

1    stakeholders?

2    A.  It was hugely important because we wanted to ensure that

3    the Bronx and the community, the many community institutions

4    were -- actually could be identified as partners, as referral

5    partners, as training partners, places where the individuals,

6    like, they had entities like Lehman College, Hostos Community

7    College, a range of different groups who had access to job

8    seekers but could actually facilitate referral to our Bronx

9    center.

10   Q.  How much of your time from the time you were awarded the

11   contract in September until the Bronx center opened was devoted

12   to that project?

13   A.  98 to 100 percent of my time.

14   Q.  Mr. Saavedra, did you have a BlackBerry?

15   A.  Yes, I did.

16   Q.  Was it issued by SEEDCO?

17   A.  Yes, it was.

18   Q.  What was it used for?

19   A.  It was used to keep tabs of all the SEEDCO e-mails that I

20   would receive.

21   Q.  Could you use it as a phone?

22   A.  No.

23   Q.  So it was just for e-mails?

24   A.  Yes.

25   Q.  Could you estimate how many e-mails you received a day?

F4lnusa2                         Saavedra – direct

1    A.  Not less than a hundred per day.

2    Q.  When did the Bronx center open?

3    A.  We had to open by January 3, 2011.

4    Q.  So you had effectively 90 days to open this center?

5    A.  Yes.

6    Q.  Were there construction or practical problems that you had

7    to address?

8    A.  As I mentioned earlier, the Bronx center was decaying.  It

9    had been there for a long time, and we did have a lot of needs

10   to spruce it up and to get connectivity for computers and

11   whatnot.

12           THE COURT:  Haven't we just heard this several times?

13           Mr. Futerfas, why are we repeating the same thing over

14   and over again?

15           MR. FUTERFAS:  I am moving forward, your Honor.

16   Q.  When the Bronx center opened what did your position become?

17   A.  I remained vice president of SEEDCO, but now as the center

18   director for the Bronx Workforce1 Career Center.

19   Q.  Who became director of Manhattan?

20   A.  Rick Green became director of the Manhattan center.

21   Q.  Was there a time in early April that you were out of New

22   York?

23   A.  Yes.

24   Q.  April 2011 to be clear?

25   A.  Yes.

F4lnusa2                              Saavedra - direct

1    Q.   Why were you out of New York?

2    A.   I had gone to take my father to the Mayo Clinic in

3    Scottsdale, Arizona.

4            MR. FUTERFAS:   Could I have published Government

5    Exhibit 5.   Scroll down to the bottom.

6            THE COURT:   Is this in evidence?

7            MR. FUTERFAS:   Yes, it is, your Honor.

8    Q.   On that date, April 7, 2011 --

9            MR. FUTERFAS:   Actually, if you can go up to the top

10   of the e-mail just for ease of reference.

11   Q.   April 7, 2011, were you in Arizona on that date?

12   A.   Yes, I was.

13   Q.   The times of the e-mails --

14           MR. FUTERFAS:   Marissa, if you could just scroll down

15   slowly.

16   Q.   -- would appear to be about 1 p.m. in the afternoon Eastern

17   Time.   Do you see that?

18   A.   Yes, I do.

19   Q.   What were you doing at about 11 a.m. on April 7 in Arizona?

20   A.   I was working with my father and consulting with his team

21   of doctors.   He has ALS, or Lou Gehrig's disease.

22   Q.   At the time these e-mails were sent, did you see any of

23   them?

24   A.   No.

25   Q.   The first e-mail in this exhibit, if we could start at the

1    1:03 e-mail.  That one right there.

2              MR. FUTERFAS:  Thank you, Marissa?

3              THE COURT:  You are talking about the time on these

4    e-mails?

5              MR. FUTERFAS:  Yes, your Honor.

6              THE COURT:  That would be the time in New York?

7              MR. FUTERFAS:  Yes, your Honor.

8              THE COURT:  And the time in Arizona is three hours

9    different.  It's three hours earlier.  So if it's 1 o'clock in

10   New York, it's 10 o'clock in Phoenix or Scottsdale.

11             MR. FUTERFAS:  Thank you, Judge.

12   Q.  Mr. Saavedra at 10 a.m. on that date, were you engaged in

13   these medical issues with your father?

14   A.  Yes.

15   Q.  Now, in that e-mail at 1:03, do you see that you are copied

16   on that e-mail?

17   A.  I do see that.

18   Q.  If we could go up to the next one.

19             Do you see that there is a response at 1:10, and you

20   are copied on that e-mail.  Do you see that?

21   A.  Yes.

22             MR. FUTERFAS:  If you could go up one more to a

23   response to that at 1:13.  Thank you.

24   Q.  Do you see in the response at 1:13 p.m. from a

25   Ms. Chandarpaul, that she's writing to Mr. Katz and a

F4lnusa2                         Saavedra - direct

1    Mr. Marmolejos, do you see that?

2    A.   Yes.

3    Q.   Do you see that you have been deleted from that e-mail

4    chain?

5    A.   Yes, I do.

6    Q.   And if I could direct you to the e-mail above that, at 1:16

7    p.m.  Mr. Katz responds to Ms. Chandarpaul's prior e-mail of

8    1:13.  Do you see that?

9    A.   Yes.

10   Q.   When Mr. Katz responds, he includes Mr. Chandarpaul and

11   Mr. Marmolejos and Ana Marchany, do you see that?

12   A.   Yes.

13   Q.   Does he add to you that response?

14   A.   No.

15   Q.   Then do you see the top e-mail?

16   A.   Sorry about that.  I guess I brought up that green arrow by

17   mistake.

18   Q.   Ms. Marchany's response, correct, in response to those

19   individuals.  Do you see that?

20   A.   Yes, I do.

21   Q.   If you could put up for your review Government Exhibit 71.

22   Do you see the e-mail that you, that was sent to you at 1:10

23   p.m. from Alan Katz.  Do you see that?

24   A.   I do.

25   Q.   Then do you see your e-mail to him at 6:36 p.m.?  Do you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    see that?

2    A.  Yes, I do.

3    Q.  You wrote to Mr. Katz, "I would like to speak to you about

4    something that has come to light."

5            Do you see that?

6    A.  Yes.

7    Q.  When you wrote to him, were you responding to the e-mails

8    underneath?

9            MS. SCHOENBERGER:  Objection.

10            THE COURT:  Overruled.

11   A.  No, not exactly.

12            THE COURT:  What do you mean "not exactly"?

13            THE WITNESS:  I wasn't responding to that e-mail.  I

14   was just replying to an e-mail chain that was easy to reply to

15   get to him.

16   Q.  During that day while you were with your father on April 7,

17   had you had any communications from SEEDCO?

18   A.  Yes, I did.

19   Q.  And can you tell us about that?

20   A.  My cell phone had been ringing, but I was literally with my

21   father and his doctors.  I didn't really look at it.  I had it

22   on vibrate, but it kept ringing.  It kept ringing.  I thought,

23   well, at some point when I did have a moment let me just see

24   who called, and I noticed that it was from SEEDCO's

25   headquarters.

F4lnusa2                          Saavedra - direct

1   Q.  So what did you do?

2   A.  I returned the call because I thought they knew where I was

3   at, so I figured it might be an emergency, so I wanted to call

4   them.

5   Q.  Did you speak to anyone at SEEDCO?

6   A.  I did.

7   Q.  Whom did you speak with?

8   A.  It was Francine Delgado and Solomon Malach, who was

9   SEEDCO's general counsel.

10  Q.  What did they tell you?

11  A.  They first asked me, from my understanding of the years in

12  working in the career centers, what I understood as a

13  placement.

14  Q.  They asked you for your understanding of the definition of

15  a placement?

16  A.  Yes.

17  Q.  Anything else that was said?

18          MS. SCHOENBERGER:  Objection.

19          THE COURT:  Sustained.

20  Q.  What else was said during the conversation?

21          MS. SCHOENBERGER:  Objection?

22          THE COURT:  Sustained.

23  Q.  As a result, did they suggest to you during that call that

24  there was a whistleblower or some problem?

25          MS. SCHOENBERGER:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              THE COURT:  Sustained.

 2   Q.  As a result of that phone call, did you then write this

 3   e-mail to Alan Katz four or five hours later?

 4              THE COURT:  Following the call did you write this

 5   e-mail?

 6              THE WITNESS:  I wrote it a few hours later.

 7   Q.  Is this the call that Mr. Katz talked about, where you

 8   asked him about if there were any problems at --

 9              MS. SCHOENBERGER:  Objection.

10              THE COURT:  Objection sustained.

11   Q.  Let's just leave it at this:  As a result of whatever phone

12   call you had with SEEDCO, did you then subsequently have a

13   phone call with Alan Katz?

14   A.  Yes, I did.  The next day.

15   Q.  When did you become aware that there was a whistleblower?

16   A.  On that day, on April 7, 2011.

17   Q.  Prior to that date, had you been aware of any improper

18   placements?

