# 15-2307

*To Be Argued By*:
ELLEN BLAIN

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 15-2307

➤◀◆▶◀

UNITED STATES OF AMERICA,

*Intervenor-Plaintiff-Appellee,*

ABC, STATE OF NEW YORK, EX REL. JOHN DOE,
UNITED STATES OF AMERICA, EX REL. JOHN DOE,

*Plaintiffs,*

(*Caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR INTERVENOR-PLAINTIFF-APPELLEE

PREET BHARARA,
*United States Attorney for the
Southern District of New York,
Attorney for Intervenor-
Plaintiff-Appellee.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2743

ELLEN BLAIN,
CHRISTOPHER CONNOLLY,
*Assistant United States Attorneys,
Of Counsel.*

—v.—

ALEX SAAVEDRA,

*Intervenor-Defendant-Appellant*,

SHOMARI GREENE, ALAN KATZ, TAGEWATEE
CHANDARPAUL, SHANDELL SANTIAGO-VELEZ,
MITCHELL McCLINTON, MONIQUE TARRY,

*Intervenor-Defendants*,

DEF, STRUCTURED EMPLOYMENT ECONOMIC
DEVELOPMENT CORPORATION,

*Defendants*.

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . 2

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . 4

Issues Presented For Review . . . . . . . . . . . . . . . . . . 4

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . 5

    A.   Procedural History . . . . . . . . . . . . . . . . . . . . . 5

    B.   Factual Background . . . . . . . . . . . . . . . . . . . . 7

        1.   The Workforce Investment Act . . . . . . . 7

        2.   SEEDCO's Operation of Workforce1 Centers and SBS's Performance Payments to SEEDCO . . . . . . . . . . . . . . 8

        3.   SEEDCO's Submission of False Placement Information to SBS . . . . . . 13

        4.   Saavedra's Participation in the Fraud   15

    C.   The District Court's Jury Instructions . . . 17

        1.   The District Court's Instruction on the Definition of "Claim" . . . . . . . . . . . . . . 18

        2.   The District Court's Instruction Regarding Charney Research . . . . . . . 20

    D.   The Jury's Request for Trial Transcripts and Its Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

PAGE

E. The Court's Imposition of Damages, Costs
and Penalties. . . . . . . . . . . . . . . . . . . . . . . . 21

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . 22

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Standards of Review . . . . . . . . . . . . . . . . . . . . . . . 24

POINT I—Saavedra Waived Any Evidentiary
Challenge to the Jury's Verdict By Failing to
Renew His Motion For Judgment as a Matter
of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

A. Saavedra Failed to Move Pursuant to Federal
Rule of Civil Procedure 50(b) Following the
Entry of Judgment . . . . . . . . . . . . . . . . . . . 26

B. The Evidence Supports the Jury's Verdict    30

1. The Government Presented Evidence
that Saavedra Submitted False Claims to
the Government. . . . . . . . . . . . . . . . . . . 30

a. Saavedra's Staff Submitted False
Placements through WorkSource1  31

b. SEEDCO's False Placement
Information Was Included in SBS's
Internal Calculations . . . . . . . . . . 32

2. The Government Presented Evidence
that Saavedra Caused a False Record or
Statement Material to a False Claim to
be Submitted to the Government . . . . 35

C. The Government Did Not Bring a Claim Based on a "Certification Theory" . . . . . . . 36

POINT II—The District Court Correctly Charged the Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

A. The District Court Correctly Instructed the Jury on the Definition of "Claim" Under the FCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B. The District Court Properly Instructed the Jury Concerning the Role of Charney Research . . . . . . . . . . . . . . . . . . . . . . . . . . 40

POINT III—The District Court Properly Exercised Its Discretion In Declining to Provide the Jury With Full Transcripts of the Testimony of Two Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

POINT IV—The District Court Correctly Assessed Damages and Penalties . . . . . . . . . . . . . . . . . . . 43

A. The False Claims Act Imposes Treble Damages, Penalties, and Costs . . . . . . . . . 43

B. The District Court Correctly Trebled Damages Pursuant to the FCA . . . . . . . . . 45

C. The District Court Did Not Abuse Its Discretion in Calculating Penalties . . . . . . 49

1. The District Court Did Not Abuse Its Discretion By Imposing the Maximum Penalties . . . . . . . . . . . . . . . . . . . . . . . . 49

PAGE

   2.   The District Court Did Not Abuse Its
Discretion By Multiplying the Maximum
Penalty Amount by the Number of False
Statements . . . . . . . . . . . . . . . . . . . . . .  50

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

# TABLE OF AUTHORITIES

*Cases*:

*Anderson v. Branen,*
   17 F.3d 552 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . 39

*Bank of China, New York Branch v. NBM LLC,*
   359 F.3d 171 (2d Cir. 2004) . . . . . . . . . . . . . . . . 39

*BE&K Const. Co. v. Will & Grundy Ctys. Bldg.*
   *Trades Council,*
   156 F.3d 756 (7th Cir. 1998) . . . . . . . . . . . . . . . . 39

*BMY–Combat Systems Div. of Harsco Corp. v.*
   *United States,*
   44 Fed. Cl. 141 (Fed. Cl. 1999) . . . . . . . . . . . . . . 44

*Christopher v. Cutter Labs.,*
   53 F.3d 1184 (11th Cir. 1995) . . . . . . . . . . . . . . . 39

*Coleman v. Hernandez,*
   490 F. Supp. 2d 278 (D. Conn. 2007) . . . . . . . . . . 44

*Cone v. W. Va. Pulp & Paper Co.,*
   330 U.S. 212 (1947) . . . . . . . . . . . . . . . . . . . . . 28, 29

*Girden v. Sandals Int'l,*
   262 F.3d 195 (2d Cir. 2001) . . . . . . .   25, 38, 39, 40

*Hudson v. United States,*
   522 U.S. 93 (1997) . . . . . . . . . . . . . . . . . . . . . . . . 50

*Jacques v. DiMarzio, Inc.,*
   386 F.3d 192 (2d Cir. 2004) . . . . . . . . . . . . . . 28, 29

PAGE

*Jarvis v. Ford Motor Co.,*
    283 F.3d 33 (2d Cir. 2002) . . . . . . . . . . . . . . . 26, 37

*Lavoie v. Pac. Press & Shear Co.,*
    975 F.2d 48 (2d Cir. 1992) . . . . . . . . . . . . . . . . . 38

*Ortiz v. Jordan,*
    131 S. Ct. 884 (2011). . . . . . . . . . . . . . . . . . . . 24, 28

*Pahuta v. Massey-Ferguson, Inc.,*
    170 F.3d 125 (2d Cir. 1999) . . . . . . . 24, 28, 29, 30

*Railway Logistics Int'l v. U.S.,*
    103 Fed. Cl. 252 (2012) . . . . . . . . . . . . . . . . . . . . 53

*Rainwater v. United States,*
    356 U.S. 590 (1958). . . . . . . . . . . . . . . . . . . . . . . 52

*S.E.C. v. Rosenthal,*
    426 F. App'x 1 (2d Cir. 2011) . . . . . . . . . . . . . . . 49

*SEC v. Pentagon Capital Mgmt. PLC,*
    725 F.3d 279 (2d Cir. 2013) . . . . . . . . . . . . . . . . 26

*Singer v. Olympia Brewing Co.,*
    878 F.2d 596 (2d Cir. 1989) . . . . . . . . . . . . . . . . 47

*Snyder v. New York State Educ. Dep't,*
    486 F. App'x 176 (2d Cir. 2012) . . . . . . . . . . . 25, 38

*Townsend v. Bayer Corp.,*
    774 F.3d 446 (8th Cir. 2014) . . . . . . . . . . . . . . . . 50

*U.S. ex rel. Eisenstein v. City of New York,*
    540 F.3d 94 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 53

*U.S. ex rel. Eisenstein v. City of New York,*
    556 U.S. 928, 129 S. Ct. 2230 (2009) . . . . . . . . . . 53

PAGE

*United States ex rel. Feldman v. Van Gorp,*
    697 F.3d 78 (2d Cir. 2012) . . . . . . . .  26, 46, 47, 48

*United States ex rel. Longhi v. Lithium Power*
    *Techs., Inc.,*
    575 F.3d 458 (5th Cir. 2009) . . . . . . . . . . . . . . . 46

*United States ex rel. Purcell v. MWI Corp.,*
    15 F. Supp. 3d 18 (D.D.C. 2014) . . . . . . . . . . . . 44

*United States ex rel. Schwedt v. Planning*
    *Research Corp.,*
    59 F.3d 196 (D.C. Cir. 1995). . . . . . . . . . . . . . . 51

*United States v. Alfisi,*
    308 F.3d 144 (2d Cir. 2002) . . . . . . . . . . . . . 38, 39

*United States v. Bonito,*
    57 F.3d 167 (2d Cir. 1995) . . . . . . . . . . . . . . 38, 39

*United States v. Bornstein,*
    423 U.S. 303 (1976). . . . . . . . . . . . .  40, 48, 51, 52

*United States v. Cossey,*
    632 F.3d 82 (2d Cir. 2011) . . . . . . . . . . . . . . . . 25

*United States v. Criollo,*
    962 F.2d 241 (2d Cir. 1992) . . . . . . . . . . . . . 41, 42

*United States v. Karron,*
    750 F. Supp. 2d 480 (S.D.N.Y. 2011) . . . . . . . . . 46

*United States v. Lisyansky,*
    806 F.3d 706 (2d Cir. 2015) . . . . . . . . . . . . . . . 37

PAGE

*United States v. Mastellone*,
　No. 10 Civ. 7374 (DLC), 2011 WL 4031199
　(S.D.N.Y. Sept. 12, 2011) . . . . . . . . . . . . . . . . . . . 44

*United States v. McElroy*,
　910 F.2d 1016 (2d Cir. 1990) . . . . . . . . .　26, 41, 42

*United States v. Medina*,
　944 F.2d 60 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . 39