19   A.  No.

20              MS. SCHOENBERGER:  Objection.

21              THE COURT:  Overruled.

22   Q.  Have you attended Friday all-staff meetings?

23   A.  I have.

24   Q.  At those meetings have you ever heard anyone suggest making

25   or making improper placements?
```

 1   A.  No.

 2   Q.  At some point did you have the view that SBS should be

 3   advised of the whistleblower's allegations?

 4             MS. SCHOENBERGER:  Objection.

 5             THE COURT:  Sustained.

 6   Q.  In the course of your duties and responsibilities, did you

 7   take any action with respect to the information you had

 8   received about the whistleblower's allegations?

 9   A.  Yes, I did.

10   Q.  What action did you take?

11   A.  I went to -- well, I was invited by Barbara Gunn, the CEO,

12   and Francine to sit and really kind of talk through what had

13   happened and what the nature of the allegations were, and it

14   included the legal counsel and also I think SEEDCO's CFO, the

15   chief financial officer, Paul Sugar to really see what is this

16   problem and how can we address it.

17   Q.  At some point did you have an understanding that it should

18   be communicated to SBS?

19             MS. SCHOENBERGER:  Objection.

20             THE COURT:  Sustained.

21   Q.  Did you take any other actions -- well, let me ask you

22   this:  Were any remedial measures implemented under your

23   direction?

24             MS. SCHOENBERGER:  Objection.

25             THE COURT:  Overruled.

F4lnusa2                         Saavedra - direct

1    A.  Yes.  We really, we felt that the point in time --

2            THE COURT:  What did you do?

3            THE WITNESS:  We undertook --

4    Q.  Mr. Saavedra, why don't you talk about what you did.

5    A.  What I did?

6    Q.  Yes.

7    A.  A attended these meetings, and I was asked by Barbara Gunn

8    and Francine Delgado to lead up a retraining initiative of

9    staff to ensure that they really were up to date on the most

10   current policies directing the operation of the center.

11   Q.  Mr. Saavedra, did there come a time that a --

12           MR. FUTERFAS:  Your Honor, would this be a good time

13   for a break?

14           THE COURT:  It sounds like you're almost finished.

15   That would be a better idea.

16   BY MR. FUTERFAS:

17   Q.  Let me ask you this:  Did there come a time that you became

18   aware of a series of New York Times articles about this?

19   A.  Yes.

20   Q.  When do you recall those articles came out?

21   A.  They were approximately August of 2011.

22   Q.  In the aftermath of those articles, are you aware of any

23   other actions that were taken by DOI or anyone else with

24   respect to the issue of placements?

25   A.  Yeah.  We knew that there would be a DOI investigation, and

F4lnusa2                            Saavedra - direct

1    SEEDCO retained general counsel -- retained counsel to also

2    look internally and question the staff at the centers.

3    Q.  Mr. Saavedra, did you eventually leave your employment at

4    SEEDCO?

5    A.  Yes.

6    Q.  When was that?

7    A.  March of 2012.

8             MR. FUTERFAS:  Your Honor, I have a question.  I would

9    like to ask the witness, but I would like your Honor's input

10   before I ask it, if possible.

11            THE COURT:  That suggests to me that you think it's

12   objectionable.

13            MR. FUTERFAS:  I don't --

14            THE COURT:  Ask it.

15   Q.  Mr. Saavedra, how is it that you have counsel in this case?

16            MS. SCHOENBERGER:  Objection.

17            THE COURT:  Objection sustained.

18            A person has a lawyer because there are issues that

19   require a lawyer to advise the client, there are issues that

20   require a lawyer in terms of a lawsuit.  There are many good

21   reasons to get a lawyer.  That's how lawyers make a living.

22   Q.  My question for you is this:  Can you afford counsel in

23   this case?

24            MS. SCHOENBERGER:  Objection.

25            THE COURT:  Sustained.

F4lnusa2                      Saavedra - direct

1            MR. FUTERFAS:  I will try it one more time.

2            THE COURT:  I think you've finished.  Anything else?

3            MR. FUTERFAS:  Let me consult, your Honor.  Thank you.

4    Q.  Let me ask you this, Mr. Saavedra:  Where are you residing

5    now?

6    A.  I'm in Albuquerque, New Mexico.  I live with my parents.

7    Q.  Are you gainfully employed?

8    A.  Recently, yes.

9    Q.  What are you doing now?

10           MS. SCHOENBERGER:  Objection.

11           THE COURT:  Overruled.

12   A.  When I returned to New Mexico I started taking part-time

13   jobs, temporary jobs.  And then an agency that was helping me

14   get to those jobs actually offered me employment as a staffing

15   consultant.

16   Q.  What is your hourly wage or salary?

17           MS. SCHOENBERGER:  Objection.

18           THE COURT:  Sustained.

19           Mr. Futerfas, you're finished.

20           MR. FUTERFAS:  We are done.  Thank you, your Honor.

21           THE COURT:  We will break for lunch and come back at

22   2:15 for the cross-examination of Mr. Saavedra.

23           Close your books and give them to Brigitte on the way

24   out.  I think we will be finished with the evidentiary part of

25   the case today, and I'll tell you then what our further work

1           (Jury not present)

2           THE COURT:  Be seated.  I need a few minutes.

3           What am I getting on damages?

4           MS. BLAIN:  Your Honor, the government submitted a

5    letter late last night.

6           THE COURT:  I read it, which promised me something,

7    but nothing is being delivered.

8           MS. BLAIN:  Your Honor, we attempted to lay out the

9    government's position with regard to the three possibilities of

10   damages.

11          THE COURT:  I read it.

12          MS. BLAIN:  OK.  So what else would your Honor like?

13          THE COURT:  Numbers.

14          MS. BLAIN:  So there are, again, three buckets of

15   numbers for the damages.  We gave the Court the first bucket,

16   which is the entire --

17          THE COURT:  I want to ask the jury to find two things:

18   The number of false records or statements material to a false

19   or fraudulent claim and the amount to which government was

20   damaged.

21          I am going to rule that the amount of damages is

22   limited to the amount of performance bonus paid by the

23   government, so that's 50 percent of 30 percent for part of the

24   time and 50 percent of 20 percent for part of the time.

25          I want to have a summary statement.  I don't think we

1    need it for the false records or statements because it's going

2    to be the number that was stated in the DOI report, but I do

3    need the amount of damages broken down into periods.

4           Let me say a little more.

5           31 U.S. Code, Section 3729, provides, "subject to

6    mitigation reduction flowing from cooperation, which is not

7    going to be applicable here, the amount of damages is a penalty

8    of not less than $5500 nor more than $11,000," and it doesn't

9    say on what that's based, "plus three times the amount of

10   damages which the government sustains because of the act of

11   that person."

12          So I've told you how I define damages, which you will

13   see in our proposed charge.  The other part of it is the

14   penalty.  So it's a penalty for violation.  The question is,

15   what is the violation?  Subsection (a)(1)(A) defines a

16   violation as, "An act of any person who knowingly presents or

17   causes to be presented a false or fraudulent claim for payment

18   or approval or knowingly makes, uses, or causes to be made or

19   used a false record or statement material or false or

20   fraudulent claim."

21          I am going to focus, if the jury finds that it is a

22   false record or statement, on that.  And each falsification of

23   the CIF is a false record, which was, if the jury finds it,

24   material to a false or fraudulent claim.

25          I am not basing it on claims.  I don't think I am,

 1     because that is more ambiguous.  Is the claim the misstatement
 2     of the CIF or is the claim a bundling quarterly of all the CIFs
 3     into the translation into the schedules that were transmitted
 4     to SBS and then verified?  So I think the claim is the bundling
 5     or the aggregate that's submitted quarterly.
 6              False records material to the claim are all those
 7     records that misstate when and where the person is working as a
 8     result of the service delivered by SEEDCO.  That requires me to
 9     ask the jury to give me the number of false records, and then
10     in postverdict proceedings I will have to find the amount of
11     the penalty.  I will also treble the amount of damages and come
12     to a final figure.
13              So I would like to have some help in terms of
14     quantification.  I don't think I need it with the DOI report.
15     I think what I have there are the contentions, the prospective
16     contentions by the defendant and the plaintiff as to how many
17     violations there were, but I want to make sure I get the right
18     number, and then the amount of damages I need to figure and a
19     way of aggregating them based on the evidence.
20              That's my thinking so far.  Any comment?
21              MS. BLAIN:  Your Honor, just in terms of the damages
22     figure and then I will address the civil penalty figure, if I
23     may.  For the damages, the evidence in the record, or the
24     government's theory has been -- just to back up for a moment --
25     that this is a grant project.  This is a grant that SEEDCO

1    received.

2              THE COURT:  I know your theory.  I have a jury out.  I

3    will go into it some more.  Really what I want to do is focus

4    you on what I need so I can make a judgment I need to do it.

5    Are you going to give me that schedule?

6              MS. BLAIN:  We can give you an estimate of the number

7    but there's not any way to break down precisely how much SEEDCO

8    got paid under the 30 percent for these three years because

9    what we have is how much SEEDCO got paid under the entire

10   contract for these three years.

11             So we can do a best estimation, and we're happy to

12   work with defendant's counsel on this for what that 30 percent

13   number has been, but that simply has not been the government's

14   focus, which is why the evidence has to be, the damages

15   calculation has to be an estimation.

16             THE COURT:  I am not giving you the aggregate.  You

17   may have a failure of proof.

18             MS. BLAIN:  Yes, I understand, your Honor.  I am just

19   trying to explain that we can give you an approximation.  I

20   can't give it to you at this very moment, but if you give me a

21   few minutes, I think we can.

22             THE COURT:  Within a few minutes?

23             MS. BLAIN:  I hope so, your Honor.  I have been

24   reaching out to various people to try to get help with the

25   calculation.  I haven't checked my BlackBerry.

1          THE COURT:  You should have it as an element of proof,

2    and you should have it as an expert issue, some calculation,

3    even if you did it yourself, but we are where we are.

4          Mr. Futerfas.

5          MR. FUTERFAS:  Your Honor, we submitted a letter to

6    you last night.

7          THE COURT:  I read it.

8          MR. FUTERFAS:  Obviously our position is there are no

9    damages, but if there some finding, we did that very carefully,

10   we took the 528, we plug it into the DOI report, which says

11   specifically how that 528 was spread between the Bronx center

12   and the Manhattan center.  We took the percentages.  We plugged

13   those percentages into the exact contract components and the

14   amounts of money that these contracts provided, because there

15   was actually a change during that period, and that calculation

16   is derived on that, your Honor.  We gave that to you last

17   night.

18         MS. BLAIN:  Your Honor, that's why I say we can work

19   with defendant's counsel to come up with a number we both agree

20   on.

21         THE COURT:  Then work together.  Here's what I propose

22   to do.  In a half hour we will have the charge ready for you.

23         I will meet with you at 9 o'clock tomorrow morning,

24   9:15.  We will have a two-hour charging conference.  I will ask

25   the jury to come in at 11:30 tomorrow morning.

1          We will have two hours of summation.  The government

2     can take an hour and the defense will take an hour.  Is that

3     enough time, folks?  An hour includes the opening and the

4     rebuttal.

5          MS. SCHOENBERGER:  Yes, your Honor.  That is certainly

6     sufficient.

7          THE COURT:  An hour for you, Mr. Futerfas?

8          MS. SCHEIN:  Your Honor, we may require a little more

9     time.

10         THE COURT:  There is no more time.  You can do it in

11    an hour.

12         MS. SCHEIN:  We are limited to an hour?

13         THE COURT:  An hour.

14         MS. SCHEIN:  That's the Court's ruling?

15         THE COURT:  Yes.

16         MS. SCHEIN:  Thank you, your Honor.

17         MR. FUTERFAS:  We will do it, your Honor.

18         THE COURT:  The jury will have lunch then around 1:30

19    quarter to in the jury room.  We will take a half hour break

20    and then I will deliver the instructions and we'll have the

21    jury start deliberations tomorrow.

22         Does that sound good?

23         MS. BLAIN:  Yes, your Honor.  Thank you.

24         MR. FUTERFAS:  Yes, your Honor.

25         THE COURT:  I want to hold you a little bit after

1    that, a little after the jury comes back and I dismiss them so

2    that we can have any further motions and you will tell me when

3    you will deliver something on damages.

4           OK.  Let's bring in the jury.

5           (Jury present)

6           THE COURT:  I am only going to detain you a minute.

7    Please be seated.

8           There is a fair amount of work that the lawyers and I

9    have to do at the end of the case, at the end of the evidence

10   portion of the case, and I am not going to detain you here

11   while we do it.

12          I am going to ask you to come back at 11:30 tomorrow

13   morning.  Here's our plan at that time.  You will hear two

14   hours of summations, divided evenly.  The plaintiff will go

15   first, the defendant will go second.  Then there is a rebuttal

16   by the plaintiff.  The plaintiff can divide up plaintiff's time

17   however they want, but rebuttal has to be short.

18          So you will hear two hours of that.  We will have

19   lunch for you tomorrow.  Ms. Jones will take your orders.

20          We will try to devote our lunchtime to about a half

21   hour, three-quarters of an hour.  We'll come back.  I will then

22   deliver the instructions of law and you will begin your

23   deliberations.

24          Does that sound OK?

25          It is very important that you not discuss the case and

1   you not make up your mind.  You must keep an open mind until

2   the case ends, and it's not ended.  It's not ended until the

3   moment you start going into that jury room, and then you will

4   have plenty of time to discuss the case and think about it.

5           So keep an open mind.  Ms. Jones will collect your

6   books and give them back to you when you come back tomorrow.

7           (Jury not present)

8           THE COURT:  Be seated.

9           I am looking at Mr. Futerfas' letter of April 20.

10  Your filing these on ECF, are you not?  Or you will?

11          MS. BLAIN:  Yes.  They are filed, both of them I

12  believe.

13          THE COURT:  Mr. Futerfas.

14          MR. FUTERFAS:  Yes, your Honor.  I think we did file

15  it last night on ECF, your Honor.

16          THE COURT:  If you haven't, you will.

17          MR. FUTERFAS:  Yes, your Honor, we will.  Thank you.

18          THE COURT:  We have 528 false job placements that are

19  in issue.

20          MS. BLAIN:  Your Honor, that is actually only for the

21  year 2011.  I believe there is evidence in the record that

22  there were false placements inserted into Worksource1 in 2009

23  and 2010.  We just can't give an exact number because the CIFs

24  were shredded for those years.

25          THE COURT:  What should I do about it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4lnusa2                        Saavedra – redirect

1          MS. BLAIN:  We have testimony from Ms. Bryant, who

2     says that half of the placements she entered were false.  We

3     know that she entered about half of the placements total for

4     Workforce1, and we also have testimony that there were 6,000

5     placements claimed for 2009 and 2010 each.  So that's 25

6     percent of each of those.

7          That is an approximation, but it's evidence sufficient

8     to approximate some number of false placements for something

9     that we can't actually document because the evidence was

10    shredded.

11         THE COURT:  So what should I do about that in

12    relationship to what the jury has to find?

13         MS. BLAIN:  If your Honor is confining the damages, as

14    you have ruled, to just the performance-based component, then

15    what we do is we look at the total contract price for 2009 and

16    2010.

17         THE COURT:  I'm not doing that.  I told you.

18         MS. BLAIN:  Right.

19         Then we take out 70 percent, which is the cost

20    reimbursement, and look at the 30 percent.  So we take 30

21    percent of the further price and we can further divide that if

22    the Court wants into 50 percent of the 30 percent because those

23    are the placements.

24         THE COURT:  Right.

25         MS. BLAIN:  If the Court gives us a few minutes, we

1    can come up with an estimation of those numbers for 2009 and

2    2010.

3                THE COURT:  Why would it be an estimation if you have

4    the exact numbers?

5                MS. BLAIN:  We have the exact numbers for what the

6    contract was worth, and we have exact numbers for what SEEDCO

7    was paid.  The problem is that the contracts are not a calendar

8    year.  They are April through May.  What SEEDCO has paid they

9    keep track of based on a calendar year.  We have to sort of

10   back into the number.

11               THE COURT:  It still doesn't make it an estimate.  You

12   can do it.  It's arithmetically possible to do it.

13               MS. BLAIN:  We just don't have a correlation from

14   month to month to month because the contracts, again, covered a

15   span of time that is over a calendar year.  It spans two

16   calendar years.

17               THE COURT:  Do what you think is correct and see if

18   you get the defendant to agree.  If you can't agree, I'll rule.

19               MS. BLAIN:  Thank you, your Honor.

20               MR. FUTERFAS:  May I be heard on that, your Honor?

21               THE COURT:  Certainly.

22               MR. FUTERFAS:  If Ms. Marchany was putting in 50

23   percent of her placements false, and if that 50 percent number

24   correlated some information then the period where we do have

25   documentation and where DOI studied every single CIF, which Ms.

1   Sung testified to --

2              THE COURT:  No, they didn't.

3              The roster was subjected to random analysis of

4   calling.

5

6              MR. FUTERFAS:  Your Honor, Ms. Sung was the DOI

7   investigator.  The DOI report found from January 1, 2011

8   through August 1, 2011 that in the Bronx 2 percent of the

9   performance-based placements were false, 2 percent, and in

10  Manhattan it was 12 percent.  Nowhere was it 50 percent or

11  close to 50 percent.  In fact, Ms. Marchany in January 1, 2011

12  went to the Bronx.

13             So, if we have accurate data from the Bronx based on

14  the DOI analysis, which there were just 2 percent they viewed

15  as problematic, when Ms. Marchany was in the Bronx from January

16  1, 2011 to August 1, 2011, what the government is asking for is

17  pure speculation, conjecture.

18             It should not be credited by the Court, and they just

19  can't do that.  You can't just extrapolate out of thin air when

20  documentary evidence shows something directly contrary and this

21  documentary evidence that is put in by the government and its

22  witnesses in its analysis.

23             MS. BLAIN:  Your Honor, I believe what Mr. Futerfas is

24  referring to are percentages the DOI found of false placements.

25  That's only relevant to penalties, your Honor.  That's where we

1   get the 528.  But in terms of damages, the damages is 30

2   percent of the contract.

3              THE COURT:  I am aware of this.  There are two aspects

4   of this.  I have to ask the jury to find how many false

5   statements were made, and I have to ask the jury to tell me how

6   much damages were incurred.

7              And I define damages as relating to the part of the

8   performance-based payment that was based on the inflation of

9   the payments.

10             MS. BLAIN:  Yes, your Honor.  All I am suggesting is

11  that we can give you that number for 2009 and 2010 and 2011.

12             THE COURT:  That is what I want you to do.

13             MS. BLAIN:  That's what we will do.

14             THE COURT:  In terms of the false statements, you can

15  do that as well.

16             MS. BLAIN:  We can with specificity for 2011, although

17  we believe that there is more than 528 because, as Ms. Sung

18  testified, they only did a portion.

19             THE COURT:  Please don't restate all your claims.

20             MS. BLAIN:  I'm sorry, your Honor.

21             THE COURT:  What's the number?  528?

22             MS. BLAIN:  We can live with that for 2011.

23             THE COURT:  So live with that.  It will be the number.

24  528 false job placements.  Those will be the number of false

25  records of statements that I will ask the jury to find if they

F4lnusa2                          Saavedra - redirect

 1    find that Mr. Saavedra is responsible for it.  For damages it

 2    has to do with the claim.

 3              So your argument, Mr. Futerfas, is not relevant to me

 4    anymore, right?

 5              MR. FUTERFAS:  Excuse me.  Let me take a second.

 6              If your Honor is limiting the government to the

 7    evidence we have, which is 528, then our position would be,

 8    consistent with the letter that we sent last night, there's

 9    nothing further to discuss.  If the government wants to go back

10    into 2010, 2009 --

11              THE COURT:  You don't --

12              MR. FUTERFAS:  Maybe I didn't follow your Honor's

13    point.

14              THE COURT:  528 will be the number of false records

15    material to the claims.

16              MR. FUTERFAS:  OK.

17              THE COURT:  The other question is what was the amount

18    of damage.  You go on to discuss that in the third full

19    paragraph on page 2 of your letter.

20              I have to see what the government comes up with.

21              MR. FUTERFAS:  Your Honor, all I want to say is, for

22    the purposes of instructing the jury that the maximum possible

23    false records is 528, we agree with that.  We are not conceding

24    obviously there's 528 records.

25              THE COURT:  I understand.

 1              MR. FUTERFAS:  OK.  They have to prove materiality and

 2     causation and all the other elements.

 3              THE COURT:  Right.

 4              MR. FUTERFAS:  In terms of giving the jury a specific

 5     instruction that the maximum number is 528, that seems to be

 6     what the evidence indicates, your Honor.

 7              MS. BLAIN:  Again, that 528 is just relevant to

 8     penalties.

 9              THE COURT:  How many times do I have to say the same

10     thing?

11              MS. BLAIN:  I wasn't sure if Mr. Futerfas was on the

12     same page as us.  OK.

13              THE COURT:  And you have to show me what the amount of

14     damages will be.

15              Is materiality an issue I find, or is it a question

16     put to the jury.

17              MR. FUTERFAS:  I believe it's an element.  We've

18     included it as an element for the jury to find in our requests

19     to charge thus far.

20              THE COURT:  The government agrees?

21              MS. BLAIN:  Yes, your Honor.

22              THE COURT:  All right.  I will see you in a half hour.

23              (Recess)

24

25

F4LJUSA3

1              (In open court; jury not present)

2              THE COURT:  Be seated.  So we've distributed the

3    proposed charge and marked it Court Exhibit 3, and a proposed

4    verdict sheet and marked that Court Exhibit 4.

5              Court Exhibit 4 has a place at the bottom to add a

6    place for signature for jury clerk for foreperson and we'll

7    replace this Court exhibit with one that is complete.

8              All right.  Study this overnight and I will see you

9    then tomorrow morning at 9:15.

10             MS. SCHEIN:  Thank your Honor.

11             MS. BLAIN:  May I clarify one thing because I didn't

12   want to misspeak earlier.  I was afraid I might have.

13             That is in terms of -- I want to make sure we heard

14   the court correctly -- in terms of the false statements in this

15   case, the government's position is the false statements are

16   actually the same as false claims because as your Honor has

17   heard, the only claims submitted in this case were exactly that

18   data put into Work Source1.  That is the only request for

19   payment that SEEDCO made.  Whatever happened after SEEDCO put

20   in that data to Work Source1 is entirely irrelevant to SEEDCO's

21   actions.

22             SEEDCO, by putting in a placement, that was their

23   request for payment.  So we have seen that SEEDCO made that

24   request for payment thousands of times a year and that at least

25   for a portion of 2011 they made false request for payments at

1    least 528 times.  There is no bundling.

2         THE COURT:  I am not sure I agree with you in the

3    categorization.  You have my proposed charge and if you don't

4    like it, prepare an alternative.

5         MS. BLAIN:  Thank your Honor.

6         MR. FUTERFAS:  Your Honor, we handed up to your

7    chambers hard copies and a disc.

8         THE COURT:  Got it.

9         MR. FUTERFAS:  Do you mind, your Honor, we'll file

10   that ECF so there is at least a record of it somewhere.

11        THE COURT:  Sure.

12        MR. FUTERFAS:  Thank you.

13        THE COURT:  It came too late for me really to study

14   and consider it.  The arguments made and language presented is

15   pretty much the same as that which you gave me before.  So if

16   there is something that you think I should have incorporated

17   from that that changes something here, then you need to give it

18   to me specifically because I passed that.  I can't go back to

19   that.

20        MR. FUTERFAS:  We'll do that tonight by ECF or --

21        THE COURT:  You can do it tomorrow morning.  Do it

22   tomorrow morning.  What we'll do is start with Page 1, the

23   first person that has -- one from each side, has a comment, let

24   me know and I'll take the comment and keep going until we reach

25   the end of the document.  That way I'll get all the changes.

1          MS. BLAIN:  Do you want the calculations now?

2          THE COURT:  Yes.

3          MS. BLAIN:  May I hand them up?

4          THE COURT:  Please.  Is it on consent?

5          MS. BLAIN:  I don't think so, your Honor.  So I think

6    I need to explain to the court how the government came up with

7    this number.

8          THE COURT:  Give me a copy.

9          MS. BLAIN:  Your Honor, in the government's

10   discretion, we proposed a total number to send back to the jury

11   of $540,409.97, and that is based on the performance-based

12   payments that SEEDCO received in 2011 from both the Upper

13   Manhattan Workforce1 Center and the Bronx center.

14         Now, we have put in evidence, of course, that the

15   fraud was happening starting in 2009 going through 2010 and

16   going through 2011.  However, we do recognize, as we have tried

17   to make clear, that the defendant here is an individual.  So

18   keeping that in mind, in our discretion, we have attempted --

19         THE COURT:  Keep that in mind -- and what is the next

20   word?

21         MS. BLAIN:  Keeping in mind the fact that the

22   defendant here is an individual, we have tried to keep the

23   damages numbers as low as possible consistent with Second

24   Circuit law under the Feldman case.

25         One way to do that, I believe, consistent with your

F4LJUSA3

1    Honor's ruling, is to look just at 20011 and just at the

2    performance-based payments and totaling the performance-based

3    payments together, you get 540.  That is for damages.

4    Penalties is obviously a separate issue we have gone over

5    multiple times.

6              So in case it is not clear on the document, I can walk

7    through the numbers, but maybe your Honor is -- maybe the

8    document is clear enough.  We typed it up very quickly.

9    Basically 2011, the number total, 3 million 4 and change.  That

10   is the total amount SEEDCO was paid under the Workforce1

11   contracts in 20011 for the Upper Manhattan Center.

12             20 percent of that amount is what they got for

13   performance-based payments.  So that is $686,333.00 and change.

14   Now, only half of that 20 percent was based on meeting job

15   placement targets.  Half of that 20 percent is only 343,166 and

16   change.  The same thing goes with under that bold line for the

17   Bronx center.

18             THE COURT:  I understand it.  What is the time period?

19             MS. BLAIN:  This is all of 2011, your Honor.

20             THE COURT:  To when in 2011?

21             MS. BLAIN:  I believe this is calendar Year 2011, so

22   January to December of 2011.

23             THE COURT:  Is there going to be dispute?

24             MR. FUTERFAS:  Your Honor, I don't know how the

25   government can take a position inconsistent with the evidence

F4LJUSA3