*United States v. Neifert-White Co.*,
　390 U.S. 228 (1968). . . . . . . . . . . . . . . . . . . . . . 51, 52

*United States v. Rogan*,
　517 F.3d 449 (7th Cir. 2008) . . . . . . . . . . . . . . . . 53

*United States v. Ruffin*,
　129 F.3d 114 (2d Cir. 1997) . . . . . . . . . . . . . 42, 44

*United States v. Salameh*,
　152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . 41

*United States v. Zan Mach. Co.*,
　803 F. Supp. 620 (E.D.N.Y. 1992) . . . . . . . . . . . . 52

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
　546 U.S. 394 (2006). . . . . . . . . . . . . . . . . . . . . . 28, 29

*Varda, Inc. v. Ins. Co. of N. Am.*,
　45 F.3d 634 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . 28

*Vermont Agency of Natural Res. v.*
　*U.S. ex rel. Stevens*,
　529 U.S. 765 (2000). . . . . . . . . . . . . . . . . . . . . . . . 53

*Zeno v. Pine Plains Cent. Sch. Dist.*,
　702 F.3d 655 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 30

PAGE

*Statutes*:

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

29 U.S.C. § 2801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

31 U.S.C. § 3729(a) . . . . . . . . . . . . . . . . . . . . . . . . 22, 51

31 U.S.C. § 3729(a)(1) . . . . . . . . . . . . . . 21, 31, 43, 44

31 U.S.C. § 3729(a)(1)(B) . . . . . . . . . . . . . . . . . . . 3, 17

31 U.S.C. § 3729(a)(3) . . . . . . . . . . . . . . . . . . . . . . . 44

31 U.S.C. § 3729(b)(2) . . . . . . . . . . . . . . 8, 19, 38, 39

31 U.S.C. § 3729(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . 33

31 U.S.C. § 3729(b)(4) . . . . . . . . . . . . . . . . . . . . . . . 37

31 U.S.C. § 3730(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

31 U.S.C. §§ 3729(a)(1)(A) . . . . . . . . . . . . . . 2, 17, 41

31 U.S.C. §§ 3729-3733 . . . . . . . . . . . . . . . . . . . . . . . 6

*Rules*:

Fed. R. Civ. P. 50(a) . . . . . . . . . . . . . . . . . . 17, 27, 30

Fed. R. Civ. P. 50(a)(1) . . . . . . . . . . . . . . . . . . . . . . . 27

Fed. R. Civ. P. 50(a)(2) . . . . . . . . . . . . . . . . . . . . . . . 27

Fed. R. Civ. P. 50(b) . . . . . . . . . . . . . . . . . . . . . . . *passim*

x

*Regulations*:

28 C.F.R. § 85.3(a)(9) . . . . . . . . . . . . . . . . . . . . . . 22, 44

*Other Authorities*:

10 Bus. & Com. Litig. Fed. Cts. § 118:40 . . . . . . . . . 38

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
### Docket No. 15-2307

———

UNITED STATES OF AMERICA,

*Intervenor-Plaintiff-Appellee,*

ABC, STATE OF NEW YORK, EX REL. JOHN DOE, UNITED
STATES OF AMERICA, EX REL. JOHN DOE,

*Plaintiffs,*

—v.—

ALEX SAAVEDRA,

*Intervenor-Defendant-Appellant,*

SHOMARI GREENE, ALAN KATZ, TAGEWATEE
CHANDARPAUL, SHANDELL SANTIAGO-VELEZ,
MITCHELL MCCLINTON, MONIQUE TARRY,

*Intervenor-Defendants,*

DEF, STRUCTURED EMPLOYMENT ECONOMIC
DEVELOPMENT CORPORATION,

*Defendants.*

———

## BRIEF FOR INTERVENOR-PLAINTIFF-APPELLEE

## Preliminary Statement

The jury in this matter determined that the United States proved, by a preponderance of the evidence, that intervenor-defendant-appellant Alex Saavedra knew that his staff lied to New York City in order to receive federal funds, and found Saavedra liable under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729(a)(1)(A) & (B). The evidence was overwhelming, the verdict was clear, and the resulting judgment should be affirmed.

The evidence introduced at trial proved that Structured Economic Employment Development Corporation ("SEEDCO") received funding from the federal government to help place unemployed New Yorkers in jobs. Saavedra, the Director of SEEDCO's two career centers, knew that his staff routinely reported to New York City, and ultimately to the federal government, that SEEDCO helped place people in jobs when, in fact, SEEDCO had not.

At trial, the jury heard former SEEDCO employees admit that they systematically falsified job placement information. The jury also heard testimony that Saavedra encouraged this practice, that the New York City Department of Investigation ("DOI") investigated and uncovered this practice, and that once New York City and the federal government learned about the fraud, SEEDCO lost its federal funding. After seven days of testimony, the jury returned a verdict of liable, finding that Saavedra submitted, or caused to be submitted, both false claims for payment, pursuant to 31 U.S.C. § 3729(a)(1)(A), and false records or statements material to false

claims for payment, pursuant to 31 U.S.C. § 3729(a)(1)(B).

Saavedra does not challenge the jury's conclusion that the fraud happened. Nor does Saavedra challenge the jury's conclusion that he knew about the fraud. Instead, he claims that that the district court's judgment should be vacated, and a new trial should be ordered, owing to what are mostly purported procedural defects. His arguments, however, are without merit.

Saavedra claims that the Government failed to present evidence sufficient to establish his liability under the FCA. But Saavedra waived any objections to the evidentiary basis for the jury's verdict because, following the entry of judgment, he failed to renew his motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. Accordingly, this Court may only consider Saavedra's evidentiary claims if it were to find that the jury's verdict is wholly without legal support—a high standard that Saavedra cannot come close to meeting. Indeed, there was more than sufficient evidence in the record supporting the jury's finding that Saavedra was liable under the FCA.

Saavedra also challenges two jury instructions given by the district court (Alvin K. Hellerstein, J.). Those challenges likewise fail. The district court correctly instructed the jury on the definition of the term "claim" by using the definition provided by the False Claims Act itself. The district court also correctly instructed the jury on the role of a third-party auditor

in assessing the accuracy of SEEDCO's claims that it had placed unemployed people in jobs.

Saavedra's remaining arguments are also without merit. He faults the district court for refusing to provide the jury with entire transcripts of the testimony of two witnesses, but the district court properly exercised its discretion by instructing the jury to instead request specific portions of that voluminous testimony. Furthermore, the district court properly trebled the damages determined by the jury, as required by the False Claims Act. Finally, given the evidence of the vast scope of the fraud, as well as Saavedra's refusal to accept responsibility for his participation in the fraud following the jury's verdict, the district court properly exercised its discretion by imposing the maximum civil penalties.

## Jurisdictional Statement

The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730(a). The jury returned a verdict on April 23, 2015, and the district court entered judgment on June 18, 2015. Saavedra filed a notice of appeal on July 17, 2015. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## Issues Presented For Review

1. Whether Saavedra waived his challenges to the evidentiary basis for the jury verdict by failing to renew his motion for judgment as a matter of law following the entry of judgment, and, even if he had not

waived those challenges, the evidence at trial supported the jury's verdict.

2. Whether the district court correctly instructed the jury on the definition of the term "claim" by using the definition provided by the False Claims Act.

3. Whether the district court correctly instructed the jury that the failure of the third-party auditor to discover the fraud does not relieve Saavedra of liability for perpetrating the fraud.

4. Whether the district court properly exercised its discretion by declining the jury's request for the entire transcripts of the testimony of two witnesses, and instead instructing the jury to identify specific portions of the testimony it wished to review.

5. Whether the district court correctly trebled the damages determined by the jury as mandated by the False Claims Act.

6. Whether the district court properly exercised its discretion by imposing the maximum civil penalty in this case, where the evidence at trial demonstrated that Saavedra oversaw the fraudulent scheme for at least three years, and where Saavedra refused to accept responsibility for his role in the fraud even after the jury returned a verdict against him.

## Statement of the Case

### A. Procedural History

This matter arose from a complaint filed in the Southern District of New York under docket number 11 Civ. 6425, on September 14, 2011, by relator Wil-

liam Harper, under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733. (Intervenor-Defendant-Appellant's Appendix ("DA") 5). On May 22, 2012, the Government filed an intervenor complaint against SEEDCO, Saavedra, and six other SEEDCO employees. (DA 5).

On December 18, 2012, the district court entered a stipulation and order of settlement and release between the Government and SEEDCO, in which SEEDCO admitted that it submitted false placement information to the City of New York, and agreed to pay the Government $1,000,000. (DA 7; Dist. Ct. ECF Nos. 27-29). Thereafter, the Government entered into stipulations and orders of settlement and release with two defendant SEEDCO employees, in which the employees admitted to, and accepted responsibility for, participating in submitting false placement information, and paid settlement amounts to the Government. (DA 9-10; Dist. Ct. ECF Nos. 51, 52).

On February 11, 2013, the Government filed an amended intervenor complaint against the remaining defendants, including Saavedra. (DA 27-64). The Government subsequently entered into stipulations of settlement and release with all remaining defendants save Saavedra, in which those defendants admitted to, and accepted responsibility for, participating in submitting false placement information, and paid settlement amounts to the Government. (DA 11-12; Dist. Ct. ECF Nos. 63-65, 73).

The district court denied Saavedra's motions to dismiss the Government's amended complaint and for summary judgment. (DA 19, 68). The case was then

tried to a jury between April 14, 2015, and April 23, 2015. (DA 1036). The jury found that Saavedra submitted or caused to be submitted to the Government false claims, as well as false records or statements material to false claims. (DA 682). On June 16, 2015, the district court imposed civil penalties on Saavedra. (DA 25-26). Judgment was entered on June 18, 2015. (DA 26).