```
 1    they introduced in the case.  The evidence introduced in the
 2    case is their witness DOI and the DOI report.  That is their
 3    evidence.
 4         Their evidence calculated 528 false placements
 5    equalling 2 percent of the performance-based payments in the
 6    Bronx and about 12 percent in Manhattan.  That number, we have
 7    calculated that number, went through it last night in a letter
 8    to your Honor.  That equals $30,000.
 9         I don't know how the government comes in after that is
10    what their proof shows and says basically every single
11    performance-based claim --
12         THE COURT:  The reason is this, Mr. Futerfas.  If 2
13    percent of the claim presented were false and which, if true,
14    would have resulted in no payment of performance-based
15    payments, the entire performance-based payments is then the
16    element of damage.  If that is the government theory, which I
17    think it is, that is how you get the 540,000.
18         Is that right?
19         MS. BLAIN:  That is exactly right, your Honor.
20         MR. FUTERFAS:  I think that goes back --
21         THE COURT:  I hold that.
22         MR. FUTERFAS:  That is a recision theory.
23         THE COURT:  That is not a recision theory.
24         The theory is because they have falsity in that
25    relatively smaller percentage of the claims, of the data, if
```

F4LJUSA3

that were true, then there would have been no performance-based

payment at all.  I am not saying that they could have recovered

the 70 percent that was cost-based.  That would have been paid

in any event.  It is only the performance part of it, and

according to the performance part of it, the amount would not

have been paid.

        Let me understand this correctly.  I don't have it in

front of me, maybe I should have, but as I remember the

contract, it said 70 percent -- maybe you can explain this to

me -- 70 percent was a cost recovery and 30 percent was based

on achieving performance-based criteria.  So 70 percent is paid

just by doing your job, showing up.  30 percent is based on

having achieved certain threshold criteria.

        If other of the criteria would have been satisfied,

but placements in the amount of the threshold set by SBS had

not been satisfied, what SBS would not have been paying would

have been only that portion relating to placements.  On that

theory, we have limited damages only to the half of the

performance portion, half of 30 percent, half of 20 percent

according to the year which relates to placements and the

failure of the SEEDCO to have achieved the required threshold

of placements.

        And so by the marginal number required to put them

over the top, SEEDCO obtained the entire half of 20 percent

relating to the threshold performance for placements.  That is

1      the theory that causes me to believe that the right amount of

2      damage resulting from what the jury may find Mr. Saavedra did

3      is $540,409.97, which then comes to me to be trebled.

4              That is your theory, right?

5              MS. BLAIN:  That's right, your Honor.

6              THE COURT:  Now let me deal with your theory.

7              MR. FUTERFAS:  Your Honor, I think the only theory of

8      damages that is cognizable under the False Claims Act are false

9      claims that actually affected the payment.  Damages means this

10     false claim, the government paid for this airplane, this

11     airplane wasn't made to the specifications it was supposed to

12     be made to.  The government paid $5 million for it.  It is a

13     false claim.  It is damages related directly to the false

14     document.  Here we actually have evidence where we can do that

15     analysis.

16             THE COURT:  Your analysis is wrong.  Go back to your

17     airplane.  Let's suppose there is a contract that says if you

18     deliver an airplane conforming to certain specifications, you

19     get a hundred million dollars.  However, if you deliver the

20     aircraft, the airplane before a certain date, you get $10

21     million more.  The contractor delivers an airplane, but he is

22     late, so he gets a hundred million dollars, not a hundred $10

23     million.  That is this case.

24             SEEDCO is entitled to the cost-base and to that

25     portion of the performance-based compensation that is other

1    than the placement.  That is what I am holding.

2            MR. FUTERFAS:  If I may, just so your Honor's clear,

3    when the placements do not -- assuming there is 528 wrong

4    placements here, when it goes into the performance-based

5    payment calculation, there is then a detailed calculation in

6    the contract so that even if there are 528 bad placements, they

7    may not have affected in any way the amount of money that

8    SEEDCO received because of the calculation that is in, in

9    Government Exhibit 34, it is called Attachment A to the --

10           THE COURT:  Put it up, please.

11           (Pause)

12           MR. FUTERFAS:  I'll hand it up, your Honor.

13           THE COURT:  I have 34.  I am on 34.  What should I

14   look at?

15           MR. FUTERFAS:  Your Honor, thank you.

16           If your Honor goes to -- there is about four pages in,

17   there is a page that is called Attachment A, performance

18   milestones.

19           THE COURT:  I'm there.

20           MR. FUTERFAS:  The way, your Honor, the contract

21   worked was that the total placements made number in the top

22   chart constitutes 50 percent of the total performance-based

23   calculation.  We have got that.  We have talked about that.

24   That is where that 50 percent comes from.

25           If your Honor goes down to the bottom of the page,

1    that is the calculation that uses the Charney validation

2    report, so the Charney validation report gets given to SBS.

3    SBS then does a calculation -- in fact, it is in our exhibit, I

4    think it is T6 in evidence -- where SBS does a calculation and

5    says okay, the total, the target was here in this example 200.

6    The placements reported by SEEDCO was 150.  So the maximum, the

7    milestone amount is 93,000.  That is the total.  That is if

8    they hit the total amount, the total target.  The next column

9    is maximum possible payment, 75 percent of milestone because

10   the reported placements is 75 percent.

11          Then next to that it says the percentage validated.

12   So what happens is that SEEDCO sends to SBS, let's say, the

13   total placements are a thousand.  SBS goes, Charney goes

14   through its validation process and says -- and the milestone

15   may have been greater.  The milestone may have been 1400

16   placements, and they only said they made a thousand, so they

17   wouldn't even start at a hundred percent of the milestone

18   payment.  They would start below the milestone because their

19   maximum --

20          THE COURT:  Except 10/17s.

21          MR. FUTERFAS:  Then Charney then takes the report and

22   starts verifying it.  Charney may verify like in this example,

23   we only verify 60 percent.  So even though you sent us, you

24   said you may be a thousand, the milestone may have been 1400,

25   you made a thousand, Charney's only verified 60 percent.

F4LJUSA3

1          So that 60 percent then gets put into the table above.

2     Your Honor sees percentage validated.  So Charney validates 60

3     percent, for example, in the hypothetical.  Then that falls

4     within 50 to 74 percent and there is a 75 percent adjustment in

5     the compensation payment with respect to total placements made.

6          If Charney validates 50 percent or below 50 percent,

7     they get nothing.  If Charney validates more than 74 percent,

8     validates 75 percent, then they could get the total.  The total

9     is not the maximum total.  The total is going to be prorated

10    depending upon the total placements made as per the chart on

11    the bottom.

12         So the bottom line is even if there is false

13    placements sprinkled in there, you would have to know to

14    determine its effect on the performance-based calculation, how

15    many placements there were, the validation process, and then

16    plug it into this formula.

17         So they may not have affected, in fact -- in fact they

18    may not have had any effect on the contract price.

19         MS. BLAIN:  All of this is entirely beside the point

20    because this is not a contract case.  This is not a benefit of

21    the bargain case where, to use airplane example, the government

22    paid for something, got a portion of it and it gets to recover

23    the market value for what it didn't actually pay for or

24    receive.

25         This is a felony case.  The Second Circuit held in

F4LJUSA3

1    2012 that a different measure of damages is appropriate in

2    cases such as this where the defendant fraudulently sought

3    payments for participating in programs designed to benefit

4    third parties rather than the government itself.  The

5    government received nothing of tangible value from the

6    defendant.

7            So the government is entitled, the Second Circuit

8    held, to damages equal to the full amount of the grants awarded

9    to the defendants based on their false statements.  So this is

10   about the value of the grants from the federal government

11   flowing ultimately to SEEDCO because SEEDCO --

12           THE COURT:  I am aware of that.

13           MS. BLAIN:  Then because of that --

14           THE COURT:  I told you I am limiting it to that part

15   that was paid because of the false statements.  That part that

16   was paid because of the false statements was 50 percent portion

17   of the performance.

18           MS. BLAIN:  That's right.

19           THE COURT:  How much was paid?

20           MS. BLAIN:  Well, your Honor --

21           THE COURT:  That which was paid is determined by

22   contract.  So that is how contract is, the contract is

23   relevant.

24           MS. BLAIN:  But whatever Charney did with the

25   information that SEEDCO put into Work Source1 is also not the

F4LJUSA3

1      only thing that is relevant to what SEEDCO paid if we are

2      looking at it in terms of the contract.

3              THE COURT:  I need to know how much, how much SBS paid

4      SEEDCO because of the misstatements regard to placements.

5              MS. BLAIN:  Your Honor, SBS wouldn't have paid SEEDCO

6      anything.

7              THE COURT:  How many times can you make that argument

8      when I told you I am rejecting that argument?

9              MS. BLAIN:  Your Honor, we have given you a chart.

10             THE COURT:  Don't make it any more!

11             MS. BLAIN:  We have given you a chart where we have

12     broken down how much SEEDCO received per year and we have done

13     an estimation.

14             THE COURT:  Is that the chart I am looking at?

15             MS. BLAIN:  Yes.

16             THE COURT:  I understand it.  The difference comes in

17     in terms of what it was that was validated and how that plays

18     into this.

19             MS. BLAIN:  Your Honor, validation --

20             THE COURT:  How Mr. Futerfas interprets it is that if

21     75 percent of the placements were validated, and the placements

22     claimed exceeded the targets, a hundred percent recovery is

23     obtained.  The question of what does it mean, "percentage

24     validated"?

25             Does that mean the number of validations that occurred

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4LJUSA3

fewer than the random sample, say, because people couldn't be

located, or does it mean placements that were found to have

been fraudulent or misstatements?  We don't know.

I interpret this contract to mean that the payments

are affected by the efforts that could be accomplished by the

validator Charney and not what Charney found to have been

misstatements.

And so the reliance I have is not only to Charney, but

to the Department of Investigation report.  I accept the

methodology reflected in the schedule Ms. Blain gave me, and so

there will be two questions put to the jury.  You'll see it if

you look at your verdict form.

After the jury delivers its verdict on Claim 1 and

Claim 2, the jury will be asked to fill out Claim 3.  If you

found for the plaintiff in Claim 1, in what amount, if any, was

the plaintiff damaged?

Presumably they'll put in $540,409.97.

Question 4, if you found for the plaintiff in Claim 2,

how many false records or statements did defendant knowingly

cause to be made or used that were material to a false or

fraudulent claim?

And presumably the jury will put in 528.

I may have to embelish the instruction that will give

rise to those numbers, but that's how I envision this document.

Now, of course if the jury finds for Mr. Saavedra on Claim 1,

F4LJUSA3

1     they won't get to Claim 3, to Question 3.  If the jury finds

2     for Mr. Saavedra on Claim 2, they won't get to 4.

3             But if they do find for the government on Claim 1,

4     they get 3, and they find for the government Claim 2, they get

5     4.  That is how this is designed to work.

6             MR. FUTERFAS:  Your Honor, obviously whether it is 550

7     or some other amount or zero is all a question for the jury.  I

8     will be --

9             THE COURT:  That's right.  It says in what amount, if

10    any, does was the plaintiff damaged.  How many false records or

11    statements you should put in, if any?  They can put in zero if

12    they want.

13            All right.  Anything further?

14            MR. FUTERFAS:  No, your Honor.  Obviously, we object

15    to the government's calculation for the reason I have

16    articulated, but I don't know that nothing.

17            THE COURT:  Okay.  See you tomorrow at 9:15.

18            (Court adjourned until Wednesday, April 22, 2015 at

19    9:15 am)

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2     Examination of:                               Page

3     CRAIG R. CHARNEY

4     Direct By Ms. Schein . . . . . . . . . . . . 706

5     Cross By Ms. Blain . . . . . . . . . . . . . 724

6     ALEX SAAVEDRA

7     Direct The Court . . . . . . . . . . . . . . 734

8     Cross By Ms. Schoenberger  . . . . . . . . . 782

9     Redirect By Mr. Futerfas . . . . . . . . . . 788

10                       DEFENDANT EXHIBITS

11    Exhibit No.                               Received

12     J-7  . . . . . . . . . . . . . . . . . . . 709

13     K-7  . . . . . . . . . . . . . . . . . . . 711

14     L-7  . . . . . . . . . . . . . . . . . . . 718

15

16

17

18

19

20

21

22

23

24

25

F4MJUSA1                    Charge Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES of AMERICA,

4                   Plaintiff,

5              v.                          11 Civ. 6425 AKH

6   ALEX SAAVEDRA,

7                   Defendant.

8   ------------------------------x

9                                   April 22, 2015
                                    9:22 a.m.
10
    Before:
11
                        HON. ALVIN K. HELLERSTEIN,
12
                                        District Judge
13                                        and a jury

14

15                        APPEARANCES

16  PREET BHARARA,
         United States Attorney for the
17       Southern District of New York
    BY:  CARINA HYATT SCHOENBERGER,
18       JENNIFER ELLEN BLAIN,
         Assistant United States Attorneys
19
    LAW OFFICES OF BETTINA SCHEIN,
20       Attorneys for defendant
    BY:  BETTINA SCHEIN, Esq.
21       – and –
    LAW OFFICES OF ALAN S. FUTERFAS,
22  BY:  ALAN SAMUEL FUTERFAS, Esq.
                   Of counsel
23

24  Also Present:
         HARRY SOLOMON, Technical Support USAO
25       MARISA ALBERTI, Defense Paralegal & Technical Support

                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

F4MJUSA1                        Charge Conference

1              (Trial resumes)

2              (In open court; jury not present)

3              THE COURT:  Good morning, everyone.  Be seated.

4              We substituted a reformatted verdict sheet that has

5    the same substance as the previous one as Court Exhibit 4.

6              Let's have Court Exhibit 3.  Who is going to make

7    comments for the plaintiff?

8              MS. BLAIN:  I am, your Honor.

9              THE COURT:  Ms. Blain?

10             Who is going to make comments for the defendant?

11             MS. SCHEIN:  I am, your Honor.

12             THE COURT:  Who has the first comment, which page?

13             What is your first comment, Ms. Blain?  It will be

14   easier if you keep seated.

15             MS. BLAIN:  Our first comment is not until Page 9,

16   your Honor.

17             THE COURT:  Anything before that, Ms. Schein?

18             MS. SCHEIN:  Yes, your Honor.  At Page 5, the second

19   full paragraph, the third line to the end, we ask that "however

20   slightly" be taken out of that sentence.

21             THE COURT:  I decline to do so.  That is the law, that

22   the scales tip even the slightest in favor of the plaintiff.

23             Next comment?

24             Anything before Page 9, Ms. Schein?

25             MS. SCHEIN:  Yes, your Honor.  Page 8, the second full

 1  paragraph, the last line, we request that the last line be

 2  taken out about you do not need to find specifically intent to

 3  defraud since there is enough elements of the False Claims Act

 4  for the jury to consider.

 5          THE COURT:  What is the government's position?

 6          MS. BLAIN:  Your Honor, that language is in the

 7  statute as reflected in the Court's --

 8          THE COURT:  You want it in?

 9          MS. BLAIN:  Yes.

10          THE COURT:  Yes, I agree it should stay in, and it

11  will stay in.  Objection overruled.

12          Anything else on Page 8, Ms. Schein?

13          MS. SCHEIN:  No, your Honor.

14          THE COURT:  You may sit down, Ms. Schein.

15          MS. SCHEIN:  Your Honor, also on Page 8.

16          THE COURT:  The other thing is, you have a mike in

17  front of you?

18          MS. SCHEIN:  Yes.

19          THE COURT:  Move it closer to you.

20          MS. SCHEIN:  On Page 8, we request that that our

21  definition of a claim which we submitted and filed in our

22  requests to charge and --

23          THE COURT:  What page?

24          MS. SCHEIN:  Page 3 of our requests to charge, at the

25  bottom the highlighted and bold section which is our contention

1    of what is a claim in this case, probably through on to Page 4.

2              THE COURT:  All right.  Let me read it.

3              MS. SCHEIN:  Thank you.

4              (Pause)

5              THE COURT:  I decline to do so.

6              First of all, you'd be able to argue your points.  I

7    define a claim as any request or demand for money or property

8    made to a contractor, guaranty or other recipient of government

9    money if the money or property is to be spent or used on behalf

10   of the government or to advance a program or purpose of the

11   government.  That is taken from 31 U.S.C. Section 3729 (b)(2),

12   and Feldman versus Vancorp, citations of which have been

13   provided in my proposed charges.

14             The suggestion of alternate language doesn't change

15   the law, but it seems to add burden to the government in an

16   unfair way.  Counsel, you can argue what you want to argue.  I

17   don't have to elaborate more than I do on the charge.

18   Otherwise, I risk confusing the jury.  Declined.

19             We are now on 9.  What is your comment Ms. Blain?

20             MS. BLAIN:  The second line from the bottom, after the

21   first comma, change the issues regarding.

22             THE COURT:  Just a minute.

23             (Pause)

24             THE COURT:  Yes, go ahead.

25             MS. BLAIN:  We suggest that it might be slightly

```
1    clearer for the jury if that were changed to affect your
2    determination regarding.  It is a minor point, your Honor.
3              THE COURT:  I don't think it changes the meaning, and
4    I think this is a little more neutral, so I will keep what I
5    have, unless you prefer the government's charge, Ms. Schein?
6              MS. SCHEIN:  Your Honor, we request that the sentence
7    be taken out starting with the fact that a third-party
8    verification service was utilized.  We think it is confusing
9    and taking away that determination, that factual determination
10   from the jury.  It is our contention that it is up to the jury
11   to decide what, if any, weight to give Charney Research, the
12   third-party verification.
13             THE COURT:  That all goes to what is the claim, and
14   that is an issue of law for me.  That it is a proper charge.
15   Objection overruled.  The government's suggestion is declined.
16             MS. SCHEIN:  Your Honor, may I be heard on that?
17             THE COURT:  You have argued that multiple times.  I
18   know your argument.
19             MS. SCHEIN:  Thank your Honor.  As to this particular
20   issue, it is taking away the jury's function of determining
21   what is claimed for payment.
22             THE COURT:  I decline.  That is a term in the statute.
23   This is an issue of law.  I define it in my instruction.  It
24   will stay that way.
25             Next comment?  Your next page, Ms. Blain?
```

 1                MS. BLAIN:  Page 10 for us.

 2                THE COURT:  What do you have on Page 10?

 3                MS. BLAIN:  This paragraph, your Honor, about damages,

 4     we suggest having a separate page just for damages for both

 5     Claim 1 and Claim 2.

 6                THE COURT:  We debated that in the Chambers.  That is

 7     a typical way to do it.  I have put it this way because I

 8     thought it was clearer.

 9                There is one consequence under the claims act for a

10     false claim.  There is another consequence under the claims act

11     for a false statement.  They lead inexorably to the issue of

12     damages in the first instance and of violations in the second

13     instance, and that is why I did it that way.

14                MS. BLAIN:  I understand, your Honor, but this

15     paragraph makes it seem as though under the False Claims Act,

16     the government can only receive damages under (a)(1)(A) and

17     penalties under (a)(1)(B), and the false claim act provides the

18     government can get damages and penalties under either (A) or

19     (B), but not both, and this makes it seem like --

20                THE COURT:  What do you think, Ms. Schein?

21                MS. SCHEIN:  Your Honor, the current request to charge

22     is fine with us.

23                THE COURT:  I will take the issue under advisement.

24     As a matter of law, Ms. Blain, you're right.

25                MS. BLAIN:  Thank you, your Honor.

1          THE COURT:  There is only one way to get violations,

2     and this is under both, yes.  I think I am going to charge it

3     separately, and I won't change the substance, but I will change

4     the style in terms of the sequence of presentation.

5          MS. BLAIN:  We have a proposed paragraph if that would

6     be helpful to the court just using the court's own language,

7     but putting it on one page and making it slight clearer.

8          THE COURT:  Have you shown that to Ms. Schein?

9          MS. BLAIN:  No, I am sorry, I haven't.

10         THE COURT:  Would you do so?

11         MS. BLAIN:  Yes.  May I hand it up to the court?

12         THE COURT:  Yes.

13         (Pause)

14         THE COURT:  We'll mark this as 3 A.  I don't want to

15    charge the separate paragraph.  Before I go into that, do you

16    have any comments, Ms. Schein?

17         MS. SCHEIN:  No, your Honor.

18         THE COURT:  I don't want to because if a claim is a

19    request for payment, the requests are submitted quarterly, and

20    it is one request.  I would like to charge that to the jury.

21    It doesn't change anything.  That's the reason I did not use

22    the conventional sequence.

23         What I will do is say something to the effect that the

24    government asked for two modes of compensation.  One is damages

25    for the amounts that are paid out that it should not have paid

F4MJUSA1                         Charge Conference

1   out and the second is for violations of the act.  Then we know

2   the numbers already, so I don't know that I need to get through

3   all of this.

4        MS. BLAIN:  That is fine, your Honor.

5        THE COURT:  I am going to try to develop another

6   instruction and show it to both of you, but rather than have

7   the jury go through a number of issues, I can say that if you

8   find that the United States paid out money that it should not

9   have, you can find any number up to -- and give them your

10  number $540,090.79.

11       MS. BLAIN:  That is fine, your Honor.

12       THE COURT:  If you find that there are false records

13  and statements, you can find any number up to -- what is the

14  number?

15       MS. BLAIN:  540?

16       THE COURT:  No.

17       MS. BLAIN:  I am sorry.  528.

18       THE COURT:  528.  What do you think, Ms. Schein?

19       MS. SCHEIN:  Your Honor, we have no objection to that

20  proposed request.

21       THE COURT:  Subject to seeing my language?

22       MS. SCHEIN:  Yes, your Honor.  Thank you.

23       THE COURT:  Back to the Exhibit 3.

24       MS. BLAIN:  I am sorry.  We are just a little confused

25  up here in terms of the definition.  I am happy to wait for the

1    instruction.  Maybe that I will understand then.

2          THE COURT:  No, I am not going to charge how many

3    false or fraudulent claims are pending.  It leads to a number

4    that is not what you want, not what you're asking for and it

5    just confuses.  Then I have to make different instructions on

6    the basis for that which complicates the instructions.  It is

7    not necessary.

8          MS. BLAIN:  So we can argue or I guess either party

9    can argue what the claim is in closing, or does the the court

10   want to instruct the jury?

11         THE COURT:  You can argue what you want to argue.  I

12   think if I were you in terms of your theory of the case, you

13   should argue what the government paid out because of claims and

14   what was the request for payment.  Ms. Schein will argue the

15   same thing.

16         The government is going to argue that the request for

17   payment is the submission of data.  Ms. Schein is going to say

18   that the claim request for payment was that which Charney

19   verified.  You both have your arguments, and the jury will

20   decide.

21         MS. BLAIN:  Thank you.

22         THE COURT:  I don't think it is necessary for you to

23   decide whether the claim is the overall request for payment

24   containing all these statements or each of the statements.

25         MS. BLAIN:  Thank your Honor.

1              THE COURT:  Anything after Page 10, Ms. Blain?

2              MS. BLAIN:  Just briefly on Page 11, the fourth

3    paragraph beginning with, "First."

4              THE COURT:  Yes.

5              MS. BLAIN:  The second sentence reads, the term record

6    and statements means in a definition.  We suggest added the

7    definition of document as it appears in the local rules, Rule

8    26.3 (c)(2).

9              THE COURT:  What is the citation?

10             MS. BLAIN:  26.3 (c)(2).

11             THE COURT:  Yes.

12             MS. BLAIN:  Which defines a document to be:

13             "Synonymous in meaning and equal in scope to the usage

14   of the term documents or electronically-stored information in

15   Federal Rule of Civil Procedure 34 (a)(1)(A)."

16             THE COURT:  I am not going to refer them to the rules,

17   but you're entitled to the instruction that a false record or

18   statement can be in electronic format.

19             MS. BLAIN:  Thank your Honor.

20             MS. SCHEIN:  Your Honor, we would object to that.

21             THE COURT:  Why?

22             MS. SCHEIN:  Because that rule, that local rule is

23   referring to the discovery process and the breadth of document

24   discovery.

25             THE COURT:  I am not going to refer to the local rule,

 1   but a false record or statement does not have to be in paper

 2   form.  It can be in electronic form.  It can be the capturing

 3   of information electronically.  I'll get a neutral way of

 4   expressing it, but it is not going to be elaborate.  It will

 5   just say something like that.  Is that satisfactory?

 6          MS. SCHEIN:  We would like to see your charge, your

 7   Honor.

 8          THE COURT:  Of course.  I am not sure I can give all

 9   all those charges because there is nothing much to charge.  It

10   just says that information that is captured electronically and

11   preserved is also a record or a statement.  It doesn't have to

12   be a document in the notional way or a writing or a written

13   memo.  It can be captured electronically and it is still a

14   record.

15          Anything else on Page 11, Ms. Blain?

16          MS. BLAIN:  No.  Thank you, your Honor.

17          THE COURT:  Ms. Schein?

18          MS. SCHEIN:  No, your Honor.

19          THE COURT:  What is the next point?

20          MS. BLAIN:  Page 12, the last paragraph, it is the

21   same point we just discussed, making it clear that damages or

22   penalties can come under either Claim 1 or Claim 2.

23          THE COURT:  It would come in the next, as it were,

24   page?

25          MS. BLAIN:  Right.

 1              THE COURT:  In substance, you object to what I say?

 2              MS. BLAIN:  No, as long as it is clear it is both for

 3    Claim 1 and Claim 2, that these options are available, damages

 4    and penalties are available for 1 and 2, and just this

 5    paragraph doesn't appear under Claim 1.

 6              THE COURT:  I'll see what I say.  Anything, Ms.

 7    Schein, on this?

 8              MS. SCHEIN:  No, your Honor.

 9              THE COURT:  The next page.

10              MS. BLAIN:  Your Honor, that is all the government

11    has.

12              THE COURT:  Ms. Schein?

13              MS. SCHEIN:  Your Honor, on Page 24, the limiting

14    instruction with regard to the DOI report, we request,

15    respectfully, a more neutral instruction and we ask the court

16    to give the instruction that the court gave in some form when

17    Ms. Sung testified, and that is at Page 425 of the record, the

18    trial record.

19              THE COURT:  Let me find it.

20              (Pause)

21              THE COURT:  It is not fair to quote me against myself!

22    Off the record.

23              (Off-the-record discussion)

24              THE COURT:  Back on the record.

25              Where on 425 is it?

F4MJUSA1                    Charge Conference

 1                MS. SCHEIN:  We request that the instruction --

 2                THE COURT:  I see it.

 3                MS. SCHEIN:  The first sentence of the first paragraph

 4      and the first sentence of the second paragraph on Page 425.

 5                THE COURT:  I will do that.

 6                MS. BLAIN:  Just to be clear, this is just to be added

 7      to this paragraph?

 8                THE COURT:  Yes, I will do that.

 9                MS. SCHEIN:  Thank you.  We request it be -- that the

10      last, if I may, that it be used instead of the instruction in

11      the proposed request to charge.

12                THE COURT:  No, no.  The instruction tracks the

13      language of Federal Rule of Evidence 803 (8).

14                MS. SCHEIN:  When we objected to its admission and

15      certainly argued vigorously that there was a lack of

16      trustworthiness, and it was an evidentiary decision.  So we

17      object to the non-neutral, the defense did not show that the

18      source of information or other circumstances indicate a lack of

19      trustworthiness in the report, and we object to that

20      instruction to the jury.

21                THE COURT:  The jury will hear that you had an

22      obligation, it is your burden to show that the source or other

23      circumstances indicate a lack of trustworthiness, and I define

24      it.  I tell them, furthermore, the fact it is a government

25      report issued by the government doesn't mean that you have to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1    give it more credibility than you give any other piece of

2    evidence.  It is your decision to what extent, if any, you give

3    this document credibility and persuasive force.

4              That is what we'll do.  Next?

5              Next, Ms. Schein?

6              MS. SCHEIN:  Your Honor, that is all we have.

7              THE COURT:  Ms. Blain?

8              MS. BLAIN:  That is all we have, too, your Honor.

9              THE COURT:  Thank you for being so easy.  Let me work

10   on what I learned from you and see if we can give you a clean

11   version.

12             MS. BLAIN:  Thank your Honor.

13             THE COURT:  The jury is not coming in until 11:30.

14             You can get something to eat from the cafeteria if you

15   want to get coffee.

16             MS. BLAIN:  That would be really lovely.

17             We didn't discuss the verdict sheet.

18             THE COURT:  Thank you very much.  Hold on a minute

19   before you go.

20             I distributed a verdict sheet, Exhibit 4.  Any

21   comments from the government?

22             MS. BLAIN:  Yes, your Honor, it goes to the same issue

23   we were talking about damages.

24             THE COURT:  I thought you accepted what I said?

25             MS. BLAIN:  I did, just to make sure that the verdict

1  sheet reflects the new instruction the court is going to draft,

2  that damages and penalties come from either Claim 1 or Claim 2.

3          THE COURT:  Well, why don't I just leave out Claim 1

4  and Claim 2.  If you find for the plaintiff, then I will have

5  (A) and (B).

6          MS. BLAIN:  Fine.

7          THE COURT:  In what amount, if any, was plaintiff

8  damaged will be (A); and (B), how many false records or

9  statements, if any, did defendant knowingly cause or make or

10 use materially false claim.

11         MS. BLAIN:  That is fine, your Honor.  Thank you.

12         THE COURT:  Your colleague argues with such force, Ms.

13 Schein.  I can't hear her words, but I can see the way she

14 makes her point.

15         MS. SCHEIN:  If we can have a moment?

16         THE COURT:  Yes.

17         (Off-the-record discussion)

18         THE COURT:  Is all that conferencing a legal point to

19 me?

20         MS. SCHEIN:  Your Honor, if we may?

21         (Off-the-record discussion)

22         MS. SCHEIN:  In the verdict sheet, at Point IV, Roman

23 Numeral IV, number of false records or statements, the verdict

24 sheet is requesting the jury make a finding as to how many

25 false records or statements?

 1          THE COURT:  Yes.  Isn't that what it says, how many?

 2          And the answer will be "up to 528."  It won't say that

 3   in the verdict sheet, but that will be in the instruction.

 4          MS. SCHEIN:  Okay, thank your Honor.

 5          MS. SCHOENBERGER:  Your Honor, just to make our

 6   record.

 7          THE COURT:  Ms. Schein, let me say this:  Unless you

 8   want it, I would suggest you tell me don't mention any number

 9   even as -- because if you mention a number, that is the number

10   that will stick in the jury's mind.  You both will be

11   mentioning numbers, so one can object to the other, but if I

12   feel the jury is completely open on the subject, I prefer not

13   to mention a number because that may have undue weight.

14          MS. SCHEIN:  We would agree, your Honor.

15          MS. BLAIN:  That is fine, your Honor.  Thank you.

16          THE COURT:  Anything further?

17          MS. SCHOENBERGER:  Your Honor, just to make our record

18   before the case goes to the jury, the government would renew

19   its motion pursuant to Rule 50 (a) for a judgment as a matter

20   of law.

21          THE COURT:  Denied.  Your motions are also renewed,

22   are they not?

23          MS. SCHEIN:  Yes, they are renewed.

24          THE COURT:  Denied.

25          (Recess)

F4mnusa2

| 1 | THE COURT:  So we are marking as Court Exhibits 5 and |

1          THE COURT:  So we are marking as Court Exhibits 5 and

2    6 the revised jury charge and the revised verdict sheet.  For

3    the purpose of discussion, there are three pages that show the

4    changes.

5          The first is the law of recovery, pages 13 and 14.

6          The second is the definition of records on page 11,

7    the fourth paragraph.

8          Third is the instruction regarding the investigative

9    claim on page 26 in the last two sentences.

10          We will start on page 11.  The definition of a record

11    or statement means, I say, the recording of an occurrence, act,

12    or event in writing or other form of hard copy or

13    electronically stored information.

14          Satisfactory to the government?

15          MS. BLAIN:  Yes, your Honor.  Thank you.

16          THE COURT:  Satisfactory to the defense?

17          MS. SCHEIN:  Yes, your Honor.

18          THE COURT:  Next is the law of recovery.  Let me give

19    you two minutes to look at that, because you haven't seen it.

20          It basically takes the paragraphs that we had in

21    Counts 1 and 2 moved them into one place.

22          THE COURT:  Government?

23          MS. BLAIN:  Yes, your Honor.  Would you prefer that I

24    stand at this point?

25          THE COURT:  You can stand.

1              MS. BLAIN:   OK.  Two quick things I believe.  One is

2    on page 13, the second paragraph, six lines from the top.

3              THE COURT:  Yes.

4              MS. BLAIN:  Which reads:  "If anything, the government

5    paid out by reason of the false claims statements or records

6    over and above what it would have paid if they were

7    untruthful."

8              THE COURT:  If they were truthful.

9              MS. BLAIN:  I'm sorry.  If they were truthful.

10             Just because of the facts of this case, the phrase

11   over and above is not exactly applicable because --

12             THE COURT:  What would you prefer?  In excess of?

13             MS. BLAIN:  No, to strike over and above.  Because in

14   this case SBS paid the claims already.  The fact that they were

15   untruthful is sort of irrelevant to the amount that was already

16   paid.

17             THE COURT:  The government paid out money by reason of

18   false claims, statements, or records an amount that was in

19   excess of that which they would have paid if the reports were

20   truthful.  So I don't know why you're complaining.  I will

21   change "over and above" to "in excess of."  But that's it.

22             MS. BLAIN:  Thank you, your Honor.

23             The final point is we just want to make sure that if

24   there is a verdict of liable, that the Court will determine the

25   number of false claims under (a)(1)(A).  We know that the Court

1       is asking the jury to find the number of false records or

2       statements.

3                   THE COURT:  You mean, if they find for the defendant

4       on Count 1 and for the plaintiff on Count 2, what would be the

5       result?  Is that what you are asking?

6                   MS. BLAIN:  If they find for the plaintiff on claim 1,

7       we need to know the number of false claims for the civil

8       penalty phase.  We understand the Court is not asking the jury

9       to find a number of false claims on this verdict sheet.  We

10      understand that is something that would happen in posttrial

11      briefing and that the Court would make that determination of

12      the number of false claims.  We need the number of false claims

13      to determine the penalty, if it's liability under Claim 1.

14                  THE COURT:  And not under Claim 2?

15                  MS. BLAIN:  And not under Claim 2, correct.

16                  THE COURT:  What is your position, Ms. Schein?

17                  MS. SCHEIN:  Your Honor, I think if we get to that

18      stage, it is for the jury to determine the number of false

19      claims.

20                  THE COURT:  You both agree.

21                  MS. BLAIN:  Your Honor, we would prefer that the Court

22      determine the number of false claims, as I believe the Court

23      indicated it was going to do earlier.  But we do need a

24      determination of the number of false claims for the penalty

25      phase, which we can take up in postverdict briefing.