## B. Factual Background

### 1. The Workforce Investment Act

Through the Workforce Investment Act of 1998, 29 U.S.C. § 2801 *et seq.* ("WIA"), the federal government provides funding to states to, among other things, establish career centers designed to help place unemployed and underemployed persons in jobs. (DA 74, 317). New York delegates responsibility for the management and oversight of such career centers to localities, including New York City. (DA 75, 173). The localities, in turn, contract with vendors that operate the career centers. (DA 75, 172-73, 177).

To fund the career centers, the United States Department of Labor ("US DOL") enters into yearly funding agreements with the New York State Department of Labor ("NYS DOL"). (DA 75, 317-23). Those agreements state that "[f]unds provided under this grant agreement must be expended in accordance with all applicable federal statutes, regulations and policies, including those of the [WIA]." (DA 75). Additionally, NYS DOL executes annual "Standard Assurances and Certifications," which provide that New York "will comply with all applicable require-

ments of all other Federal laws, executive orders, regulations and policies governing this program." (DA 75, 312-23).

New York City's Division of Small Business Services ("SBS") administers the WIA program in New York City on behalf of NYS DOL. (DA 75, 172-73, 177). SBS contracts with vendors to operate the career centers, which are known in New York City as "Workforce1 Career Centers," and pays the vendors who operate the centers with funds received from US DOL. (DA 75-78, 173). SBS also determines the annual job placement goals for the vendors who operate the career centers. (DA 76, 180-81).

SBS and NYS DOL are "contractor[s], grantee[s], or other recipient[s]" of federal funds that are "to be spent or used . . . to advance a Government program." 31 U.S.C. § 3729(b)(2). (DA 78). A grantee under the WIA program that makes false reports is not in compliance with the terms and conditions of the WIA program and risks losing federal funds. (DA 325-27). Thus, reports from NYS DOL to US DOL based on false data would jeopardize New York's receipt of funds through the WIA program. (DA 319-27).

## 2. SEEDCO's Operation of Workforce1 Centers and SBS's Performance Payments to SEEDCO

SEEDCO is a private corporation that receives funding from the federal government and private sources to, among other things, provide job training and job placement assistance. (DA 76). In 2004, SEEDCO contracted with SBS to operate a Work-

force1 Career Center in Upper Manhattan. (DA 76). In January 2011, SEEDCO contracted with SBS to operate a second Workforce1 Career Center in the Bronx. (DA 76). The contracts between SEEDCO and SBS (the "Contracts") provide that the Workforce1 Career Centers' operation and funding are intended "to provide workforce investment activities that increase the employment, retention and earnings of participants," consistent with the goals of the WIA. (DA 76, 705).

From 2009 through 2011, the Contracts provided that SEEDCO was eligible to receive approximately $4 million per year. (DA 392). SEEDCO received 70% of its annual funding to cover operating costs. (DA 179-80). SEEDCO could receive the remaining 30% based on its performance. (DA 179-80).[1] To measure SEEDCO's performance, SBS devised "performance milestones." (DA 180, 835). One of those performance milestones was SEEDCO's number of "total job placements," *i.e.*, the number of individuals SEEDCO assisted in securing jobs or obtaining promotions or additional hours at currently-held jobs. (DA 125-27, 180-81, 835). The closer SEEDCO came to meeting a performance milestone, the more federal funds it was entitled to receive. (DA 179-81, 835).

SEEDCO reported its performance to SBS by entering information into a live database managed by SBS known as "WorkSource1." (DA 181-82, 191). The information entered into WorkSource1 included the

_____

[1] In 2011, the reimbursement percentages changed to 80% and 20%, respectively. (DA 262).

client's contact information, work history, and a de-
scription of the services he or she received from
SEEDCO, as well as information concerning any new
job, or promotion at a preexisting job, that the client
obtained after receiving services from SEEDCO.
(DA 191). SBS examined the data in WorkSource1
"on a daily, weekly, monthly, [and] quarterly basis"
(DA 191-94), and used the data to determine if
SEEDCO was meeting its performance milestones,
including its job placement targets (DA 195-98). The
information that SEEDCO entered into WorkSource1
was the only documentation that it provided to SBS
concerning its performance. (DA 201-02). Indeed, SBS
considered WorkSource1 to be the "system of record,"
and relied solely on the data in WorkSource1 to moni-
tor SEEDCO's job placement performance. (DA 181-
82, 194-95).

At the end of each quarter, SBS tested the infor-
mation SEEDCO entered into WorkSource1 by ex-
tracting from the database a list of clients whom
SEEDCO claimed to have placed in jobs (known as a
"roster"). (DA 197-99). SBS provided that roster to an
outside consultant, Charney Research, which in turn
contacted a statistically significant sample of individ-
uals on the roster in an attempt to verify the job
placement information that SEEDCO staff had en-
tered into WorkSource1. (DA 198-201).[2]

_____

[2] Saavedra claims that Charney Research "veri-
fied" every placement that SEEDCO entered in
WorkSource1, and that Saavedra "knew that all job
placements entered into WorkSource1 were verified

SBS paid SEEDCO based on both the total number of job placements SEEDCO claimed and Charney Research's statistical analysis of those claimed placements. Specifically, after Charney Research reported the results of its validation process to SBS, SBS entered those results into a performance milestone chart to determine what percentage of each milestone payment SEEDCO was entitled to receive. (DA 202, 835, 908-12). For example, for the job placement milestone, the Contracts provide, in relevant part:

| Percentage Validated | Payment Adjustment |
|---|---|
| 75-100% | 100% |
| 50-74% | 75% |
| Less than 50% | 0% |

| Quarterly Placement Targets | Reported Placements | Milestone Amount | Max Payment Possible | Percentage Validated | Payment Adjustment | Payment Total |
|---|---|---|---|---|---|---|
| 200 | 150 | $93,519 | $70,139 | 60% | 75% | $52,604 |

by Charney Research," apparently suggesting that Saavedra could not knowingly have been engaged in fraudulent placement practices. Intervenor-Defendant-Appellant's Brief ("Def. Br.") 7. But Craig Charney, the founder of Charney Research, testified that his firm did not actually contact every person on the roster. (DA 516-20). In any event, the jury heard Saavedra testify about his understanding of Charney Research's work, and nevertheless found that Saavedra knowingly submitted or caused to be submitted false claims to the Government. (DA 682).

| | 75% of Target | | 75% of Milestone | Based on Charney Results | Based on Table above | 75% of Max Possible |
|---|---|---|---|---|---|---|

(DA 835). Thus, if SBS set a quarterly job placement target of 200 individuals, SEEDCO could receive a maximum payment of $93,519 for meeting this milestone. (DA 835).[3] If SEEDCO claimed to place 150 individuals, or 75% of the placement target, SEEDCO would be entitled to a maximum payment of 75% of $93,519 ($70,139). (DA 835). If Charney Research then verified 60% of those 150 claimed placements, SEEDCO would be entitled to 75% of the $70,139 ($52,604). (DA 835). As a result, SEEDCO's performance payments were based on both the total number of job placements it claimed to have made, as well as Charney Research's statistical sampling of that number. (DA 835). Accordingly, the more individuals SEEDCO claimed to place, the more federal funds SEEDCO was potentially entitled to receive. (DA 835).

Based on the total number of placements entered into WorkSource1, as well as Charney Research's statistical testing of WorkSource1 data, SBS made per-

---

[3] While the milestone numbers changed throughout the life of the Contracts, the percentage calculations remained consistent. (DA 262, 272-73).

formance payments to SEEDCO on a quarterly basis. (A 835).[4]

### 3. SEEDCO's Submission of False Placement Information to SBS

From 2009 to 2011, Saavedra served as Director of SEEDCO's Workforce1 Centers in Upper Manhattan and the Bronx. (DA 74). During that time, SEEDCO falsely claimed to have placed hundreds of clients in jobs. (DA 684-93; Intervenor-Plaintiff-Appellee Appendix ("PA") 3-5, 62, 74).

SEEDCO carried out this fraud by entering false information into the WorkSource1 database. Typically, during a client's first visit to a Workforce1 Center, he or she would complete a Customer Information Form ("CIF"), and a SEEDCO intake department staff member would then enter the information on the CIF into WorkSource1. (DA 149-51). The CIF included a field for "work history," which called for the client's past and current employment information. (DA 149-51; PA 21). But the CIF did not include a field to record a job or promotion obtained after the client's initial intake. (DA 149-51; PA 21). Instead,

_____

[4] Saavedra's argument that an SBS witness "agreed that 'each claim was subject to validation process by Charney Research,'" Def. Br. 20-21 (quoting DA 311), mischaracterizes the testimony. As the entirety of the witness's testimony makes clear, Charney Research sampled only a portion of claimed placements, and SBS paid for placements even if they were not validated. (DA 202).

when a client obtained a job or promotion after receiving SEEDCO services, staff in SEEDCO's Recruitment and Placement department ("R&P") completed an Employment Information Form ("EIF") identifying the new job or promotion, and then entered that information into WorkSource1 as a "placement." (DA 151, 153). Thus, in the normal course, because intake staff only processed CIFs, they would not record placements; R&P staff, by contrast, would only handle EIFs and therefore would be responsible for entering all placements into Work-Source1. (DA 153-54; PA 79-80).

SEEDCO staff used information from CIFs to fabricate job placements. (A 688-89). Instead of entering a job candidate's current or prior employment information into WorkSource1 as "work history," Saavedra's staff would enter that information into the database as a "placement." (PA 17-18, 24, 34-43, 52-57, 72-80, 86-91; DA 345-50, 359-61, 688-89). Specifically, after a client filled out a CIF, Saavedra's intake department gave the CIF to the R&P department, which then changed the dates of the client's employment or promotion to make it appear that the client had obtained the employment or promotion after receiving services from SEEDCO. (PA 17-18, 24, 34-43, 52-57, 72-80, 86-91; DA 345-50, 359-61, 688-89). These false placements created the appearance that SEEDCO was achieving the job placement goals set by SBS. (PA 34, 36-37, 54-55, 88, 90-91).