```
 1              THE COURT:  No, I think it's too complicated.  I think
 2    it should be a jury question, since you both agree it is a fact
 3    issue.
 4              It depends what you are asking me to find.  If we are
 5    confining ourselves to 2011, we would have three requests for
 6    payment, three amounts, maybe doubled because you have
 7    Manhattan and the Bronx.  If you are going to argue 2009 and
 8    2010, that makes it 11, or possibly, for whatever time there
 9    were two districts, something more than 11.
10              MS. BLAIN:  That's right, your Honor.  For the damages
11    we are just seeking for 2011.
12              THE COURT:  I understand that.
13              MS. BLAIN:  So that would be six, your Honor.
14              THE COURT:  I understand.  If you put that issue to
15    me -- let me ask you this.  When did the Bronx start?
16              MS. BLAIN:  January 1, 2011.
17              THE COURT:  So it would be probably 11.  11 false
18    records, 11 false claims.
19              MS. BLAIN:  If we are defining claim as your Honor has
20    held, as the bundling.
21              THE COURT:  Right.  Requests for payment in the
22    aggregate submitted quarterly.  I would find 11.
23              Knowing that, Ms. Schein and Ms. Blain, do you want me
24    to have additional questions for the jury or leave it the way
25    it is?
```

F4mnusa2

```
 1                MS. SCHEIN:  Your Honor, no additional questions.

 2                MS. BLAIN:  As long as either the Court or the jury

 3     comes up with the number of false claims, and I think 11 is

 4     fair.

 5                THE COURT:  It would be 11.

 6                MS. BLAIN:  Thank you.

 7                And 11 is based on one per quarter from each of the

 8     two centers for 2011?

 9                THE COURT:  Yes.

10                MS. BLAIN:  So would that be six.

11                THE COURT:  Three.  I don't think they were separately

12     submitted.  They were all submitted together.

13                MS. BLAIN:  Three false claims?

14                THE COURT:  Three false claim for 2011, four for 2010

15     and four for 2009.

16                MR. FUTERFAS:  Your Honor.

17                THE COURT:  I'm sorry.  Ms. Schein.

18                MS. SCHEIN:  I am going to cede to Mr. Futerfas.

19                THE COURT:  I am not listening to Mr. Futerfas, just

20     to you.

21                MS. SCHEIN:  Your Honor, there has been no proof about

22     false claims in other than the January 1, 2011 to August 2011.

23     So in that analysis --

24                THE COURT:  What is your proof, Ms. Blain?

25                MS. BLAIN:  Your Honor, as you know, the government's
```

F4mnusa2

1    position has always been that the claims are the Worksource1

2    data entries, and that is 528.  That's been the position all

3    along.  The false claims equals what is in the database.

4              THE COURT:  I know.  If the jury doesn't find for the

5    plaintiff on Count 2, but only on Count 1, what is your

6    position?

7              MS. BLAIN:  Again, if we define claims as your Honor

8    has, which is the quarterly submissions.

9              THE COURT:  Right.

10             MS. BLAIN:  Then three things:  One is Defendant's T6

11   actually is an example of one of these quarterly reports, and

12   Exhibits 30, 43 and 46 are the contracts that provide that

13   these submissions should be made.

14             So it is in the contracts.  It's in a document, and it

15   was submitted, shown to Ms. Kamath, who agreed that these

16   things were submitted quarterly.  That's the proof for that

17   definition of a claim.

18             THE COURT:  Is that satisfactory, Ms. Schein?

19             MS. SCHEIN:  No, your Honor, because the government

20   hasn't put in any evidence that there were false claims during

21   that time, and the evidence they've put in, including the DOI

22   report, is for the time frame January 1, 2011 to the end of

23   August 2011.

24             MS. BLAIN:  That's the time frame we are discussing,

25   your Honor.

F4mnusa2

```
 1            THE COURT:  No, we are not.  We are discussing 2009

 2       and 2010.  The difference between 3 and 11.

 3            MS. BLAIN:  So for 2009 and 2010 Alan Katz testified

 4       you don't have documentary evidence because the CIFs, as you

 5       know, were shredded.

 6            THE COURT:  How many times are we repeating the same

 7       thing?  I do listen to what happens at the trial.

 8            MS. BLAIN:  It's the testimony, your Honor, that Alan

 9       Katz submitted.  He stated that never in his time at SEEDCO

10       which is 2009 to 2011 did they hit the green light with only

11       legitimate placements.

12            THE COURT:  Could you find that snippet of testimony?

13            MS. BLAIN:  Yes, your Honor.

14            MS. BLAIN:  It is at transcript 169, lines 22 to 25,

15       and transcript 170 at lines 1 to 9.

16            THE COURT:  169, 22 to 25 and?

17            MS. BLAIN:  170, 1 to 9.

18            THE COURT:  Do you have it, Ms. Schein.

19            MS. SCHEIN:  No, your Honor.  We're pulling that.

20            THE COURT:  He says, "A majority of my tenure were not

21       legitimate."  That is not much testimony.

22            THE COURT:  Question at page 170, line 1:

23            "To your knowledge, while you were at SEEDCO, did the

24       Workforce1 Center ever meet a placement target without using

25       false placements?
```

F4mnusa2

1    "A. When I started, I started the end of August, so it was

2    around the time the first targets were met.  So I'm not sure if

3    that was legitimate or not.  But during the majority of my

4    tenure, no.  No.  Not legitimate.  All of the placements, no."

5            MS. BLAIN:  And 169, lines 22 to 25.

6            THE COURT:  Line 22:

7    "Q. When the center made its placement targets, was that based

8    only on jobs that SEEDCO helped job seekers obtain?

9    "A. No.  It was on proper placements that we had helped

10   individuals obtain and improper.  It was a mixture.  That

11   doesn't tell me enough about each quarter."

12           MS. BLAIN:  And Ms. Bryant also testified that 50

13   percent of the placements she entered were false.

14           THE COURT:  What is the implication of that?

15           What's the page and line number.

16           MS. BLAIN:  It is 181, lines 7 to 11.

17           THE COURT:

18   "Q. How often did you change the start date from an EIF into

19   the system?

20   "A. A lot.

21   "Q. Can you estimate how much a lot is?

22   "A. Maybe 50 percent of the time."

23           That is not sufficient.

24           MS. BLAIN:  Your Honor, there is simply no document

25   that is in existence out there --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  So that's a failure of proof.  I am not

2     saying you didn't do a good job.  I'm saying the proof is not

3     sufficient to prove 2009 and 2010.

4          MS. BLAIN:  Under the definition of the false claim as

5     a report submitted quarterly, not from SEEDCO but from a third

6     party to SBS, we understand, your Honor.

7          THE COURT:  The testimony was that SEEDCO's data was

8     shared.  It was in a format that could be accessed by SBS and

9     by Charney.

10          MS. BLAIN:  This is right, your Honor.

11          THE COURT:  As the Court I believe permitted us

12     earlier today, we intend to argue to the jury that a false

13     claim is exactly that data, the data in Worksource1.

14          THE COURT:  No, the false claim is not just the data.

15     It's the request.  The claim is defined as a request.

16          MS. BLAIN:  Because the data is the request.  SEEDCO

17     did not give any other request.

18          THE COURT:  I'm not interpreting it that way.  Please

19     don't come up with the same point.

20          MS. BLAIN:  OK.

21          THE COURT:  There is a difference between a record and

22     a claim.  The claim is a request.  If the custom under the

23     contract is to ask for payment quarterly, then that is the

24     request and that's the claim.

25          MS. BLAIN:  If that is the Court's ruling.

F4mnusa2