In early 2011, SEEDCO employee William Harper uncovered this fraudulent scheme. (DA 466-67). Thereafter, SBS learned of Harper's allegations, and

on August 8, 2011, SBS referred the matter to the New York City DOI. (DA 685). DOI reviewed the Contracts, SBS policies, SBS email communications, SEEDCO email communications, information in WorkSource1, and client resumes, as well as the CIFs generated from January 1, 2011, through August 8, 2011.[5] (DA 686). DOI also interviewed SEEDCO clients and employees. (DA 686). In its subsequent report (the "DOI Report"), DOI concluded that SEED-CO submitted at least 528 false job placements to SBS in the eight-month period between January 1, 2011, and August 8, 2011, and that "[m]ultiple SEEDCO employees processed, directed, and/or had knowledge of the reporting of false placements to [SBS]." (DA 686). As a result of DOI's investigation, SBS terminated the Contracts with SEEDCO. (DA 244-50).

### 4. Saavedra's Participation in the Fraud

For the duration of the fraudulent scheme, Saavedra held senior managerial positions at the Upper Manhattan and Bronx Workforce1 Centers. (DA 74). As shown at trial, Saavedra either knew about, was

---

[5] As DOI explained in its report, "DOI's findings of false job placements in Worksource1 were limited to the period of approximately January 1, 2011 to August 8, 2011 because," from 2008 to February 2011, SBS "deemed it acceptable for all [CIFs] to be shredded once the information from the documents was entered into Worksource1." (DA 686).

deliberately ignorant of, or acted in reckless disregard of, the fraud occurring on his watch.

Saavedra directed his staff to enter false information about job placements into WorkSource1. For example, Saavedra's Administrative Assistant, Kimberly Nesmith, testified that Saavedra directed her to call SEEDCO clients to determine whether they were employed before they received SEEDCO services; if the clients were employed, Saavedra nonetheless directed Nesmith to enter their employment information into WorkSource1 as a placement. (DA 164-66).

Saavedra presided over staff-wide meetings at which the fraud was openly discussed. (DA 164-66). During such meetings, members of the intake team would report the number of placements they entered based on preexisting employment information from clients' CIFs. (DA 159-60). The fraud was also openly discussed at weekly R&P team meetings and throughout the Workforce1 Centers. (DA 160; PA 30-31).

Saavedra received emails in which his staff discussed precisely how they intended to fraudulently boost SEEDCO's placement numbers. For example, on April 7, 2011, Tagewatee Chandarpaul, Saavedra's Deputy Director at the Upper Manhattan Workforce1 Center, emailed two SEEDCO supervisors, copying Saavedra, and asking, "[w]hat is our plan for this week to ensure that we [meet our placement goals]? We are behind everyone." (PA 89-91). Alan Katz, the director of R&P team, responded, "Intake is giving all CIFs to us." (PA 89-91).

Saavedra actively monitored the Workforce1 Centers' daily placement rates and encouraged the fraudulent practices by pressuring SEEDCO staff to meet job placement targets, including by telling staff that their jobs were "at stake" and "on the line" if SEEDCO did not meet its job placement goals. (PA 16-17, 92-93, 96-98). Saavedra also sent and received emails in which he and his senior staff members pressured SEEDCO staff to meet implausibly high job placement targets. (PA 13, 48-49). And Saavedra encouraged at least one employee, Mitchell McClinton, to lie to SBS when discussing SEEDCO's performance. (PA 94-95, 99-100).

## C.   The District Court's Jury Instructions

In its intervenor complaint, the Government alleged that Saavedra violated the FCA by (1) submitting, or causing to be submitted, false claims to the Government, in violation of 31 U.S.C. § 3729(a)(1)(A), and (2) making, or causing to be made, statements material to false claims submitted to the Government, in violation of 31 U.S.C. § 3729(a)(1)(B). (DA 59-60). The case was tried to a jury from April 14, 2015 to April 23, 2015. (DA 1036). Following the Government's case-in-chief, both parties moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a), and the district court denied both motions. (DA 431-40). At the conclusion of all testimony, the Government and Saavedra submitted proposed jury charges and verdict sheets. (DA 941-79). The district court held a charging conference where it addressed, among other things, the parties' competing definitions of the term "claim," and Saavedra's objection to

the district court's proposed instruction concerning the significance of Charney Research's verification of some job placement data from WorkSource1. (DA 552-608).

### 1. The District Court's Instruction on the Definition of "Claim"

During the charging conference, Saavedra argued that the claims were "the document[s] prepared by SBS quarterly to calculate the amount of Performance Based Compensation payment due to SEED-CO for that quarter." (DA 583-84, 908, 964). The Government disagreed, arguing that the quarterly SBS calculations could not be the claim because they were not submitted by SEEDCO to SBS. (DA 566-67). Instead, the Government argued that the claims were the data that SEEDCO entered into WorkSource1, because that was the only information that SEEDCO staff presented to SBS in order to receive payments for reaching performance milestones. (DA 566-67).

Out of the presence of the jury, the district court agreed with Saavedra that the claims were the internal calculations that SBS performed quarterly. (DA 600). Accordingly, the district court determined that there were a total of three false claims on which penalties could be based: the internal SBS calculations for the first, second, and third quarters of 2011, *i.e.*, the three quarters for which CIFs existed, and during which Saavedra served as Director of the Workforce1 Centers. (DA 310-11, 605-06, 908).

Nonetheless, the district court declined to instruct the jury that the claims in this case were the internal

SBS calculations. (DA 583-84). Instead, the district court stated that it would charge the jury with the definition of "claim" provided in the FCA, and then allow both sides to argue to the jury their respective applications of that definition to the facts of this case. (DA 584). The district court asked Saavedra's counsel whether she was "satisfied with the instruction" concerning the definition of claim. (DA 606). Saavedra's counsel responded: "Yes, your Honor. Thank you." (DA 606).

The district court thus instructed the jury on the legal definition of claim by using the definition provided by the FCA: "any request or demand . . . for money or property . . . made to a contractor, grantee or other recipient if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States government . . . provided any portion of the money or property requested or demanded or will reimburse the contractor, grantee, or other recipient for any portion of the money or property requested or demanded." (PA 107); *see also* 31 U.S.C. § 3729(b)(2). The district court also instructed the jury: "If you find that Mr. Saavedra presented or caused to be presented claims for payment, you need to determine if at least one of those claims was false or fraudulent." (PA 108). The district court did not, however, ask the jury to determine how many false claims Saavedra submitted, or caused to be submitted. (DA 606-07).[6]

_____

[6] By contrast, the district court did ask the jury to determine the number of "false records or state-

## 2. The District Court's Instruction Regarding Charney Research

The district court also proposed during the charging conference to include the following instruction concerning the role of Charney Research:

> You heard testimony that the New York City Department of Small Business Services contracted with an entity known as Charney Research to verify the job placement data submitted by SEEDCO. The fact that a third-party verification service was utilized does not, by the mere fact of its use, change the issues regarding Mr. Saavedra's liability if you find that he presented, or caused to be presented, false claims for payment to the Department of Small Business Services.

(DA 988-89).

Saavedra requested that the district court remove this instruction, arguing that "it is up to the jury to decide what, if any, weight to give Charney Research[.]" (DA 585). The district court disagreed and ultimately delivered its instruction concerning Charney Research to the jury. (DA 585).

———————

ments . . . material to a false or fraudulent claim" that Saavedra "knowingly made, used, or caused to be made or used." (PA 109-11).

### D. The Jury's Request for Trial Transcripts and Its Verdict

On April 23, 2015, the jury requested full transcripts of the testimony of DOI Investigator Chanterelle Sung and the relator, William Harper. (DA 676-77). The district court declined to provide those full transcripts, and instead instructed the jury that "[i]f there is something specific that you can't recall or that you're debating about, let me know what that specific item is and we'll send that back to you." (DA 680). The jury ultimately did not request any specific portions of the trial transcripts. (DA 681-82).

Later that day, the jury returned a verdict for the Government, finding that Saavedra had both (1) submitted, or cause to be submitted, false claims to the Government, and (2) made, or caused to be made, statements material to false claims. (DA 682-83). Specifically, the jury found that Saavedra made, or caused to be made, 13 false statements, resulting in $13,000 worth of damage to the Government. (DA 682-83). Despite having been found liable on two claims under the FCA, following the jury's verdict, Saavedra issued a press release stating that he was "gratified by the verdict," which he characterized as "a very significant vindication." (DA 1030).

### E. The Court's Imposition of Damages, Costs and Penalties

Following the verdict, in accordance with 31 U.S.C. § 3729(a)(1), the district court trebled the damages found by the jury to $39,000. (DA 1033). The

district court also awarded the Government $10,872.29 in litigation costs. (DA 1034).

Pursuant to 31 U.S.C. § 3729(a) and 28 C.F.R. § 85.3(a)(9), the district court imposed the maximum civil penalty of $11,000 per violation of the FCA. (DA 1033-34). The district court determined that the maximum penalty was appropriate because: (1) "[t]estimony was introduced at trial that the falsification of records, and defendant Saavedra's knowledge thereof, was prevalent from at least August 2009 through October 2011"; (2) "the evidence introduced a trial showed that falsification of records was a deliberate method of doing business"; and (3) "even after the jury issued its verdict, Saavedra has not accepted responsibility for his actions, issuing a press release stating that he was 'gratified by the verdict' and stating that the verdict 'is a very significant vindication.'" (DA 1033-34). Because the jury determined that Saavedra committed 13 violations of the FCA, the district court imposed a penalty of $143,000. (DA 1034).

Judgment was entered on June 19, 2015. (DA 1036-37). Following the entry of judgment, Saavedra did not renew his motion for judgment as a matter of law as provided for by Fed. R. Civ. P. 50(b). (DA 26).