```
 1              THE COURT:  So we are down to three.
 2              MS. BLAIN:  That's fine, your Honor.
 3              THE COURT:  If the jury finds for the defendant on
 4    Claim 1 and for the plaintiff on Claim 2, notwithstanding what
 5    the jury does, it will be reduced to three.
 6              MS. BLAIN:  That's fine, your Honor.
 7              THE COURT:  Given that, Ms. Schein, are you satisfied
 8    with the instruction?
 9              MS. SCHEIN:  Yes, your Honor.  Thank you.
10              THE COURT:  And given my ruling and reserving your
11    objection as to that ruling, are you satisfied?
12              MS. BLAIN:  Yes.  Thank you, your Honor.
13              THE COURT:  With regard to the definition on
14    (a)(3)(A), does that satisfy you, Ms. Schein?  Page 26, I think
15    it was.
16              MS. SCHEIN:  Your Honor, we still would request that
17    point three, the defense did not show the source of
18    information, our prior objection we still maintain.
19              THE COURT:  You feel you did show it?
20              MS. SCHEIN:  Yes, your Honor, we do.
21              THE COURT:  It is a jury finding.  I say if you find
22    that the report did one and two and three, the defense did not
23    show.  So the jury finds whether the defense shows.  I will
24    stay with this and your objection is overruled.
25              How about the revised verdict sheet?
```

F4mnusa2

1            Is it satisfactory to the plaintiff?  That is now

2       Court Exhibit 6.

3            MS. BLAIN:  Your Honor, I think we now need to ask the

4       jury, either the jury or the Court, for the number of false

5       claims.

6            THE COURT:  The jury is going to find that.  The

7       number you can argue is up to -- what is it?  528?

8            MS. BLAIN:  I believe that's the false records or

9       statements, your Honor.

10           THE COURT:  Right.

11           MS. BLAIN:  What we don't have on here is the number

12      of false claims.

13           THE COURT:  Exactly for the reasons I said.  Because

14      if they find for the plaintiff on Claim 1 and for the defendant

15      on Claim 2, you will make a motion for me to reduce that to

16      three and I will.  Or if they don't give anything, they won't

17      give an answer to that question.

18           MS. BLAIN:  We just need somewhere in the record there

19      to be a finding of the number of false claims, and if the Court

20      has issued that finding, should there be a finding of

21      liability, then that is sufficient.

22           THE COURT:  I will find it, and I think Ms. Schein

23      agrees.

24           MS. SCHEIN:  Yes, we agree.  Thank you, your Honor.

25           THE COURT:  Given that, is the verdict sheet

1    satisfactory to plaintiff?

2              MS. BLAIN:  Yes, your Honor.  Thank you.

3              THE COURT:  Is the verdict sheet satisfactory to the

4    defendant?

5              MS. SCHEIN:  Yes, your Honor.

6              THE COURT:  I think now we can bring in the jury.

7              MR. FUTERFAS:  Your Honor, one brief matter.

8              THE COURT:  Yes.

9              MR. FUTERFAS:  The government has mentioned this issue

10   of shredding a couple of times.  On my cross-examination --

11             THE COURT:  It is not an issue.  I told the jury it's

12   not an issue.

13             MR. FUTERFAS:  I'm kind of alerting the government.  I

14   didn't want to object in the middle of summation.

15             THE COURT:  You can object.  I don't mind objections

16   in the middle of summation.  Both sides can object.

17             MR. FUTERFAS:  As a matter of courtesy, I prefer not

18   to.

19             THE COURT:  Who's giving the summations for the

20   government?

21             MS. SCHOENBERGER:  I am, your Honor.

22             THE COURT:  And who is giving the summations for the

23   defendant?

24             MR. FUTERFAS:  Your Honor, I will.

25             THE COURT:  Mr. Futerfas.

F4mnusa2

 1            MR. FUTERFAS:  Thank you.

 2            THE COURT:  Very well.

 3            Visitors, you can't leave in the middle.  There's not

 4    going to be a break.  You're here for the duration of the

 5    summations.  If anybody can't do that, you should leave right

 6    now.

 7            (Jury present)

 8            THE COURT:  Good morning, ladies and gentlemen.

 9            Please be seated, everybody.

10            We will have the summations now.  The summations are

11    summaries of what each side thinks they have proved.  The

12    summations themselves are not evidence.  Those of you keeping

13    notes can make a clear demarcation in your notebook to separate

14    what is evidence and what is not evidence.  Nevertheless, the

15    attorneys have lived with this case, and they feel they know

16    what they have proved and they will present the information to

17    you.

18            It is your job to listen and to evaluate.  You are the

19    triers of fact.  The fact that an attorney says something

20    doesn't mean that it's true.  It's your job to determine

21    credibility and integrity and reliability of information.  Each

22    side will have an hour.  There will be no break except if you

23    need it to pay attention.  So a break will be very short, and

24    we'll have a short of stretch in place in the middle.

25            Ms. Schoenberger will give the summation for

1   government, and she will go first.  She can reserve any amount

2   of time that she wants, but it should be short for the

3   rebuttal.  She will go first and last.

4           Mr. Futerfas will speak second for the defense, and he

5   will have an hour.

6           It's now 10 minutes to 12.  We should be finished with

7   this process shortly before 2 o'clock.  Then you will break for

8   lunch.  After lunch, I will give the charge.  It will take

9   about an hour, hour and 15 minutes or so, and then you will

10  begin to deliberate.  You are the entire jury.  Nobody is going

11  to be excused.  You are here for the whole process.

12          Anything I missed, folks?

13          Ms. Schoenberger, you ready?

14          MS. SCHOENBERGER:  Yes.

15          THE COURT:  Let's go.

16          MS. SCHOENBERGER:  Ladies and gentlemen, and may it

17  please the Court, last week we told you that this was a case

18  about lies and about the man who was in charge, who knew about

19  these lies and allowed them to continue.

20          Now you have met that man, and you have heard all of

21  the evidence.  What has the evidence shown?

22          It has shown three important things:

23          One, these lies happened;

24          two, these lies mattered; and,

25          Three, the defendant knew about these lies.

f4mnusa2                     Summation – Ms. Schoenberger

1           This is the government's opportunity to review some of

2    the evidence with you before you deliberate today.  After the

3    attorneys sit down, Judge Hellerstein will instruct you on the

4    law.  I cannot tell you what the law is, but I expect the three

5    things that I just mentioned -- that the lies happened, that

6    they mattered and the defendant knew -- will be important in

7    determining whether the government has proven its case under

8    the False Claims Act.  I also expect that Judge Hellerstein

9    will tell you that the government has to prove its case by a

10   preponderance of the evidence, and that means that something is

11   more likely than not.

12          So let's start with one.  These lies happened.  SEEDCO

13   employees lied about the number of New Yorkers that they helped

14   to get jobs.  They put false information into SBS's Worksource1

15   database to make it look like SEEDCO had gotten jobs for people

16   when it hadn't.

17          Witnesses told you that these lies happened.  During

18   the government's case, you met three former SEEDCO employees.

19          First was Alan Katz.  Mr. Katz ran the recruitment and

20   placement team within SEEDCO's Workforce1 centers.  He reported

21   directly to Alex Saavedra.

22          What did Mr. Katz tell you?  He told you that he gave

23   explicit instructions to his staff to gather information about

24   people's past jobs, their work history, or their current jobs

25   that SEEDCO had not helped them get, and he used that

1    information to falsely take credit for getting those jobs.

2          He told you about the different ways in which they did

3    this.  His staff found information from the customer

4    information forms that you have seen a few of.  Work history

5    was taken from those forms.  They also reviewed résumés and

6    looked if someone was currently working and then used that job

7    as a false placement.

8          He also told you about how he would send his

9    recruiters to new-hire orientations.  These were not the

10   orientations that were put on by SEEDCO introducing them to the

11   Workforce1 Center and things like that.  These were

12   orientations put on by employers for people that they had

13   hired, not necessarily with the help of SEEDCO, but Alan Katz

14   told you that SEEDCO recruiters would go to those orientations

15   with CIFs in hand and get people's information so that they

16   could go back to the Workforce1 Center and report that

17   information as a placement, but SEEDCO had not placed those

18   people in jobs.

19         Mr. Katz told you that he did these things a lot.  He

20   said that he sent 22 different people to these events to gather

21   information to make false placements.  He said that during the

22   majority of his time at SEEDCO he never saw that they would

23   meet their job placement targets or the green lights that you

24   have heard about through solely legitimate placements.  He said

25   it was a mixture of true placements and fake ones.

1          You also met Ana Bryant.  That's her married name.

2     When she worked at SEEDCO she went by Ana Marchany.  She was

3     one of the computer-level employees whose job it actually was

4     to type the information into Worksource1.  She was the one who

5     was actually following her manager's instructions to put in

6     information about jobs that SEEDCO had not helped people get

7     and report them as placements, falsely taking credit for those

8     jobs to SBS.

9          She got information from SEEDCO's intake department,

10    that was the department that got the customer information forms

11    from new customers, and then she used that work history to make

12    false placements.  She also told you this happened a lot.  She

13    thought she did this about half of the time.  About 50 percent

14    of the placements she put in were fake.

15         Next you met Kimberly Nesmith.  You may recall that

16    she was defendant's very own administrative assistant.  What

17    did she tell you?  She told you that the defendant himself

18    instructed her to put information into Worksource1 about

19    people's jobs that had been obtained without SEEDCO's help as

20    placements, and she followed Mr. Saavedra's instructions.

21         But those three weren't the only SEEDCO employees that

22    you have heard from, because one of defendant's own witnesses,

23    Shandell Velez, admitted that SEEDCO submitted reports to New

24    York City falsely representing that job candidates had been

25    placed by the assistance of SEEDCO, and she admitted that she

1   was involved.

2           You also know that these lies happened because of the

3   documents that you have seen in this case.  You have seen

4   e-mails.  You have sheen Government's Exhibit 10.  Mr. Solomon

5   can pull that up for you.  This is an e-mail between Alan Katz,

6   who we talked about, and Monique Tarry, who was another manager

7   in the Workforce1 Center.  She worked in the intake department.

8           Mr. Katz is reminding her that they need to get

9   information from CIFs for placements.  And, as he said on the

10  stand, he was telling the people in her department not to do

11  their jobs, not to enter in the work history because then they

12  couldn't count it as a placement.

13          Monique Tarry responds.  She said that she reinforced

14  this with her team and that they had been submitting a lot of

15  placements that way.

16          You also saw Government Exhibit's 8.  Here's another

17  set of people talking about the same types of practice also.

18  In this case, it's Tage Chandarpaul.  She was the deputy

19  director who worked under Mr. Saavedra.

20          And she is talking with a woman named Deborah

21  Stephenson.  She had a job like Monique Tarry's.  She was a

22  manager and she ran the intake department.  The same type of

23  thing:  Ms. Chandarpaul is saying let your staff know not to

24  enter any CIFs for customers that are working.  Leave them for

25  Ana in recruitment and placement to enter.  Ms. Stephenson

1    responds and says done, indicating she has talked to her staff.

2    So another group of people who know about this practice and are

3    participating in it.

4            You also saw Government's Exhibit 70.  Government's

5    Exhibit 70 is another e-mail.  This one is between Ana Marchany

6    and yet another person Rosanna Lamb.  Here Ms. Bryant is saying

7    specifically if someone comes in currently working, don't mark

8    currently working.  Mark that they are unemployed.  Lie about

9    it, so then we can use that information as a placement.

10           Another e-mail you saw was marked as Government

11   Exhibit 6.  This is an e-mail from Alan Katz.  Now he is

12   talking about résumés:  When you see résumés from customers

13   that say that they have present employment, use that, bring it

14   to recruitment and placement, because we have been hitting the

15   green light on a weekly basis due to this type of assistance.

16           Who did Mr. Katz send this e-mail to?  He sent it to

17   everybody.  He sent it to the entire staff in the Workforce1

18   Center, and that included Mr. Saavedra.

19           In addition to e-mails, you have also seen a couple of

20   examples of the actual customer information forms.

21           One of those was marked as Government's Exhibit 57.

22   This was a CIF for someone named Amy Bursor.  You saw on the

23   front of this page that she marked that she was employed.  And

24   on the work history section of her form she says she is

25   employed as a bartender and that is at Broadway East and that

1      she got that job in September of 2009.  She signed this form in

2      January of 2011.

3              But what does it say when we looked into the data from

4      the Worksource1 database.  There we see that it's Amy Bursor

5      and that she is employed as a bartender at Broadway East, but

6      here it says that she started her job on January 28, 2011.  So

7      that's two days after she signed the CIF form, but two years

8      after she said that she started at that job.

9              We saw another CIF and this one was marked as

10     Government's Exhibit 67.  This was filled out by someone named

11     Damiana Payano.  On this form Ms. Payano checked the box for

12     unemployed, not currently working.

13             The reason for that was shown in the work history

14     section of her form.  She used to work at Allied Barton.  She

15     start that had job in August of 2007, but that job ended.  It

16     ended in April of 2009.  And Ms. Payano signed this form on

17     March 22, 2011.

18             Let's take a look at what we see in the Worksource1

19     database regarding Ms. Payiano.  Here it says that Ms. Payano

20     is employed.  She was a placement.  And her job was at Allied

21     Barton.  The job start date is the same date that she signed

22     her CIF, March 22, 2011.

23             Finally, you know that these lies happened because you

24     heard from Chanterelle Sung.  She was the investigator for the

25     New York City Department of Investigation that conducted an

1    extensive investigation into SEEDCO's placement practices.

2           You saw parts of the report that she and her team

3    prepared.  If you look at page 16 of that report, you will see

4    the findings that her team came to.

5           The Department of Investigation substantiated the

6    allegation that SEEDCO reported false job placements in the

7    Worksource1 database.  Even more than that, DOI determined that

8    SEEDCO developed regular practices to report false placements

9    to SBS.

10          And DOI in the course of its investigation looked at

11   the available data for a short period of time -- this was

12   January 2011 through August 2011 -- and they found 528 examples

13   of the exact kind of false reports that you heard the SEEDCO

14   employees on the stand tell you that they were making.

15          Now, Mr. Saavedra's attorney may stand up and show you

16   some of these CIFs and offer some possible explanations about

17   how they could possibly be true.  For example, maybe Ms. Bursor

18   got some raise and that's why she is putting this in.  Perhaps

19   Ms. Payano was rehired at the job she left two years ago on the

20   same day she signed the CIF.

21          Does that really make sense?  For one thing, does

22   getting a raise change the date you started your job?  It

23   shouldn't.  For another thing these kind of discrepancies are

24   the exact kind of thing that the SEEDCO employees you heard

25   from said that they were doing.

1          So isn't it more likely than not that when you see

2   information in Worksource1 that looks fake, when you also look

3   at the CIF that it is in fact fake?

4          So, one, these lies happened.

5          That brings us to two.  These lies mattered.

6          They mattered for two different reasons.  Between 2009

7   and 2011 SEEDCO received over $12 million in federal taxpayer

8   money to operate the Workforce1 centers.

9          And the reason that these lies mattered are two:  One,

10  SEEDCO was making claims for payment to SBS.  And part of the

11  request that it was making were based on its performance.  You

12  heard a little about about it contracts between SEEDCO and SBS

13  and how they worked, and you heard about how part of those

14  contracts was based on the costs that SEEDCO incurred, but part

15  was based on its performance.  And those performance measures

16  included the number of job placements that were made.

17         So every quarter a report was generated that was used

18  by SBS to determine what to pay SEEDCO, and part of that report

19  were placement numbers.  So these placements numbers were part

20  of a claim for payment for federal money.  That's why the lies

21  mattered.  The lies also mattered because they affected

22  decisions that were made about the money that could be paid to

23  SEEDCO.

24         You met the deputy commissioner from SBS, Angie

25  Kamath.  She told you that when SBS found out about these lies

1      they ended their relationship with SEEDCO.

2             SEEDCO lost its Workforce1 contracts and the federal

3      funding that went along with it.  You saw this laid out in a

4      letter that was marked as Government's Exhibit 68.

5             This exhibit was a letter from the commissioner of SBS

6      to SEEDCO, and the commissioner said that the relationship was

7      ending because the improper practices uncovered by the DOI

8      investigation have not only undermined the city's efforts but

9      have directly and negatively impacted many New Yorkers who

10     counted on the services SEEDCO provides.

11            You also heard from Ernesto Lirag.  If you will

12     recall, he was from the United States Department of Labor.  And

13     his job involves working with the grants that are made, like

14     the kind that was eventually received by SEEDCO that were

15     intended to help people find jobs.

16            He told you that false reporting doesn't further the

17     objectives of the United States program to help job seekers

18     find jobs.  When you receive federal money and spend it in a

19     way that doesn't further the government's goals and its

20     purposes for the public, you have to give that money back.

21            And so, two, these lies mattered.

22            Now we are at three:  Defendant knew about these lies.

23            Judge Hellerstein will instruct you on the law, as I

24     mentioned.  I expect that he will tell you what it means to act

25     knowingly under the False Claims Act, which is the law that the

 1  government's suit is brought under.

 2          I expect that you will hear that, just like in your

 3  everyday life, the law recognizes that there are different ways

 4  of knowing things.  Sometimes you know something because you

 5  are told directly, but sometimes you know things because you

 6  ignore it or because you turn a blind eye.

 7          So let's look at some of the ways the evidence showed

 8  that Mr. Saavedra knew what was going on, allowed it to

 9  continue, and caused false claims and false statements to be

10  submitted to SBS.

11          First, one, what have the witnesses told you?

12          Well, we already talked about Kimberly Nesmith.  This

13  was Mr. Saavedra's administrative assistant.  She testified

14  that she received a direct instruction from Mr. Saavedra.  He

15  told her that you could use somebody's job from before they

16  ever received a SEEDCO service and count that as a job

17  placement.  That's what he told her, and she followed his

18  instruction and entered false placements into the Worksource1

19  database.  So Kimberly Nesmith told us a reason that

20  Mr. Saavedra knew what was going on.

21          We also heard from Ana Bryant that the practices that

22  she was a part of were discussed openly at meetings and that

23  staff was reminded by managers to gather information about

24  current jobs and give it to Ana or the recruitment and

25  placement team to enter its placements.  And she testified that

1    this happened at all-staff meetings which included

2    Mr. Saavedra.

3            You also heard from Alan Katz.  He was very closely

4    involved with all of the practices that led to these false job

5    placement reports.  And I believe his exact word was that he

6    was not discreet about it.  He said he talked about it openly

7    in meetings and within the Workforce1 Center.

8            He said it was an open layout, and he didn't keep his

9    voice down in saying things like, "Ana, I've got CIFs to enter

10   as placements."

11           He didn't try to keep these practices secret and

12   Mr. Saavedra was there in the Workforce1 Center at that same

13   time.  We also heard one of the things that Mitch McClinton

14   testified Mr. Saavedra told him about Alan Katz.  I believe

15   what he said was that Mr. Saavedra said that he was going to

16   give Alan enough room to hang himself, indicating that he knew

17   what was going on with alan and his practices.

18           MR. FUTERFAS:  Objection.

19           THE COURT:  Overruled.

20           MS. SCHOENBERGER:  Alan Katz did tell you about how

21   closely he was involved with these things.  You heard from

22   Mr. Saavedra in the recorded conversation just how closely he

23   worked with Alan Katz.

24           He said, I listened to everything Alan does because I

25   have worked with him so long.  We play off each other.  And

1    Mr. Saavedra identified with Alan Katz, as you heard him say,

2    because they are both gab artists who know how to bullshit.

3            When Mr. Saavedra gives Mitch McClinton instructions

4    in that recorded conversation, you might remember that what he

5    told him to do was to be lock in step with Alan.

6            So Alan was certainly on Mr. Saavedra's radar, and

7    isn't it more likely than not that he knew what was going on

8    and that he was aware of the practices that Alan Katz made no

9    effort to hide?

10            In addition to testimony, again, you saw e-mails that

11    showed that Mr. Saavedra had knowledge about what was happening

12    in the Workforce1 centers where he worked.

13            We already looked at Government 6.  That was one of

14    those all-staff e-mails that went to Mr. Saavedra.

15            Then we also have Government's 1.  This is another

16    similar e-mail, this time from Irwin Traydman.  That was

17    someone you heard has a job like Ana Bryant's.  He's one of the

18    people who entered information into Worksource1.  Again, he's

19    making a reminder to people that when they find customers who

20    are employed give that information to him.

21            He sends this e-mail out on January 19.  At that time

22    they had 164 placements, and they said they need to be at 441

23    by the end of the month, so more than double where they are

24    already at in just a couple of weeks.

25            As you heard Mr. Katz testify, he did not typically

1   see that they could meet those targets just using legitimate

2   job placements.  Someone replied to that e-mail, and that

3   someone is Mr. Saavedra.  And he thanks Irwin and also says

4   they will be digging in in the Bronx to capture as many

5   placements as possible.

6          In the e-mails that you have seen, there's been a lot

7   of different names, and you don't necessarily need to remember

8   who all those names were.  But think in your head about how

9   many people are now involved.  We have Monique Tarry talking to

10  her whole teem and Deborah Stephenson talking to her whole

11  team.

12         There's the witnesses you have seen on the stand and

13  you have the witnesses you have seen sending these e-mails.

14  Remember each Workforce1 center only had about 40 people

15  working in it, so as we add up all the people who are directly

16  involved, we see just how common this knowledge was within the

17  Workforce1 centers.

18         Then there's Government's Exhibit 71.  This is another

19  e-mail.  If you can take a look at the second e-mail there.

20  This is from Alan Katz.  It's sent to just three people:  Tage

21  Chandarpaul, Alex Saavedra, and Andy Marmolejos.

22         In the previous e-mail Ms. Chandarpaul wanted to know

23  from Alan Katz how he was going to avoid getting a red light

24  that week.  In other words, she wanted to know, how are we

25  going to meet our targets.

1          Again, Alan Katz says they meet their targets through

2     a mix of real and fake placements, and his e-mail response to

3     her reflects that.  Because the first point he makes is that

4     the team is following up on all referrals.  As you heard, that

5     is a legitimate way to find out whether the Workforce1 Center

6     would make an indirect placement.  So that's one way that he's

7     going to avoid a red light that week.

8          But then the second point talks about reaching out to

9     working candidates at a recruitment event and entering the CIFs

10    into Worksource1 in capturing placements.  Mr. Katz told you

11    that what he was referring to there was a false job placement

12    practice.

13         His third point also referred to a false job placement

14    practice.  That was that intake is giving all of the CIFs to

15    us, in other words, intake was giving the customer information

16    forms to the recruitment and placement team.  And Ana Bryant

17    told that you there wasn't a reason for the recruitment and

18    placement team to have the CIFs.  Those were properly kept with

19    the intake department.  So this was a statement of something

20    that was an improper job placement practice.

21         Alex Saavedra received this e-mail.  We know he

22    received it because he responded to it.

23         Mr. Solomon, if you could pull up Mr. Saavedra's

24    response.

25         He writes back, just to Alan Katz, and he says, "I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    will have to speak with you about something that has come to