## Summary of Argument

The district court's judgment should be affirmed. At the threshold, Saavedra waived his challenge to the evidentiary basis for the jury's verdict because he failed to renew his motion for judgment as a matter of

law following the entry of judgment. *See infra* Point I.A. Moreover, Saavedra cannot meet the high threshold required for the Court to reach this waived argument, because the evidence plainly supported the jury's finding of liability. *See infra* Point I.B. And even if the Court were to reach Saavedra's waived argument concerning the sufficiency of the Government's evidence, that argument lacks merit. There can be no real dispute that SEEDCO submitted false claims for payment to the federal government: SEEDCO's career centers were created to further a federal program, SEEDCO received federal funds, and SEEDCO staff admitted to repeatedly submitting false information about its performance under that program. *See infra* Point I.B. Furthermore, whether the jury based its verdict on the Government's or Saavedra's interpretation of the term "false claim" is irrelevant, because the record provides ample support for the jury's liability finding under *either* definition. *See infra* Point I.B. Saavedra also misapprehends the Government's case against him: the Government did not pursue a "certification theory" against Saavedra. *See infra* Point I.C.

Saavedra's challenges to the district court's jury instructions are likewise unavailing. The district court correctly instructed the jury on the definition of "claim" by employing the definition provided by the False Claims Act itself. *See infra* Point II.A. Likewise, the district court properly instructed the jury that Charney Research's role in attempting to verify the job placement information that SEEDCO submitted to SBS has no bearing on the Government's claims against Saavedra. *See infra* Point II.B.

Next, and contrary to Saavedra's claims, the district court properly exercised its discretion in declining to provide the jury with the entirety of two witnesses' testimony, and instead directing the jury to request specific sections of testimony that it required. *See infra* Point III.

Finally, Saavedra's challenges to the district court's calculation of damages and penalties also fail. The district court correctly trebled the damages awarded by the jury because doing so is required by the FCA. *See infra* Point IV.B. Additionally, the district court properly exercised its discretion by imposing the maximum civil penalties in this case in light of the ample evidence of fraud presented at trial, and Saavedra's refusal—even after the jury verdict—to accept responsibility for his participation in it. *See infra* Point IV.C.

# ARGUMENT

## Standards of Review

Where, following the entry of judgment, a party fails to renew a previously-denied motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 50(b), that party waives any challenge on appeal to the evidentiary basis for the jury's verdict. *See, e.g., Ortiz v. Jordan*, 131 S. Ct. 884, 892 (2011). In such circumstances, this Court may reach party's waived arguments and order a new trial "to prevent a manifest injustice in cases [w]here a jury's verdict is wholly without legal support." *Pahuta v. Massey-*

*Ferguson, Inc.*, 170 F.3d 125, 129 (2d Cir. 1999) (citation and internal quotation marks omitted).

Where a party preserves an objection to a jury instruction, the Court "review[s] a district court's jury instruction *de novo* to determine whether the 'jury was misled about the correct legal standard or was otherwise inadequately informed regarding the controlling law.'" *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001). A new trial is required only if, "considering the instruction as a whole, the cited errors were not harmless, but in fact prejudiced the objecting party." *Id.* This Court has not yet determined whether the plain error standard or fundamental error standard applies to its review of unpreserved objections to jury charges. *See Snyder v. New York State Educ. Dep't*, 486 F. App'x 176, 178 n.2 (2d Cir. 2012) (collecting Second Circuit cases reviewing unpreserved objections to jury instructions under both standards). Under the plain error standard, an "appellant must show there was (1) error (2) that is plain and (3) that affects substantial rights." *United States v. Cossey*, 632 F.3d 82, 86–87 (2d Cir. 2011). Even if those criteria are satisfied, the Court "may exercise [its] discretion to notice the forfeited error only if the error seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 87 (internal quotation marks omitted). The fundamental error standard is "more stringent" than the plain error standard, *Snyder*, 486 F. App'x at 178 n.2, insofar as it requires that, for the Court to reach the unpreserved objection, the district court's error must be "so serious and flagrant that it goes to the very integrity

of the trial," *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 62 (2d Cir. 2002) (internal quotation marks omitted).

The Court reviews a district court's decision regarding which portions, if any, of the trial testimony to read back to the jury for abuse of discretion. *See United States v. McElroy*, 910 F.2d 1016, 1026 (2d Cir. 1990) (citing cases).

Finally, the Court reviews a district court's damages calculations *de novo*, *United States ex rel. Feldman v. Van Gorp*, 697 F.3d 78, 87 (2d Cir. 2012), and its imposition of civil penalties for abuse of discretion, *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013).

## POINT I

### Saavedra Waived Any Evidentiary Challenge to the Jury's Verdict By Failing to Renew His Motion For Judgment as a Matter of Law

### A. Saavedra Failed to Move Pursuant to Federal Rule of Civil Procedure 50(b) Following the Entry of Judgment

Saavedra's primary argument on appeal is that the Government failed to present evidence sufficient to establish that he either submitted, or caused to be submitted, false claims, or that he made, or caused to be made, statements material to false claims. Def. Br. 39-45. But Saavedra waived that challenge to the evidentiary basis for the jury's verdict when he failed to renew his motion for judgment as a matter of law following the entry of judgment.

Rule 50(a) of the Federal Rules of Civil Procedure provides that parties may move for judgment as a matter of law during the course of a jury trial:

> [i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

> (A) resolve the issue against the party; and

> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). A Rule 50(a) motion "must specify the judgment sought and the law and facts that entitle the movant to judgment" and "may be made at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2).

Rule 50(b) provides that parties may renew a previously-denied motion for judgment as a matter of law following the entry of judgment:

> No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter

> of law and may include an alternative or joint request for a new trial under Rule 59.

Fed. R. Civ. P. 50(b). Rule 50(b) motions are "necessary because '[d]etermination of whether a new trial should be granted or a judgment entered under Rule 50(b) calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart.'" *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 401 (2006) (quoting *Cone v. W. Va. Pulp & Paper Co.*, 330 U.S. 212, 216 (1947)).

Where a party fails to submit to the district court a motion for judgment as a matter of law under Rule 50(b), the Supreme Court has "repeatedly held" that the party waives any challenge on appeal to the evidentiary basis for the jury's verdict. *See, e.g., Ortiz*, 131 S. Ct. at 892 ("Absent such a motion, we have repeatedly held, an appellate court is powerless to review the sufficiency of the evidence after trial.") (citing *Unitherm*, 546 U.S. at 405).

This Court has likewise held that a party that fails to file a Rule 50(b) motion waives any evidentiary challenge to the jury verdict on appeal. *See, e.g., Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 199-200 (2d Cir. 2004); *Pahuta*, 170 F.3d at 129. In such circumstances, the Court may reach the waived issue and order a new trial "'to prevent a manifest injustice' in cases [w]here a jury's verdict is wholly without legal support.'" *Pahuta*, 170 F.3d at 129 (quoting *Varda, Inc. v. Ins. Co. of N. Am.*, 45 F.3d 634, 638 (2d Cir.

1995)). The Court is otherwise "without power to direct the District Court to enter judgment contrary to the one it had permitted to stand," *Unitherm*, 546 U.S. at 400-01 (quoting *Cone*, 330 U.S. at 218). Moreover, the Court will excuse a party's failure to make a Rule 50(b) motion "only in very narrow circumstances," namely, "when the district court has indicated that the motion need not be renewed, and the party opposing the motion could not reasonably have thought "that the movant's 'initial view of the insufficiency of the evidence had been overcome and there was no need to produce anything more in order to avoid the risk of [such] judgment.'" *Jacques*, 386 F.3d at 199 (quoting *Pahuta*, 170 F.3d at 129 (further citations and quotation marks omitted)).

Here, prior to the conclusion of trial, Saavedra moved for judgment as a matter of law pursuant to Rule 50(a), and the district court denied that motion. (DA 431-39). To preserve his appeal rights with respect to any evidentiary challenges, he was required to renew his motion under Rule 50(b) following the entry of judgment. He failed to do so. (DA 26). Although Saavedra appears to ignore this procedural requirement on appeal, he cannot overcome it. Saavedra has waived any challenge to the evidentiary basis for the jury's verdict, and cannot now belatedly challenge the sufficiency of the evidence the Government presented trial. *See, e.g., Jacques*, 386 F.3d at 200 ("Because of this failure [to move under Rule 50(b)] and the lack of circumstances excusing it, we decline to address the sufficiency of the evidence to support the jury verdict favoring Jacques on her ADA claim."); *Pahuta*, 170 F.3d at 129 (holding that appel-

lant "procedurally defaulted when it[,] after entry of judgment, failed to renew its Rule 50(a) motion," and declining to "overlook such a default" where there was no manifest injustice).

## B. The Evidence Supports the Jury's Verdict

Because Saavedra waived his challenge to the evidentiary basis for the jury's verdict, and because he can offer no excuse for his failure to move under Fed. R. Civ. P. 50(b), the Court may only reach his arguments "to prevent a manifest injustice" where the "jury's verdict is wholly without legal support." *Pahuta*, 170 F.3d at 129. Saavedra cannot come close to meeting that high standard because the record is replete with support for the jury's verdict. Indeed, even if this Court were to find that Saavedra had not waived his evidentiary challenges and reviews his claims *de novo*, *see Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012), those claims would still fail because the jury plainly had "a legally sufficient evidentiary basis" to find for the Government, Fed. R. Civ. P. 50(a).

### 1. The Government Presented Evidence that Saavedra Submitted False Claims to the Government

At the threshold, the evidence established that the federal government (through SBS) contracted with SEEDCO to further a government program; SEEDCO received federal funds under that program; SEEDCO staff submitted false information to SBS; and when SBS discovered the fraud, SEEDCO lost its federal funding. (DA 74-76, 244-50, 684-93). Those facts

alone demonstrate that SEEDCO staff, under Saavedra's supervision and direction, submitted false claims for payment to the Government. *See* 31 U.S.C. § 3729(a)(1), (b)(2).

Furthermore, the evidence established that Saavedra submitted, or cause to be submitted, false claims under either the Government's or Saavedra's theory of what constituted a claim in this case.