2    light."

3              Something that has come to light.  When Mr. Saavedra

4    testified, he admitted to you that what he's referring to here

5    are whistleblower allegations about false job placement

6    practices.

7              He replied to an e-mail from Alan Katz that outlined

8    false job placement practices and said to him, I need to talk

9    to you about something that has come to light about false job

10   placement practices.  So isn't it more likely than not that

11   Mr. Saavedra knew just what Alan Katz was referring to in this

12   e-mail?

13             Mr. Saavedra and Mr. Katz did talk after this e-mail.

14   You heard about a phone call that they had.  During that phone

15   call, Mr. Saavedra told Mr. Katz about the allegations.  And

16   Mr. Katz told you what Alex Saavedra said to him and that was,

17   Whatever is going on needs to stop.

18             But it is also what Mr. Saavedra didn't say that is

19   important.  As you heard from Mr. Katz, Mr. Saavedra did not

20   ask him at any point whether the whistleblower allegations were

21   true.  Mr. Saavedra wouldn't have to ask that question, would

22   he, if he already knows that they're true.

23             At the same time that you have seen this evidence that

24   shows that Mr. Saavedra knew that false job placements were

25   being reported to SBS, we have also seen he was pushing his

1    staff to meet job placement numbers, and he was pushing them

2    hard.

3            He admitted to you that he told his staff that their

4    jobs were at stake with respect to placement numbers.  He said

5    this at meetings and he said it in face-to-face conversations

6    with his employees.  Mitchell McClinton told you that the

7    defendant always wanted know about his numbers and that he was

8    extremely on top of that.

9            Mr. Saavedra sent e-mails like Government Exhibit 2.

10   If we look at one of the last paragraphs here, "Mr. Saavedra

11   reminds his staff that we cannot have a slip this quarter.  We

12   absolutely cannot."

13           While there is all the reason in the world to believe

14   that his staff is gathering false information to use as

15   placements, Mr. Saavedra is pushing them to meet more and more.

16   Mr. Saavedra's attorney may stand up and tell you how busy the

17   defendant was, that he had a loft responsibility.  There were a

18   lot of jobs that kept him outside of the office.  But he wasn't

19   too busy to be focusing on the numbers.  We've seen that.

20           He wasn't too busy to care about the information that

21   was being provided to SBS.  We heard this very clearly in the

22   recorded conversation between Mr. Saavedra and Mitchell

23   McClinton.

24           In this conversation, Mr. Saavedra was giving

25   instructions to Mr. McClinton about how to present numbers to

1   SBS.  You will recall that SBS is the governmental agency that

2   was responsible for providing the federal funds to SEEDCO to

3   operate its Workforce1 centers.

4           In that conversation, Mr. Saavedra criticized

5   Mr. McClinton because he was very honest, as if that were a bad

6   thing to be when you are in a meeting with a government agency.

7           Instead he told Mr. McClinton that he needs to take an

8   acting class and finesse the art of bullshit, because that's

9   the name of the game.

10          When Judge Hellerstein instructs you on the law, I

11  expect he will tell you that knowing is defined three different

12  ways under the False Claims Act.  There can be actual

13  knowledge, deliberate ignorance, or reckless disregard for the

14  truth or falsity of information.

15          The evidence clearly shows that under the False Claims

16  Act Mr. Saavedra knowingly caused false placements to be

17  submitted to SBS.  At the very least, you can tell that he was

18  deliberately ignorant or acted recklessly, that he saw what was

19  going on and he just turned a blind eye, all the while pushing

20  his employees to meet targets.

21          In the face of all of this evidence, Mr. Saavedra's

22  testimony that he did not know what was going on is simply not

23  credible.

24          So, three:  Defendant knew.

25          If you decide that these lies happened, that they

f4mnusa2                    Summation - Ms. Schoenberger

1   mattered, and that the defendant knew about them, you will be

2   asked to decide damages.  In other words, you will be asked to

3   decide how the government was harmed in terms of money.  In

4   this case, the government seeks damages in an amount up to

5   $540,409.97.  If you will bear with me for a minute, I will

6   tell you how we get there.

7            As you have heard, there were contracts between SBS

8   and SEEDCO.  They were split, depending on the year, 70/30 or

9   80/20.  And the 70 or 80 percent was based on the costs that

10  SEEDCO incurred, and then the 30 or 20 percent was based on

11  performance.  They would get performance-based payments.  About

12  half of that smaller portion was based on job placement

13  numbers.

14           So, if you start with the total $12 million that was

15  paid out in 2009, 2010 and 2011, you can then back out the 70

16  or 80 percent, depending on the year, that was based just on

17  costs.  With the remainder you can back out half of that and

18  that was for performance measures that were unrelated to the

19  job placement numbers we are talking about.

20           When you do that, you are left with a number that is

21  about $1.65 million over the course of the three years that are

22  at issue here.  The government isn't asking for $1.65 million

23  as damages here.  In its discretion it's just focusing on one

24  year, and that is 2011.  When you look just at that year, the

25  number you get is the figure I told you, which is just a little

f4mnusa2                    Summation – Ms. Schoenberger

1    bit above $540,000.  That's the maximum amount of damages that

2    the government would be seeking if you find that the defendant

3    is liable here.

4            If you find that the defendant is liable, you will

5    also be asked one other numbers question.  That question is the

6    number of false statements or records that were made, in other

7    words, the number of false placements that were recorded.

8            We can't know certainly what the exact number of false

9    placements are, and that is because not all the CIFs for the

10   whole three-year period are available.  That's because some of

11   the falsities that were entered into the Worksource1 system may

12   not be detected.

13           We did hear from Ana Bryant that about half of what

14   she put in was false, but again we don't know the number with

15   precision.  There is one number we do know for sure, though,

16   and that is 528.  You will remember that is the number from the

17   DOI's investigative report.  Those were the 528 placements that

18   they were able to substantiate as false.

19           So the government respectfully requests that if you

20   reach this question that you come to the same number as well,

21   and find that there was at least 528 false placements that were

22   submitted by SEEDCO to SBS with Mr. Saavedra's knowledge.

23           After I sit down, as Judge Hellerstein told you,

24   Mr. Saavedra's attorney will have his opportunity to review the

25   evidence with you, and then I will have one more opportunity to

1   talk to you briefly.

2          But before I do that, I do want to thank you for your

3   service on this jury.  Last week Ms. Blain asked to you pay

4   close attention to the evidence, the documents, and the

5   witnesses.  We've seen that you've done that, and we very much

6   appreciate it.

7          Ms. Blain also asked to you listen closely to the

8   judge's instructions and follow his instructions, and she asked

9   you to rely on your common sense.  It is your most important

10  asset as a jury.  So we ask again that you do those things.

11         Listen to Judge Hellerstein's instructions and listen

12  to your common sense.  If you do that, you will return a

13  verdict that is fair and just, and the government will ask that

14  the verdict that you return is the one that's proven by the

15  evidence.  That is a verdict for the plaintiff, the United

16  States, on both claims that it has brought against Mr. Saavedra

17  under the False Claims Act.

18         Thank you.

19         THE COURT:  Thank you, Ms. Schoenberger.

20         You may stretch, members of the jury.

21         MR. FUTERFAS:  Your Honor, may I have two minutes?

22         THE COURT:  Does anybody need to use the facilities?

23         Go ahead.

24         MR. FUTERFAS:  Thank you, your Honor.

25         (Pause)

1          (Pause)

2          MR. FUTERFAS:  Thank your Honor.

3          THE COURT:  Take your time, Mr. Futerfas.

4          MR. FUTERFAS:  Thank you.

5          (Pause).

6          THE COURT:  We'll now hear Mr. Futerfas for the

7     defense.

8          MR. FUTERFAS:  Ladies and gentlemen of the jury, may

9     it please his Honor, the Government.

10         The first thing I want to say is that a week ago you

11    were pulled out of your lives and brought to this courtroom,

12    questioned by his Honor and agreed to sit as jurors in this

13    case.  That is an extraordinary responsibility, it is an

14    extraordinary opportunity to watch what we do, to watch our

15    justice system, our justice system of work and it is my

16    privilege and my honor to represent, with Ms. Schein,

17    Mr. Saavedra in this action.

18         It is a difficult case because you have a person who

19    worked his entire life for the benefit of others, and he gets

20    some bad apples who did wrong, there is no question they did

21    wrong, Ana Marchany did wrong, Alan Katz did wrong, and they

22    were found out, and Alan Katz took the Fifth Amendment when the

23    DOI went to talk to Alan Katz, and Mr. Saavedra did not.

24         But to whether it is to cleanse their conscience or to

25    get out of whatever issues they have, they come in and they say

1    oh, everyone knew it.  50 people working day and night working,

2    and you saw some of them, we brought them in, they all knew of

3    wrongdoing.  They all showed up.  George Mills, who worked on a

4    nuclear submarine for 20 years, he showed up every day at work

5    and I knew in the Recruitment & Placement Department because it

6    is talked about in the hallways they're putting in false

7    placements, everyone knew about it.

8            Newton James, who was there for 15 years, do you think

9    Newton James showed up for work every day, and Alan Katz is

10   walking around, this is what we are doing putting in false

11   placements right and left?  Do you credit that testimony?  Do

12   you credit it?

13           You're going to hear instructions from his Honor,

14   you're the determiner of the facts, you're the determiner of

15   who is telling the truth, you're the determiner of what

16   happened.

17           The government likes to weave and has woven a very

18   articulate, very broad statement about what happened, but when

19   you delve into the details, what people actually said -- for

20   instance, Alan Katz worked so closely with Mr. Saavedra, you

21   heard, you just heard.  Yet on the witness stand he was asked

22   did you ever have a discussion with Alex Saavedra about

23   improper placements?

24           What was the answer?  Do you recall?  No, not a secret

25   meeting, not a water cooler whisper, nothing, "no" was the

1    answer to the question.

2         So we can all paint with a broad brush and we can tell

3    a nice story that -- and these are excellent prosecutors,

4    they're very good at what they do, but when you look in the

5    details of what the case is about and what the evidence shows,

6    you will find, and it is your determination, your duty to find,

7    that Mr. Saavedra is not liable, he did not know.

8         He is out every day.  The reason we put in all this

9    evidence about all the programs, and it got a little

10   repetitive, and I apologized to his Honor, but there is a

11   reason we did that, because what this case is about is whether

12   a person who is for four months writing grant proposals for

13   three centers down at 915 Broadway or going to the Bronx to set

14   up a new Bronx center, or meeting with hospitals and doctors

15   and meeting with community organizations and running to

16   employment and meeting big employers and setting up and

17   staffing the entire East River development, a thousand jobs,

18   Alan Katz said a thousand jobs, he knew, he knew that in the

19   corner of his staff Ana Marchany is sitting at her computer, is

20   stupidly putting in false placements.  He knew that.

21        One of the interesting parts of this trial -- and I

22   will get to it in a minute -- is the testimony of someone who

23   was never here, who never showed up, Bill Harper.  Who is Bill

24   Harper?  What is Bill Harper?  You heard the government put in

25   a young lawyer or an intern in their office and read testimony,

1    Marisa got up and read some testimony, and maybe you're

2    wondering who is this guy?  What is this about?

3            Well, Bill Harper was not available.  He could not

4    come in to testify, but he had testified on a prior occasion,

5    and who was Bill Harper?  Bill Harper was the whistleblower.

6    He's the one who goes on April 5th, 2011 to corporate counsel

7    for SEEDCO, Ms. Mallon and he said I've got a problem here,

8    I've discovered some wrongdoing.  That was Bill Harper.  He is

9    the whistleblower.  He is the do-gooder here.  He discovered

10   this.

11           His title was SOC.  SOC means strategic operations

12   coordinator, and I will tell you in a few minutes about his

13   duties and responsibilities, but briefly, briefly Bill Harper's

14   role was the data.  That was his job.  His job was analyzing

15   the data, getting the policy statements from SBS every day.

16           He testified, again through our surrogates, that he

17   sat outside the door of Mr. Saavedra's office, outside the

18   door, Mr. Saavedra's office was there, he is outside the door,

19   he was there every day.  He was not tasked to go to the Bronx.

20   He was not at 915 Broadway doing proposals.  That was not his

21   job.  His job was being at that center, at 105th Street,

22   analyzing data, doing policies, checking up, and I will read

23   you his testimony exactly what he says his job was.  He

24   discovers this.

25           You know what else he says?  He says in his testimony

1    I got all these e-mails.  You see the government put up the

2    all-staff e-mails, everyone got those e-mails, he says everyone

3    got them.  If you look at those e-mails that everyone got, ha,

4    you know for sure they knew wrongdoing was afoot.

5         You know what Bill Harper testified to under oath?

6    The do-gooder, the whistleblower, I got all those e-mails.  Not

7    only I got all those e-mails, I was at all the meetings.

8    Remember the Friday morning, Ana Marchany, every Friday we got

9    a meeting and oh, yeah, it was discussed openly we were putting

10   in false placements, there were code words, everyone knew the

11   code words, this, that whatever it was.  Remember all of that?

12   Bill Harper was at all of those meetings.

13        What did he testify to?  He said I never knew anything

14   about false placements until, bad placements until I discovered

15   forms in early trading desks and in file cabinet.  Everyone of

16   those meetings, I never heard anyone talk about improper

17   activities in those meetings and I never saw an e-mail that

18   suggested to me there were improper activities.  That is what

19   Bill Harper said, the whistleblower, the do-gooder, the reason,

20   quite frankly, there was an an investigation by the DOI or

21   anybody else.

22        That is what he said.  Not only did he say, Newton

23   James said that, George Mills, who got out of the Navy and

24   joined in January 2011, he was only there since 2011, okay, and

25   George Mills said I never saw e-mails that were problematic to

1    me.  I was at the meetings, I never heard stuff at the

2    meetings.  Newton James, he was there however long, many years,

3    he is lying, too, they're all lying.  Ana Marchany, you really

4    think that 50 people are showing up to all-staff meetings and

5    people are talking about placement activities and everyone, oh,

6    yeah, sure, that is what we're going to do.

7            You had a small cabal of wrongdoers, a small cabal of

8    wrongdoers, there is no question about it.  How many bad

9    placements they put in we don't know, but I am going to talk to

10   you about that in a moment.  But that happened?

11           Now the question is while they're doing their little

12   dirty work amongst themselves, did Mr. Saavedra know about it?

13   Did he approve it of?  Did he say it's okay?  Even Alan Katz,

14   given the opportunity here, even him to say yeah, you know, we

15   whispered about it at the water cooler.  No, I never had a

16   conversation with him, and neither did Ana Marchany say that.

17   She didn't say she had a conversation with Mr. Saavedra,

18   either, about this.

19           Her entire testimony of knowledge, entire testimony,

20   Ana's knowledge was that things were discussed openly in

21   meetings, which you know just simply can't be the truth.

22           Let's talk about the case a little bit.  You're going

23   to hear False Claims Act, you're going to hear his Honor charge

24   there are elements in this charge, elements that you have to

25   find or decide upon.  The first is what is a claim?  What is

1      the claim?  One of the first things his Honor is going to talk

2      to you about, what is the claims?  This is the False Claims

3      Act.  There has to be a false claim.

4           The first thing you have to talk about is what is a

5      claim?  Then you're going to have to talk about or think about

6      was the false, were there false claims presented for payment?

7      So you have to have a false claim, right, a claim, and it is a

8      claim for money.  You have to have a false claim, and then that

9      claim has to be presented for payment, presented for money.

10          Then there is in the second claim.  There are two

11     claims in this matter.  In the second claim there is a question

12     of -- and the judge will give you the instructions --

13     essentially was there a false record that was material to a

14     false claim.  Then if you determine there was or whatever, then

15     even if there was, then you have to get to the well, did, did

16     Mr. Saavedra even know about it.

17          I want to briefly get some water and talk to you about

18     the claim, the first claim.

19          So you're going to see something.  It is Defendant's

20     Exhibit T6.  Defendant's T6 -- a lot of documents came into

21     this case and we cannot expect you to be familiar with every

22     single one, but this one, this is actually put in not by the

23     government.  This was put in by us, by the defense because we

24     wanted you to know what -- how did this happen?  What is a

25     claim?  And were claims submitted for payment?  What is that in

 1    this case?  That is what we wanted you to know.  So we put in a

 2    document, T6, and what is T6.

 3            If you look at the cover letter, it is from SBS, all

 4    Angie, Kamath, Workforce1, PCP, performance compensation

 5    payment, okay, and it says please see the attached

 6    authorizations for payment memo, outcomes, validation

 7    spreadsheet and the Charney report.  Let me know if you have

 8    any questions.  That is the covering e-mail.

 9            Then Ms. Alberti, if we can go to the memorandum about

10    four pages later, so this is -- and look at the subject

11    heading, authorization for performance-based payments to

12    SEEDCO.  This letter authorizes payment of performance-based

13    contract milestones.

14            Then you read SBS has determined that SEEDCO has met

15    the payment requirements stipulated in the --

16            THE COURT:  Slow, slow, slow, slow.

17            MR. FUTERFAS:  Yes, your Honor.

18            THE COURT:  You can't speak faster than we can hear.

19            MR. FUTERFAS:  Fair enough, your Honor.

20            Then if you can scroll down, Marisa, please.  At the

21    bottom it says the following backup documentation is attached.

22    A spreadsheet demonstrating the performance, the payment

23    calculations, number one; two, underlying Charney Research

24    reports substantiating the survey outcomes for the outcome

25    measures in various tables, and all these people are CC'd

 1    including Ms. Kamath, and then there is an amount, $195,724.00.

 2         This is, this, we respectfully submit, this is the

 3    claim.  This is the false claims case.  This is the claim.  So

 4    the first question you have is well, did the government prove

 5    the claim?  Where is the government's evidence of a claim that

 6    submitted for payment?  Where is it?  Why did the defense put

 7    it in?  We are -- where are the ones from the government?  What

 8    are the claiming the claim is in this case?

 9         We think it is that.  That is the only piece of paper

10    saying I'm requesting money and what is the records supporting

11    the claim, the records that are material to the claim?  Well,

12    the records are very clear.  They're the documents that are

13    attached to the e-mail and to the memorandum.  They're the

14    documents that says this is what we are relying upon to seek

15    the money.  Simple.  It is a lot of complexities in this case,

16    but this is simple.

17         What is material to the claim?  The documents that are

18    right here, this is what we're relying upon.  You can look at

19    this exhibit, the only claim that has been put in evidence in

20    this case, you can look at this exhibit fifty ways to Sunday,

21    is Work Source data of some generic kind in here or relied upon

22    for this money?  No.

23         Are Work Source data that was admitted legitimate or

24    not legitimate, that was never even sent to SBS or that was not

25    sent to Charney Research for validation, is that in here?  No.

1          What is in here?  The only things that is in here is

2     the Charney validation report validating the placements.  That

3     is in here.  What else is in here?  An analysis by SBS pursuant

4     to the contract.

5          Can we put up Government Exhibit 34 quickly, please.

6          While she is trying to find that, you may recall that

7     there was a contract and then it had all these charts on it,

8     and that there was somewhat complicated testimony about, about

9     mathematics that were done once they received the verification

10    report that went into various tables to calculate the amount of

11    payment, but you don't even have to get to Government Exhibit

12    34 to figure it out or figure out what they did because, quite

13    frankly, that math is right here on the second page of

14    Defendant's Exhibit T6.

15          MS. ALBERTI:  Do you want T6 up there?

16          MR. FUTERFAS:  No.  That is okay.  Just scroll down to

17    the charts, please.

18          THE COURT:  What do we have on the --

19          MR. FUTERFAS:  This is Government Exhibit 34, right

20    there.

21          So this says, you see validation, payment threshold,

22    validation, Charney will survey all place customers using Work

23    Source1 roster.  That includes all place customers, et cetera.

24    Then if you scroll down a little bit, please, keep on going and

25    stop.  There is an example and percentage validated and all

1    that.  That is part of the contract.

2         It says so no reconciliation between the Charney

3    validated data and any other data.  You heard testimony from

4    SBS meant this governed, if Charney found that 30 percent were

5    validated and everything else couldn't be validated --

6         THE COURT:  Mr. Futerfas, he has take down, he has to

7    take down what you say.

8         MR. FUTERFAS:  Sorry, your Honor, if I am going too

9    fast.

10        THE COURT:  It is only through the superhuman efforts

11   of Jerry Harrison that he keeps up with you!

12        MR. FUTERFAS:  Sorry, your Honor.

13        You'll actually see on the second page of T6 which is

14   in evidence, you can look at it and ask for any exhibit in the

15   jury room, any exhibit or testimony, you can ask for testimony,

16   you can ask for readbacks, and we will provide it, all of us

17   will provide it for you.

18        In the second page of this exhibit you'll see the

19   calculation is there.  What did, just very quickly what did

20   Charney Research do, okay?

21        Now, in evidence the other day was Defendant's Exhibit

22   K-7, if you can find that.

23        MS. ALBERTI:  Yes.

24        MR. FUTERFAS:  We put into evidence the questionnaires

25   so that there is no ambiguity what they did because at the end

1    of the day if you're going to find that there was, if you're

2    going to think about and consider whether a single bad

3    placement by Ana Marchany got paid, a single one, a single one,

4    okay, you're going to find a single one, you've got to at least

5    consider what was the validation process?  How accurate was it?

6    What was it done?

7            So we put it in evidence.  If you can go to the first

8    page, please.  Scroll down, please.  Stop.  Thank you.

9            Look at the questions.  You remember the testimony

10   about this?  This was put together, Mr. Charney from Charney

11   Research testified, this was put together by him in conjunction

12   with SBS.  They had numerous drafts that went back-and-forth

13   because SBS wanted to make sure, SBS did, that when they called

14   a job seeker, did that job seeker, was that person actually was

15   placed.  That was the point of this exercise.  It is right

16   there.  Question 1.  Since you began receiving services until

17   now, have you begun a paid job?  That is one question.

18           Go to Page 2, please, Marisa.  Stop there, please.

19   Look at 1 A.  And this actually answers one of his Honor's

20   questions during the case because you may remember, these are

21   some of the complexities when DOI says there is 528 they think

22   are -- now they're calling them discrepancies.  When the trial

23   first started, I thought they were false.  Now they're

24   discrepancies.

25           But, in any event, 1 A says did you have a paid job

1    for one day or more during that period?  Remember the

2    conversation, remember the discussion about what happens if

3    someone shows up to Fairway.  This is the mess of the process.

4    A person shows up to Fairway.  The person is there, the person

5    is hired on the spot.  The individual in the field fills out a

6    CIF because it is an off-site recruiting event.  You heard from

7    everybody that is what they did all the time, that is proper,

8    legitimate what they're supposed to do, that is how they got

9    jobs, they got people into the center and they had all these

10   off-site improvement events for employer.

11           Some of them, you heard about a lot of them if the

12   person shows up, the employer says they're hired or the job

13   seeker says to the SEEDCO staff I got hired, the manager told

14   me I'm hired, okay?  Under the policies that we showed you,

15   that is sufficient for a placement.  That policy is an SBS

16   policy.  Now the job seeker works one day at Fairway.

17   Meanwhile, meanwhile at the Fairway event a hundred people

18   showed up.  They collected a hundred CIFs, right, because a

19   hundred people showed up and they got all their CIFs done and

20   there were other recruitment events.