### a.  Saavedra's Staff Submitted False Placements through WorkSource1

Evidence presented at trial supported the Government's contention that SEEDCO submitted at least 528 false job placements—and thus false claims—through WorkSource1 during the time that Saavedra served as Director. SBS used only the information in WorkSource1 to determine the amount of the performance-based payments to SEEDCO. (DA 191-95, 201-02). Thus, whenever SEEDCO identified a "placement" in WorkSource1 based on falsified data (such as a false employment start date), it submitted a false claim.

SEEDCO staff admitted to entering false placements into WorkSource1. (PA 17-18, 24, 34-43, 52-57, 72-80, 86-91). The SEEDCO employee responsible for entering CIF data into WorkSource1 testified that, approximately "50% of the time," she changed SEEDCO clients' work history to make it appear as though SEEDCO had helped those clients obtain a job. (PA 74). Similarly, the SEEDCO employee who "routinely" instructed staff to enter false placements testified that, "during the majority of [his] tenure,"

from August 2009 through October 2011, SEEDCO did not meet placement targets using "legitimate placements," but instead relied on falsified data to make illegitimate claims. (PA 2, 62-63). Additionally, SBS's Deputy Commissioner testified that placement information entered into WorkSource1 was the only data SEEDCO submitted to SBS to claim payment for attaining job placement goals. (DA 201, 835-39). SBS then used the information in WorkSource1 to calculate its performance payments to SEEDCO. (DA 196).

In addition to testimony, the Government introduced the DOI Report, in which DOI concluded that SEEDCO staff reported at least 528 false job placements to SBS between January 1, 2011, and August 8, 2011. (DA 358, 684-693). The Government also showed the jury examples of three CIFs, and compared the information provided by the client on each CIF with the corresponding information that SEEDCO staff entered into WorkSource1. (DA 150-51, 345-61; PA 68). Those examples demonstrated that the information in WorkSource1 was false because it included, for example, backdated job start dates, and therefore should not have resulted in SEEDCO claiming a placement. (DA 345-61).

**b.    SEEDCO's False Placement Information Was Included in SBS's Internal Calculations**

Alternatively, interpreting the "claim" in this case as the internal SBS calculations, as Saavedra urged (DA 637-39), the Government also presented evidence sufficient to demonstrate that SEEDCO's false claims

were included in SBS's quarterly internal calculation.[7]

As the contracts provide, and as the internal SBS calculations make clear, SBS determined SEEDCO's performance payments based on both Charney Research's statistical sampling results and SEEDCO's total claimed placements. That is because the more job placements SEEDCO claimed, the more federal funding it was potentially entitled to receive. (DA 835). The chart at page 11, *supra*, is illustrative. Under the Contracts, SEEDCO would receive $52,604 if it reported 150 placements and Charney validated only 60% of those placements. (DA 835). But if SEEDCO reported 200 placements and Charney still validated only 60% of those placements, SEEDCO would receive $70,136—almost $20,000 more.

Thus, the number of total placements in WorkSource1—regardless of whether that total included false or accurate job placements—directly influenced how much of the performance milestone payment SBS would pay SEEDCO, regardless of Charney's sampling results. As the SBS Deputy Commissioner

---

[7]   The Government did not argue that the claims in this case were the internal SBS calculations, because SEEDCO staff did not submit those calculations to SBS. Instead, the only "request[s] . . . for money," 31 U.S.C. § 3729(b)(2)(A), that SEEDCO submitted to SBS were through WorkSource1—every time SEEDCO staff indicated in WorkSource1 that SEEDCO had made a placement, SEEDCO requested payment for meeting performance-based milestones.

testified, SBS paid SEEDCO "for the body of work that was X percent verified." (DA 202). In other words, SEEDCO received federal funding not only for those placements verified by Charney Research, but also for placements that were not verified by Charney Research. This payment process is reflected in SBS's quarterly internal calculations, which calculate SEEDCO's performance payment based, in part, on SEEDCO's claimed placements (DA 909-10)—many of which were false.

Finally, the SBS Deputy Commissioner testified that an internal SBS email confirmed that 401 false placements were included in the roster sent to and validated by Charney. (DA 262, 265, 859). In arguing otherwise, *see* Def. Br. 43-44, Saavedra ignores the fact that the SBS Deputy Commissioner testified that SBS determined that at least one false placement "passed through" the Charney verification process, and that SBS paid SEEDCO for that false placement. (DA 291-92). The record therefore contained sufficient evidence for the jury to conclude that false placements were included in the Charney sample, and thus in SBS's internal payment calculations. Thus, even if Saavedra had not waived his challenge to the evidentiary basis for the jury's verdict, that verdict was amply supported by the evidence.

## 2. The Government Presented Evidence that Saavedra Caused a False Record or Statement Material to a False Claim to be Submitted to the Government

Saavedra's arguments concerning the purported lack of evidence that he made, or caused to be made, false statements material to false claims, Def. Br. 44-45, fare no better. The Government argued that the false claims and the false statements material to false claims were one and the same: the entries into Work-Source1. (A 566-67). Specifically, each database entry associated with a SEEDCO client included a field to record whether the client could be counted as a placement (thus constituting a claim), as well as a field to record the reason that the customer counted as a placement (such as a job start date). (PA 72-74; DA 348-50, 397-400). Thus, for every false placement (or claim), there was at least one false data entry in WorkSource1, and the number of false claims and false statements were equivalent. Because those entries were the only information SEEDCO provided to SBS concerning its placement numbers (DA 201-02), the false WorkSource1 information was a "request for payment," and also contained statements "material to a request for payment." Evidence in the record—for example, the three sample CIFs and corresponding data entered into WorkSource1 that the Government showed the jury (DA 150-51, 345-61)—supported the Government's position.

Alternatively, even if false statements are defined as the material attached to the internal SBS calculations, as Saavedra argued (DA 639), the Government

presented sufficient evidence for the jury to conclude that such material contained false placement information. The material attached to the internal SBS calculations included the internal authorization memorandum from one section of SBS to another, allowing SBS to release funds to SEEDCO; a summary of the data entered into WorkSource1 for that quarter; and the Charney sampling results of that data. (DA 908-12). The data on which those calculations are based was the data in WorkSource1, and SEEDCO staff routinely entered false information into WorkSource1. *See supra* Point I.B.1.

## C. The Government Did Not Bring a Claim Based on a "Certification Theory"

Finally, Saavedra's claims that the Government's "certification theory" was unsupported by the evidence, Def. Br. 52, is a red herring. Saavedra's argument is based on his belief that the Government's claims against him were based on his purported false certifications of SEEDCO's compliance with applicable statutes and contractual terms. Def. Br. 52-54. In fact, the Government did not advance any such theory of liability against Saavedra. (DA 72, 947-48).

Saavedra misapprehends the testimony concerning SEEDCO's participation in the WIA program. *See* Def. Br. 52-54. The Government presented the testimony of two witnesses, former SBS Deputy Commissioner Angie Kamath and US DOL Division Chief Ernesto Lirag, to demonstrate that the false information in WorkSource1 was "material" to payment, and thus satisfied the False Claims Act's materiality

requirement. (DA 207, 210-14). Both of those wit-
nesses testified that entering false information in
WorkSource1 not only would "have a natural tenden-
cy to influence" whether or not SEEDCO would con-
tinue to receive federal funds, 31 U.S.C. § 3729(b)(4),
but in fact did influence whether or not SEEDCO
continued to receive federal funds, (DA 196, 242-50,
326-27). But the Government did not use this testi-
mony to establish that Saavedra falsely certified
compliance with any statutes or contractual terms.
Saavedra's argument on appeal is therefore without
merit, in addition to having been waived along with
the rest of his challenges to the evidentiary basis for
the jury's verdict.

## POINT II

### The District Court Correctly Charged the Jury

#### A. The District Court Correctly Instructed the Jury on the Definition of "Claim" Under the FCA

The district court's jury instruction concerning the
definition of the term "claim" was proper. As an ini-
tial matter, Saavedra failed to preserve his challenge
to the district court's charge by agreeing to it during
the charging conference, even though it did not com-
port with Saavedra's preferred definition. (DA 606-
08). Having acquiesced to the instruction, Saavedra
cannot now challenge it. *See, e.g., United States v.
Lisyansky*, 806 F.3d 706, 713 (2d Cir. 2015) (appel-
lant waived any objection to jury instruction because
counsel "agreed [it] should be given") (citing *Jarvis*,

283 F.3d at 57); *Lavoie v. Pac. Press & Shear Co.*, 975 F.2d 48, 55 (2d Cir. 1992) ("Failure to object to a jury instruction . . . prior to the jury retiring results in a waiver of that objection.").

Saavedra's unpreserved objection fails because the district court's instruction satisfied both the plain error and fundamental error standards. *See Snyder*, 486 F. App'x at 178. Indeed, even if Saavedra had preserved his objection, Saavedra's challenge would still fail because the instruction did not mislead the jury about the correct legal standard. *See Girden*, 262 F.3d at 203.

"The purpose of jury instructions is to give the jury a clear and concise statement of the law applicable to the facts of the case." *Id.* (quotation marks and citations omitted). Here, the district court provided a "clear and concise statement of the law," by employing the definition of "claim" provided by the False Claims Act itself. (PA 107 (quoting 31 U.S.C. § 3729(b)(2)). "Where a district court's jury instructions accurately track the language and meaning of the relevant statute," the Court "generally will not find error." *United States v. Alfisi*, 308 F.3d 144, 150 (2d Cir. 2002) (rejecting appellant's argument that the jury instructions "were not sufficiently specific," and finding it "significant that the district court's explanation of [two elements of the crime] virtually mirrors the statutory language"); *see also United States v. Bonito*, 57 F.3d 167, 171 (2d Cir. 1995) (because the district court "accurately tracked the statutory language . . . [n]o more was required"); 10 Bus. & Com. Litig. Fed. Cts. § 118:40 (3d ed.) (providing

"standard jury instruction" for FCA cases that defines "claim" using the definition in the FCA). Here, Saavedra does not contend that the district court inaccurately quoted 31 U.S.C. § 3729(b)(2). Applying the statutory definition, the jury determined that the Government had proved that Saavedra submitted, or caused to be submitted, false claims to the Government. There was no error in the district court's instruction. *See Alfisi*, 308 F.3d at 150; *Bonito*, 57 F.3d at 171.