21           At 125th Street there is a stack of CIFs.  Back at

22   Fairway the job seeker shows up, gets hired, told he is hired,

23   works one day at Fairway.  Then he decides I don't like

24   Fairway.  I don't like the job I have been hired for or I got a

25   better job or something.  That one day counts as a placement.

1    Did you have a paid job for one day or more?  He is placed.

2    Then what happens is the CIF, though, so you get a placement on

3    whatever day he I hired, but there is a backlog with the CIFs.

4         This is not Google.  This is not IBM.  This is a

5    non-profit agency with people who are juggling tons of forms

6    and documents and they're running to events.  Sometimes you

7    have a few people covering an event where hundreds of people

8    show up.  This is reality.

9         So this person gets placed, maybe goes on to another

10   job.  Meanwhile the CIF is in a backlog and the CIF date

11   doesn't get entered until two weeks later, and you can take

12   that example and multiply that about 5,000 times and you get

13   all types of examples of what can happen in this process.

14        It is a messy, imperfect process, but it is one that

15   SBS knows all about and has rules and policies that govern.

16   I'll even show you a policy that says you cannot have more than

17   two placements in one quarter, in one quarter, in other words,

18   three months.  You can get two placements in a quarter.

19        Then what about Advance at Work?  You heard all this

20   testimony about people coming in, and they already are employed

21   and they're filling out a CIF.  Well, yeah, because there is a

22   whole program called Advance at Work.  If you come in and

23   you're already employed, why are you showing up to the center?

24        You're showing up to the center because you're not

25   happy with your current employment.  You're not making enough

 1    money.  You want a raise.  Maybe you want more hours.  Maybe

 2    you want a better job, but you're showing up to the center

 3    already employed.

 4         So then they look and they see and you get a service.

 5    After that service maybe you get a raise, maybe you didn't get

 6    a raise, and there is something else that can happen, too.

 7    That is when there is a policy statement in evidence about this

 8    as well, there is a policy statement that I can show you, it is

 9    a look-back provision of 180 days.  If you got a service four

10    or five months ago from -- you went to Work Source and got a

11    service at workforce and you got a service.  So you went there

12    and they saw you and they gave you training or whatever service

13    you received.

14         Now you go out and get a job, okay?  You go out and

15    get a job after the service, but guess what?  No one -- that is

16    a placement, right -- no one has contacted you.  So no one

17    knows if a placement has occurred.  That is one of the reasons

18    why they spent all this time on re-engagement calls because if

19    any of you show up, if any of us or I show up to the service

20    site, I need resume training, I need this or that, whatever,

21    here is your service.  I go out.  A week or two later I get a

22    job.  That is an indirect placement.  No one knows about it.

23    SEEDCO doesn't know about it.  SBS doesn't know about it.

24         There is a placement out there no one has captured and

25    they're not going to find about it unless they re-engage and

 1   call me and they call me and dial me and dial me and finally

 2   get me on the phone.  Mr. Futerfas, you were here a few weeks

 3   ago for services.  How is everything?  Did you get a job?  I

 4   got a job.  You did?  Great!  Where are you working?  How many

 5   hours?  What is the salary?  No one has captured that placement

 6   until that call occurs.

 7           If I go out and get a service and then I get a job and

 8   I walk back into Workforce1, I walk back in.  Now I come in, I

 9   am already employed, but I am now a placement because four

10   months before I had a service and no would be captured, no one

11   re-engaged me on the phone, but I am walking back into the

12   center.  So I am employed, okay?  But I am walking back in the

13   center and they say oh, great, you're back in the center.  We

14   give you CIF.

15           You are a placement because you got a CIF before and

16   you got a job after.  These are the complexities that are going

17   on here.  These are the complexities that are involved that we

18   have to deal with, and that in terms of determining whether,

19   what is a false placement, whether Mr. Saavedra knew about it.

20           This 508, where does that number come from?  We can

21   show Government Exhibit 13 A, please.

22           THE COURT:  548.

23           MR. FUTERFAS:  528.  This is the DOI report.  If you

24   can turn to Page 17, please, there you go.

25           THE COURT:  What exhibit is up?

1          MR. FUTERFAS:  This is Government Exhibit 13 A.

2          THE COURT:  Page?

3          MR. FUTERFAS:  17, the top of Page 17.

4          DOI, as you know, conducted an investigation and they

5     looked.  Kamath testified they went through 10 boxes of CIFs,

6     10 boxes of CIFs, and after all this analysis, they did 7

7     months of the investigation, they came up with the number 528

8     out of 10 boxes of CIFs.

9          436 Upper Manhattan from August, January to August,

10    and 92 out of almost 4,000 out of the Bronx, where, by the way,

11    at that time Mr. Saavedra was from, all from January to August.

12    The top number is about 12 percent.  The bottom number is about

13    2 percent.  You heard that before.

14          So I'm not saying that number is accurate.  In fact, I

15    think there are a lot of problems with that number, but didn't

16    Ms. Marchany -- by the way, she was in the Bronx during this

17    period of time because on January 1st, 2011, she got moved to

18    the Bronx.  She is the one who stands up there and says -- the

19    government just quoted her -- that says oh, 50 percent of all

20    the stuff, I will estimate 50 percent was bad.  DOI looks at

21    all of this and says 92 out of almost 4,000, 2 percent.  It is

22    not even a margin of error in the Charney Research Report, not

23    even a margin of error.

24          Do you think she might have been exaggerating just a

25    little bit?

1          Now, let me ask you this.  Where is the proof?  Where

2     is the proof, okay?  I think I just showed you, here is the

3     authorizations, there is only one in evidence, but there were

4     others that you heard during this time 2011.  Where is the

5     proof that one of those 528, that one of those 528 made it into

6     or were calculated into the data that actually got submitted

7     for payment?

8          I am going to ask you this question.  Where is the

9     proof that one was submitted for payment, one?  One bad one,

10    one really truly bad one, okay?  Was it a promotion?  Because

11    there are bad ones.  We recognize there were bad ones.  I think

12    the government ended up putting I think nine CIFs for people

13    into evidence.  I think there are clearly two or three of those

14    that are not good.

15         There are others that are actually legitimate

16    promotions, but there are probably three of those that are

17    truly not good placements.  Where is the evidence that after

18    the Charney validation?

19         MS. SCHOENBERGER:  Objection.

20         THE COURT:  Overruled.  You'll remember the evidence

21    yourself.  What the lawyers say is not evidence.

22         MR. FUTERFAS:  Now, guess who --

23         THE COURT:  It is for you to evaluate.

24         MR. FUTERFAS:  -- guess who was trying to figure that

25    question out?  SBS.  Can we put up Defendant's Exhibit 5-F.

1    This is an e-mail from Charles Houston, who is at SBS, to a

2    bunch of SBS people including Angie Kamath, and look at the

3    date of this e-mail, October 11, 2012.

4           The report, the DOI report comes out in March 2012,

5    and the report says there is 528, right?  That is what they

6    determine.  So SBS, 7 or 8 months later is saying to itself,

7    internally talking and they say of the 525 listed in the DOI

8    during January to March -- can you shift it this way a little

9    bit so we can see it -- anyway, that are not associated with

10   the Charney group sent for validation.  What it says, and this

11   document is in evidence, 24 of them were never even sent to

12   Charney.  Then there is another 401 that are in the group.

13          They were sent to Charney.  Then he writes I would

14   need additional customer information for any further

15   determination.  So who is trying to figure this out?

16          The question is did any of these, did a single one of

17   these get submitted within the Charney validation report which

18   was part of the package submitted for payment.  I asked Angie

19   Kamath this question many, many times.  I don't think I

20   received a responsive answer, but your recollection governs.

21          By the way, the government has the burden of proof.

22   You can consider a failure of proof, you can consider that.

23   You can say where is the proof of X?  I am going to scour the

24   record, I am going to look at everything, I am going to take

25   every exhibit, I am going to examine all the testimony, and you

1    can come back and say they failed to prove it, I don't have the

2    proof of this.

3          Who else had difficulty determining that same

4    question?  Actually, they couldn't determine that question.

5    The DOI.  If I could have the DOI again, please, at Page 87.

6          THE COURT:  13 A?

7          MR. FUTERFAS:  Yes, your Honor.

8          Take a look at that top paragraph.  Here is the DOI,

9    after seven months of investigation, looking at everything, and

10   I will just read it.  While DOI has not yet determined a dollar

11   amount of fraud or potential fraud associated with the number

12   of identified false placements, its false reporting does

13   implicate the amount of payment that SEEDCO will receive or has

14   already received.

15         Then the next sentence says if the veracity of

16   reporting number for time periods has not yet been determined

17   through its external verification, the consequence -- and you

18   can continue -- SEEDCO could potentially receive or could have

19   already received --

20         THE COURT:  Jerry, are you getting this?

21         MR. FUTERFAS:  Jerry can get it.

22         What is the bottom line here, ladies and gentlemen?

23   What is the bottom line?  DOI who looked at this says they have

24   not yet determined a dollar amount, and they talk about the

25   amount of money that SEEDCO could potentially receive or may

F4MJUSA3                    Summation - Mr. Futerfas

1    have received.

2         Then the next paragraph says contractual money values

3    aside, there are greater consequences, and they talk about

4    those being a reduction in transparency.

5         So the DOI couldn't determine whether a single false

6    placement was entered, got submitted for payment.  I

7    respectfully submit that there is no evidence that SBS was able

8    to determine it even though it is pretty clear they were trying

9    to figure that out.

10         The government is asking you in this case, they

11    couldn't do it, they're asking you to do it.  I respectfully

12    submit that is a failure of proof.  You don't have anything

13    before you that they didn't have.  In fact, the DOI didn't have

14    three witnesses.  She testified they had 20 witnesses.

15         I want to quickly cover one other thing, and that is

16    that we start with the proposition that of almost if you add up

17    the numbers, if you add up just in 2011, according to the DOI,

18    there were 3200 placements, placements in Upper Manhattan, 3800

19    in the Bronx, for a total of over 7,000 real, 7,000 placements.

20         Out of those, DOI says 528 they don't think are good,

21    528 out of 7,000.  Out of that 528, you've seen 9 in evidence.

22    I respectfully submit -- and I cross-examined Chanterelle Sung

23    about those -- just put them up.  I said to her -- I don't have

24    time to do the demonstrative on the chart, but I said to her,

25    well, Ms. Sung, isn't a promotion a placement?  And I don't

 1  want any confusion about that.  Can we put up Defense Exhibit

 2  D-4, D like David, 4.  Can you bring it up a little bit,

 3  Marisa, please.

 4          This is an SBS policy.  D-4 says this is an SBS policy

 5  statement sent by SBS, and it says an advance of either wages

 6  or hours by a job seeker with the same employer that occurred

 7  after consumption of services is a promotion.

 8          If you go through the -- in fact, can you scroll up to

 9  the top of the document -- look at the top.  Work Source1

10  placement and promotion record.  If you go through the

11  document, all through the document it is placement and

12  promotion, placement and promotion, okay?

13          What happens if you go through the 9 out of the 7,000

14  in 2011, now you have 528 for DOI, now the government has put

15  for you 9, and now we look at some of the 9.  You look at some

16  of the 9 and you say hold on a second, though, out of these 9,

17  Mr. Diaz, Government Exhibit 45, he was an instructor and he

18  continued being an instructor.  He was earning $15.00 an hour

19  10 hours a week, but now the placement says he is earning

20  $50.00 an hour 20 hours a week, a thousand dollars.  So he has

21  an increase in salary.  Is that a promotion?

22          Ladies and gentlemen, maybe it is.  Maybe it is not.

23  I am not standing up here and saying that Ana Marchany or any

24  of the miscreants she worked with didn't do dumb things, but

25  how are you going too know that?  How are you going to

1    determine with reliability that it is not?

2           Very simple.  You make a re-engagement call.  The DOI

3    worked on this case for seven months.  Call someone up and say

4    Mr. Diaz, that is what the Workforce1 did every day, e-mails,

5    make your re-engagement calls, call them up find out what

6    happened.  All you have to do is call Mr. Diaz and say

7    Mr. Diaz, the job is the same but it looks like you got an

8    increase in salary, you got more hours.

9           Did that really happen?  Mr. Diaz said yes, I went in

10   and -- whatever, I got an increase, got promotion.  Then it is

11   real.  Then he says I don't know what you're talking about, I

12   always had the same salary, you know it is not.  That is all.

13   Simple.  Simple.

14          You go to another one for Government Exhibit 46, no

15   CIF salary information provided at all.  Salary information is

16   in the placement.  Again you can't tell.

17          We are at 47, Santiago.  I won't use any more names.

18   Government Exhibit 47, maintenance had certain number of hours,

19   no hours provided in a certain job.  Now he has more hours.

20   Maybe it is a promotion.

21          The bottom line, ladies and gentlemen, this is

22   complicated.  It is complicated.  Is 528 a real number?  No.

23   No one called these people.  We are now at the point in the

24   trial where the government is calling it a discrepancy.  This

25   isn't about discrepancies.  This case is about false

1    placements, people putting in intentionally false information.

2    This isn't about discrepancies.  Discrepancies are business

3    errors.  I've got to move forward.

4          Let's talk about, based on the evidence that is before

5    you, there is no false claim.  They haven't proved a false

6    claim.  They haven't put claims in evidence for 2011 much less

7    shown that the data, the records material to the claim which

8    are clearly the Charney Research validated placements, a single

9    placement supporting it.  They haven't proved a false claim,

10   period.

11         Now let's talk about Mr. Saavedra's knowledge.  I have

12   25 minutes maybe.  They have to prove that if there was a false

13   claim, if they proved a false claim, that Mr. Saavedra knew

14   about it, he knew about it when he was up at the Bronx, finding

15   a new place to open a Bronx center, he knew about it when he

16   was downtown at 915 Broadway preparing proposals, he knew about

17   it.

18         I could say to you right now, question to Alan Katz:

19         Before April 2011, did you ever have a discussion with

20   Alex Saavedra --

21         THE COURT:  You have to slow down if you went too

22   quickly.

23         MR. FUTERFAS:  -- with Alex Saavedra about improper

24   placement practices at SEEDCO?  No.

25         T-146 of the record.  Everything I read to you in the

1   next 15 minutes I will give you a T cite.  That is the

2   transcript page.  Go check it.  It is there.

3           That is the end of the story?  "no."

4           Alan Katz sees he got to SEEDCO in August 31.  He

5   didn't do this kind of work before, and when he got there, he

6   just didn't start showing up on the job, giving people

7   directions to input false placements.  That is what he said.

8   Ana Bryant said she walked in and said oh, I never did this

9   before Alan Katz told me to do it.  You want to compare

10  testimony?  Go ahead.  Alan Katz's testimony, at T-148, he says

11  I didn't walk in and give directions to do false placements.

12  Ana Bryant said oh, yes, you did at page 206 of the record.

13          You remember that Government Exhibit 2, the e-mail,

14  and that is the e-mail showed you, April, in April of 2010 when

15  Mr. Saavedra moves downtown and starts working on all the

16  e-mails and sends an e-mail, I am downtown, out of the office,

17  doing all these proposals, you guys have to step up and he says

18  words like, and Rick Greene will tell you to do things and

19  things you're not used to doing.  Mr. Saavedra testified, yeah,

20  you going to be pulling reports and pulling spreadsheets and

21  pulling data, stuff that will take you more time so that we can

22  put these proposals together.

23          While during that testimony his Honor asked Mr. Katz

24  whether that, whether he understood that e-mail, whether this

25  was reflected, reflected in instruction even implicitly to get

1   improper placements.  Alan Katz's answer was no.  Page 47 of

2   the record.

3         Alan Katz says I told you before he was outward about

4   this.  He testified, oh, we were outward, we were going through

5   the hallways and talking to everybody.  I have gone through

6   with you Newton James, George Mills, Shandell Velez,

7   Mr. Saavedra, the whistleblower, the whistleblower.

8         The best is this:  Alan Katz says did you try -- asked

9   by the government -- did you try to hide any of the practices

10  your team used to generate placements?  Answer:  No.

11        Page 59 of the record.  Answer:  No.

12        Do you remember what Mitch McClinton said?  Page 565

13  of the record.  Maybe it is in my stack.

14        (Pause)

15        THE COURT:  You have 15 minutes to go.

16        MR. FUTERFAS:  Your Honor, I will move very quickly.

17        Sometimes in the case, and it is part of our justice

18  system, the truth will out.  Sometimes the truth will come out.

19  So what happens is Ana and Alan Katz, oh, this was all out,

20  everyone knew about it.  Just by happenstance his Honor asked

21  Mitch McClinton a question.  He says to Mr. McClinton, you made

22  a distinction between advice and instructions.  What did you

23  mean by that?

24        And Mr. McClinton starts telling a story.  He says

25  when I was selected to become business service manager of

1    Harlem, Mr. Katz, he was shifting out and I was taking over his

2    role, and Mr. Saavedra told me, instructed Alan to meet with me

3    and get me up to speed on what I needed to know.

4          That never happened, he said.  I e-mailed Alan, I

5    called him, I tried to touch base with him so we could meet, do

6    lunch.  He was busy in the Bronx.  For whatever reason the

7    meetings never occurred.  I was always where I was supposed to

8    be.  Alan Katz never showed up.  He was busy.  He came to the

9    Harlem location to empty out his desk.  Alan Katz came to

10   Harlem to empty out his desk and get his things.

11         He began telling me these are little secrets, what you

12   might want to employ by changing information on the CIF to make

13   it look like, you know, you can count it for a placement.

14         So, ha, the guy is walking around the hallways.  Alan

15   is not even there most of the time anyway.  He is telling you

16   I'm walking around the hallways, bumps into Mitch McClinton

17   when he is emptying out his desk.  I will share with you our

18   secrets.  That is the witness's testimony.

19         What else?  Mitch McClinton did not say on the witness

20   stand.  He did not say he ever had a conversation with

21   Mr. Saavedra about improper placements.  He did not say he

22   considered these e-mails evidence of improper placements or

23   that he even knew about improper placement activity prior to

24   having this secret conversation with Mr. Katz.

25         Mr. McClinton, who is also at the Workforce1, so now

1    how many witnesses do we have who did not understand that

2    improper practices were going on but who were there in addition

3    to Newton and George Mills and everybody else?

4          Add Mr. McClinton to the list.  Little secrets.

5          Let me talk to you one minute about this tape

6    recording.  Humbly, I humbly suggest to you this is a

7    substitution of proof that the government is trying, a

8    substitution of proof.  If you have proof that he knew about

9    improper placements, put it on.  If you have proof that

10   improper placements made their way to payment, show us.  But

11   play us a recording where Mr. Saavedra is, for lack of a better

12   word, making some dumb remarks, that is not proof of the

13   allegations in this case.  If this case was about did he have a

14   dumb conversation, that is another story.  That is not what the

15   case is about.

16         In Mr. Saavedra's examination, and you heard it today,

17   the government said that he told people you better get the

18   placements, you got to do it.  You saw e-mails to that effect.

19   That is an instruction to commit fraud?  That is an instruction

20   to put improper placement data?  Get it done, do your job, sell

21   more cars, whatever it is, that is recklessness?

22         He is not there much, and you know we put in all this

23   evidence about all these programs, homeless programs and

24   veterans programs.  Why did we do that?  Because this case is

25   about knowledge in addition to the claim part, it is about

1    knowledge.  What did he know?  If you're dealing with all these

2    people, getting hundreds of e-mails a day, if you're doing your

3    job and you are getting 7,000 placements in 2011, okay, then do

4    you know what people are doing, this little cabal is doing in

5    the corner that Alan Katz told Mitch McClinton is a secret?

6        That is why we put this in.  He was busy, busy, busy

7    doing what he was supposed to do.  I also think that if

8    that's -- no one would ever take an executive position if it is

9    pushing my staff to do what they're supposed to do and then

10   someone does something improper, I'm responsible for it.

11       You heard Ms. Nesmith testify that, ah, ah, I was, I

12   was calling 200 hours a week, and I want to talk about Ms.

13   Nesmith for a minute.  Go back if you want to reread her

14   testimony, have it reread.  You can ask for it.  Read every

15   word of her testimony.

16       I do not understand what she said that she claims Alex

17   said to her that suggests an improper placement.  She was

18   talking about re-engagement.  She was saying there was

19   nothing -- there was nothing she said that was not explained

20   through all of the policies and Advance at Work and people had

21   jobs and came back to the center, any of those things.  I don't

22   understand what is wrong about what was said.

23       10 minutes, your Honor?

24       THE COURT:  About.

25       MR. FUTERFAS:  Let me talk to you about Bill Harper

1     because it is really important.  Bill Harper gets in this job

2     and he says -- could you find the Bill Harper testimony -- he

3     gets in this job as SOC, and his job description, he testifies

4     about his job description, and -- I have it here.  It is

5     detailed.

6              I was strategic operations coordinator.  I was

7     responsible for the day-to-day function, functioning of the

8     Work Source system, the data entry system.  I was responsible

9     for initiating change iniatives that SBS would put out

10    regarding policy, new features in the systems.  I was

11    responsible for training and being up to date.  I was

12    responsible for reporting metrics.  I was responsible for

13    becoming subject matter expert around the Workforce1 system.  I

14    was responsible for coordinating with the city on all its

15    operations, okay?

16             Pages 495 to 497 of the record.

17             So what happens?  He testifies -- and this is at 673

18    of the record going forward -- he testifies that in around

19    January of 2011, after he has been there eight months, remember

20    he is there, on site every day, he is not an executive like

21    Mr. Saavedra who is out doing all the stuff he's got to do, and

22    he testifies he started to get suspicious about some of the

23    data.  What else does he do?  He starts snooping around.  That

24    is what he starts doing.

25             What does he discover?  It takes him a while.  He

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    doesn't discover it in a day.  It takes him a series of months,

2    January, February, and he testifies to this, and he says I

3    began looking at information, and he came to the conclusion in

4    February or March or even April, he actually went to the senior

5    counsel in April, April 5th, 2011, and he went to him, but

6    interestingly what he says about how he found out about this is

7    fascinating.

8           At the time you were working before January, February

9    2011 when you began to do this exploration of improper

10   placements before then, did you even suspect that someone was

11   asking you in an e-mail to do something wrong or enter a false

12   placement?  No.

13          He didn't say he had any information concerning

14   Mr. Saavedra at all about improper placements.  He said the

15   same thing about meetings.  He was asked were you in all these

16   meetings?  Yes, I was.  Did you hear anything in those meetings

17   suggesting improper placements?  And he said no, I did not.

18          Then what happens is this.  Page 501 of the record,

19   and you can ask to have any of this read back, he said the CIF

20   was one of the CIFs I looked at on Irwin Tradydman's trading

21   desk and file cabinets.  That is how he finds out about this.

22          For Mr. Saavedra not to be reckless and not to be

23   deliberately indifferent after he is done putting the proposals

24   together, opening the Bronx, filling in for Francine Delgado,

25   running 15 programs, he has got to be going under the desks,

1   yeah, opening drawers, opening file cabinets, opening file

2   cabinets to find CIFs?  That is what Bill Harper did.  That is

3   how Bill Harper discovered this.  He is not deliberately

4   indifferent.  He didn't know and he wasn't reckless.  He was

5   doing his job.

6          Ladies and gentlemen, I am concluding my summation.  I

7   very, very, very much appreciate your service and your

8   attention.  It is a complicated case, a lot of complicated

9   facts, but to all of us, you are extremely attentive and

10  engaged and we appreciate it.