Saavedra fails to cite any cases suggesting that a district court must do more than provide a "clear and concise statement of the law," *Girden*, 262 F.3d at 203, much less that a district court must instruct the jury on the defendant's version of what constitutes a "claim" in a False Claims Act case. *See* Def. Br. 46. Indeed, none of cases on which Saavedra relies are False Claims Act cases. *See id.* (citing *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004) (RICO case); *Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994) (*Bivens* case); *United States v. Medina*, 944 F.2d 60 (2d Cir. 1991) (criminal conspiracy case); *BE&K Const. Co. v. Will & Grundy Ctys. Bldg. Trades Council*, 156 F.3d 756 (7th Cir. 1998), *as amended* (Nov. 23, 1998) (Labor Management Relations Act case); *Christopher v. Cutter Labs.*, 53 F.3d 1184 (11th Cir. 1995) (products liability case)). And in *Bank of China*, the court found error because the district court misstated the law, an error that is not present here. *See* 359 F.3d at 179-80.

## B. The District Court Properly Instructed the Jury Concerning the Role of Charney Research

The district court also correctly instructed the jury that "the mere fact" that SBS used a third-party auditor is irrelevant to the Government's claims against Saavedra. (PA 109).

"A correct application of the [FCA] statutory language requires . . . that the focus in each case be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." *United States v. Bornstein*, 423 U.S. 303, 313 (1976). Thus, the False Claims Act is designed to impose liability on those who present false information to the government, regardless of whether any intermediary discovers the fraud. *See id.* at 312-13 (finding liability for subcontractor even though contractor ultimately presented claims to the government, and noting that "[t]he statute . . . does not penalize [the subcontractor, United] for what [the contractor] did. It penalizes *United* for what *it* did") (emphasis added).

The district court instructed the jury that "[t]he fact that a third-party verification service was utilized does not by the mere fact of its use change the issues that you have to decide regarding Mr. Saavedra's liability." (DA 672). That instruction was consistent with controlling authority, *see Bornstein*, 423 U.S. at 313, and therefore did not mislead the jury, *see Girden*, 262 F.3d at 203. Whatever Charney Research (or SBS) did with the false placement information provided by SEEDCO is irrelevant to whether Saavedra submitted, or caused to be submitted, false

placement information. Saavedra and his staff entered false information into WorkSource 1, and that information was relied upon by SBS. (DA 195-98). Accordingly, the district court correctly conveyed to the jury that the "mere fact" that SBS used Charney Research to conduct a sampling of Saavedra's staff's work "does not . . . change the issues that [the jury] ha[s] to decide" (DA 672): namely, whether Saavedra: (1) "knowingly" (2) "present[ed] or caus[ed] to be presented a . . . claim for payment" (3) that was "false or fraudulent," 31 U.S.C. § 3729(a)(1)(A).

## POINT III

### The District Court Properly Exercised Its Discretion In Declining to Provide the Jury With Full Transcripts of the Testimony of Two Witnesses

Saavedra's argument that the district court erred in declining to provide the jury with the entire testimony of two witnesses, Chanterelle Sung and William Harper, Def. Br. 49-51, lacks merit. The district court properly exercised its discretion when it instead instructed the jury to request particular portions of the testimony.

"Whether to allow testimony to be reread to the jury is a matter committed to the sound discretion of the trial court[.]" *McElroy*, 910 F.2d at 1026. Thus, a trial court's "refusal to allow read-backs of testimony in response to jury requests during deliberations is within its broad discretion." *United States v. Salameh*, 152 F.3d 88, 133 (2d Cir. 1998) (citing *United States v. Criollo*, 962 F.2d 241, 243 (2d Cir. 1992);

*McElroy*, 910 F.2d at 1026). While this Court has "indicated [its] preference for providing juries with readbacks of testimony when requested during their deliberations," it has also noted that a trial court's "response to a jury request for a readback should balance the jurors' need to review the evidence before reaching their verdict against the difficulty involved in locating the testimony to be read back, the possibility of undue emphasis on a particular portion of testimony read out of context, and the possibility of undue delay in the trial." *Criollo*, 962 F.2d at 243.

Saavedra's assertion that the district court "refus[ed] to permit the jury to hear the testimony of Mr. Harper," Def. Br. 51, mischaracterizes the record. Instead, the district court properly exercised its discretion by refusing to provide the jury with entire transcripts, and instead directing the jury to identify particular portions of the testimony it required. The district court stated, "If there is something specific that you can't recall or that you're debating about, let me know what that specific item is and we'll send that back to you." (DA 680). Thus, if the jury wished to view any portion of Harper's or Sung's testimony, it could have requested it. It is not "error for the district court to respond to the jury's initial request for a read-back of the entire trial by asking the jurors to be more specific about what they wanted to hear." *United States v. Ruffin*, 129 F.3d 114, at *4 (2d Cir. 1997) (table).

In any event, the district court's refusal to read back the entirety of both witnesses' testimony did not prejudice Saavedra, because not all of Harper's and

Sung's testimony was significant for the liability is-
sues in this case. Harper was not present at trial and
both the Government and Saavedra read portions of
Harper's deposition into evidence. (DA 394, 466) The
Government read portions of Harper's testimony sole-
ly to authenticate and admit into evidence several
CIFs. (DA 394-404). On the other hand, the vast ma-
jority of Harper's testimony presented by Saavedra
was redundant and irrelevant, as the district court
repeatedly noted. (DA 471-75, 481-87.) Saavedra
merely speculates that this testimony was "crucial"
and of "central importance" to the jury. *See* Def.
Br. 50-51. That speculation is belied by the fact that,
rather than accept the district court's invitation to
specify the portion of the testimony they required, the
jury made no further requests for testimony and in-
stead rendered its verdict.

## POINT IV

### The District Court Correctly Assessed Damages and Penalties

### A. The False Claims Act Imposes Treble Damages, Penalties, and Costs

Consistent with the jury's verdict that Saavedra
caused the United States to suffer $13,000 in damag-
es, the district court trebled that amount, to $39,000,
as required by 31 U.S.C. § 3729(a)(1). Saavedra's ar-
gument that he was entitled to a set-off from the
amounts paid to the Government by other defend-
ants, *see* Def. Br. 55, mischaracterizes both the law
and the import of the jury's verdict against him. The

False Claims Act is designed, in part, to make the Government whole, which required the trebling of the damages attributable to Saavedra, regardless of the results of the Government's settlements with other defendants.

The False Claims Act provides for damages equal to "3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). It further provides for a "civil penalty of not less than $5,000 and not more than $10,000, as adjusted [for inflation]." *Id.*; *see also* 28 C.F.R. § 85.3(a)(9) (adjusting amounts to $5,500 and $11,000). Lastly, the False Claims Act further provides that "[a] person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages." 31 U.S.C. § 3729(a)(3).

The FCA does not specify how penalties are to be calculated. Courts have considered a variety of factors to determine how to arrive at a penalty figure within the mandatory range, including: the seriousness of the defendant's conduct, *United States v. Mastellone*, No. 10 Civ. 7374 (DLC), 2011 WL 4031199, at *3 (S.D.N.Y. Sept. 12, 2011); the damage to the Government, *Coleman v. Hernandez*, 490 F. Supp. 2d 278, 282-83 & n. 3 (D. Conn. 2007); the Government resources required to litigate the case, *United States ex rel. Purcell v. MWI Corp.*, 15 F. Supp. 3d 18, 32 (D.D.C. 2014), *appeal docketed*, No. 14-5210 (D.C. Cir. Aug. 28, 2014); and the defendant's willingness to accept responsibility, *BMY–Combat Systems Div. of Harsco Corp. v. United States*, 44 Fed. Cl. 141, 151

(Fed. Cl. 1999) ("the court will tend to lean towards the more severe penalty the longer these proceedings are drawn out without [defendant] accepting responsibility for its fraud"). The district court's assessment of damages and penalties here was consistent with the relevant statutes and case law.

## B. The District Court Correctly Trebled Damages Pursuant to the FCA

The jury concluded that the Government was damaged in the amount of $13,000 based on Saavedra knowingly submitting, or causing to be submitted, false claims, and making, or causing to be made, false records or statements material to false claims. (DA 682, 1033). The district court properly rejected Saavedra's argument that the district court should not impose damages because the Government received payments from settling defendants. (DA 1033). As the district court explained:

> The jury found that Plaintiff was damaged in the amount of $13,000 because of *Defendant's* actions—as a result of his knowing presentment of false and fraudulent claims and false records or statements which were material thereto. The damages caused by defendant Saavedra are not "common damages" caused by the acts of other defendants, and are not offset by the previous defendants' settlements.

(DA 1033) (emphasis in original).

The Government presented evidence that the United States paid SEEDCO approximately $12.8 million from 2009 through 2011 (and $5.4 million in 2011 alone), the time period during which SEEDCO staff admittedly entered false information into the WorkSource1 database. (DA 392). The Government also introduced evidence that when SBS discovered that SEEDCO staff entered such false information into Worksource1, SBS ended its contractual relationship with SEEDCO. (DA 246-50). Accordingly, as a result of SEEDCO staff's conduct—including Saavedra's—the Government was harmed in the amount of approximately $12.8 million, because had the Government known about the fraudulent conduct, it would not have contracted with SEEDCO at all. *See Feldman*, 697 F.3d at 88 (where "the defendant fraudulently sought payments for participating in programs designed to benefit third-parties rather than the government itself and the government received nothing of tangible value from the defendant . . . the government is . . . entitled to damages equal to the full amount of grants awarded to the defendants based on their false statements") (citations and internal quotation marks omitted); *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 473 (5th Cir. 2009); *United States v. Karron*, 750 F. Supp. 2d 480, 492-93 (S.D.N.Y. 2011) (amount of FCA damages was the total amount obtained by defendant who misappropriated funds in connection with cooperative agreement, less restitution), *aff'd*, 481 F. App'x 703 (2d Cir. 2012); *see also* DA 316-19 (testimony from US DOL employee explaining that

the funds SEEDCO received were pursuant to a WIA grant and intended to benefit third parties).