11         There is plenty did not say.  The last thing I will

12  say is this.  This is so interesting, and the court told you

13  this, both sides were on a time schedule.  It is actually very

14  interesting because it actually makes both sides focus their

15  case and do it in a very efficient manner, and so actually,

16  your Honor, I appreciate that.  We both did that, tried to

17  focus you directly on what the issues are.

18         If there is something I didn't say, you've heard a

19  lot, think about it.  If the government talks to you now in

20  their rebuttal or if you're near deliberations and someone says

21  something, think about well, hold on a second, what would the

22  defense say about that?  There are a lot of complexities here.

23  That is all I have.  Thank you very much.

24         Thank you, your Honor.

25         THE COURT:  Thank you, Mr. Futerfas.

 1            Does anyone need to use the facilities?  We have up to

 2     25 more minutes before we break.   Ready?

 3            MS. SCHOENBERGER:  Yes, your Honor.

 4            THE COURT:  Okay.

 5            MS. SCHOENBERGER:  Ladies and gentlemen, this is not

 6     actually a complicated case.  It is a simple one.  It is a case

 7     about whether lies happened and whether they mattered and

 8     whether Mr. Saavedra -- and we heard a bit about the knowledge

 9     portion of the case, and I would like to address that with you

10     now and then we'll get to some of the more technical things Mr.

11     Futerfas mentioned.

12            Again, it is a simple case.  One of the things we are

13     talking about is the the defendant knew about this lies.   This

14     is not a case whether Newton James knew about these lies or

15     whether George Mills knew about these lies.  It is whether

16     about the man in charge, the director of the Workforce1 centers

17     knew what was going on.  And, yes, there is testimony that this

18     was discussed in meetings, and you saw the witnesses on the

19     stand and you can assess their credibility and decide whether

20     that was the case.

21            That is not the only evidence that Mr. Saavedra knew

22     what was going on.  Although we heard that Newton James and

23     George Mills didn't think they heard anything, Bill Harper

24     didn't think anyone was instructing him specifically to do

25     anything improper, that doesn't negate some of the other

1    evidence showing that Mr. Saavedra did know what was going on,

2    and we didn't hear much about that.

3           For example, his instructions to Ms. Nesmith, he told

4    her it is okay to take someone's job if they worked in the last

5    quarter and enter it as a placement even if they hadn't

6    received any SEEDCO services.  That is not a job that SEEDCO

7    can take credit for.  Mr. Saavedra did not deny that he said

8    that.

9           We also didn't hear any sort of denial about the facts

10   that Mr. Saavedra said to Alan Katz whatever is going on has to

11   be stoped when he found out about the false placement

12   allegations.  We already looked at the e-mail that brought on

13   that conversation.  It was an e-mail talking about false job

14   placements.  So while it is possible that Newton James wouldn't

15   have received Alan Katz's e-mail and thought this refers to

16   false job placements, Mr. Saavedra did.

17          As to whether or not Mr. Saavedra knew, you can take

18   the witnesses' word for that.  That is part of your job in

19   assessing credibility.  You don't have to because you have

20   other evidence to rely on because I showed you e-mail after

21   e-mail, a variety of people talking about these things.

22          It wasn't just Alan Katz and it wasn't just Ana

23   Marchany Bryant.  It was Chandarpaul, Ms. Lam, Deborah

24   Stevenson, a number of people talking about the same things in

25   e-mails.  Again if you build them up in your mind in the

F4MJUSA3                         Rebuttal - Ms. Schoenberger

 1   various teams of people that knew what was going on, you'll see

 2   that this was not the kind of behavior that was kept secret.

 3          Alan Katz testified that he didn't have a conversation

 4   with Mr. Saavedra about improper placements, but do you really

 5   need to have a conversation with somebody after you've just

 6   said something about what you're doing in front of him in a

 7   meeting?  The question doesn't prove that Mr. Saavedra didn't

 8   know.

 9          As to the question of whether there is a claim here,

10   you'll recall again about the contracts.  There are two parts.

11   There is the cost part and there is the performance part.  Part

12   of the performance section of the contracts is based on

13   payments for job placements.  There was one way in which SEEDCO

14   provided information to SBS about these job placements, and

15   that one way was by entering information into the Work Source1

16   database.

17          By doing that, they were providing the information to

18   SBS that allowed SBS to determine whether or not it was going

19   to pay SEEDCO performance-based payments.  That information is

20   a request to be paid with federal funds under the contract.

21          So whether you view the claim as coming through Work

22   Source1 or whether you view it as some sort of compilation of

23   those placements like in Defendant's T-6, it amounts to the

24   same thing.  It is SEEDCO saying we placed these people into

25   jobs, please pay us the money under the contract that is

1  connected to making job placements.

2         As you heard, exhibits can be available to you while

3  you're deliberating, and feel free to look at Defendant's T-6,

4  and you will see there is a spreadsheet there, and one of the

5  facts and figures on the spreadsheet is the total placements

6  claimed.  SBS, these are the placements we made, please pay us

7  money.  That was the request for payment.

8         Another question that was just put to you was whether

9  any of these false placements were paid.  Again you heard

10 testimony about the frequency with which false placements were

11 entered into SBS, and once again I cannot instruct you on the

12 law, and neither can Mr. Saavedra's attorney, but the Judge

13 will instruct you on the law.

14        When he tells you what you have to find under the

15 False Claims Act, you will not hear an instruction that the

16 government had to pay out anything.  That makes sense because

17 the law is in place to prevent people from lying to the

18 government to try to get money.  Lying to the government is

19 part of the law.  So although there is evidence to show that

20 the government has paid out money because there were these

21 performance-based payments that used federal funds, you'll find

22 that that was not something that you have to find after you

23 hear the Judge's instructions.

24        An issue that came up was the percentage of false

25 placements that DOI found when it conducted its investigation,

1   and I think the point was that they're relatively small

2   percentages, but something to keep in mind is again DOI was

3   looking at a limited period of time and it was a period of time

4   during which these allegations were raised about false

5   placements.

6           If Mr. Solomon can please pull up Government Exhibit

7   5.  This is an e-mail from April of 2011.  You'll see in the

8   center of the page an e-mail from Tage Chandarpaul, and this is

9   again in response to Mr. Katz's e-mail that we already talked

10  about where he is laying out the false job placement practices,

11  and she says at the beginning of April 2011 how are we doing

12  intake CIFs?  We cannot do this any more since SBS will be

13  asking for these CIFs.

14          This was after the whistleblower's allegations.  So

15  DOI is looking at a period of time --

16          MR. FUTERFAS:  Objection.

17          THE COURT:  Overruled.

18          MS. SCHOENBERGER:  -- January 2011 to August 2011, but

19  at the beginning of April 2011 the allegations have already

20  come to light, as you heard, and Tage Chandarpaul is saying how

21  can we do this any more?  So maybe they didn't do it any more.

22  So we see an eight-month period, but it is reasonable to

23  conclude that, in fact, we are looking at a four-month period.

24          And again percentages aside, you heard what the

25  testimony about what was going on and have seen numerous people

1    that were involved.  There is no reason to doubt the 528

2    e-mails, 528 number of false placements, but you also don't

3    have to accept that they were the only false placements.

4          We talked briefly about Charney Research.  As Ms.

5    Blain told you last week, you don't need to think about Charney

6    Research.  Not only did we hear from SBS and Mr. Charney

7    himself that they didn't actually contact all of the people

8    that were claimed to be placements, but Ms. Kamath testified

9    that the kind of false activity that was going on, the kind of

10   lies that were being submitted by SEEDCO to SBS were not the

11   type that Charney would have been able to detect.

12         In the e-mail that Mr. Futerfas showed you about

13   trying to figure out where these 400 came from and whether they

14   were in the Charney group, well, Ms. Kamath told you about

15   that, too.  She said what they were trying to do was figure out

16   how this happened to make sure that it never happened again.

17         Mr. Futerfas also wanted to cast some doubt on the DOI

18   report.  One of the things that he brought up was that these

19   people could have been called, but you did hear the

20   investigator.  She talked to you, and she told you that they

21   did call job seekers.  That was part of their investigation.

22         Don't lose sight of your common sense.  There is a

23   bunch of information that has been brought up to you.  Is there

24   a claim?  Was there a failure of proof?  Is there substitution

25   of proof?

 1          But you don't need to lose your common sense because

 2   this case is a simple one.  There were lies.  The lies matter,

 3   and the defendant knew about them.

 4          Based on all the evidence that you have carefully

 5   observed, the government now respectfully requests that you

 6   return a verdict for plaintiff, the United States, that you

 7   assess damages up to the figure of $540,409.97, and that you

 8   find that 528 false placement reports were submitted to SBS.

 9          Thank you.

10          THE COURT:  Thank you, Ms. Schoenberger.

11          Members of the jury, we are going to now have a

12   30-minute break.  You have lunch back --

13          (off-the-record discussion)

14          THE COURT:  Members of the jury, this is important.

15          You cannot start your deliberations until you hear my

16   charge.  There is no point in having you sit around here.

17   Lunch will come in in about five minutes.  We'll come back

18   here -- it is now a quarter to 2:00 -- we'll come back here at

19   2:15.  I'll deliver my instructions.  After that, and subject

20   to any corrections, you can go back and begin your

21   deliberations.

22          Please do not discuss the case over lunch or before

23   lunch or after lunch, until we are ready.

24          (Off-the-record discussion)

25          THE COURT:  All right.  So you can now retire to the

1   jury room.  Ms. Jones will collect your books as you go out and

2   she will give them back to you when you return.

3           (Jury excused)

4           THE COURT:  Recess until 2:15.

5           (Luncheon recess)

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4nmusa4                     Charge

1    SEEDCO to present false or fraudulent requests for payment to

2    the New York City Department of Small Business Services and

3    that that money was to be paid in whole or in part from the

4    United States government.

5           Mr. Saavedra denies all these allegations.

6           First, you need to determine if Mr. Saavedra presented

7    or caused another to present a claim for payment.  The False

8    Claims Act is intended to reach any person who knowingly

9    assisted in causing the government to pay claims grounded in

10   fraud.  If you find that Mr. Saavedra presented or caused to be

11   presented claims for payment, you need to determine if at least

12   one of those claims was false or fraudulent.

13          If you find that at least one of those claims was

14   false or fraudulent, you must determine if Mr. Saavedra acted

15   knowingly using the three definitions of knowingly that I gave

16   to you before.

17          If you find that he acted knowingly, then you may find

18   him liable on the first category of claim.

19          If you find that the United States has not proved that

20   element by a preponderance of the evidence, you may find

21   Mr. Saavedra not liable to the United States on the first

22   category of claim.

23          There was testimony in the case that the New York City

24   Department of Small Business Services contracted with Charney

25   Research to verify the job placement data submitted by SEEDCO.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    The fact that a third-party verification service was utilized

2    does not by the mere fact of its use change the issues that you

3    have to decide regarding Mr. Saavedra's liability.  The

4    question is if he knowingly presented or caused to be presented

5    one or more false claims for payment to the Department of Small

6    Business Services with funds that ultimately came from the

7    United States.

8         Those are the terms applicable to the first category

9    of claim.

10        Do I need to repeat it?

11        OK.  The second category.  The same law in another

12   subsection provides that any person who . . .knowingly makes,

13   uses, or causes to be made or used, a false record or statement

14   material to a false or fraudulent claim is liable to the United

15   States."  Any person who knowingly makes, uses or causes to be

16   made or used a false record or statement material to a false or

17   fraudulent claim.

18        I have already defined "knowingly."  It is the same

19   definition, three categories, remember.

20        I've already defined what is a claim.  That is a

21   request for payment.

22        "False" and "fraudulent" have the same meaning.

23        So the United States alleges that Mr. Saavedra

24   knowingly made used or caused to be made or used false records

25   or statements that were material to false or fraudulent claims

 1          THE COURT:  We are going to swear the court's security

 2  officer now.

 3          JUROR:  One of our jurors takes Access-A-Ride.  If we

 4  don't come to a verdict by 4:45, we would like to --

 5          THE COURT:  We will deliberate until 4:45, and if

 6  there is no verdict today, you will start tomorrow at 10:00?

 7  Or start earlier?

 8          Would you poll the jury, Ms. Blackburn.

 9          JUROR:  10:00.

10          THE FOREPERSON:  Everybody is happy with 10:00.

11          THE COURT:  Go right to the jury room and stay in the

12  jury room without discussing the case until all eight of you

13  are assembled.  The court security officer will then report

14  what time it begins, but you needn't wait for me.  If there is

15  any question, you can address it to me, I'll be here, but you

16  needn't wait for me.  Be seated.  Remain in your seat.

17          (The court security officer was duly sworn)

18          THE COURT:  The court security officer will now

19  conduct the jury into the jury room.  You will be given some

20  note paper and a verdict form to Ms. Blackburn.  The jury may

21  begin deliberations.

22          (The jury left the courtroom at exactly 3:29 pm to

23  begin deliberations)

24          THE COURT:  Thank you, counsel.  Thank you, Jerry, and

25  thank you, Sam, for your assistance and cooperation in this

F4MJUSA5                    Charge

1   trial.  We are in recess.

2           (Recess)

3           (Court adjourned until Thursday, April 23, 2015, at

4   10:00 o'clock a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4NJUSAF                          Deliberations

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES of AMERICA,

4                    Plaintiff,

5             v.                              11 Civ. 6425 AKH

6   ALEX SAAVEDRA,

7                    Defendant.

8   ------------------------------x

9                                            April 23, 2015
                                             10:16 a.m.
10
    Before:
11
                        HON. ALVIN K. HELLERSTEIN,
12
                                             District Judge
13                                              and a jury

14

15                          APPEARANCES

16  PREET BHARARA,
          United States Attorney for the
17        Southern District of New York
    BY:  CARINA HYATT SCHOENBERGER,
18        JENNIFER ELLEN BLAIN,
          Assistant United States Attorneys
19
    LAW OFFICES OF BETTINA SCHEIN,
20        Attorneys for defendant
    BY:  BETTINA SCHEIN, Esq.
21        – and –
    LAW OFFICES OF ALAN S. FUTERFAS,
22  BY:  ALAN SAMUEL FUTERFAS, Esq.
                     Of counsel
23

24  Also Present:
          HARRY SOLOMON, Technical Support USAO
25        MARISA ALBERTI, Defense Paralegal & Technical Support

 1          (Deliberations resume)

 2          (In open court; jury not present)

 3          THE COURT:  Good morning, everyone.  Be seated,

 4     please.  So I have two notes, marked Court Exhibit 8 and Court

 5     Exhibit 9.  Court Exhibit 8 says Cyrille Blackburn is the

 6     foreperson, and she is number one.

 7          Exhibit No. 9 came in yesterday.  It doesn't have a

 8     date.  The jury wants to see -- it doesn't have a time, I

 9     mean -- it came in yesterday.  The jury wants to see J-7, L-7,

10     SSS, F-5, D-4, K-7, and Government Exhibits 3, 2, 71, 34, 22,

11     45 Page 2, 13 A Page 5.

12          I gather that you have collected those exhibits and

13     they're ready to be given to the jury?

14          MS. BLAIN:  Yes, your Honor.  Except for the

15     government's exhibit, I know the jury wants just Page 2 of 45

16     and Page 5 of 13 A, but we prepared to hand the jury all of 45

17     and all of 13 A.

18          THE COURT:  With consent?

19          MR. FUTERFAS:  I didn't know that, your Honor.  If I

20     can take a quick look.

21          (Off-the-record discussion)

22          MR. FUTERFAS:  Without objection.

23          THE COURT:  Okay, very well.  Please give it to

24     Ms. Jones.

25          The jury also asked for the testimony of Department of

 1   Investigator Sung, the testimony of William Harper, the

 2   cross-examination of Saavedra.  I will tell the jury they can't

 3   have that.  If there is anything in the testimony which they

 4   can't recall or about which they're debating, they can ask for

 5   something specific, and we'll respond to it, but they will not

 6   get globs of the testimony.  That was their job at the trial,

 7   and they can have their mutual recollections aided.

 8              MR. FUTERFAS:  Your Honor, respectfully, we object.

 9   They asked for a read-back.  The government and the defense

10   actually prepared transcripts to send to them.  If your Honor

11   doesn't wish to do that, we certainly would request a

12   read-back.  Harper was read --

13              THE COURT:  Overruled.  Overruled.

14              MR. FUTERFAS:  Thank you.

15              MS. SCHEIN:  May I hand these up?

16              THE COURT:  What are those?

17              MS. SCHEIN:  These are our exhibits the jury

18   requested.

19              THE COURT:  You have one copy of each?

20              MS. SCHEIN:  We put in four copies.

21              MS. BLAIN:  Two copies.  I thought we were instructed

22   to give two copies of each exhibit and I believe and four

23   copies of the transcript, which we are now not giving them the

24   transcript, obviously, but we have given them two copies of the

25   government's exhibits, and I guess the defense has given them

1    four copies of the defense exhibits.

2            MS. SCHEIN:  We prepared four copies of the exhibits

3    and two copies of the transcripts.

4            THE COURT:  Take out two copies, please.  There should

5    be two copies of each exhibit.

6            (Pause)

7            THE COURT:  Have you got two copies of each now?

8            MS. SCHEIN:  Yes, I do.

9            MS. BLAIN:  Your Honor, we have a suggestion, if we

10   may.  We see a possible confusion for the jury if they actually

11   have two copies of each document because they could start to

12   think that the two copies are actually two different e-mails

13   when they start to think about the evidence and get confused.

14   I just don't want them to be confused, obviously.

15           THE COURT:  Let me see the exhibits.

16           MR. FUTERFAS:  Your Honor, there is no issue of

17   confusion.  Every document is labeled with an exhibit, but

18   there are eight jurors, so to have one document passed around

19   amongst eight people, I think for efficiency's sake they should

20   have a few copies of each exhibit, clearly marked as to what

21   they are.

22           THE COURT:  The purpose of deliberation is discussion

23   and persuasion, not separate reading.  Juries have to function

24   together.  If there is one document, someone will read it and

25   the others will discuss it, and that is what I want.  The more

 1   copies, the less discussion.

 2          The government's concern about confusion is misplaced.

 3   Each document is clearly labeled.

 4          (Pause)

 5          THE COURT:  Bring in the jury, please.

 6          MR. FUTERFAS:  Your Honor, before we do that, I am

 7   sorry, but we are concerned.  Your Honor instructed the jury

 8   that they could ask for testimony to be read back.

 9          THE COURT:  Did you just make that objection, Mr.

10   Futerfas?

11          MR. FUTERFAS:  I did, your Honor.

12          THE COURT:  And what did I do?

13          MR. FUTERFAS:  Your Honor denied the objection.

14          (The jury entered the courtroom at exactly 10:25 am)

15          THE COURT:  Good morning, everyone.

16          So you've given me two notes.  The first announces

17   that as Cyrille Blackburn is the foreperson.  Congratulations,

18   Ms. Blackburn.

19          The second is a request to see various things.  Both

20   notes were given to me yesterday.  Please date and time the

21   notes as well.

22          THE FOREPERSON:  Time the notes?

23          THE COURT:  Please date them.

24          THE FOREPERSON:  What is at the top?

25          THE COURT:  Just 4-22-15.  There is no problem from

1   now on.  You want to see various exhibits, J-7, L-7, SSS, F-5,

2   D-4, K-7.  Those are defendant's exhibits.

3          The Government Exhibits 3, 2, 71, 34, 22, 45 Page 2.

4   We are giving you the whole page.  And 13 A Page 5.  We are

5   giving you the entire exhibit.

6          We have two copies of each for you.  Please give them

7   to Ms. Blackburn.

8          THE FOREPERSON:  Thank you.

9          THE COURT:  You also asked for the testimony of DOI

10  Sung, the testimony of Harper, the cross-examination of Mr.

11  Saavedra's testimony.  I am not going to give you those.  The

12  purpose of the trial is to give you all this evidence.  If

13  there is something specific that you can't recall or that

14  you're debating about, let me know what that specific item is

15  and we'll send that back to you.

16         We are not sending back globs of testimony, okay?

17  Thanks very much.  Continue your deliberations.

18         (The jury left the courtroom at exactly 10:30 am to

19  continue deliberations)

20         THE COURT:  Thank you.

21         (Recess)

22         (Luncheon recess)

23         (Continued on next page)

24

25

F4NJUSAF                    Deliberations

1            AFTERNOON SESSION

2            3:25 pm

3            (Deliberations resume)

4            (In open court; jury not present)

5            THE COURT:  Be seated, please.

6            I received a letter in chambers from Mr. Futerfas,

7    requesting that I advise the jury that they are entitled to a

8    read-back of the specific portions of Mr. Harper's testimony or

9    any other witness and that they may request to have portions of

10   the trial transcript made available to them, and there are some

11   reasons for it.

12           I received a letter from the government opposing that

13   as unnecessary and prejudicial.

14           I put the following endorsed order on ECF:

15           "Motion denied.  Counsel may not choose to supplement

16   his summation.  The jury was instructed as to its right to ask

17   for rereadings."

18           I have and marked Exhibit 10 the following note:

19           "We are ready with a verdict, signed Cyrille

20   Blackburn, April 23, 2015, 3:00 pm."

21           Any reason not to bring in the jury?

22           MS. SCHOENBERGER:  No, your Honor.

23           MS. SCHEIN:  No, your Honor.

24           (The jury returned to the courtroom at exactly 3:27

25   pm)

F4NJUSAF                    Deliberations

1          THE COURT:  Good afternoon, ladies and gentlemen.  Be

2     seated, everyone.  I have the following note:

3          "We are ready with a verdict.  Signed, Cyrille

4     Blackburn, April 23, 2015, 3:00 pm."

5          We have marked it as court Exhibit No. 10.  Will the

6     Clerk please take the attendance of the jury.

7          (Jury attendance taken; all jurors present)

8          THE CLERK:  All jurors are present.

9          THE COURT:  The Clerk will please recover the verdict

10    from Ms. Blackburn and approach.

11         (Pause)

12         THE COURT:  Return it, please, to Ms. Blackburn.

13         THE CLERK:  Will the foreperson please rise.

14         How do you find on Claim 1, for the plaintiff the

15    United States or for the defendant Mr. Saavedra?

16         THE FOREPERSON:  For the plaintiff, the United States.

17         THE CLERK:  How do you find on Claim 2, for the

18    plaintiff the United States or for the defendant Mr. Saavedra?

19         THE FOREPERSON:  For the plaintiff, the United States.

20         THE CLERK:  If you found for the plaintiff in answer

21    to either or both questions one and two above, in what amount,

22    if any, was the plaintiff damaged?

23         THE FOREPERSON:  $13,000.

24         THE CLERK:  If you found for the plaintiff in answer

25    to Question 2 above, how many material false records or

```
 1    statements, if any, did the defendant knowingly cause to be

 2    made or used?

 3              THE FOREPERSON:  13.

 4              THE COURT:  Please show the verdict to the counsel.

 5    Thank you, Ms. Blackburn.

 6              (Pause)

 7              THE COURT:  Does counsel wish the jury to be polled?

 8              MS. SCHOENBERGER:  No, your Honor.

 9              MS. SCHEIN:  No, your Honor.

10              THE COURT:  Is there any reason not to discharge the

11    jury?

12              MS. SCHOENBERGER:  No, your Honor.

13              MS. SCHEIN:  No, your Honor.

14              THE COURT:  You are finished.  I want to thank you

15    very much for your service, four intense days plus a day of

16    deliberation, and you did your job.  You were partners in

17    delivery of justice in this Court.  It is an interesting job.

18    I don't know if you had it before.  You can't make a living out

19    of it, but once in a while it is good to serve, and I thank you

20    very much for your service.

21              As I mentioned before, what goes on and what went on

22    in the jury room is something that is private to you.  There is

23    no rule announcing whether you can or cannot discuss this with

24    anyone else.  You are free.  You not bound by the rule.  In the

25    absence of rule, you are free to discuss this with anyone you
```