To recover damages based on the fraudulent conduct of SEEDCO's employees, the Government initiated an action against SEEDCO and seven individual SEEDCO managers, including Saavedra. (DA 5). SEEDCO and six individuals settled for a combined total of $1,843,500—far less than the total single damages amount suffered by the Government. *See Feldman*, 697 F.3d at 88.[8] Thus, because the Government has not been "made completely whole" for the single damages it suffered, *id.* at 87, let alone the treble damages it is entitled to under the False Claims Act, Saavedra is not entitled to any offset from monies received from other sources. While it is true that a non-settling defendant can be entitled to an offset based on monies the Government received from other sources to satisfy a common wrong, *see, e.g., Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989), such a defendant is not entitled to an offset where, as here, the Government has not been made whole, *Feldman*, 697 F.3d at 88.

The jury in this case was not asked to determine the total amount the Government was damaged as a result of SEEDCO staff's fraudulent conduct. Rather, as the district court instructed, "No other party is a

---

[8] The Government negotiated those settlement amounts based on each defendant's financial ability to pay. *See* Dist. Ct. ECF No. 27 ¶ 12, Nos. 51-2, 63-5, 73 ¶¶ 11. As a result, the Government still has not recovered the entirety of the damages it suffered.

defendant in this case . . . . You examine the facts regarding the government's proof against Mr. Saavedra on all the 4 questions you are to decide." (PA 119-20). The district court specifically instructed the jury to "focus only on the case against Mr. Saavedra" (PA 61), and to determine how much, if at all, Mr. Saavedra's actions damaged the United States (PA 112). The jury was not asked to make findings regarding SEEDCO's or other SEEDCO staff's actions, nor was it asked to determine damages resulting from those actions. The jury determined that Saavedra knowingly submitted, or caused to be submitted, false claims, and knowingly made, or caused to be made, 13 false records or statements material to a false claim. (DA 682). The jury further determined that, as a result of Saavedra's actions, the Government was damaged in the amount of $13,000. (DA 682). Thus, the jury determined the damages that Saavedra caused to the Government owing to his own misconduct, and not the damages the Government suffered due to SEEDCO's fraudulent scheme as a whole. *See Bornstein*, 423 U.S. at 313 ("The Act, in short, penalizes a person for his own acts, not for the acts of someone else.").

The district court therefore correctly determined that Saavedra is liable for *his* actions, and he is not entitled to any reduction based on the Government's settlements with other defendants. *See Bornstein*, 423 U.S. at 313; *Feldman*, 697 F.3d at 88. Saavedra's request that this Court reject the jury's finding and award no damages is an attempt to avoid the jury's verdict and the purpose of the False Claims Act, and thus should be denied.

## C. The District Court Did Not Abuse Its Discretion in Calculating Penalties

### 1. The District Court Did Not Abuse Its Discretion By Imposing the Maximum Penalties

The district court properly exercised its discretion by imposing the maximum civil penalty of $11,000 because the evidence overwhelmingly supported Saavedra's liability, and because Saavedra refused to accept responsibility for his role in the fraud even after the verdict.

Saavedra was the highest-level manager at the two SEEDCO Workforce1 Career Centers that routinely submitted or caused to be submitted false claims for payment to SBS via WorkSource1 as a "deliberate method of doing business." (DA 1033). He directly supervised employees who admitted to submitting false claims to SBS or instructing others to do so. Saavedra's own assistant testified that he instructed staff to record fraudulent placements. (A 164-65). The jury found Saavedra liable under the FCA for his conduct, and further found that the Government was damaged as a result. Imposing the maximum statutory penalty was therefore appropriate. *See, e.g., S.E.C. v. Rosenthal*, 426 F. App'x 1, 4 (2d Cir. 2011) ("the district court did not abuse its discretion in finding that the defendants' repeated and knowing violations of the securities laws warranted a civil penalty equal to two times the illegal profits generated from their violations").

In addition, Saavedra's conduct following the verdict supports assessing the maximum penalty. First, civil penalties are intended to have a punitive and deterrent effect, *Hudson v. United States*, 522 U.S. 93, 102 (1997), and Saavedra's actions since trial indicate that the verdict alone has not succeeded in punishing Saavedra or deterring him from engaging in similar conduct in the future. In fact, far from accepting responsibility for his misconduct—or even acknowledging the import of the jury's liability findings—Saavedra instead issued a press release stating that the jury's verdict was "a very significant vindication." (DA 1030). As the district court correctly found, such a statement disclaiming any wrongdoing flouts the actual conclusions of the jury and suggests that a liability finding alone will not serve to punish or deter Saavedra from future misconduct. (DA 1033). Moreover, an imposition of limited or no penalties would undermine the broader purpose of the False Claims Act, which is to deter others from engaging in similar conduct and defrauding the public. *See, e.g., Townsend v. Bayer Corp.*, 774 F.3d 446, 458 (8th Cir. 2014) ("A wrongdoer's prosecution [under the False Claims Act] serves as a deterrent to others who may be contemplating the same conduct, but are discouraged by the successful prosecution.").

### 2. The District Court Did Not Abuse Its Discretion By Multiplying the Maximum Penalty Amount by the Number of False Statements

The False Claims Act does not require a court to multiply penalties by the number of false claims, un-

der Section 3729(a)(1)(B), rather than the number of false records or statements material to a false claim, under Section 3729(a)(1)(A), as Saavedra suggests. *See* Def. Br. 55-56. Accordingly, the district court did not err in multiplying the maximum penalty amount by the number of false statements found by the jury.

The statute imposes a civil penalty for each violation of the False Claims Act. *See* 31 U.S.C. § 3729(a) (providing that "any person who" "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government for a civil penalty"); *see also Bornstein*, 423 U.S. at 313 (imposing civil penalty for each violation of the statute); *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995) ("Each individual false claim or statement triggers the statute's civil penalty."). Indeed, the False Claims Act "reaches beyond 'claims' which might legally be enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968). Thus, "the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government," and the Supreme Court "has consistently refused to accept a rigid, restrictive reading, even at the time when the statute imposed criminal sanctions as well as civil." *Id.* at 232. In *Bornstein*, the Supreme Court eschewed the concept that damages must be pinned to claims, and imposed damages based on the particular "acts" committed by the defendant. *See Bornstein*, 423 U.S. at 313 (holding that three separate shipments of defective electron tubes by subcon-

tractor resulted in three penalties, despite fact that the three shipments caused the general contractor to submit 35 separate false claims.)

Here, the jury determined that Saavedra committed 13 violations of the False Claims Act, and the district court properly multiplied the penalties by that amount, consistent with the purpose of the statute. *See Neifert-White Co.*, 390 U.S. at 232 ("the objective of Congress in enacting the False Claims Act 'was broadly to protect the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, of the government instrumentality upon which such claims were made'" (quoting *Rainwater v. United States*, 356 U.S. 590, 592 (1958)). While it is true that, as the Government stated in district court, "Penalties are typically assessed per false claim submitted, or caused to be submitted, by the liable defendant" (DA 1017), that is not a requirement, particularly where the false statements were submitted in order to get claims paid, *see United States v. Zan Mach. Co.*, 803 F. Supp. 620, 625 (E.D.N.Y. 1992) (assessing penalties based on the number of false records or statements material to a false claim). Thus, each statement or record material to a false claim made by a defendant is a separate act sufficient to form the basis on which to calculate a penalty. *See Bornstein*, 423 U.S., at 313 ("the focus in each case [should] be upon the specific conduct of the person from whom the Government seeks to collect statutory [penalties]").

The cases Saavedra cites for the proposition that FCA penalties must always be based on the number

of false claims are inapposite, because none of those cites evaluated the imposition of penalties based on false statements. *See* Def. Br. 55-56 (citing *Vermont Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 768-69 (2000) (evaluating "whether a private individual may bring suit in federal court on behalf of the United States against a State (or state agency) under the False Claims Act"); *U.S. ex rel. Eisenstein v. City of New York*, 540 F.3d 94, 96 n.2 (2d Cir. 2008) (evaluating the time period for when a private party must file a notice of appeal in an FCA cases where the United States is not a party), *aff'd sub nom. U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 129 S. Ct. 2230 (2009); *Railway Logistics Int'l v. U.S.*, 103 Fed. Cl. 252, 259 (2012) (evaluating fraud counterclaim); *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (evaluating whether penalty was excessive, but not basis of penalty)).

Moreover, even if the district court committed error by multiplying the maximum penalty amount by the number of false statements material to a false claim, rather than by the number of false claims, that error was harmless. As the Government demonstrated at trial, the false claims and false statements material to false claims are one and the same in this case: the data entered into WorkSource1. *See supra* Point I.B.2. Each false placement constitutes a false claim, and each false placement contained at least one false statement material to that false placement, such as a fraudulent job start date. *See id.* Thus, the number of false claims in this case equals the number of false statements; as a result, the jury's finding of 13 false statements material to false claims is equiva-

lent to the jury finding 13 false claims. The district court's decision to multiply the maximum statutory penalty by the number of false statements or records material to a false claim therefore was not an abuse of discretion.

## CONCLUSION

**The district court's judgment should be affirmed.**

Dated:   New York, New York
         March 11, 2016

                    Respectfully submitted,

                    PREET BHARARA,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for Intervenor-Plaintiff-*
                    *Appellee.*

ELLEN BLAIN,
CHRISTOPHER CONNOLLY,
    *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B). As measured by the word processing system used to prepare this brief, there are 12,385 words in this brief.

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York*

By: ELLEN BLAIN,
*Assistant United States Attorney*