# 15-2307

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 15-2307

◆━━◆

UNITED STATES OF AMERICA,

*Intervenor-Plaintiff-Appellee,*

ABC, STATE OF NEW YORK, EX REL. JOHN DOE,
UNITED STATES OF AMERICA, EX REL. JOHN DOE,

*Plaintiffs,*

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX FOR INTERVENOR-PLAINTIFF-APPELLEE

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for Intervenor-*
  *Plaintiff-Appellee.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2743

—v.—

ALEX SAAVEDRA,

*Intervenor-Defendant-Appellant,*

SHOMARI GREENE, ALAN KATZ, TAGEWATEE
CHANDARPAUL, SHANDELL SANTIAGO-VELEZ,
MITCHELL McCLINTON, MONIQUE TARRY,

*Intervenor-Defendants,*

DEF, STRUCTURED EMPLOYMENT ECONOMIC
DEVELOPMENT CORPORATION,

*Defendants.*

# INTERVENOR-PLAINTIFF-APPELLEE'S APPENDIX
## TABLE OF CONTENTS

PAGE

Direct Examination of Alan Stephen Katz,
    April 14, 2015 ................................................................................................ PA-1

Excerpt of Re-Direct Examination of Alan Stephen Katz,
    April 15, 2015 .............................................................................................. PA-62

Direct Examination of Ana Yatiz-Bryant,
    April 15, 2015 .............................................................................................. PA-63

Excerpts of the Direct Examination of Mitchell McClinton,
    April 20, 2015 .............................................................................................. PA-94

Excerpts of the Cross Examination of Alex Saavedra,
    April 21, 2015 .............................................................................................. PA-96

The District Court's Jury Instructions,
    April 22, 2015 ............................................................................................ PA-101

F4FJUSA3                        Opening – Schein

1          Based on all the evidence that you'll hear, I am

2    confident that at the end of the case when the defense gets up

3    to give you our summation, after you hear all of the witnesses

4    testify and viewed all of the evidence that is put in, you will

5    find that Alex Saavedra worked tirelessly to help people, that

6    he had no knowledge that any staff member entered false

7    placements into the work source 1 data system and that you will

8    return a verdict for Mr. Saavedra of not liable of the two

9    claims the United States Government has brought against him.

10          THE COURT:  Thank you, Ms. Schein.

11          MS. SCHEIN:  Thank you for your attention and your

12    service.

13          THE COURT:  The government's first witness is Alan

14    Katz.

15     ALAN STEPHEN KATZ,

16          called as a witness by the Government,

17          having been duly sworn, testified as follows:

18    DIRECT EXAMINATION

19    BY MS. SCHOENBERGER:

20    Q.  Good afternoon, Mr. Katz.

21    A.  Good afternoon.

22    Q.  Mr. Katz, did you ever work for an organization called

23    Structured Employment Economic Development Corporation?

24    A.  Yes.

25    Q.  Was that called SEEDCO for short?

F4FJUSA3                         Katz - direct

```
 1    A.   Yes.

 2    Q.   When did you work at SEEDCO?

 3    A.   From August 2009 to October 2011.

 4    Q.   What kind of work did SEEDCO do?

 5    A.   It helped disadvantaged individuals with work supports and

 6    family supports and helped them achieve self-sufficiency.

 7    Q.   When you started at SEEDCO in 2009, what was your role?

 8    A.   My role was senior account manager.

 9    Q.   What were your responsibilities as a senior account

10    manager?

11    A.   It was to oversee the recruitment and placement team, team

12    of recruiters and account managers.

13    Q.   What did it mean to oversee that team?

14    A.   To supervise the team.

15    Q.   What did the team do?

16    A.   They assisted candidates in securing job opportunities

17    throughout Manhattan, throughout the city.

18    Q.   Who did you report to at that time?

19    A.   I reported to Alex Saavedra.

20    Q.   Did you report directly to him?

21    A.   Yes.

22    Q.   What was Mr. Saavedra's role at that time?

23    A.   He was the vice president, center director of the Upper

24    Manhattan Workforce1 Career Center.

25    Q.   What is a Workforce1 Career Center?
```

F4FJUSA3                        Katz - direct

1    A.  Workforce1 Career Center are centers throughout the city,

2    throughout the city overseen by the Department of Small

3    Business Services that assist individuals within the

4    communities with various work supports and help them connect

5    them with employment.

6    Q.  You mentioned the Department of Small Business Services.

7    Is that known also as SBS?

8    A.  Yes.

9    Q.  Do you have an understanding of what SBS was?

10   A.  They oversaw each of the Workforce1 career centers within

11   the boroughs, within all the boroughs, so they awarded

12   contracts to the different vendors.

13   Q.  In October 2009 when you started at SEEDCO, how many

14   Workforce1 centers did SEEDCO operate?

15   A.  I started in August 2009.

16   Q.  Where was that located?

17   A.  Upper Manhattan, 125th Street.

18   Q.  How many people worked at that Workforce1 Career Center at

19   the time?

20   A.  Approximately 40, 45.

21   Q.  How many people did you oversee as senior account manager?

22   A.  Initially, six recruiters, six recruiters and a couple of

23   operations assistants.

24   Q.  What is a recruiter?

25   A.  Account management for fulfillment.  They meet with

F4FJUSA3                          Katz - direct

1   candidates, they screen job seekers that come through the

2   center and refer them to job opportunities.

3   Q.  What is an operations assistant?

4   A.  It is an administrative assistant that supports the

5   recruitment placement team.

6   Q.  Did your title ever change while you were at SEEDCO?

7   A.  It did, it changed, but it was the same job, so it was a

8   senior account manager and then a business services manager.

9   Q.  When did you get the title of business services manager?

10  A.  Some time in 2010.

11  Q.  Did your job responsibilities change at all when you became

12  the business services manager?

13  A.  No.

14  Q.  Who did you report to when you were the business services

15  manager?

16  A.  Alex Saavedra.

17  Q.  Was his role the same?

18  A.  Yes.

19  Q.  What was his role?

20  A.  The vice president, center director Upper Manhattan.

21  Q.  Was there anyone with a higher managerial level at the

22  Upper Manhattan career center than Mr. Saavedra?

23  A.  No.

24  Q.  Did your location of where you worked change at any time?

25  A.  It did in 2011, 1-1-2011.

# PA-5

F4FJUSA3                          Katz - direct

1   Q.  January 1, 2011?

2   A.  Yes.

3   Q.  Where did your location change to?

4   A.  The Bronx Workforce1 Career Center.

5   Q.  At that point how many Workforce1 career centers did SEEDCO

6   operate?

7   A.  We operated two centers, two large centers.

8   Q.  Did SEEDCO still operate the Upper Manhattan center?

9   A.  Yes.

10  Q.  And also the Bronx center?

11  A.  Yes.

12  Q.  Who did you report to in the Bronx?

13  A.  To Alex Saavedra for nine months, my tenure there in the

14  Bronx, and then Tage Chandarpaul the last couple of months.

15  Q.  When you were in the Bronx and reported to Mr. Saavedra,

16  was he the highest level manager in the center?

17  A.  In the Bronx, yes.

18  Q.  Why did you leave SEEDCO in October of 2011?

19  A.  I was terminated.

20  Q.  Do you have an understanding as to why you were terminated?

21  A.  Yes.

22  Q.  What is your understanding?

23  A.  My involvement in improper placements throughout the

24  workforce center in Manhattan and the Bronx.

25  Q.  Can you explain a little more what you mean by that.

# PA-6

1    A.   Sure.   There was an investigation.   There was a whistle

2    blower that came forward with claims of improprieties at the

3    Workforce1 center, and that spawned an investigation into

4    hiring practices and placement practices throughout the center.

5    Q.   Before we get to that, let me ask you, in your job at

6    SEEDCO, did you become familiar with the term "placement

7    targets"?

8    A.   Yes.

9    Q.   What does the term "placement target" refer to?

10   A.   They're quarterly placement goals that the recruitment

11   placement team needs to attain.

12   Q.   Do you know where the targets came from?

13   A.   From SBS.

14   Q.   How do you know that?

15   A.   Each quarter we were given targets through SBS.

16   Q.   How were those targets communicated to you?

17   A.   I don't recall how they're communicated to us, the e-mail

18   or -- I am not sure.

19   Q.   Did you have an understanding as to the purpose of having a

20   job placement targets?

21   A.   Would you repeat the question.

22   Q.   Did you have an understanding as to the purpose of having

23   job placement targets?

24   A.   The purpose, yes.

25   Q.   What was your understanding?

F4FJUSA3                              Katz - direct

1    A.   We need to exceed these targets every quarter, so each

2    center throughout the city was given targets that they had to

3    meet on a quarterly basis, and we just had to place a certain

4    number of job applicants into positions.

5    Q.   Do you recall approximately what a job placement target

6    would be for a quarter?

7    A.   1200 towards the end of my tenure there, 1200, 1300.

8    Q.   Was achieving placement targets a significant part of your

9    job?

10   A.   It was my job.  Yes, that was my job.

11   Q.   Did SEEDCO keep track of its job placements?

12   A.   Yes, yes.

13   Q.   How did it do that?

14   A.   We kept track of job placements through a system called the

15   Work Source1 System.

16   Q.   What is the Work Source1 System?

17   A.   It is an applicant system that tracks job seekers or anyone

18   for that matter who comes into the Workforce1 Career Center.

19          So everyone that comes through the doors, they're

20   registered with the career center so they can obtain free

21   services such as career advisement, recruitment.  They can

22   utilize the computer labs throughout the whole city.

23   Q.   Do you have an understanding as to who had access to the

24   Work Source1 database?

25   A.   Yes.  SBS had access and our operations assistants.

F4FJUSA3                    Katz – direct

1   Q.  Were these operations assistants that you managed?

2   A.  Yes.

3   Q.  Was information regarding job placement provided to SBS?

4   A.  The placements were, yes.

5   Q.  Do you have an understanding of how that information was

6   provided to SBS?

7   A.  Through reports.  They can run reports based on placement

8   numbers and accounts, but also through verbal communication

9   with each of the centers.

10  Q.  When you say "run reports," what do you mean?

11  A.  They oversaw the Work Source1 System, so they can run

12  placement reports and metrics off of entry, data entry that we

13  placed in there.

14  Q.  Were placement numbers discussed within SEEDCO when you

15  worked there?

16  A.  Yes.

17  Q.  By whom?

18  A.  Mostly by me, but also by managers.  We've had regular

19  meetings, whether it was within management team within the

20  career center, whether it was with SEEDCO higher-ups that work

21  within the center, with SBS had daily meetings with the

22  recruitment and placement team.  It was almost constant.

23  Q.  Who were you referring to when you referred to the

24  management team?

25  A.  The coordinators within the center, so Alex, Rick Greene,

# PA-9

F4FJUSA3                      Katz - direct

1   Tage, Shandell, Monique.  Who else?

2         We had a advance at work supervisor Cody was his name,

3   so we had those weekly management meetings within the center.

4   Q.  Were you part of the management team at SEEDCO?

5   A.  Yes, within the career center, within the Workforce1 Career

6   Center, yes.

7   Q.  Did any SEEDCO employees ever communicate any expectations

8   to you regarding placement targets?

9   A.  No.  The communication was that we needed to hit and exceed

10  our targets constantly.  So those were open conversations and

11  constant conversations within the center and just where we were

12  with our targets.

13  Q.  Mr. Katz, if you can take a look at one of the binders in

14  front of you, it is marked as Binder No. 1 and turn to the tab

15  marked 7.  This is a document that is marked as Government

16  Exhibit 7.

17        Mr. Katz, do you know what this document is?  Just one

18  minute.  We are going to make sure that it comes up on

19  everybody's screen.

20        MS. SCHOENBERGER:  Does your Honor have the exhibit in

21  front of him?

22        THE COURT:  7.

23  BY MS. SCHOENBERGER:

24  Q.  Mr. Katz, do you know what this document is?

25  A.  Yes.

# PA-10

F4FJUSA3                          Katz - direct

1   Q.  What is this document?

2   A.  It is an e-mail.

3   Q.  Were you a participant in this e-mail?

4   A.  Yes.

5   Q.  Did you receive it as part of your job at SEEDCO?

6   A.  Yes.

7           MS. SCHOENBERGER:  Your Honor, the United States

8   offers Government Exhibit 7 as evidence.

9           MR. FUTERFAS:  No objection.

10          THE COURT:  Received.

11          (Government Exhibit 7 received in evidence)

12          MS. SCHOENBERGER:  Your Honor, may we publish received

13  exhibits to the jury?

14          THE COURT:  You may.

15          When a document is received in evidence, members of

16  the jury, it is displayed to you, and since it is received in

17  evidence, it is evidence.  You can read it and remember it for

18  what it is worth.

19  BY MS. SCHOENBERGER:

20  Q.  Mr. Katz, we are going to start on Page 2 of this document.

21  If you can look at the one e-mail on that page that includes a

22  table.  Mr. Katz, who sent this e-mail?

23  A.  Lisa Frantzen.

24  Q.  Who is Lisa Frantzen?

25  A.  She is a strategic operations coordinator.

# PA-11

F4FJUSA3                        Katz - direct

1    Q.  Is that a position at SEEDCO?

2    A.  It is a position within each of the Workforce1 career

3    centers.  She was a SEEDCO employee and she was our strategic

4    operations coordinator, I believe, in the Bronx.

5    Q.  What is the date of this e-mail?

6    A.  February 167, 2011.

7    Q.  Did you receive this e-mail?

8    A.  Yes.

9    Q.  Did Alex Saavedra also appear on the "to" line of this

10   e-mail?

11   A.  Yes.

12   Q.  What is the "subject" line here?

13   A.  Workforce1 daily performance, COB February 15, 2011.

14   Q.  Do you have an understanding of what daily performance

15   refers to?

16   A.  Yes.

17   Q.  What does that refer to?

18   A.  Placements.

19   Q.  Do you have an understanding of what information this chart

20   shows?

21   A.  Yes.

22   Q.  What information does the chart show?

23   A.  It shows our overall total placements and the percentage of

24   our goal to date.

25   Q.  What does "total placement" mean?

# PA-12

F4FJUSA3                         Katz - direct

1    A.  They're total placements, direct placements and indirect

2    placements.

3    Q.  What is a direct placement?

4    A.  A direct placement is account manager or recruiter

5    interviews a job seeker, refers to employer, job seeker gets

6    the job, that is a placement.  That is a direct placement.

7         An indirect placement would be candidates that came

8    through the Workforce1 Career Center doors and we've given them

9    any variations of work support.  Maybe a candidate comes

10   through our doors and they're not exactly -- maybe they don't

11   have a resume, maybe they're not sure, maybe they're not sure

12   how to interview.

13        They weren't referred to a job by one of the

14   recruitment placement account managers, but they found a job on

15   their own outside of the service, the actual referral from

16   SEEDCO, so maybe we gave them that confidence to interview on

17   their own.  They found a position on their own, we would call

18   to say Joe Smith, what is your job status?  They found a

19   position on their own.  We didn't refer them directly, but they

20   found it on their own, but we take credit for placement right

21   there.  That is indirect.

22   Q.  Could both direct and indirect placements be counted toward

23   the total placements?

24   A.  Yes.

25   Q.  Other than calling individuals after they've come to the

 1   center, was there any other way to find out if someone actually

 2   got a job after they received services?

 3   A.  Maybe they came back to the center and told us they found a

 4   job, so we could count that as a placement as well.

 5   Q.  Did you receive a daily performance e-mail every day?

 6   A.  Yes.

 7   Q.  Who were the daily performance e-mails sent to?

 8   A.  For the most part the managers, but also sent to the folks

 9   within the center.

10   Q.  Can you turn to Page 1 of this document.  Focus your

11   attention on the bottom e-mail.  Who sent this e-mail?

12   A.  Tage Chandarpaul.

13   Q.  Who was Tage Chandarpaul?

14   A.  At this point, she was the deputy director in the Bronx

15   Workforce1 Center.

16   Q.  Do you know who she reported to?

17   A.  She reported to Alex.

18   Q.  Can you please read the second paragraph of Ms.

19   Chandarpaul's e-mail to the jury.

20   A.  "Going forward, we have to continue to stay ahead of our

21   target to ensure we do not get any red light.  So by the end of

22   this week it is expected that we are at 874 placements for 60

23   percent of our placement goal, which means we need another 124

24   placements by close of business Friday."

25   Q.  Are you familiar with the phrase, "red light"?

# PA-14

F4FJUSA3                         Katz - direct

1   A.   Yes.

2   Q.   What does "red light" mean?

3   A.   You do not, you don't meet your target goal, you don't meet

4   your placement goal.

5   Q.   Did you become familiar with a light system while you were

6   at SEEDCO?

7   A.   Yes.

8   Q.   What is the light system?

9   A.   There are three tiers of placements.  Green light means

10  you're exceeding your placement goal.  Yellow, you're just

11  barely at goal.  And red, you have a lot of work to do.

12  Q.   Can you tell what day of the week this e-mail is sent.

13  A.   Wednesday.

14  Q.   Can you take a look now at the top e-mail on this page.

15  What day of the week was this e-mail sent?

16  A.   Thursday.

17  Q.   Is that the same week as the previous e-mail?

18  A.   Yes.

19  Q.   Who is this e-mail from?

20  A.   It is from Tage Chandarpaul.

21  Q.   Who did this e-mail go to?

22  A.   All staff in the Workforce1 Center in the Bronx.

23  Q.   Who would that have included?

24  A.   All management, all SEEDCO employees in the Bronx including

25  management support employees.

# PA-15

F4FJUSA3                        Katz - direct

1   Q.   Would that have included you as well?

2   A.   Yes.

3   Q.   What is the subject line of this e-mail?

4   A.   "Need another 83 placements."

5   Q.   Can you please read Ms. Chandarpaul's e-mail to the jury.

6   A.   Sure.  "Dear all, as of this morning we are at 764

7   placements; we need another 83 by close of business tomorrow to

8   be at 60 percent.  Please ensure you are doing everything to

9   get us to our target by tomorrow."

10  Q.   Would it have been unusual for you to receive e-mails

11  regarding placements two days in a row?

12  A.   No, not unusual.

13  Q.   Would it be unusual for you to receive a reminder from the

14  deputy director about the exact number of placements that were

15  needed?

16  A.   No.

17  Q.   Mr. Katz, can you please turn to Tab 2 in your binder.

18  This is 2, Government Exhibit 2.

19          Mr. Katz, do you know what this document is?

20  A.   Yes, it is an e-mail.

21  Q.   Is this an e-mail that you received?

22  A.   Yes.

23  Q.   Did you receive it as part of your job at SEEDCO?

24  A.   Yes.

25          MS. SCHOENBERGER:  Your Honor, the government offers

# PA-16

F4FJUSA3                          Katz - direct

1   Exhibit 2 into evidence.

2                MR. FUTERFAS:  Without objection.

3                THE COURT:  Received.

4                (Government Exhibit 2 received in evidence)

5                THE COURT:  You may publish.

6   BY MS. SCHOENBERGER:

7   Q.  Mr. Katz, is Exhibit 2 an e-mail from Alex Saavedra?

8   A.  Yes.

9   Q.  Who was it sent to?

10  A.  Sent to all staff, Upper Manhattan Workforce1 Career

11  Center.

12  Q.  That would have included you again?

13  A.  Yes.

14  Q.  What is the date of this e-mail?

15  A.  Wednesday, April 28th, 2010.

16  Q.  Would you please read the 5th paragraph down to the jury.

17  A.  "It is particularly critical that we meet our current

18  progress and exceed it, especially since Bronx and Queens are

19  already at levels that far surpass others in the system."

20  Q.  At the time that you received this e-mail, did you have an

21  understanding of what "levels" referred to?

22  A.  Yes.

23  Q.  What did "levels" refer to?

24  A.  Placements.

25  Q.  The next paragraph reads:

F4FJUSA3                          Katz - direct

1              "Rick is going to ask every one of the teams to step

2       it up in ways you are already used to and in some ways you are

3       not used to.  We can have not have a slip this quarter, we

4       absolutely cannot."

5              Do you know who Rick is, Mr. Katz?

6       A.  Yes.

7       Q.  Who is Rick?

8       A.  Rick Greene, the deputy director in Upper Manhattan

9       Workforce1.

10      Q.  Who did Mr. Greene report to?

11      A.  He reported to Alex.

12      Q.  Mr. Katz, when you worked at SEEDCO in the Workforce1

13      centers, did you ever instruct employees to report false job

14      placements to SBS?

15      A.  Repeat the question.

16      Q.  Sure.

17             When you worked in the Workforce1 centers, did you

18      ever instruct employees to report false job placements?

19      A.  Yes, but not in those verbatim terms, but, yes.

20      Q.  Can you explain how you gave those instructions.

21      A.  Sure.  I told them that we needed to secure placements by

22      any means necessary.  So any, any job seeker that walked

23      through our center that went through our intake program, our

24      intake team, I would collect CIFs, and so those were from

25      candidates that were currently working.

# PA-18

F4FJUSA3                              Katz - direct

```
1           I've deployed staff to new hire orientations, to

2    employers such as T.J. Maxx, Century 21, Ricky's.  So any high

3    volume employers I would send, send our recruiters with CIFs to

4    these events, with the goal that they would come back with

5    those CIFs completed so we can enter those into our Work

6    Source1 System as a placement even though we really didn't do

7    much work to secure that placement.

8           So to answer your question, I didn't say verbatim go

9    get me improper placements, "get me placements" meant

10   legitimate placements and illegitimate placements.  We needed

11   numbers, and that was always the goal.

12   Q.  I will ask you a few questions about --

13          THE COURT:  Is there anything in that, this document,

14   Exhibit 2, that reflects this?

15          THE WITNESS:  No.

16   BY MS. SCHOENBERGER:

17   Q.  Mr. Katz, a couple of questions about some of the

18   terminology that you used.  First, what is intake?

19   A.  When intake candidates come through for the first time

20   through our center, they are given orientation from our intake

21   staff.  So those are generally the first staff members of the

22   Workforce1 Center that new candidates would meet if they were

23   coming in off the street.

24   Q.  Did you oversee the intake team?

25   A.  I did not.
```

# PA-19

F4FJUSA3                        Katz – direct

1   Q.  What is a CIF?

2   A.  It is a Customer Information Form.

3   Q.  Can you turn to Tab 57 which is actually in the second

4   binder there.

5   A.  Okay.

6   Q.  Mr. Katz, do you know what this document is?

7   A.  Yes, it is a Customer Information Form, CIF.

8   Q.  Is this the type of document that you referred to in your

9   last answer?

10  A.  Yes.

11  Q.  Did you become familiar with documents like these when you

12  worked at SEEDCO?

13  A.  Yes.

14  Q.  Who entered the handwriting on these types of documents?

15  A.  The job seekers.

16  Q.  Were documents like this regularly collected as part of

17  SEEDCO's business?

18  A.  It was, yes.

19          MS. SCHOENBERGER:  Your Honor, the United States

20  offers Government Exhibit 57 into evidence.

21          MR. FUTERFAS:  No objection.

22          THE COURT:  Received.

23          (Government Exhibit 57 received in evidence)

24          THE COURT:  You may publish Exhibit 57 to the jury.

25  BY MS. SCHOENBERGER:

1    Q.  I'll also have you look at -- pardon me -- yes, I'll have

2    you look at Tab 65, please.

3           THE COURT:  Why don't you explain 57 so the jury

4    understands it.

5           MS. SCHOENBERGER:  Yes, your Honor.

6    BY MS. SCHOENBERGER:

7    Q.  When would a job seeker fill out a CIF like this one?

8    A.  They'd fill this out when they came through our Workforce1

9    Career Center or when they met, when they met members of the

10   team.  If they weren't registered in the workforce, in a

11   Workforce1 system, they were handed a Customer Information

12   Form.

13          So they have been through our intake team, it could

14   have been through our recruitment placement team, career

15   advisers and were really connected within the center, can

16   ideally give Customer Information Forms to new candidates, but

17   it was the majority of intake staff and recruitment placement

18   staff.

19   Q.  Can you tell the jury what the first two sections of this

20   form ask from a job seeker.

21   A.  Sure.  The first section is just basic candidate

22   information, name, address, number, e-mail.

23          Section 2, is their education, highest level of

24   education, whether they're enrolled in school, like a job

25   application essentially.

1          MS. SCHOENBERGER:  Mr. Solomon, would you please

2     expand the Part C of the form.

3     BY MS. SCHOENBERGER:

4     Q.  Mr. Katz, what type of information does Part C of this

5     provide?

6     A.  Current employment status.

7     Q.  If you can turn to the second page of the CIF.  How many

8     pages long are these forms?

9     A.  Two pages, generally front and back.

10    Q.  Do you see Section D of the form?

11    A.  Yes.

12    Q.  What type of information is sought in Section D?

13    A.  Work history.

14    Q.  What type of information about work history is asked for?

15    A.  Their working past or are they currently looking, what

16    types of positions have they worked in the past.

17    Q.  If you can take a look at the very last section of this

18    form, Section E.  What is the purpose of this section of the

19    form?

20    A.  This is a verification information that the job seeker

21    would sign off and date.

22    Q.  Do you know what that date signifies?

23    A.  The date, that day that they signed the document and

24    completed the form.

25    Q.  I'll now have you take a look at the document behind Tab

F4FJUSA3                        Katz - direct

1   65.  Do you know what this document is?

2   A.  Yes.

3   Q.  What is this document?

4   A.  This is a CIF.

5   Q.  Is this different than the CIF in the previous Exhibit 57?

6   A.  No.  It is the same.

7   Q.  Does it contain different information?

8   A.  Yes.

9           MS. SCHOENBERGER:  Your Honor, the government offers

10  Exhibit 65 into evidence.

11          MR. FUTERFAS:  No objection.

12          THE COURT:  Received.

13          (Government Exhibit 65 received in evidence)

14  BY MS. SCHOENBERGER:

15  Q.  Can you please take a look at the document behind Tab 66.

16  What is this document?

17  A.  It is also a CIF.

18          MS. SCHOENBERGER:  Your Honor, the government offers

19  Exhibit 66 into evidence.

20          MR. FUTERFAS:  No objection.

21          THE COURT:  Received.

22          (Government Exhibit 66 received in evidence)

23  BY MS. SCHOENBERGER:

24  Q.  And one more, if you can take a look behind Exhibit Tab 67,

25  Government Exhibit 67, what is this document?

F4FJUSA3                          Katz – direct

1    A.  It is a CIF.

2            MS. SCHOENBERGER:  The government offers Exhibit 67

3    into evidence.

4            MR. FUTERFAS:  No objection.

5            (Pause)

6            MS. SCHOENBERGER:  Is this exhibit received, your

7    Honor?

8            THE COURT:  Received.

9            (Government Exhibit 67 received in evidence)

10   BY MS. SCHOENBERGER:

11   Q.  During your time at the Workforce1 Center, did you become

12   familiar with the term CIF'g?

13   A.  Yes.

14   Q.  What is CIF'g referring to?

15   A.  Candidates, having candidates complete CIF forms.

16   Q.  For what purpose?

17   A.  To enroll them into our center with the overall goal of

18   placement.  That was always the goal why you would CIF someone.

19   Q.  Were you CIF'g people that received SEEDCO services?

20   A.  Yes.

21   Q.  Earlier you referred to new hire orientations.  Is that

22   right?

23   A.  Yes.

24   Q.  What is a new hire orientation?

25   A.  Employers would conduct an intro of their employment to a

F4FJUSA3                          Katz – direct

1   new hire, to a new employee of their organization, they would

2   attend an orientation to go over the policies and the

3   positions.

4   Q.  What role did new hire orientations have in generating

5   placements?

6   A.  We would send account managers to these orientations

7   because the understanding was that anyone that was invited, or

8   a job seeker that attended these new hire orientations were

9   hired through the employer.  So we have a new hire orientation

10  that may have 50 individuals that attend, the goal is to CIF

11  folks that you may not have met in the past in your career

12  center.

13  Q.  Were those people then counted as placements?

14  A.  Yes.

15  Q.  Had SEEDCO helped get them those jobs?

16  A.  No.

17  Q.  Did you know that at the time?

18  A.  Yes.

19  Q.  Did the recruiters that you sent to those orientations know

20  that at the time?

21  A.  Yes.

22  Q.  How many times was this done when you worked in Workforce1

23  career centers?

24  A.  As many times as we could.  I couldn't put a number on it.

25  It would really depend on if we managed those accounts, if we

F4FJUSA3                    Katz - direct

1   managed the relationship, so it really depended, but as much as

2   we can attend those, we attended.

3   Q.  How many different employees did you send to new hire

4   orientations to gather CIFs?

5   A.  One, maybe two at the most.

6   Q.  Was that per orientation session or total?

7   A.  Just in general, two events -- well, to orientation, one to

8   two.  It would be the person that managed the account and like

9   an operations assistant could accompany them to help with the

10  CIF collection and completion.

11  Q.  Was there anyone on your team that you didn't send at one

12  time or another to one of these new hire orientations to gather

13  CIFs?

14  A.  No, no.  Irwin Trademan.

15  Q.  Over the course of your little over two years at SEEDCO,

16  how many different people were on your team?

17  A.  14 at the max, 14 were the recruitment placement account

18  managers, the business development account managers, the

19  community-based organization supervisor reported up to me and

20  three operations assistants.

21  Q.  Does that number refer to the size of your team at one time

22  or the total number of employees that you supervised over your

23  time at -- over the course of your time at SEEDCO?

24  A.  No.  That was at full capacity at one time.  I have managed

25  more than that in the Bronx and Upper Manhattan.

```
F4FJUSA3                        Katz - direct
```

1    Q.  Can you tell me about how many total?

2    A.  Just different folks that I've managed.  Total?

3    Q.  Correct.

4    A.  20, 25.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# PA-27

F4enusa1                          Katz – direct

```
 1   Q.  Of those 25, how many did you send to new-hire orientations

 2   to gather CIFs?

 3   A.  I managed 25, 22.

 4   Q.  I believe you mentioned that you worked with an intake team

 5   to generate placements, is that right?

 6   A.  Yes.

 7   Q.  How did that work?

 8   A.  I would go to the intake area and collect CIFs, would have

 9   the intake team or specifically the intake supervisor pull CIFs

10   or hold them to the side of individuals that were currently

11   working so I can collect them.

12   Q.  When you say currently working, what do you mean?

13   A.  Candidates that come to the Workforce1 Center and they were

14   currently employed in a job.

15   Q.  Did you or your team count those as placements?

16   A.  Yes.

17   Q.  How was that done?

18   A.  Our operations assistant would enter the employee or the

19   candidate information into the Worksource system, but would

20   omit the current job that the employee was working at that

21   moment, with the goal to go back in -- I don't know when, a

22   couple of days later or whatever -- to enter placement

23   information in so we can count it as an indirect placement.

24   Q.  Was the information about current employment changed at all

25   in order to be counted as a placement?
```

# PA-28

F4enusa1                              Katz - direct

1    A.  Well, it was not entered in when they entered the new

2    customer information in, but the start date would change.

3    Q.  What do you mean that it would change?

4    A.  For us to count it as a placement that we gave them a

5    service, we reengaged them or we didn't reengage them, but you

6    would have to enter the date, the start date after the day they

7    came in the Workforce1 Career Center.

8            So, in this example, if this person came in and signed

9    the CIF on March 22, 2011 and they were currently working, we

10   couldn't enter their start date, like for this person,

11   August -- I don't know what that says, but it says like August

12   2007.  They put 2007.  Obviously we did not help them secure

13   that position.  So the goal was, you came in, you got the

14   service through us, and then you went out on your own and got

15   this position, but your start date doesn't reflect what your

16   actual start date was.

17   Q.  Other than working with intake to get CIFs and going to

18   new-hire orientations, were there any other practices that you

19   used in order to generate placements during your time at

20   SEEDCO?

21   A.  Yes.  We had access to résumé search through Career Builder

22   and I believe Monster.

23           So one of the tools to -- the résumé search through

24   Career Builder and entering the upper Manhattan Workforce1 zip

25   code and do a search in a 25-mile radius to folks that may be

F4enusa1                         Katz – direct

1  currently employed with the goal that they have somehow been

2  into our center.  At some point, we can say, oh, OK, let me

3  print out Mike Smith's résumé.  He's currently working.  Mike

4  Smith's been here.  He lives in this area.  He is currently

5  working wherever.  We can enter that placement in as we've, you

6  know, kind of like we have engaged the person.

7  Q.  Was this ever done for anyone that did not come into SEEDCO

8  for services?

9  A.  I believe so, yes.

10  Q.  Any other practices besides the ones you've talked about

11  that were used to generate placements?

12  A.  We have had a working relationship with Business Solution

13  Center, that was also operated by SEEDCO.  They had different

14  targets and metrics that they had to meet, such as business

15  development, helping small businesses, but also part of their

16  metric was also developing positions for the recruitment and

17  placement team that I managed to send candidates to.  So we

18  worked with them as well to, you know, bring placements back at

19  some points.

20  Q.  Were those placements for people that SEEDCO had actually

21  helped get jobs?

22  A.  No.  Some of them -- if I could backtrack, yes, some of

23  them.  But there were also folks that we've never seen that

24  would have been sprinkled in.

25  Q.  Of the number of placements that your team entered into

F4enusa1                          Katz - direct

1    Worksource1, do you have an understanding of how many of them
2    were placements for people that SEEDCO had actually helped
3    versus placements for people that SEEDCO had not helped?
4    A.  No.  I'm not sure what the breakdown was.
5    Q.  Do you know how frequently you or members of your team
6    entered placements for people that had not received services at
7    SEEDCO?
8    A.  Often.  It was part of getting the number.  So whether it
9    was legitimate entry of referrals or capturing legitimate
10   placements versus, you know, any of these practices I
11   mentioned, those were just common to make sure that we had the
12   high volume to meet our goals.  So frequent I would say.
13   Q.  Mr. Katz, did you try to hide any of the practices that
14   your team used to generate placements?
15   A.  No.
16   Q.  Did you discuss them at work?
17   A.  Yes.
18   Q.  With whom?
19   A.  Just with -- outward with everyone.  Just everyone within
20   the center, within meetings, whether it was providing
21   updates -- I may not have used the word improper placements,
22   but orientation meant legitimate and high volume.  So it was
23   common, just open speak within the center.
24   Q.  Who would participate in the meetings that you are
25   referencing?

F4enusa1                          Katz - direct

1  A.  We had weekly center-wide meetings.  Everyone at some point

2  during the week participated in these meetings.  It consisted

3  with every day meeting the recruitment and placement team every

4  single day for update.  Once a week we had a management

5  meeting, so internally SEEDCO managers in the Workforce1 Center

6  met.  I met with the business solutions centers, with their

7  management and our management attending as well.  SBS meetings.

8  Towards the end of my tenure those were much more frequent.  So

9  almost every day there was some sort of communication of

10  updates.

11  Q.  At the time that you discussed the practices that you are

12  talking about, did you have an expectation as to whether the

13  people you were talking to would understand whether you were

14  talking about legitimate or illegitimate job placements?

15  A.  It is just focused on numbers.  So whether they were -- you

16  know, whether I meant, you know, illegitimate or legitimate,

17  just my communication was how to get the high-volume number.

18       So, at some points, of course, you know, it was just

19  normal speak within the center of going to the intake team and

20  outward -- you know, we are open floor plan -- saying, "Ana, I

21  went to the intake team and I have 15 CIFs that were collected

22  for the last couple of days.  Enter these in."

23       So I wasn't exactly discreet.

24  Q.  Who is Ana?

25  A.  Ana was an operations assistant, an admin within the

# PA-32

F4enusa1                          Katz - direct

1   recruitment placement team.

2   Q.  Was she a part of the intake team?

3   A.  No, not when I got there.  I believe she worked as part of

4   that team prior to my arrival at some point.

5   Q.  Would there be any reason for Ana to have CIFs from the

6   intake team?

7   A.  Yes.

8   Q.  What was that reason?

9   A.  Well, for her to enter the placements.  She was really our

10  go-to admin when it came to the administrative piece of

11  entering placements into Worksource.  She knew the system

12  really well.

13  Q.  Can we turn back to Exhibit 57 and take a look at those two

14  pages.  Again, is this a customer information form, or a CIF?

15  A.  Yes.

16  Q.  Is there anything on this form that asks for a placement

17  made by SEEDCO?

18  A.  No.

19  Q.  Mr. Katz, can you please turn to tab 10.  This is

20  Government's Exhibit 10.

21          Do you know what this document is?

22  A.  It is an e-mail, yes.

23  Q.  Was this an e-mail that you participated in?

24  A.  Yes.

25  Q.  Did you participate in it as part of your job as SEEDCO in

F4enusa1                          Katz – direct

1   2010?

2   A.  Yes.

3           MS. SCHOENBERGER:  Your Honor, the government offers

4   Government's Exhibit 10 into evidence.

5           MR. FUTERFAS:  No objection.

6           THE COURT:  Received.

7           (Government's Exhibit 10 received in evidence)

8   Q.  Mr. Katz, did you send the top e-mail on this page with the

9   subject line, "Indirect Placements CIF"?

10  A.  Yes.

11  Q.  Who did you send it to?

12  A.  The top e-mail to Anna Marchany and Giselle Rodriguez.

13  Q.  And who are Anna Marchany and Giselle Rodriguez?

14  A.  They are both operations assistants on our team.

15  Q.  Did you send the e-mail at the bottom of this page, which

16  is dated April 13, 2010?

17  A.  Yes.

18  Q.  Who did you send this e-mail to?

19  A.  To Monique Tarry.

20  Q.  Was Monique Tarry a SEEDCO employee?

21  A.  She was.

22  Q.  What was her role?

23  A.  At this time she was the intake coordinator, supervisor.

24  Q.  Can you please read your e-mail to Monique.

25  A.  Sure.

# PA-34

F4enusa1                         Katz – direct

1    Q.  "Hi, Monique.  A gentle reminder to let the team know that

2    if they see anyone that is currently working they can give the

3    CIF to Ana to enter as an indirect placement.  We shouldn't

4    enter the CIF into Worksource, as we cannot capture the

5    placement once the work history is inputted.  Let me know if

6    you have any questions.

7             "Thanks to you and your team for your efforts.

8             "Alan."

9    Q.  Can you explain what you meant by this e-mail.

10   A.  Yes.  I didn't want her team to enter CIFs into Worksource

11   of folks that were currently working.  I wanted them to put it

12   to the side so Ana can enter the placement so she would -- so

13   Ana can enter the CIF and a couple of days later enter a

14   placement for us.

15   Q.  Was it part of the job of Monique Tarry's team to enter

16   information from CIFs into Worksource1?

17   A.  Yes.

18   Q.  Were you asking her team not to do their job?

19   A.  I was asking -- yes, I was asking them to put CIFs that we

20   could potentially get placements for, so, yes.

21   Q.  Why wouldn't you capture the placement once the work

22   history is inputted?

23   A.  Because if it's already inputted, and the date, the date

24   that they started is before the date that they sign their CIF,

25   we couldn't capture any direct placement.

F4enusa1                         Katz - direct

```
 1   Q.  Can you take a look at Ms. Tarry's response to you, which

 2   is the next e-mail up?

 3              THE COURT:  Number?  It's part of 10?

 4              MS. SCHOENBERGER:  It is Exhibit 10, yes, your Honor,

 5   the second e-mail on the page.

 6   Q.  Can you read the first two sentences of Ms. Tarry's e-mail

 7   to the jury.

 8   A.  "Hi, Alan.

 9              "I spoke to Ana and Giselle about this.  As far as I

10   know, there were only a few EIF's submitted where staff forgot

11   to not enter work history.  I also spoke to my team to

12   reinforce that they do not add work history for indirect

13   placements."

14   Q.  What is an EIF?  Do you know what an EIF is?

15   A.  I do.

16   Q.  What is an EIF?

17   A.  I am not exactly sure what the acronym -- but it is a form

18   that we completed once we found out that candidates were

19   placed.  We would complete this EIF form with the placement

20   information.

21   Q.  Typically would an EIF be filled out before or after a CIF?

22   A.  After.

23              THE COURT:  The customer fills out the CIF?  Is that

24   right?

25              THE WITNESS:  Yes, your Honor.
```

F4enusa1                          Katz - direct

1              THE COURT:  And the staff fills out the EIF, is it?

2              THE WITNESS:  Correct, yes.

3              THE COURT:  And then the information flows to where?

4              THE WITNESS:  The information flows into the

5     Worksource system, into our --

6              THE COURT:  A report that captures that?

7              THE WITNESS:  Yes.

8              THE COURT:  What is that called?

9              THE WITNESS:  Worksource1 report, placement report.

10    There are many different reports that we can run.

11             THE COURT:  We saw a job placement report earlier, GX

12    7 I think, Exhibit 7.

13             I'm just trying to let the jury understand the flow.

14             So it starts with the customer filling out something,

15    and then the staff fills out something, the EIF.  The

16    information flows into a job placement report.  Is that

17    generally how it goes?

18             THE WITNESS:  That's correct.

19    Q.  At the time that you had this e-mail exchange with

20    Ms. Tarry, did you have a view as to whether it was important

21    that work history not be entered for indirect placements?

22    A.  It was extremely important, yes.

23    Q.  Why was that?

24    A.  We wouldn't be able to capture a placement if the work

25    history was already entered into the Worksource1 system.

# PA-37

F4enusa1                         Katz - direct

1   Q.  And was that a true placement or a false placement?

2   A.  It was a false placement.

3   Q.  Do you know who was on Ms. Tarry's team that she says that

4   she spoke to about this?

5   A.  I don't remember the name.  Israel Polanco maybe was on her

6   team.  I can't recall the names.

7   Q.  Do you remember how many people were on Ms. Tarry's team?

8   A.  Five maybe.

9   Q.  Do you know who Ms. Tarry reported to?

10  A.  I believe she reported -- yes.

11  Q.  Who did she report to?

12  A.  I believe she reported to Rick Green.

13  Q.  Who did Rick Green report to?

14  A.  To Alex.

15  Q.  What was Rick green's role at the time that Ms. Tarry

16  reported to him?

17  A.  He was the deputy director of the upper Manhattan

18  Workforce1 center.

19  Q.  Were there any managers in the hierarchy between the deputy

20  director, Rick Green, and the director, Alex Saavedra?

21  A.  No.

22  Q.  Did you forward your e-mail exchange with Monique Tarry to

23  Ana Marchany and Giselle Rodriguez?

24  A.  Yes.

25  Q.  Why did you do that?

F4enusa1                          Katz - direct

1   A.  Just to give them a heads-up, just to give them the

2   heads-up that the conversation was had for the intake team to

3   put the work history CIFs to the side.

4   Q.  Can you please turn to tab 6.

5           THE COURT:  How are you doing members of the jury?

6           Still awake?

7           MS. SCHOENBERGER:  Your Honor, this is a fine --

8           THE COURT:  Do you want to water.  Slog through?

9           Keep going.

10  Q.  Mr. Katz, if you can look at what's been marked as

11  Government's Exhibit 6.  Do you know what this document is?

12  A.  Yes.

13  Q.  What is this document?

14  A.  This is an e-mail.

15  Q.  Did you send this e-mail?

16  A.  Just me.  I was in the wrong exhibit.  Excuse me.

17  Q.  Pardon me.  Exhibit 6.

18  A.  Yes.

19  Q.  I will just start again.  What is Exhibit 6?

20  A.  It is an e-mail.

21  Q.  And did you participate in this e-mail?

22  A.  Yes.

23  Q.  Did you participate in this e-mail as part of your job at

24  SEEDCO in 2010?

25  A.  Yes.

# PA-39

```
F4enusa1                          Katz - direct
```

1          MS. SCHOENBERGER:  Your Honor, the government offers

2    Government Exhibit 6 into evidence.

3          MR. FUTERFAS:  No objection.

4          THE COURT:  Received.

5          (Government's Exhibit 6 received in evidence)

6    Q.  Mr. Katz, did you send the e-mail at the top of the page

7    with the subject line, "Need More Indirect Placements" with

8    three exclamation points?

9    A.  Yes, I did.

10   Q.  Can you please read your e-mail to the jury starting with

11   "This e-mail serves"?

12   A.  Sure.

13          "This e-mail serves as a reminder to continue to

14   collect indirect placement.  If you have résumés in your area

15   or receive résumés from customers, please check to see if the

16   customer is currently working, which should be noted as

17   'present' on the résumé.  We've been hitting the green light on

18   a weekly basis due to your assistance so it is greatly

19   appreciated.  Let me know if you have any questions.

20          "Thanks.

21          "Alan."

22   Q.  Can you please explain what you meant regarding résumés in

23   this e-mail?

24   A.  Sure.  If they had regular résumés in their area, they were

25   instructed to check the most current position, generally in the

F4enusa1                          Katz - direct

1    top of résumé, to make sure there was no end date to that

2    employer.  If they were currently working, it should say

3    present, and they should put that to the side so we can enter

4    and figure out how to enter that in for a placement.  So that's

5    an indirect as well.

6    Q.  Would that refer to a placement that SEEDCO had assisted a

7    job seeker in obtaining?

8    A.  No.

9    Q.  Who did you send this e-mail to?

10   A.  To the whole center in upper Manhattan.

11   Q.  And would that have included Alex Saavedra?

12   A.  Yes.

13   Q.  Did you have any concerns about including Mr. Saavedra on

14   an e-mail that discussed a practice that resulted in false

15   placement?

16   A.  No.

17   Q.  Why not?

18   A.  It just wasn't thinking about as -- my focus was how we

19   were going to stay out of a yellow light or below.  I just

20   cared about our numbers.

21   Q.  Do you recall whether Mr. Saavedra responded to this

22   e-mail?

23   A.  I don't recall.

24   Q.  Do you recall whether he ever asked you any questions about

25   this e-mail?

# PA-41

F4enusa1                           Katz - direct

1    A.  No.

2    Q.  Can you please turn to Exhibit 8.  That is behind tab 8.

3            Do you know what this document is?

4    A.  Yes.

5    Q.  What is this document?

6    A.  It is an e-mail regarding indirect placements.

7    Q.  Is this an e-mail that you participated in?

8    A.  I was on the e-mail, so yes.

9    Q.  Was it sent to you?

10   A.  Yes.

11   Q.  Was it sent to you as part of your job at SEEDCO in 2011?

12   A.  Yes.

13           MS. SCHOENBERGER:  Your Honor, the United States

14   offers Government's Exhibit 8 into evidence.

15           MR. FUTERFAS:  No objection, your Honor.

16           THE COURT:  Received.

17           (Government's Exhibit 8 received in evidence)

18   Q.  What is the subject of this e-mail, Mr. Katz?

19   A.  Indirect placements for Ana.

20   Q.  Can you please look at the second e-mail in this string.

21   That's the line in the middle of the page.

22           Do you know who sent this e-mail?

23   A.  Tage Chandarpaul.

24   Q.  Do you know what her role was at the time?

25   A.  She was the deputy director in the Bronx.

```
F4enusa1                    Katz - direct
```

1   Q.   Who was the director in the Bronx at that time?

2   A.   Alex.

3   Q.   And who did Ms. Chandarpaul address her e-mail to?

4   A.   She addressed it to Deborah Stephenson, who is the intake

5   coordinator in the Bronx, she addressed it to myself, and to

6   Ana Marchany.

7   Q.   Did Ms. Stephenson's role differ from Ms. Tarry's?

8   A.   No.

9   Q.   Were they intake coordinators at the same career center?

10   A.   No.   Deborah was the intake coordinator in the Bronx.

11   Monique in 2010 was the intake coordinator in upper Manhattan.

12   Q.   Do you know who Ms. Stephenson reported to?

13   A.   I am not exactly sure, but it could have been Tage

14   Chandarpaul.

15   Q.   Can you please read Ms. Chandarpaul's e-mail to

16   Ms. Stephenson to the jury.

17   A.   Sure.

18          "Hi, Deborah.

19          "We are unable to enter the placement info for the

20   indirects today.  You have to let you staff know not to enter

21   any CIFs for customers that are working.  Leave them for Ana to

22   enter.  If we do not follow this process, the indirect will not

23   be counted."

24   Q.   Do you have an understanding as to what Ms. Chandarpaul

25   meant by her e-mail?

F4enusa1                          Katz - direct

1    A.  Yes.

2    Q.  What was your understanding?

3    A.  That they should not enter work history of folks who came

4    in for the first time currently working into Worksource.  They

5    should put those to the side for Ana Marchany to enter.

6    Q.  Would those placements be true placements or false

7    placements?

8    A.  False placements.

9            THE COURT:  Let me ask you something.  You mentioned

10   direct placements and indirect placements.

11           What are direct placements.

12           THE WITNESS:  Direct placements, recruitment and

13   placement team interviewed candidates, they interviewed job

14   seekers in the center and they send them, they refer them to

15   employers such as T.J. Maxx.  I meet someone in the center, I

16   feel they are the right fit for the position, I send them to an

17   employer for the interview.  They interview with the employer,

18   and they secure the job.

19           THE COURT:  That goes to satisfaction of your target?

20           THE WITNESS:  Yes.

21           THE COURT:  How long does a person have to work in

22   order to satisfy your target?

23           Suppose he comes in for a day and doesn't show up the

24   next day?  Does that count?

25           THE WITNESS:  If they secured the job and didn't show,

F4enusa1                        Katz - direct

1    it shouldn't count.

2                THE COURT:  It should not count?

3                THE WITNESS:  It should not count.

4                THE COURT:  But, normally speaking, when you place

5    somebody and he goes to work, it counts?

6                THE WITNESS:  Correct.

7                THE COURT:  That is a direct placement?

8                THE WITNESS:  Yes.

9                THE COURT:  What is an indirect placement?

10               THE WITNESS:  It's job seekers that came in to our

11   center that we meet with, maybe we didn't refer them to T.J.

12   Maxx but we gave them some, you know, some advice on how to

13   interview, how to reword their résumé, and then they found a

14   job on their own.  They left the center, and they -- you know,

15   this person went down the street to Checkers, you know, the

16   fast food place.  They interviewed, they did really well on the

17   interview, and they got the job on their own, without us

18   referring them.  So we --

19               THE COURT:  Those indirect placements go to satisfying

20   your targets?

21               THE WITNESS:  Yes.

22               THE COURT:  It makes no difference whether it's direct

23   or indirect?

24               THE WITNESS:  For the overall target, correct.

25               THE COURT:  So what makes for an indirect placement?

F4enusa1                              Katz - direct

1   How much effort do you have to go through?

2           THE WITNESS:  We've had to touch them at some point

3   within the center.  How much effort --

4           THE COURT:  Suppose they fill out the form and they

5   disappear and then you find out a month later they have a job?

6   Do you count it?

7           THE WITNESS:  And they came through our center?

8           THE COURT:  They dropped in, they filled out a form

9   and they left.  That is all you know.  They end up having a

10  job.  Is that an indirect placement?

11          THE WITNESS:  It's an indirect placement.

12          THE COURT:  So anything you touch, the person gets a

13  job, it goes to satisfying your targets?

14          THE WITNESS:  Anything we touch.

15          THE COURT:  You define it.

16          THE WITNESS:  Yes.  So if we have the conversation

17  with them and they found the job on their own, yes, we would

18  count that as an indirect placement and that applied to our

19  target.

20          In my orientation team if I sent one of my staff

21  members to a new-hire orientation, we touched the person

22  saying, "Here fill this CIF out.  I met you for the first time,

23  fill the CIF out."

24          If it doesn't work out here, the message was you can

25  always come to our center and we have plenty of opportunities.

F4enusa1                        Katz - direct

1              You are working right now in that orientation.  We

2       didn't touch you.  In your example, we touched them by speaking

3       with them for a couple of minutes to make them aware of us, but

4       that is not an indirect placement -- that is an indirect

5       placement that we --

6              THE COURT:  It goes to satisfy the targets?

7              THE WITNESS:  Right.

8              THE COURT:  So if the person is working already, even

9       though you may process some claim from him, you can't count it?

10             THE WITNESS:  Right.  Exactly.

11             So in the work history example, yes, they came in for

12      the very first time, but they are already employed.  Maybe they

13      are not happy with their job, we don't know, but they're

14      already employed, we met them for the first time, that should

15      not apply to our placement target.

16             THE COURT:  If you introduce them to some other

17      employer and they go to the other employer, you can count them.

18             THE WITNESS:  Yes.

19             THE COURT:  But if he doesn't change his job, you

20      can't count him, is that right?

21             THE WITNESS:  Correct.  Exactly right.

22             THE COURT:  Are is there any other categories that I

23      missed, Ms. Schoenberger?

24             MS. SCHOENBERGER:  I don't believe so, your Honor.

25             THE COURT:  OK.

# PA-47

F4enusa1                          Katz - direct

1    BY MS. SCHOENBERGER:

2    Q.   Just to finish up with looking at Exhibit 8 here, Mr. Katz.

3    Did Ms. Stephenson respond to Tage Chandarpaul's e-mail?

4    A.   She did, yes.

5    Q.   What did she say?

6    A.   She just typed, "Done."

7    Q.   Do you know how many people were on Ms. Stephenson's staff

8    at this time?

9    A.   About six, seven.  The intake folks also oversaw like the

10   front desk staff as well.  So, yeah, six, seven.

11   Q.   And as of the date of this e-mail, January 19, 2011, where

12   were you located?

13   A.   I was in the Bronx:

14   Q.   And where was Ms. Chandarpaul located?

15   A.   She was in the Bronx.

16   Q.   And where was Ms. Stephenson and her team located?

17   A.   In the Bronx.

18   Q.   Who was the director of the Bronx center at that time?

19   A.   Alex.

20   Q.   Can you turn to Exhibit 1, please, under tab 1.  What is

21   this document, Mr. Katz?

22   A.   It is an e-mail.

23   Q.   And was this an e-mail sent during your time that you

24   worked at SEEDCO?

25   A.   Yes.

F4enusa1                         Katz – direct

1   Q.  It was sent within SEEDCO?

2   A.  Yes.

3           MS. SCHOENBERGER:  Your Honor, the government offers

4   Government's Exhibit 1 into evidence.

5           MR. FUTERFAS:  Without objection, your Honor.

6           THE COURT:  Received.

7           (Government's Exhibit 1 received in evidence).

8   Q.  Mr. Katz, can you please take a look at the e-mail at the

9   bottom of this page and tell us who it is from.

10  A.  From Irwin Traydman.

11  Q.  Who is Irwin Traydman?

12  A.  He was operations assistant in upper Manhattan.

13  Q.  Who was this e-mail sent to.

14  A.  It was sent to the upper Manhattan Workforce1.

15  Q.  Can you please read the first two sentences of

16  Mr. Traydman's e-mail.

17  A.  Sure.

18          "This is just a friendly reminder that if you come

19  across any customers who are employed, please capture their

20  placement information and bring it over to me.  We are

21  currently at 164 total placements.  We need to be at 441

22  placements by the end of the month to achieve a green light for

23  January."

24  Q.  What were Mr. Traydman's responsibilities as an operations

25  assistant, if you know?

F4enusa1                         Katz - direct

1   A.   When I first started, he was more of a phone banker.  He

2   was the reengagement person who would, you know, reach out to

3   folks based on reports of people that had been into the center.

4   Then his responsibilities increased with -- when SEEDCO

5   operated the Bronx center.  Ana came to the Bronx, so Irwin

6   stayed in upper Manhattan in the same responsibilities as Ana.

7   Q.   Did Mr. Saavedra respond to Mr. Traydman's e-mail?

8   A.   Yes.

9   Q.   Is that the e-mail at the top of this page?

10  A.   Yes.

11  Q.   Can you please read Mr. Saavedra's response to the jury?

12  A.   "Thanks, Irwin.

13          "I would like to emphasize that it is important to be

14  at par with the rest of the system.  We're also digging in here

15  in the Bronx to capture as many placements as possible."

16  Q.   Who was this e-mail sent to?

17  A.   It was sent to the Workforce1 Career Center in upper

18  Manhattan.  I'm not sure if it was also to the Bronx, but also

19  copying his manager.

20  Q.   Who was Alex's manager?

21  A.   Francine Delgado.

22  Q.   Did Ms. Delgado work in a Workforce1 Career Center?

23  A.   No, she didn't work in the center.

24  Q.   Where did she work?

25  A.   She worked at SEEDCO headquarters.

F4enusa1                          Katz – direct

1   Q.  Where was SEEDCO headquarters located?

2   A.  19th street, Flatiron District, in that vicinity.

3   Q.  Was that outside of the Workforce1 Center?

4   A.  Yes.

5   Q.  Can you please turn to tab 71 -- sorry.  That is in the

6   second binder there.

7           Mr. Katz, what is the document that's been marked as

8   Government's Exhibit 71.

9   A.  It is an e-mail.

10  Q.  Did you participate in this e-mail?

11  A.  Yes.

12  Q.  Was that as part of your job at SEEDCO in 2011?

13  A.  Yes.

14          MS. SCHOENBERGER:  Your Honor, the government offers

15  Government Exhibit 71 into evidence.

16          MR. FUTERFAS:  Without objection.

17          THE COURT:  Received.

18          (Government's Exhibit 71 received in evidence)

19  Q.  If you could look at the e-mail that is in the center of

20  the page, the middle of the string from Tage Chandarpaul,

21  please.

22          What was Ms. Chandarpaul's role at this time?

23  A.  She was the deputy director of the Workforce1 Center in the

24  Bronx.

25  Q.  At this time, April 2011, do you know who the director of

F4enusa1                        Katz - direct

1   the Bronx was?

2   A.  It was Alex, yes.

3   Q.  Can you please read Ms. Chandarpaul's e-mail to the jury?

4   A.  "Hey, guys.  What is our plan for this week to ensure we do

5   not get a red light?  We're behind everyone."

6   Q.  Would it have been unusual for Ms. Chandarpaul to check in

7   on your plan for getting placements?

8   A.  No, it wouldn't be unusual.

9   Q.  How frequently would you receive that kind of check-in?

10  A.  Frequently, whether it was e-mail or verbally or in

11  passing.

12  Q.  Did you respond to Ms. Chandarpaul's e-mail?

13  A.  Yes.

14  Q.  How soon after she sent her e-mail.

15  A.  Seven minutes.

16  Q.  Can you please read the first point on your e-mail.

17  A.  Tage, the team is following up on all referrals.

18  Q.  What does that refer to?

19  A.  Following up with employees or candidates that we referred

20  to jobs.

21  Q.  What would be the result of such follow-up?

22  A.  It would result in direct placements.

23  Q.  Would that be a true or false placement?

24  A.  A true.

25  Q.  Can you please read the second point on your e-mail.

# PA-52

```
F4enusa1                          Katz - direct
```

1  A.  "We've implemented a system in that the career coaches are

2  attending our recruitment events and directing all working

3  candidates to their colleagues for services.  They're going to

4  enter all of the CIFs into Worksource, and we'll capture the

5  placement."

6  Q.  Can you explain what you meant by this point in your

7  e-mail?

8  A.  Yes.  One second.  Yes.  Our career coaches were looking

9  out for CIFs that had employees or candidates, excuse me, that

10  were working, and they would be referred within the center so

11  we can get the placement.

12  Q.  Would that refer to a true placement or a false placement?

13  A.  A false placement.

14          THE COURT:  Let's look at its terms.

15          The career coaches, who were they?

16          THE WITNESS:  They were individuals within the center

17  who assisted with résumé workshops.

18          THE COURT:  Employees of SEEDCO?

19          THE WITNESS:  Yes.

20          THE COURT:  So these coaches are coaching somebody.

21  They are going to recruitment events and directing working

22  candidates.

23          What do you mean by working candidates?

24          THE WITNESS:  To candidates that were currently

25  working.

# PA-53

F4enusa1                         Katz - direct

```
1              THE COURT:  That had jobs?

2              THE WITNESS:  That had jobs, correct.

3              THE COURT:  And these career coaches are directing

4    these people who are working to their colleagues.

5              Who are the colleagues?

6              THE WITNESS:  They are colleagues, the recruitment and

7    placement team to the other career coaches within the center

8    for their types of services.

9              THE COURT:  All employed at SEEDCO?

10             THE WITNESS:  Yes, correct.

11             THE COURT:  And giving more services to these working

12   candidates?

13             THE WITNESS:  Correct.

14             THE COURT:  Then it goes on to say, "They're going to

15   enter" --

16             Who is they?

17             THE WITNESS:  It would be my team, Ana.

18             THE COURT:  Employees of SEEDCO?

19             THE WITNESS:  Employees of SEEDCO, yes.

20             THE COURT:  "All the CIFs."

21             Whose CIFs are they, the working candidates?

22             THE WITNESS:  Yes.

23             THE COURT:  So each of the people who are working on

24   some other job already are filling out CIFs that go into the

25   SEEDCO system.  Is that what is going on?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# PA-54

```
F4enusa1                          Katz – direct
```

 1                  THE WITNESS:  Correct.

 2                  THE COURT:  And the CIFs, "are they being entered into

 3    the WS?"  What is the WS?

 4                  THE WITNESS:  Worksource.

 5                  THE COURT:  Is that a report of some kind?

 6                  THE WITNESS:  That's the system that we used within

 7    the all the Workforce1 Centers to enter candidate information,

 8    job seeker or anyone that came through the doors for services.

 9                  THE COURT:  Only working candidates or?

10                  THE WITNESS:  Everyone.

11                  THE COURT:  Everybody?

12                  THE WITNESS:  Yes.

13                  THE COURT:  Everybody for whom you are looking for

14    credit?

15                  THE WITNESS:  Yes.  That's always the call, yes.

16                  THE COURT:  "And we will capture the placement,"

17    meaning SEEDCO will capture the placement, is that right?

18                  THE WITNESS:  Yes.

19                  THE COURT:  What does it mean, capture the placement?

20                  THE WITNESS:  We will enter the placement.

21                  THE COURT:  And count it as progress towards the goal

22    set by the SBS?

23                  THE WITNESS:  Yes.

24                  THE COURT:  Regardless of whether the person is

25    getting a new job or staying in his old job?  Is that what you

# PA-55

F4enusa1                          Katz - direct

1   mean.

2          THE WITNESS:  That's what I mean.  Correct, yes.

3   BY THE COURT:

4   Q.  Mr. Katz, who besides SEEDCO employees had access to the

5   Worksource1 system?

6          THE COURT:  Louder.  Don't let your voice drop.

7   Q.  Who besides SEEDCO had -- SEEDCO employees had access to

8   the Workforce1 system?

9   A.  The Department of Small Business Services, SBS.

10  Q.  Can you take a look at the third point on your e-mail?

11         THE COURT:  What do you mean by that?  I don't

12  understand that question.  Let me get the question.

13         Who besides SEEDCO had access to the Workforce1

14  system?

15         MS. SCHOENBERGER:  Pardon me.  The Worksource1 system.

16         THE COURT:  What?

17         MS. SCHOENBERGER:  The Worksource computer system.

18         THE COURT:  The WS that you referred to?

19         MS. SCHOENBERGER:  Correct, your Honor.

20         THE COURT:  You said the SBS?

21         THE WITNESS:  Had access to WS, yes.

22         THE COURT:  How did they have access to that?

23         THE WITNESS:  They can view metrics, placement totals

24  through each enter, through each center that they oversaw the

25  referrals --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4enusa1                          Katz - direct

1           THE COURT:  If you capture information in the WS

2     system, based on a CIF filled out by somebody who already was

3     working, does the system make a distinction between that person

4     who is already working and someone who is going to get a new

5     job?

6           THE WITNESS:  Yes, yes.  Because the date, the date

7     that they started their job is entered into the Worksource

8     system from the CIF.  So essentially everything that they

9     include on the CIF, including their current job, legitimately

10    is entered into the Worksource1 system with their current

11    employer, the day they started that job.

12          THE COURT:  But nobody will know from that whether

13    it's a job that you got or a job they already had, is that

14    right?

15          THE WITNESS:  Yes.

16          THE COURT:  Proceed.

17          When you ask questions try to keep the same terms of

18    reference as in the document that you're working with.

19          MS. SCHOENBERGER:  Yes, your Honor.

20    Q.  Mr. Katz, if could you read the third point in your e-mail

21    to the jury.

22    A.  "Intake is giving all CIFs to us."

23    Q.  How does intake giving all CIFs to us respond to

24    Ms. Chandarpaul's question of how you are going to ensure that

25    you don't get a red light?

```
F4enusa1                    Katz - direct
```

1   A.  Because those folks that we get from intake that are

2   currently working, we're going to -- you know, we hope that all

3   of them that came in are currently working, so we can enter it

4   in as an indirect placement at some point.

5   Q.  Did you send this e-mail to Alex Saavedra?

6   A.  Yes.

7   Q.  Did Alex Saavedra respond to your e-mail?

8   A.  He responded, but I'm not sure if he was addressing this

9   e-mail.

10  Q.  Do you see a response from him on this page?

11  A.  Yes.

12          MR. FUTERFAS:  Objection.

13          THE COURT:  Overruled.  Is his response on the page?

14          THE WITNESS:  Yes.

15          THE COURT:  Where?

16          THE WITNESS:  On the top.

17          THE COURT:  It's not evident here.  You mean in the

18  caption?

19          MS. SCHOENBERGER:  Perhaps if I can take a step back.

20          THE COURT:  I will see counsel, one from each team.

21  Mr. Futerfas, you might as well come up.

22      (Continued on next page)

23

24

25

# PA-58

F4enusa1                          Katz - direct

1                  (At sidebar)

2                  THE COURT:  What is the basis of the objection?

3                  MR. FUTERFAS:  The characterization of it as a

4       response.  As the witness testified, the e-mail that he

5       received from Mr. Saavedra was not in response to the prior

6       e-mails.  It was an e-mail, but it was not in response.

7                  THE COURT:  There is no objection that it wasn't from

8       Saavedra?

9                  MR. FUTERFAS:  Correct.

10                 THE COURT:  Objection overruled.

11                 (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
F4enusa1                    Katz - direct
```

1            (In open court)

2    Q.  Mr. Katz, we're looking at Mr. Saavedra's response at the

3    top of the page here.  Can you please read his e-mail to the

4    jury.

5    A.  "I will have to speak with you about something that has

6    come to light."

7    Q.  At the time that you received this e-mail, did you have an

8    understanding of what Mr. Saavedra meant?

9    A.  Not exactly, no.

10   Q.  Did you later develop an understanding of what he meant?

11   A.  Yes.

12   Q.  How?

13   A.  Through a phone call with Alex, Tage, and myself.

14   Q.  When did that phone call take place?

15   A.  If not that day, the next day.

16   Q.  Other than you and Mr. Saavedra and Ms. Chandarpaul, was

17   anyone else on the call?

18   A.  No.

19   Q.  Where were you during that phone call?

20   A.  I was in the Bronx, and we were in Tage's office.

21   Q.  And was Mr. Saavedra also in the Bronx?

22   A.  He was working in the Bronx, but he wasn't in the Bronx

23   that day.

24   Q.  Do you know where he was that day?

25   A.  He was in New Mexico.

F4enusa1                         Katz - direct

1   Q.  What was said on the phone call?

2   A.  It was a very short call.  He said whatever -- a

3   whistleblower has come forward, and whatever is going on in,

4   whatever is going on needs to stop.

5          THE COURT:  What is a whistleblower?

6          THE WITNESS:  An individual within the organization

7   that brought these allegations to light.  I suppose within

8   SEEDCO and SBS.

9   Q.  Did he say anything else besides that there was a

10  whistleblower and that whatever was going on has to stop?

11  A.  No.

12  Q.  Did you say anything on the call?

13  A.  I did.  I asked who the whistleblower was.

14         THE COURT:  I can't hear you?

15         THE WITNESS:  I asked him who the whistleblower was.

16  Q.  Did Mr. Saavedra ask you if the whistleblower's allegations

17  were true?

18  A.  No.

19  Q.  At any point after that call did Mr. Saavedra ask you if

20  the whistleblower's allegations were true?

21  A.  No.

22  Q.  Mr. Katz, were you ever a defendant in this lawsuit?

23  A.  Yes.

24  Q.  Are you still a defendant in this lawsuit?

25  A.  No.

# PA-61

```
F4enusa1                        Katz - direct
```

1    Q.  Why not?

2                THE COURT:  Stop there.

3                You are trying the case against Mr. Saavedra only.

4    You are to put out of your mind whatever happened to other

5    people or companies who may also have been defendants.  What

6    happened to them is of no concern to you.  You have enough

7    business with this particular case alone, and so let's focus

8    only on the case against Mr. Saavedra.

9                MS. SCHOENBERGER:  Your Honor, may the witness respond

10   to the question.

11               THE COURT:  No.  We can talk about it some more after

12   the jury is excused for the day.

13               MS. SCHOENBERGER:  Thank you, your Honor.  I have no

14   further questions at this time.

15               THE COURT:  Cross-examination.

16               JUROR:  Your Honor, can we have a two-minute break.

17               THE COURT:  Sure.  Before you get up, I have another

18   matter that I have scheduled for 4 o'clock.  I'm going take it

19   at 4:30.  So we are going to go until 4:30, and then we will

20   resume at 10 o'clock tomorrow.

21               Five-minute break.  Don't discuss the case, please.

22   Those of you with books can leave them on your chairs.

23               (Continued on next page)

24

25

# PA-62

F4fnusa2                              Katz – redirect

1              My question to him was who's the whistleblower.  And I
2    learned it was Bill Harper.  And I don't remember the rest of
3    the call.  It was relatively short.
4              MS. SCHOENBERGER:  Thank you.
5              THE WITNESS:  That's when I learned.
6    Q.  You testified yesterday when we were talking with
7    Mr. Futerfas that you and others worked hard to get people real
8    jobs, right?
9    A.  Yes.
10   Q.  Some of the job placements that your team took credit for
11   were based on real jobs, right?
12   A.  Yes.
13   Q.  Were some of them based on promotions as well?
14   A.  Yes.
15   Q.  Were some of the jobs that your team took credit for jobs
16   that SEEDCO did not get for people?
17   A.  Yes.
18   Q.  During your time at SEEDCO, did the Workforce1 center ever
19   make a green light, in other words, meet its target placement
20   goals?
21   A.  Yes.
22   Q.  When the center met its placement targets, was that based
23   only on jobs that SEEDCO helped job seekers obtain?
24   A.  No.  It was on proper placements that we've helped
25   individuals obtain and improper.  It was a mixture.

# PA-63

F4fnusa2                          Katz - redirect

1    Q.  To your knowledge, while you were at SEEDCO, did the

2    Workforce1 Center ever meet a placement target without using

3    false placements?

4              MR. FUTERFAS:  Objection.

5              THE COURT:  Overruled.

6    A.  When I started, I was -- I started the end of August, so it

7    was around the time the first targets were met.  So I am not

8    sure if that was legitimate or not.  But during the majority of

9    my tenure, no.  No.  Not legitimate, all the placements, no.

10             MS. SCHOENBERGER:  Thank you.  Nothing further, your

11   Honor.

12             THE COURT:  OK.

13             MR. FUTERFAS:  If I may have a moment.

14             (Defense counsel conferred)

15             MR. FUTERFAS:  Nothing from the defense, your Honor.

16             THE COURT:  You are excused, Mr. Katz.

17             THE WITNESS:  Thank you.

18             (Witness excused)

19             THE COURT:  Next witness.

20             MS. BLAIN:  Your Honor, the government calls Ana

21   Yatiz-Bryant.

22    ANA YATIZ-BRYANT,

23        called as a witness by the Plaintiff,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4fnusa2                           Yatiz-Bryant - direct

1   BY MS. BLAIN:

2             THE COURT:  Ms. Blain, you may inquire.

3             MS. BLAIN:  Thank you, your Honor.

4   Q.  Good morning, Mrs. Bryant.

5   A.  Good morning.

6   Q.  Mrs. Bryant, can you please tell the jury your name again.

7   A.  Ana Yatiz-Bryant.

8   Q.  Did you ever go by the name Ana Marchany?

9   A.  Yes.

10            THE COURT:  I need you to keep your voice up.  Lean

11  forward and speak loudly.

12  Q.  Maybe if I ask the witness to move your microphone slightly

13  closer to your body.  Why do you know go by the name of Ana

14  Yatiz-Bryant?

15  A.  I got married.

16  Q.  Mrs. Bryant, are you currently employed?

17  A.  Yes.

18  Q.  Where do you currently work?

19  A.  Lantern Group.

20  Q.  What is Lantern Group?

21  A.  They provide supportive housing for people with

22  disabilities.

23  Q.  What is your position at Lantern Group?

24  A.  Leasing and compliance.

25  Q.  I'm sorry?

F4fnusa2                        Yatiz-Bryant - direct

1    A.  Leasing and compliance.

2    Q.  Mrs. Bryant, did you ever work at an organization called

3    SEEDCO?

4    A.  Yes.

5    Q.  When did you work at SEEDCO?

6    A.  I believe in 2008.

7    Q.  That is when you started at SEEDCO?

8    A.  Yes.

9    Q.  What positions did you have at SEEDCO?

10   A.  I was the front desk greeter and then operations assistant.

11   Q.  When you started at SEEDCO, at which SEEDCO location did

12   you work?

13   A.  Upper Manhattan.

14   Q.  Was that a Workforce1 Center?

15   A.  Yes.

16   Q.  At your time at SEEDCO, did you always work at the upper

17   Manhattan Workforce1 Center?

18   A.  No, they moved me to the Bronx center.

19   Q.  When did you move to the Bronx center?

20   A.  I think it was 2011 when they first got the center.

21           THE COURT:  Is the jury hearing Ms. Bryant?

22           JURORS:  Yes.

23           THE COURT:  OK.

24   Q.  Now let's focus on the time that you worked at the front

25   desk.  When you worked at the front desk, did you know Alex

F4fnusa2                    Yatiz-Bryant - direct

1    Saavedra?

2    A.  Yes.

3    Q.  Were you familiar with his role?

4    A.  Yes.

5    Q.  What was Alex Saavedra's role at the Workforce1 Center when

6    you worked at the front desk?

7    A.  He was the director.

8    Q.  What were your job responsibilities when you worked at the

9    front desk?

10   A.  Greeted the customers when they came in, asked them what

11   they were there for and directed them in the right direction.

12   Q.  When you worked at the front desk, did you become familiar

13   with the term CIF?

14   A.  Yes.

15   Q.  How did you become familiar with a CIF?

16   A.  When the customers came to the center, we had to give them

17   the CIF form at the front desk so that they can complete it at

18   orientation.

19   Q.  What is a CIF?

20   A.  A customer information form.

21   Q.  Are you familiar with the information on a customer

22   information form?

23   A.  Yes.

24   Q.  What information is contained on a customer information

25   form?

1   A.  The customer's name, address, date of birth, Social

2   Security number, work history, and what they were at the center

3   for.

4   Q.  Do you know who fills out a CIF?

5   A.  A customer.

6   Q.  Mrs. Bryant, if I can please direct your attention to

7   Exhibit 57.  You should have 57 in that second binder in front

8   of you, I believe.

9           MS. BLAIN:  Your Honor, this has been received into

10  evidence.

11          May I publish it to the jury?

12          THE COURT:  You may.

13  Q.  Do you have Exhibit 57 in front of you?

14  A.  Yes.

15  Q.  What is Exhibit 57?

16  A.  A CIF form.

17  Q.  What is the name of the job seeker that appears on the CIF?

18  A.  Amy Bursor.

19  Q.  And if you could turn to the second page, please.  What

20  does the date on the bottom of this document represent?

21  A.  The date that they came for the orientation.

22  Q.  So what date appears on the bottom of this document?

23  A.  January 24, 2011.

24  Q.  What does this person do as reflected in the CIF?

25  A.  Currently working as a bartender.

F4fnusa2                          Yatiz-Bryant - direct

1   Q.  So this person is currently working?

2   A.  Yes.

3   Q.  Would this person be currently working when this person

4   filled out the CIF?

5   A.  Yes.

6   Q.  Where does this document say the person is currently

7   working?

8   A.  The third column on the right, where it says currently

9   employed.

10  Q.  Do you know at what employer this person works?

11  A.  It says Broadway East.

12  Q.  When did this person start that job at Broadway East as

13  reflected on this form?

14  A.  September 2009.

15  Q.  So did this person have this job at Broadway East before

16  going to SEEDCO?

17  A.  Yes.

18  Q.  How do you know that?

19  A.  The job start date is before the date they signed the CIF

20  form.

21  Q.  Mrs. Bryant, are you familiar with the term "placement"?

22  A.  Yes.

23  Q.  What do you understand a placement to mean?

24  A.  When a customer got a job after receiving services at the

25  Workforce1 Center.

F4fnusa2                          Yatiz-Bryant - direct

1   Q.  So, under normal circumstances, would Mrs. Bursor's job

2   here at Broadway East count as a placement by SEEDCO?

3   A.  It shouldn't be.

4   Q.  Why do you say it shouldn't be?

5   A.  Because she was working already.

6   Q.  Do you know what department at SEEDCO was responsible for

7   processing the information on CIFs?

8   A.  The intake department.

9   Q.  Do you know what the intake department would do with the

10  information on CIFs?

11  A.  Place this information into the computer system.

12  Q.  Do you know what that computer system was called?

13  A.  Worksource1.

14  Q.  Are you familiar, or at the time that you worked at SEEDCO,

15  were you familiar with Worksource1?

16  A.  Yes.

17  Q.  What did you understand Worksource1 to be?

18  A.  Just like an online database of all our customers.

19  Q.  After you worked at the front desk, what was your next

20  position?

21  A.  Operations assistant.

22         MS. BLAIN:  Mr. Solomon you can take down Exhibit 57.

23  Thank you.

24  Q.  In what department were you an operations assistant?

25  A.  Recruitment and placement.

F4fnusa2                         Yatiz-Bryant - direct

1    Q.  When you first joined recruitment and placement, who did

2    you report to?

3    A.  Joel Donawal.

4    Q.  Do you know who Mr. Donawal reported to?

5    A.  Alex Saavedra.

6    Q.  Were you familiar with Mr. Saavedra's role at that time?

7    A.  He was still the director.

8    Q.  Did you always report to Mr. Donawal when you were in the

9    recruitment and placement department?

10   A.  No.  Mr. Donawal left.

11   Q.  Who was the next person you reported to?

12   A.  Alan Katz.

13   Q.  Do you recall when you started reporting to Alan Katz?

14   A.  No.

15   Q.  What were your job responsibilities when you joined the

16   recruitment and placement team as an operations assistant?

17   A.  First, I was just, you know, helping the recruitment and

18   placement team with whatever they needed help with entering

19   placements into the system.

20        I did the orientation.  At one point they changed like

21   who was doing the orientation from the intake department, so I

22   did it for a little while.

23   Q.  When you said you entered placements into the system, what

24   did you mean?

25   A.  Data entry of placements.

# PA-71

F4fnusa2                         Yatiz-Bryant - direct

1    Q.  How did you enter placements?

2    A.  There was an EIF form which stated the customer's name,

3    information, their job placement information, so we would just

4    enter it into Worksource1.

5    Q.  I believe you said EIF, is that right?

6    A.  Yes.

7    Q.  What is an EIF?

8    A.  Employment information form.

9    Q.  Are you familiar with the information that would be

10   contained on an EIF?

11   A.  Yes.

12   Q.  Can you tell the jury again what information was on an EIF.

13   A.  The customer's name, some identifying information, like the

14   last four digits of the social or date of birth, and what job

15   they received, the title, the job start date.

16   Q.  How is an EIF different than a CIF?

17   A.  The EIF was given, was submitted when a placement was

18   claimed, and a CIF was given when the customer first walks into

19   the center.

20   Q.  So who fills out an EIF?

21   A.  Staff.

22   Q.  Not a job seeker?

23   A.  No.

24   Q.  Under ordinary circumstances, would the date that a person

25   got a job as reflected on an EIF be after the date that the

# PA-72

F4fnusa2                              Yatiz—Bryant - direct

1   person first went to Workforce1 for help?

2   A.  Yes.

3   Q.  After a SEEDCO staff member fills out an EIF, where would

4   that document go?

5   A.  To the recruitment and placement team.

6   Q.  And that would include you?

7   A.  Yes.

8   Q.  And then what would you do with that document, the EIF?

9   A.  Enter it into the computer.

10  Q.  When you started as an operations assistant, did you get

11  any training on how to enter that information into the

12  computer?

13  A.  No.  It was pretty straightforward.  The EIF paper was the

14  same as in the computer.

15  Q.  What do you mean by the same as in the computer?

16  A.  The same information.  So the EIF would say customer's

17  name, you would type in the customer's name; the title, you

18  would type in the title; start date, type in the start date.

19  Q.  Was recording this information a significant part of your

20  job when you were an operations assistant?

21  A.  Yes.

22  Q.  When you were an operations assistant, did you always

23  accurately enter the information contained on an EIF into

24  Worksource1?

25  A.  No.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4fnusa2                    Yatiz-Bryant - direct

1   Q.  What information did you not accurately enter?

2   A.  We were instructed to play with the start dates and make

3   sure it looked correct in the system.  We were told to, if a

4   customer was working already when they walked in, to enter it

5   into the system.  And if a customer was, came to the, came and

6   was working within the last couple of months to enter it into

7   the system.

8   Q.  When you say play with the start date, what do you mean?

9   A.  So, a customer that came in already working, the start date

10  would be before the date the customer came to the center.  So

11  we had to put a date that was after the date that the customer

12  came in so it wasn't really the date the customer started

13  working.

14  Q.  Mrs. Bryant, if I can direct your attention to Exhibit 57

15  again, and the second page of that.

16          MS. BLAIN:  You can publish it.

17  Q.  If you received information about this job seeker -- we've

18  seen the CIF before, right?

19  A.  Yes.

20  Q.  If you received --

21          THE COURT:  What is the exhibit number again?

22          MS. BLAIN:  Exhibit 57, your Honor.

23  Q.  If you received information about this customer who was

24  currently working at Broadway East, what information, if any,

25  would you change into the Worksource1 system?

# PA-74

F4fnusa2                          Yatiz-Bryant - direct

1    A.  The job start date.

2    Q.  Would you make the job start date come before January 24,

3    2011 or after?

4    A.  After.

5    Q.  What was the purpose of doing that?

6    A.  To make it look right in the system.

7    Q.  How often did you change the start date from an EIF into

8    the system?

9    A.  A lot.

10   Q.  Can you estimate how much a lot is?

11   A.  Maybe 50 percent of the time.

12   Q.  Please turn to tab 10 in your binder, which is the other

13   binder on your table.

14           MS. BLAIN:  Your Honor, this has already been received

15   into evidence.  May I publish it?

16           THE COURT:  What is the number?

17           MS. BLAIN:  Exhibit 10.

18           THE COURT:  Yes, you may.

19           MS. BLAIN:  Thank you very much.

20   Q.  Mrs. Bryant, do you recognize this to be an e-mail string?

21   A.  Yes.

22   Q.  Did you receive this e-mail string?

23   A.  Yes.

24   Q.  On what date did you receive this e-mail string?

25   A.  April 15, 2010.

F4fnusa2                         Yatiz-Bryant - direct

1   Q.  Did this e-mail string to you contain three e-mails?

2   A.  Yes.

3   Q.  What is the subject line of this e-mail?

4   A.  Indirect placements -- CIF.

5            (Continued on next page)

1   Q.  Please focus on the e-mail on the bottom of the page.  Who

2   sent the e-mail at the bottom of the page?

3   A.  Alan Katz.

4   Q.  Who is Mr. Katz at this time?

5   A.  He was the supervisor of Recruitment & Placement.

6   Q.  Was he your supervisor?

7   A.  Yes.

8   Q.  He sends this to someone named Monique Tarry.  Is that

9   right?

10  A.  Yes.

11  Q.  Did you have an understanding who Monique Tarry at the

12  time?

13  A.  Yes.

14  Q.  Who was she?

15  A.  She was the supervisor of intake.

16  Q.  Please read, if you would, to the jury the second sentence

17  of this bottom paragraph starting with, "We shouldn't enter."

18  A.  "We shouldn't enter CIF, the CIF into Work Source as we

19  cannot capture the placement once the work history is

20  inputted."

21  Q.  Did you have an understanding at the time as to who the

22  "we" referred to in this sentence?

23  A.  Staff.

24  Q.  Particularly what staff?

25  A.  Intake.

# PA-77

F4FJUSA3                              Bryant - direct

1   Q.  Did you have an understanding at the time of what, "We

2   shouldn't enter the CIF to the WS" meant?

3   A.  Yes.

4   Q.  What does that mean?

5   A.  That the CIF shouldn't be entered into Work Source.

6   Q.  Did you have an understanding at the time as to what

7   information on the CIF shouldn't be entered into Work Source?

8   A.  The work history.

9   Q.  If we can quickly turn back to Exhibit 57.  So to flip

10  between your binders, Mrs. Bryant.

11  A.  (Pause)

12  Q.  And the second page, can you identify where the work

13  history is on this document that should not be, "should not be

14  entered into Work Source"?

15  A.  Section D, No. 5.

16          MS. BLAIN:  Would you highlight that, please, Mr.

17  Solomon, Section D.

18  BY MS. BLAIN:

19  Q.  Is this the information that you understand Mr. Katz is

20  directing the intake team not to enter into Work Source?

21  A.  Yes.

22  Q.  Flip back to the e-mail which is Exhibit 10.  Again focus

23  on that bottom e-mail, when Mr. Katz writes, "We shouldn't

24  enter the CIF into WS as we cannot capture the placement once

25  the work history is inputted."

F4FJUSA3                            Bryant - direct

1           Did you have an understanding at the time as to what

2      we cannot capture the placement meant?

3      A.  Yes, we can't put it in as a placement.

4      Q.  Why was that?

5      A.  Because if it was put in as work history, you can't,

6      couldn't be counted as a placement.

7      Q.  If we can focus on the second e-mail on the page which is

8      in the middle, if you could read to the jury the first sentence

9      of this e-mail.

10     A.  "I spoke to Ana and Giselle about this.  As far as I know,

11     there were only a few EIFs submitted where staff forgot to not

12     enter work history."

13     Q.  Who sent this e-mail?

14     A.  Monique Tarry.

15     Q.  Who did she end it to?

16     A.  Alex Katz.

17     Q.  Again Monique Tarry was the supervisor of intake?

18     A.  Yes.

19     Q.  Did you have an understanding at the time what she meant

20     when she wrote, "As far as I know, there were only a few EIFs

21     submitted"?

22     A.  That they only submitted a few EIF forms to Recruitment &

23     Placement where the staff forgot to enter work history.

24     Q.  Did you have an understanding at the time whether the

25     intake department was filling out EIFs as well as receiving

F4FJUSA3                          Bryant - direct

1    information from CIFs?

2    A.  Yes.

3    Q.  What was that understanding?

4    A.  If someone came in with a work history, they would fill

5    out -- enter the CIF as well as submit an EIF for placement.

6           We also were instructed to do re-engagement phone

7    calls, so anyone at the center, including intake, would be

8    filling out the EIF forms.

9    Q.  Once intake filled out an EIF with the job seeker's

10   information, what would intake do with that EIF?

11   A.  Bring it to recruitment.

12   Q.  What would you do with that EIF?

13   A.  Enter it into the system.

14   Q.  To the best of your understanding, did EIF sometime contain

15   the work history that was on Part D of that CIF?

16   A.  Yes.

17   Q.  And then Recruitment & Placement, would you enter Part D of

18   that CIF into Work Source1 as a SEEDCO placement?

19   A.  Yes.

20   Q.  In the normal course, would the Recruitment & Placement

21   team have any of these that have CIFs?

22   A.  They shouldn't have.

23   Q.  Why do you say they shouldn't?

24   A.  Because that was intake's document basically.

25   Q.  Could placements in the normal course, could placements be

# PA-80

1  recorded based on the information job seekers gave in a CIF?

2  A.  It shouldn't happen.

3  Q.  Do you know if it actually was?

4  A.  Yes.

5  Q.  Do you have an understanding as to whether you ever entered

6  a person's current employment as having been obtained by

7  SEEDCO?

8  A.  Now I believe I did, yes.

9  Q.  Did you have an understanding at the time?

10  A.  Not really.  I mean the e-mails came, so yes.

11  Q.  What do you mean, "yes"?

12  A.  Yes, we knew because the e-mails directed us basically to

13  do it.

14  Q.  When you changed a job seeker's start date, were you

15  requesting that SEEDCO get credit for that person's job?

16  A.  Can you repeat that.

17  Q.  When you made a job seeker's start date come after the time

18  the person went to Work Source, were you, therefore, requesting

19  that SEEDCO got credit for that job?

20  A.  Yes.

21  Q.  At the time did you know that that person got the job

22  before going to SEEDCO?

23  A.  If it was on the EIF form, there really was no way of

24  telling unless someone told us that it was because the EIF,

25  there wasn't like a verifying -- there was no way to verify a

1    job placement.  We didn't have to call the employers.  We just

2    were entering what was on the EIF form.  So unless we saw the

3    CIF form, we really didn't know.

4    Q.  How did you know what date to back-date the start date?

5    A.  You would look at the services and you will see like the

6    date that it was entered into Work Source1, so you would enter

7    a date after that.

8    Q.  I am sorry.

9            So how did you know what date to make the person's

10   start date?

11   A.  To make it active the date the CIF was entered.

12           THE COURT:  Any date?

13           THE WITNESS:  Yes.

14           THE COURT:  Any date afterwards?

15           THE WITNESS:  Yes.

16           THE COURT:  You picked them?

17           THE WITNESS:  Yes.

18   BY MS. BLAIN:

19   Q.  So why did you enter this inaccurate information into Work

20   Source1?

21   A.  We were directed to do it.

22   Q.  Who directed you to do it?

23   A.  Alan Katz.

24   Q.  How often did Mr. Katz tell you to enter false entries?

25   A.  Like verbally?

F4FJUSA3                          Bryant - direct

1   Q.   What was your understanding about what he told you to do?

2   A.   To enter, just make it look right in the system.

3   Q.   How often did he tell you to do that?

4   A.   Probably a couple of times, and then it just was the common

5   practice.

6   Q.   Was the practice of gathering false placements discussed in

7   meetings?

8   A.   Yes.

9   Q.   Which meetings was it discussed in?

10  A.   Staff meetings.

11  Q.   What do you mean by, "staff meetings"?

12  A.   There would be all-staff meetings and team meetings.

13  Q.   What do you recall hearing in those all-staff meetings

14  about improper placements?

15  A.   They would tell the staff if anyone comes across customers

16  that are working, to submit it into the Recruitment & Placement

17  team.

18  Q.   Do you recall if Mr. Saavedra attended these meetings?

19  A.   Yes.

20  Q.   How often do you recall Mr. Saavedra attending these

21  meetings?

22  A.   Pretty often.  We were mandated to go to the meetings.  We

23  were threatened with a write-up if staff wasn't there.  So for

24  the most part all staff was always at the meetings.

25  Q.   When Mr. Saavedra attended these meetings, was he the

F4FJUSA3                         Bryant – direct

1    highest level manager at these meetings?

2    A.  Yes.

3    Q.  Did he ever run these meetings?

4    A.  Yes.

5    Q.  Was entering false placements into Work Source1 also

6    discussed in Recruitment & Placement meetings?

7    A.  Yes.

8    Q.  Who participated in those Recruitment & Placement meetings?

9    A.  The Recruitment & Placement team.

10   Q.  Do you recall if Mr. Saavedra ever attended these meetings?

11   A.  I am not too sure.

12   Q.  Would you please turn to Exhibit 70 in your binder.

13   A.  70?

14   Q.  Yes, 7-0.  It should be all the way towards the back.

15           THE COURT:  This has not been offered yet?

16           MS. BLAIN:  Correct, your Honor.

17   BY MS. BLAIN:

18   Q.  Mrs. Bryant, do you have Exhibit 70 in front of you?

19   A.  Yes.

20   Q.  What is this document?

21   A.  An e-mail.

22   Q.  Did you receive and send this e-mail string as part of your

23   job at SEEDCO?

24   A.  Yes.

25   Q.  What is the date of this e-mail?

F4FJUSA3                          Bryant - direct

1    A.  January 19th, 2011.

2           MS. BLAIN:  Your Honor, the United States offers

3    Government Exhibit 70 into evidence.

4           MR. FUTERFAS:  No objection.

5           THE COURT:  Received.

6           (Government Exhibit 70 received in evidence)

7           THE COURT:  You may publish it.

8    BY MS. BLAIN:

9    Q.  Mrs. Bryant, this is an e-mail string between you and

10   Rosanna Lam?

11   A.  Yes.

12   Q.  Who is Rosanna Lam?

13   A.  She worked on the intake team.

14   Q.  At what SEEDCO location were you working at the time?

15   A.  The Bronx.

16   Q.  What is the subject line of this e-mail?

17   A.  "Regarding walk-in CIFs who are currently employed."

18   Q.  Mrs. Bryant, if you can read to the jury, focusing on this

19   bottom e-mail, the bottom of the page, the first sentence.

20   A.  "I just wanted to make sure I'm entering appropriate fields

21   for the customers that checked that they are currently

22   employed."

23   Q.  Did you have an understanding what she meant when she

24   wrote, "appropriate fields"?

25   A.  Yes.

# PA-85

F4FJUSA3                          Bryant - direct

1   Q.  What did she mean?

2   A.  The work history part of the CIF.

3   Q.  Did you have an understanding what she meant when she

4   wrote, "I'm entering appropriate fields for the customers that

5   checked they're currently employed"?

6   A.  Yes.

7   Q.  What did you understand that to mean?

8   A.  She wanted to know the right information to put into Work

9   Source for the customers that came into the center working.

10  Q.  Can you read, please, to the jury the next sentence.

11  A.  So far I've entered everything as-is from the CIF,

12  including the customer is employed.

13  Q.  Did you have an understanding as to what she meant when she

14  wrote so far I've entered everything as is from the CIF?

15  A.  Yes, she entered everything that was written on the CIF.

16  Q.  When she says, "Including that the customer's employed," do

17  you have an understanding what that meant?

18  A.  That she clicked the customer was currently employed in the

19  system.

20  Q.  Can you read to the jury the next sentence, please.

21  A.  "As per Deborah's request, I'm not entering the current job

22  info during the work history tab."

23  Q.  When she wrote, "I am not entering the current job info,"

24  what did you understand her to mean?

25  A.  That she is not inputting the customer's current job

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4FJUSA3                         Bryant - direct

1    information.

2    Q.   Would that be reflected in Section D of the CIF?

3    A.   Yes.

4    Q.   The same sort of Section D that you've seen?

5    A.   Yes.

6    Q.   Can you read to the jury the next sentence, please.

7    A.   "Let me know if there's anything that needs to be done

8    differently."

9    Q.   Do you have an understanding what she meant?

10   A.   She is asking if she is doing it correctly.

11   Q.   Can you please focus on your response.  Can you read to the

12   jury the first sentence of your response to her.

13   A.   "If the customer is currently working, we should not mark

14   'currently employed' when entering the CIFs."

15   Q.   What did you mean when you wrote, "We should not mark

16   currently employed when entering the CIFs"?

17   A.   That we shouldn't put that the customer is currently

18   working.

19   Q.   We should not put that where?

20   A.   In Work Source1.

21   Q.   Can you please read the next sentence.

22   A.   "That may raise a red flag when we enter the placement

23   information."

24   Q.   What do you mean, that that may raise a red flag?

25   A.   I meant if the customer came in working, it needed to be

1   put in as work history.  It wouldn't be counted as a placement.

2   Q.  Why wouldn't it be counted as a placement?

3   A.  Because it will be in work history.

4   Q.  Could you go back into the system once work history was

5   inputted by intake?  Let me rephrase that question.

6           Could you go back into that system and exchange the

7   work history once work history was entered by intake?

8   A.  I don't think so.  I am not sure.

9   Q.  Once work history was entered by intake into Work Source1,

10  that is the way it appeared in Work Source1?

11  A.  Yes.

12  Q.  Can you please read the next sentence.

13  A.  "Please mark them as unemployed."

14  Q.  What did you mean by that?

15  A.  That she should have checked they weren't working when they

16  came into the center.

17  Q.  Where should she check they're not working?

18  A.  In Work Source1.

19  Q.  As a result of this, what were you instructing her to do?

20  A.  Put that the customer wasn't working in the system.

21  Q.  Even if the customer was working?

22  A.  Yes.

23  Q.  Can you read the next sentence, please.

24  A.  "Also I will need a copy of the CIFs for the customers that

25  are currently working so I may capture that information."

F4FJUSA3                          Bryant - direct

1   Q.  When you wrote "capture that information," what did you

2   mean?

3   A.  Enter it as a placement.

4   Q.  As a result of intake not entering a job -- withdrawn.

5          As a result of intake not entering a customer's

6   current job, would you then use that person's current job as a

7   SEEDCO placement?

8   A.  Yes.

9   Q.  Even though that person got the job before going to SEEDCO?

10  A.  Yes.

11  Q.  If you could turn, please, to Tab 5 in that same binder.

12  A.  In the other one?

13  Q.  It will be in the front.

14          MS. BLAIN:  This has not yet been received, your

15  Honor.

16          THE COURT:  What is the number?

17          MS. BLAIN:  Exhibit 5.

18  BY MS. BLAIN:

19  Q.  Do you have Exhibit 5 in front of you, Mrs. Bryant?

20  A.  Yes.

21  Q.  What is this document?

22  A.  An e-mail.

23  Q.  Are you copied on this e-mail string?

24  A.  Yes.

25  Q.  What date is this e-mail string?

F4FJUSA3                          Bryant - direct

1   A.  April 7th, 2011.

2   Q.  Did you receive and send this e-mail string as part of your

3   job at SEEDCO in 2011?

4   A.  Yes.

5            MS. BLAIN:  Your Honor, we offer Exhibit 5 in

6   evidence.

7            MR. FUTERFAS:  No objection.

8            THE COURT:  Received.

9            (Government Exhibit 5 received in evidence)

10  BY MS. BLAIN:

11  Q.  If you could please focus on the second to, the e-mail the

12  second from the top.  It is from Alan Katz.  Again what is the

13  date of this e-mail?

14  A.  April 7th, 2011.

15  Q.  Who did Mr. Katz send this e-mail to?

16  A.  Tage Chandarpaul, Andy Marmolejos and myself.

17            THE COURT:  Please keep your voice up.

18  BY MS. BLAIN:

19  Q.  Who is Tage Chandarpaul at this time?

20  A.  She was the director of the Bronx center.

21  Q.  Do you know who she reported to?

22  A.  Alex Saavedra.

23  Q.  Who is Andy Marmolejos at this time?

24  A.  He was the community-based liaison.

25  Q.  Do you know to whom he reported at the time?

F4FJUSA3                         Bryant - direct

1   A.  I believe Alex Saavedra.

2   Q.  Can you read to the jury what Mr. Katz writes in this

3   e-mail.

4   A.  Can you repeat that?

5   Q.  Can you read to the jury what Mr. Katz writes in this

6   e-mail.

7   A.  "Ana, correct me if I'm wrong, but they're entering the

8   CIFs minus the work history for us to capture the placement

9   without any backlash from SBS, right?"

10  Q.  Did you have an understanding as to what Mr. Katz meant

11  when he said they're entering the CIFs?  Who is "they"?

12  A.  Intake.

13  Q.  Did you have any understanding at the time what he meant

14  when he wrote, "they're entering the CIFs minus the work

15  history"?

16  A.  Yes, the intake wasn't going to put the work history from

17  the CIF.

18  Q.  What did you understand him to mean when he wrote they are

19  entering the CIFs --

20          MS. BLAIN:  I am sorry, your Honor.  I am trying to

21  make this have no feedback.

22          THE COURT:  I need you to keep your voice up.  That is

23  the basic point.

24          MS. BLAIN:  My voice?

25          THE COURT:  Your voice and the witness's voice.

# PA-91

F4FJUSA3                        Bryant – direct

1              MS. BLAIN:  Okay.

2    BY MS. BLAIN:

3    Q.  Again focusing on this e-mail, Mrs. Bryant, what did you

4    understand him to mean when he wrote they're entering the CIFs

5    minus the work history for us to capture the placement?

6    A.  That intake was entering the CIFs without the work history.

7    Q.  What did you understand him to mean when he wrote, "without

8    any backlash from SBS"?

9    A.  That we wouldn't get in trouble.

10   Q.  Why would you have gotten in trouble?

11   A.  Because if a customer came in working, they should have

12   been put in as work history.

13   Q.  How did you respond to Mr. Katz?

14   A.  "Correct."

15   Q.  If you can please turn to Exhibit 3 in your binder, Tab 3.

16   What is this document?

17   A.  An e-mail.

18   Q.  Did you receive this e-mail as part of your job at SEEDCO?

19   A.  Yes.

20   Q.  What is the date of this e-mail?

21   A.  January 15th, 2009.

22             MS. BLAIN:  Your Honor, the United States offers

23   Government Exhibit 3 into evidence.

24             MR. FUTERFAS:  No objection.

25             THE COURT:  Received.

# PA-92

F4FJUSA3                          Bryant - direct

1          (Government Exhibit 3 received in evidence)

2          THE COURT:  It may be published.

3   BY MS. BLAIN:

4   Q.  Mrs. Bryant, is this the top e-mail an e-mail from Alex

5   Saavedra?

6   A.  Yes.

7   Q.  He sent it to staff WF1 CC.  Is that right?

8   A.  Yes.

9   Q.  Who is included in the staff WF1 CC?

10  A.  Everyone who worked at the Workforce1 Center.

11  Q.  Would that include you?

12  A.  Yes.

13  Q.  Can you please read the first paragraph of his e-mail.

14  A.  "We won't have a lot of time to get on track.  We'll brief

15  everyone on our quarterly face-to-face.  Placements is the

16  biggest problem, mainly our percentage of fulfillment."

17  Q.  Did you have any understanding as to what he meant when he

18  wrote placements is the biggest problem?

19  A.  That we haven't captured enough.

20  Q.  Can you please read the next paragraph to the jury.

21  A.  "I would like for everyone to double their efforts to gain

22  indirect placements as the R/P team is digging in to build a

23  decent quarter."

24  Q.  Did you understand what the R/P team meant?

25  A.  Yes.

F4FJUSA3                              Bryant – direct

1   Q.  What did that mean?

2   A.  Recruitment & Placement.

3   Q.  Mrs. Bryant, when did you stop working at SEEDCO?

4   A.  October 2011.

5   Q.  Do you have an understanding as to why you stopped working

6   at SEEDCO?

7   A.  They terminated me due to the investigation.

8   Q.  What investigation are you referring to?

9   A.  The investigation into false placements.

10          MS. BLAIN:  Thank you very much.

11          THE COURT:  Did you conclude your questioning?  Have

12  you concluded your questioning?

13          MS. BLAIN:  Yes, your Honor, I have.

14          THE COURT:  Cross-examination, Mr. Futerfas.

15          MR. FUTERFAS:  Thank you, your Honor.  May I inquire?

16          If the government can leave up, if possible, what they

17  just had up which was Government Exhibit 3.

18          THE COURT:  Yes, leave it up.

19  CROSS-EXAMINATION

20  BY MR. FUTERFAS:

21  Q.  Ms. Bryant, good afternoon.

22  A.  Good afternoon.

23  Q.  Let me direct your attention to the third paragraph in that

24  e-mail on Government Exhibit 3.  That is actually underlined.

25  Could you read those words, please, to the jury.

# PA-94

F4knusa1                          McClinton - direct

1   Q.  Mr. McClinton, did you hear Mr. Saavedra refer to an Alan

2   in that clip?

3   A.  Yes, I did.

4   Q.  Do you have understanding who Alan is?

5   A.  Yes.

6   Q.  Who is Alan?

7   A.  At the time Alan Katz.  I believe he was also a business

8   services manager at the time --

9           THE COURT:  Keep your voice up.

10  A.  -- or a director for the Bronx location.

11          MS. SCHOENBERGER:  Mr. Solomon, if you can pick up the

12  recording again at minute 14 and 45 seconds, please.

13          (Audio played)

14          MS. SCHOENBERGER:  Thank you, Mr. Solomon.

15  Q.  Mr. McClinton, who does Mr. Saavedra tell you to lock and

16  step with here?

17  A.  Alan Katz.

18  Q.  Did you understand Mr. Saavedra to be giving you

19  instructions during this meeting?

20  A.  Yes.

21  Q.  What did you understand those instructions to be?

22  A.  That to just speak numbers that would appease SBS.

23  Q.  What do you mean appease SBS?

24  A.  If I have to fluff a little, then fluff a little.  Just to

25  quote-unquote bullshit Jackie Mallon.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# PA-95

F4knusa1                    McClinton – direct

1   Q.  Jackie Mallon was an SBS employee, is that right?

2   A.  Yes.

3           MS. SCHOENBERGER:  We are now going to play some

4   additional excerpts from this recording that were designated by

5   the defendant.

6           So Mr. Solomon, if you can begin the recording at

7   minute 3, 25 seconds.

8           THE COURT:  You will see on the transcript these are

9   defendant's excerpts.  In other words, Mr. Futerfas has gone

10  over the same document, and we are doing it all together to

11  save time.

12          (Audio played)

13          MS. SCHOENBERGER:  Mr. Solomon, if you can begin at 4

14  minutes 38 seconds, please.

15          (Audio played)

16          MS. SCHOENBERGER:  Mr. Solomon, if you can begin at

17  minute 6 and 4 seconds.

18          (Audio played)

19          (Continued on next page)

20

21

22

23

24

25

F4lnusa2                        Saavedra - cross

```
 1              MS. SCHOENBERGER:  Your Honor, may I approach the
 2      witness?
 3              THE COURT:  Yes.
 4      A.  Thank you.
 5      Q.  You're welcome.
 6              If you can please look at page 182 of this transcript,
 7      and at lines 21 through 25.
 8              THE COURT:  Is there a question?
 9              MS. SCHOENBERGER:  Question --
10              THE COURT:  No.
11              Were you asked and did you answer the following
12      question.
13      Q.  Mr. Saavedra and did you answer the following question.
14      A.  Yes.
15      "Q. Did you state verbally to staff that their jobs were at
16      stake if with respect to placement numbers?
17      "A. I'm sure I did.  On -- on different occasions, yes.  My job
18      was on the line."
19              Was that your answer?
20      A.  Yes, it is.
21      Q.  So you also stated to your employees that their jobs were
22      at stake with respect to placement numbers, right?
23              THE COURT:  That was your answer.  Does that now
24      refresh your recollection that --
25              THE WITNESS:  It does.
```

# PA-97

F4lnusa2                          Saavedra - cross

1           THE COURT:  -- your job was on the line?

2   A.  Yes, it does.

3   Q.  You stated to your employees, didn't you, that their jobs

4   were at stake with respect to placement numbers?

5   A.  I did, yes.

6   Q.  You stated that in meetings, didn't you?

7   A.  I think it was at one meeting, yes, or maybe a couple, yes.

8   Q.  And in one-on-one conversations?

9           THE COURT:  Don't read it.  It is a question about

10  your recollection.  Do you now remember that you told your

11  employees that their jobs also were on the line?

12          THE WITNESS:  I do, your Honor.  Yes.

13  Q.  And you stated that in meetings you testified, yes?

14  A.  Yes.

15  Q.  And you stated it in one-on-one conversations with your

16  employees, didn't you?

17  A.  On occasion perhaps, yes.

18  Q.  And in e-mails as well, isn't that right?

19  A.  I don't recall.

20  Q.  Let's turn to Government's Exhibit 2.

21          MS. SCHOENBERGER:  If you could bring that up, please,

22  Mr. Solomon.

23  Q.  Do you recall your counsel showing you this exhibit just

24  before lunch?

25  A.  I do.

F4lnusa2                          Saavedra - cross

1   Q.  And you testified, didn't you, that the statement, "Rick is

2   going to ask every one of the teams to step it up in ways you

3   are already used to and in some ways that you are not used to,"

4   to be referring to certain data reports that you were asking in

5   order to prepare your proposal.  Was that your testimony?

6   A.  Yes.

7   Q.  But right before that sentence, you said, "It is

8   particularly critical that we meet our current progress and

9   exceed it."  Isn't that right?

10  A.  Correct.

11  Q.  And right after that sentence, you say, "We cannot have a

12  slip this quarter."  And, in all capitals, "We absolutely

13  cannot."  Do you see that?

14  A.  Yes, I do.

15  Q.  And that's referring to the center's placement numbers,

16  isn't it?

17  A.  Yes.

18  Q.  You also looked at what's been marked as Government Exhibit

19  71.  Do you remember that?

20          MS. SCHOENBERGER:  Mr. Solomon, if you can bring that

21  up, please.

22  A.  Yes, I do remember seeing that.

23  Q.  And you received the e-mail from Alan Katz dated April 7,

24  2011 at 1:10 p.m., correct, the second e-mail on this page?

25  A.  Correct.

F4lnusa2                        Saavedra - cross

1    prepare him for a presentation to SBS, isn't that right?

2    A.  You're correct.

3    Q.  SBS is a governmental agency, isn't that right?

4    A.  Yes.

5    Q.  And it is a governmental agency that provided federal

6    funding used to operate the Workforce1 Centers that you

7    directed, isn't that right?

8    A.  Correct.

9    Q.  And you were very concerned about Mr. McClinton's

10   presentation regarding the center's numbers to SBS, weren't

11   you?

12   A.  I was concerned about his presentation.

13   Q.  You made him do a practice presentation for you, is that

14   what you testified?

15   A.  Yes, I did.

16   Q.  And you were concerned about his performance, weren't you?

17   A.  Yes.

18   Q.  And you told him that he needed to take an acting class,

19   right?

20   A.  I believe I did, yes.

21   Q.  You told him that he was very honest, right?

22   A.  I do believe I did.

23   Q.  That he wasn't a gab artist, right?

24   A.  I do recall that, yes.

25   Q.  And that he didn't know how to bullshit like you and Alan

F4lnusa2                          Saavedra – cross

1   Katz, isn't that right?

2   A.  I did say that.

3   Q.  You resigned from SEEDCO, didn't you, Mr. Saavedra?

4   A.  I did.

5   Q.  That was in March of 2012?

6   A.  Correct.

7   Q.  That was the same month that DOI's investigative report

8   came out, wasn't it?

9   A.  Yes.

10   Q.  It was strongly recommended that you resign, wasn't it?

11   A.  Yes.

12          MS. SCHOENBERGER:  Nothing further, your Honor.

13          THE COURT:  Very briefly, your Honor.

14          All right.

15   REDIRECT EXAMINATION

16   BY MR. FUTERFAS:

17   Q.  Mr. Saavedra, at the time that you met with Mr. McClinton

18   in that meeting in September, had he been your direct report?

19   A.  No, not up to that point.

20   Q.  Who had he reported to before that?

21   A.  Rick Green.

22   Q.  So how long had you had to know him at the time you met

23   with him?

24   A.  At most a week or two.  He had been on vacation.  I had

25   transitioned back to the Harlem center while he was on

# PA-101

F4nmusa4                          Charge

1                    A F T E R N O O N    S E S S I O N

2                         (2:30 p.m.)

3           (Jury present)

4           THE COURT:  Good afternoon, members of the jury.

5           Be seated, everyone.

6           So, as did the lawyers, I would like to thank you for

7     your attention, your patience, and your involvement in this

8     case.  Cases in this court are important.  They are important

9     to the parties.  They are important to the public.  They are

10    important in our society.  They require the participation of a

11    jury.  You participated, you have been a partner with the

12    lawyers, with me, in administering this case, and now to

13    continue in doing the proper justice in this case.

14          The last phase of this trial is to deliver these

15    instructions.  These instructions will be the law of the case.

16    As I told you before, they are the law because this is my job

17    to present to you.  Your job is to follow the law in finding

18    the facts.  You should not ask yourself if what I say is wise

19    or not wise in the whole or in any respect.  Your job is to

20    follow it.  It is my job to be the judge in the case and to

21    give you the law to follow.

22          The jury charge will do three things.  I will explain

23    the rules and procedures that generally apply to a jury trial.

24    I will explain how you determine if the plaintiff has proved

25    that it is entitled to recovery by a preponderance of the

F4nmusa4                         Charge

1   evidence, and I will explain the procedures by which you

2   conduct your deliberations.

3          As I said, the jurors are critical to the

4   administration of justice.  The United States Constitution and

5   statutes provide for the right to a jury trial in civil cases

6   as well as in criminal cases.  This right to trial by jury is

7   an important safeguard of individual liberties and the

8   rendition of justice fairly and impartially to all of the

9   citizens and inhabitants of the land.

10         Your role as jurors is to pass upon and decide the

11  fact issues in the case.  You are the sole and exclusive judges

12  of the facts, you pass upon the weight of the evidence, you

13  determine the credibility of the witnesses, you resolve

14  whatever conflict might exist in the testimony, and you draw

15  whatever reasonable inferences are appropriate to be drawn from

16  the facts as you see the facts.  I will give you some of the

17  rules that you can use in applying these determinations to

18  credibility issues, fact issues, conflict issues and the like.

19         You took an oath to render judgment impartially and

20  fairly without prejudice or sympathy, without fear, based

21  solely upon the evidence in the case and the applicable law.  I

22  know that you will do this and reach a just and true verdict.

23         The evidence before you consists of the answers given

24  by witnesses, that is, their testimony and the exhibits that

25  were received in evidence.  You must base your verdict solely

# PA-103

F4nmusa4                              Charge

1   upon the evidence developed at trial or the absence of evidence

2   on any particular issue that it's that party's burden to prove.

3          What I have said, what the lawyers have said, that is

4   not evidence.  What the witnesses say is the evidence.

5          You may not consider any testimony or exhibits that I

6   directed you to disregard or that I kept from being entered

7   into evidence.  If I struck an answer, you must entirely

8   disregard it as though the words were never spoken.  Questions

9   not answered are not evidence.  Objections that are argued are

10  not evidence.  You should not infer from a failure to answer an

11  objectionable question or a document that was not allowed what

12  that witness might have said or what the document might have

13  said.  They are not evidence.  Only that which was testified to

14  responsive to questions and what the documents say that are in

15  evidence are allowed to be considered.

16         The United States has alleged that it was injured as

17  the result of actions committed by Mr. Saavedra.  As the

18  plaintiff, the United States must prove the facts to support

19  its allegations by a preponderance of the evidence.  And when

20  the United States appears as a party, whether it be a plaintiff

21  or a defendant is of no account.  It's not to be given any

22  preference or any bias or any weight whatever.  It is the same

23  as any individual, no different.  Mr. Saavedra and the United

24  States are equal under the law in this Court, and you must be

25  guided accordingly.

1           When a party is required to prove a fact by a

2     preponderance of the evidence, it means that the party must

3     prove that the fact is more likely true than not true.  A

4     preponderance of the evidence means the greater weight of the

5     evidence.  In determining if a claim has been proved by a

6     preponderance of the evidence, you should consider the relevant

7     testimony of all witnesses, regardless who called them, and all

8     exhibits received in evidence, regardless who presented them.

9     If you find that the credible evidence on a given issue is

10    evenly divided between the parties, that is, it is equally

11    probable that plaintiff is right as it is that the defendant is

12    right, then that issue is decided against the plaintiff.

13          However, if plaintiff proves, however so slightly,

14    that the plaintiff's proof is more likely true than not true --

15    ever so slightly -- that's sufficient to qualify as a

16    preponderance of the evidence.  In preparation for the trial I

17    gave you the example of a scale with weights on either side --

18    equal.  If it's equal, no one has proved by the preponderance,

19    and it's the plaintiff's burden to do that.  If it tips ever so

20    slightly, that means that the party, if it tips in favor of

21    that party, the party with the burden of proof has proved by a

22    preponderance.

23          You may have heard of proof beyond a reasonable doubt,

24    which is the standard of proof in a criminal trial.  That does

25    not apply here.  Our standard is preponderance of the evidence.

1          The United States, the plaintiff, has made two

2     categories of allegations against Alex Saavedra, the defendant.

3     The first allegation is that Mr. Saavedra knowingly presented

4     or caused to be presented false and fraudulent claims for

5     payment to the United States or some party connected to the

6     United States.  Mr. Saavedra denies that false and fraudulent

7     claims for payment were presented, and he denies that he had

8     any knowledge of any false or fraudulent claims.  Thus, the

9     issue is drawn for you to consider.

10          The fact that somebody made an allegation is not

11     proof.  The fact that someone denied an allegation is not

12     proof.  Your job is to see if the party with the burden of

13     proof, that is, the United States, proved its claim by a

14     preponderance of the evidence.

15          The second category of allegation is that Mr. Saavedra

16     knowingly caused false records or statements to be made or used

17     which were material to a false or fraudulent claim made to the

18     United States or a party connected with the United States --

19     knowingly caused false records or statements to be made or used

20     material to a false or fraudulent claim.

21          Again, Mr. Saavedra denies that anything was false or

22     anything was material or he knew about any false records or

23     statements, and thus the issue is drawn as to the second claim.

24          In the next few minutes I will define each of these

25     terms.  The government must prove each of these terms by a

F4nmusa4                          Charge

```
1    preponderance of the evidence in order to succeed on the
2    category of claim.
3          We are dealing with the False Claims Act.  That is a
4    statute of the United States.  It is found in title 31, Section
5    3729, of the laws of the United States.
6          It provides in relevant part that "any person who . .
7    . knowingly presents, or causes to be presented, a false or
8    fraudulent claim for payment or approval . . . is liable to the
9    United States Government."
10         The government does not have to prove that it suffered
11   damages in order to find the defendant liable under this
12   statute.  Again, any person who knowingly presents or causes to
13   be presented a false or fraudulent claim for payment or
14   approval.
15         The first term is "knowingly."  There are three
16   definitions provided by statute for "knowingly:"
17         Actual knowledge of the information;
18         Acting in deliberate ignorance of the truth or falsity
19   of the information;
20         Acting in reckless disregard of the truth or falsity
21   of the information.
22         You do not have to find that there was any specific
23   intent to defraud.  "Knowingly" means any one of those three
24   things:  Actual knowledge, deliberate ignorance of truth or
25   falsity, reckless disregard of truth or falsity.
```

# PA-107

F4nmusa4                              Charge

1           You heard claims.  What is a claim?  A claim is "any

2     request or demand . . . for money or property . . . made to a

3     contractor, grantee or other recipient if the money or property

4     is to be spent or used on the Government's behalf or to advance

5     a Government program or interest, and if the United States

6     government . . . provided any portion of the money or property

7     requested or demanded or will reimburse the contractor,

8     grantee, or other recipient for any portion of the money or

9     property requested or demanded."

10          I'll do it again.

11          Claim means any request or demand for money or

12    property made to a contractor, grantee, or other recipient, if

13    the money or property is to be spent or used on behalf of the

14    government or to advance a government program or interest,

15    provided that the government -- the United States government --

16    has put up any portion of that money or property or will

17    reimburse a party for any expenditure of such money or

18    property.

19          Got it?

20          The next term is "presented."

21          The claim has to be presented.  That means it must be

22    submitted as a request for payment.  If I ask in some form to

23    be paid and I make that known, it's presented.

24          So the United States alleges that the defendant

25    Saavedra knowingly presented or caused SEEDCO or employees of

# PA-108

F4nmusa4                              Charge

1   SEEDCO to present false or fraudulent requests for payment to

2   the New York City Department of Small Business Services and

3   that that money was to be paid in whole or in part from the

4   United States government.

5          Mr. Saavedra denies all these allegations.

6          First, you need to determine if Mr. Saavedra presented

7   or caused another to present a claim for payment.  The False

8   Claims Act is intended to reach any person who knowingly

9   assisted in causing the government to pay claims grounded in

10  fraud.  If you find that Mr. Saavedra presented or caused to be

11  presented claims for payment, you need to determine if at least

12  one of those claims was false or fraudulent.

13         If you find that at least one of those claims was

14  false or fraudulent, you must determine if Mr. Saavedra acted

15  knowingly using the three definitions of knowingly that I gave

16  to you before.

17         If you find that he acted knowingly, then you may find

18  him liable on the first category of claim.

19         If you find that the United States has not proved that

20  element by a preponderance of the evidence, you may find

21  Mr. Saavedra not liable to the United States on the first

22  category of claim.

23         There was testimony in the case that the New York City

24  Department of Small Business Services contracted with Charney

25  Research to verify the job placement data submitted by SEEDCO.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# PA-109

F4nmusa4                              Charge

1    The fact that a third-party verification service was utilized

2    does not by the mere fact of its use change the issues that you

3    have to decide regarding Mr. Saavedra's liability.  The

4    question is if he knowingly presented or caused to be presented

5    one or more false claims for payment to the Department of Small

6    Business Services with funds that ultimately came from the

7    United States.

8           Those are the terms applicable to the first category

9    of claim.

10          Do I need to repeat it?

11          OK.  The second category.  The same law in another

12   subsection provides that any person who . . .knowingly makes,

13   uses, or causes to be made or used, a false record or statement

14   material to a false or fraudulent claim is liable to the United

15   States."  Any person who knowingly makes, uses or causes to be

16   made or used a false record or statement material to a false or

17   fraudulent claim.

18          I have already defined "knowingly."  It is the same

19   definition, three categories, remember.

20          I've already defined what is a claim.  That is a

21   request for payment.

22          "False" and "fraudulent" have the same meaning.

23          So the United States alleges that Mr. Saavedra

24   knowingly made used or caused to be made or used false records

25   or statements that were material to false or fraudulent claims

# PA-110

F4nmusa4                              Charge

1    for payment to New York City Small Business Services, and that

2    the money requested by such claims came from the United States

3    government.  Mr. Saavedra denied those allegations.

4         So first you need to determine whether the government

5    proved by a preponderance of the evidence that Mr. Saavedra

6    made, used, or caused to be made or used a false record or

7    statement.

8         A record or a statement is a record of an occurrence,

9    act, or event.  The record can be in writing or some other form

10   of hard copy, or it can be electronic, capable of being stored

11   in a computer.  There's no requirement that the record be a

12   piece of paper.  It can be in electronic format.

13        If you find that Mr. Saavedra made, used, or caused to

14   be made or used, a false record or statement you should

15   determine if the false record or statements was material to a

16   false or fraudulent claim.

17        "Material" means "having a natural tendency to

18   influence, or be capable of influencing, the payment or receipt

19   of money or property."  A natural tendency to influence or be

20   capable of influencing payment.

21        If you find both of those things, you must determine

22   if Mr. Saavedra acted knowingly, again using the definitions of

23   knowingly that I gave you before.  If you find that he did this

24   knowingly, you may find him liable on the second category of

25   claim.  If you find that the United States did not prove a

# PA-111

1    claim and each element of the claim by a preponderance of the

2    evidence, you may find Mr. Saavedra not liable on the second

3    category of claim.

4           Excuse me for one moment.

5           I think I have neglected to define what is false or on

6    fraudulent.  So let me do it now.  It pertains to both

7    categories of claims.

8           A claim is false or fraudulent if it is based on or

9    contains an assertion or statement that is materially untrue.

10   "Material" I have defined.

11          So "false or fraudulent" means that it contains or is

12   based on an assertion or statement that is materially untrue.

13   Again, it must be made knowingly.

14          Fraud requires a knowing assertion of a fact that is

15   true when it is not true or it's made regardless of whether you

16   know it's true or false or with reckless indifference to

17   whether it's true or false.

18          I am now going to instruct you on the law of recovery.

19   You may remember that the statute said is liable to the United

20   States.

21          Now, let me tell you how you find that.  First of all,

22   the fact that I'm giving you this instruction should not be

23   taken by you that I feel that you should get on to this issue

24   of recovery.  You can only get on to this issue if you first

25   decide the first and second questions, whether the plaintiff

F4nmusa4                          Charge

1    has proved by a preponderance of the evidence that there has

2    been a false claim, a knowingly false claim or a knowing false

3    statement as I've defined those issues.

4           So, the United States seeks compensatory damages for

5    the amount of damages it sustained because of Mr. Saavedra's

6    act in violation of the law.  If you find that Mr. Saavedra

7    knowingly presented or caused SEEDCO or its employees to

8    present a false or fraudulent claim for payment, or if you find

9    that Mr. Saavedra caused false statements or records to be made

10   or used which were material to a false or fraudulent claim, and

11   made it false or fraudulent, you then go on to determine how

12   much, if anything, the government paid out by reason of the

13   false claims, statements, or records in excess of what it would

14   have paid if those claims and records had been truthful -- the

15   difference between what the United States would pay if the

16   claims were truthful, if the government has proved that they

17   are false, and the amount it paid because they were false is

18   the quantum of damage.

19          In other words, you must determine the amount that the

20   United States paid to SEEDCO through the New York City

21   Department of Small Business Services that would not have been

22   paid to SEEDCO if Mr. Saavedra did not knowingly present or

23   cause to be presented false and fraudulent claims for payment

24   and/or did not knowingly make use or cause to be made or used

25   false statements or records that were material to such false

F4nmusa4                          Charge

1   claims.

2           You will have a verdict sheet to record and perhaps

3   help you in your deliberations.  It's one sheet of paper.  It

4   has the caption of the case and it has four questions.

5           Question No. 1, relating to Claim 1, is:  How do you

6   find on Claim 1?  Claim 1 is the false claims question.

7           For plaintiff, United States; for defendant,

8   Mr. Saavedra.

9           Depending on what the verdict is, that's the box you

10  check.

11          Claim 2 is the false records or statements claim.

12          It asks:  How do you find on Claim 2?

13          And you mark either the top box, for plaintiff, United

14  States; or the bottom box for, the defendant, Mr. Saavedra,

15  depending in both these questions if the government has

16  sustained its burden to prove each element of the claim by a

17  preponderance of the evidence.

18          If you found for the plaintiff in answer to either of

19  these two questions or both, you then fill out the third box,

20  how much.  In what amount, if any, was the plaintiff damaged?

21          The lawyers have argued that to you, and I take it you

22  will remember.  If not, you will be reminded.

23          And then the fourth question, If you found for the

24  plaintiff in answer to question 2 above -- that has to do with

25  the false records -- how many material false records or

# PA-114

1    statements, if any, did defendant knowingly cause to be made or

2    used?  And there is a box and you will fill out that number.

3              Again, the attorneys have argued that to you, and I

4    need not repeat it.

5              Then there is a box for the signature of the

6    foreperson and the date.  I'll tell you more about this later.

7              That is the verdict sheet that you fill out.

8              So I broke off after I was saying how much you should

9    fill out that you have to fill out an amount on question No. 3

10   if you found for the government, for the United States, on

11   questions 1 and 2 or 1 or 2.

12             If you found Mr. Saavedra liable to the United States

13   on the second category of claim -- this is question 4 on the

14   verdict sheet -- you must determine the number of times

15   Mr. Saavedra violated this provision of the False Claims Act;

16   that is, you must determine the number of times Mr. Saavedra

17   made used or caused to be made or used a false record or

18   statement material to a false or fraudulent claim.

19             You should mark that number in answer to question 4 on

20   the verdict sheet.

21             (Continued on next page)

22

23

24

25

1          That completes the instructions with regard to the

2   definitions of claims and the issue of recovery.  You get to

3   the issue of recovery only if you make the requisite findings

4   on the claims.

5          Next I want to talk to you about various rules and

6   guides that might help you evaluate the testimony of witnesses

7   and make your inferences regarding to the case.

8          As I told you at the outset, there are very generally

9   two categories of evidence; direct evidence and circumstantial

10  evidence.  You may rely upon either in reaching your decision.

11         Evidence is direct when exhibits that are admitted

12  into evidence show facts or when the testimony is sworn to by

13  witnesses who have actual knowledge of those facts as something

14  they derived from the exercises of their senses, something they

15  heard, something they saw, something they smelled, something

16  they touched, and so on circumstantial evidence.

17         Circumstantial evidence is evidence that tends to

18  prove a disputed fact or the negative of a fact by proof of

19  other facts.  You infer, on the basis of reason and experience

20  and common sense, from an established fact the existence or the

21  nonexistence of another fact.

22         Circumstantial evidence is of no less value than

23  direct evidence.  As a general rule, the law makes no

24  distinction between direct and circumstantial evidence.  When

25  you draw an inference, that's circumstantial proof, you

1    conclude from one or more established facts that another fact

2    exists, and you do so on the basis of your reason, experience

3    and common sense.

4         The process of drawing inferences from facts in

5    evidence is not a matter of guesswork, suspicion or

6    speculation, it is a reasoned, logical deduction or conclusion

7    that you may draw, but are not required to draw, from the facts

8    that have been established by the direct or circumstantial

9    evidence, using your common sense and drawing from the facts

10   that were proven whatever reasonable inferences you find to be

11   justified in light of your experience.

12        So you look out the window and you see rain falling,

13   that is direct evidence.  Say the windows are closed as they

14   are now and the drapes are drawn and you can't see the outside.

15   If someone comes inside with a dripping umbrella, you can infer

16   circumstantially that he was outside in the rain or whether he

17   passed under a bucket, either one.

18        How do you evaluate a witness's testimony?

19        How do you evaluate the credibility or believability

20   of witnesses?  Use the same tests for truthfulness that you

21   would use in determining matters of importance in your everyday

22   lives.  Did the witness impress you as honest, open and candid,

23   or was the witness evasive and edgy as if the witness was

24   hiding something?  How did the witness appear, the witness's

25   bearing, behavior, manner and appearance?  Was the witness as

F4MJUSA5                           Charge

1    responsive on cross-examination as the witness was on direct

2    examination?

3            Did the witness have an adequate opportunity to see,

4    hear and know about the things the witness testifies about, or

5    was the witness trying to make things up?

6            How do you appreciate the candor or the readiness of

7    the witness to answer questions, the intelligence of the

8    witness, the reasonableness and probability of the witness's

9    testimony, taking all the other facts into consideration, the

10   witness's consistency in testifying, direct and cross, and with

11   prior testimony, and the corroboration or lack of corroboration

12   with all the other evidence in the case?

13           Size up the witness in light of the witness's

14   demeanor, the explanations given to support testimony and

15   everything else in the case using your common sense, good

16   judgment and life experiences.

17           Few people recall every detail of every event

18   precisely in the same way.  The fact that some witnesses give

19   you different versions doesn't necessarily mean that one is

20   lying and one is truthful, or both are lying.  There can be

21   many shades in-between.  That is the importance of sizing up

22   each witness and asking how consistent or not and what does it

23   mean in relationship to other evidence?

24           You have to determine if whatever consistencies there

25   are are significant or inconsequential.

# PA-118

1              Witnesses sometimes discuss the facts of a case in

2      their testimony with their lawyers before appearing in court,

3      sometimes their own lawyer, sometimes a different person's

4      lawyer.  That happens all the time, but it has weight.  It may

5      have weight.  You judge it.  You judge whether that preparation

6      is just to remind the witness by his own recollection of what

7      he is testifying about or whether there were suggestions to

8      answer in one way or the other, to shade the truth in favor of

9      one party or another.  All of these things are measures you

10     take in sizing up the credibility of witnesses.

11             If you find that a witness intentionally testified

12     falsely on some matter of importance, you should weigh that

13     witness' testimony very carefully.  If the witness has

14     willfully testified as to a material fact -- that is, something

15     that is important -- the law permits you to disregard

16     completely the entire testimony of that witness upon everything

17     the witness has said, or on some things the witness has said,

18     or you can think it is not consequential at all or some

19     innocent mistake.  You have a full range of how to judge

20     credibility.

21             If the witness' prior statements particularly under

22     oath are confronted to the witness, and the witness is

23     contradictory, you can take that into consideration.  A prior

24     inconsistent statement may be said to have impeached the

25     credibility of the witness, to lessen the regard that you pay

F4MJUSA5                              Charge

1    for that witness' testimony, but it all depends how important

2    it was, how innocent or not innocent it was, and all the other

3    factors that I've talked about.  It is your duty, based upon

4    all the evidence and your own good judgment to determine if

5    there was an inconsistency and what it should mean.

6           The defendant was a witness in this case, Alex

7    Saavedra.  You should examine and evaluate his testimony the

8    same way you regard the testimony of all other witnesses,

9    having in mind, however, that Mr. Saavedra has a unique

10   interest in the outcome of the case.  That is his bias.

11          Whether that bias should affect how you regard his

12   credibility is for you to determine.  Just because a witness is

13   a party or a party is a witness does not mean that the party is

14   not capable of giving full and truthful answers.  It all

15   depends.  You are the judges.

16          During the course of the trial you've heard references

17   to and information from other individuals who had previously

18   been defendants in the case and some of the impeachment of the

19   evidence relating to those witnesses.  Do not speculate why

20   some persons are on trial and other persons are not.  Do not

21   speculate why this trial is only against one defendant Alex

22   Saavedra.  No other party is a defendant in the case.  You are

23   not judging the government's case against any other party.  You

24   are not discussing the motivations of any other party.

25          You examine the facts regarding the government's proof

1   against Mr. Saavedra on all the 4 questions you are to decide,

2   and if you decide regarding each separate question whether the

3   government has proved its case by a preponderance of the

4   evidence, you then deliver the verdict accordingly.

5        Do not consider any personal feelings you may have

6   about the personal characteristics of any of the parties or the

7   lawyers for any of the parties, factors such as race, religion,

8   ethnicity, national origin, sex or other such factors are

9   entirely irrelevant.  It would be highly improper for any juror

10  to allow his or her feelings based on these factors to

11  influence a verdict.  Verdicts are based on the evidence, on

12  the testimony of witnesses and the credibility and on what the

13  documents say and the credibility and consistency of those

14  documents.  Any other considerations extrinsic to that would be

15  a transgression of your oath and not fitting for a Court of the

16  United States, for each and all of us are entitled to the equal

17  protection of the laws and the fair and impartial verdicts of

18  jurors.

19       One more point.  One element of proof was an excerpt

20  of a report prepared by the New York City Department of

21  Investigation relating to SEEDCO's job placements.  You may

22  consider the truth and the persuasive quality of the findings

23  in the Department of Investigation report and you may give it

24  such weight, if any, as you think it deserves, and you should

25  be guided in that by some of the following:

# PA-121

F4MJUSA5                              Charge

1           Does the report set out factual findings?

2           Does the report emanate from a legally authorized

3    investigation?

4           Did the defense show that the sources of information

5    or other circumstances indicate a lack of trustworthiness in

6    the report?

7           And beyond that, use your own common sense and

8    intelligence because the report is a piece of evidence like

9    many other pieces of evidence, each one you have to give

10   concern to, analysis to and determine is it credible?  Is it

11   important?  How important is it?  Is it consistent or

12   inconsistent with all the other facts in the case?  How do you

13   weigh it?  Did the government use it in a proper way and

14   persuade you that it has proved its case by a preponderance of

15   the evidence?  Did it fail to do that?  These are the

16   considerations that you take and decide.

17          The fact that a New York City department issued the

18   report does not give it more or less evidentiary weight.  I was

19   benefited in this case by the active involvement of the

20   attorneys.  They had input every way.  They objected when they

21   had grounds to object or when they thought they had grounds to

22   object, and I ruled.

23          The fact that an attorney is aggressive or not, the

24   fact an attorney makes an objection or not, these are not

25   relevant.  If I asked a question -- and I did -- it is entitled

F4MJUSA5                        Charge

1    to no more weight than if the attorneys asked the questions.

2    It is what the witness says that is important, not the question

3    or who asked the question, as long as the answer is responsive

4    to the question.

5           Don't ask yourself whether I like the lawyer or not.

6    I like all the lawyers equally.  That is true.  I was once a

7    lawyer myself for 38 years.  Don't consider if I cut off a

8    lawyer or I thought a lawyer was taking too much time to make a

9    point or not.  Lawyers are not always the best judge on how

10   long it takes to prove a point, and sometimes the judge will

11   hasten them along.  It does not indicate they have proved or

12   not proved a particular point.  It is the evidence that counts

13   and your recollection of the evidence that is crucial.

14          You, as I said many times, are the sole and exclusive

15   judges of the facts.  You decide the credibility of the

16   witnesses, you decide the weight to be given to the evidence.

17   My opinions, the lawyers' opinions are not worth anything.  My

18   rulings do not pertain to the evidence.  These instructions, of

19   course, guide you and control you in terms of your

20   deliberations.  My rulings on the evidence throughout the trial

21   are not intended to give you any idea of how I feel.

22          I have done a pretty good job in not having opinions

23   on the cases before me.  It is not my job.  It is your job.  I

24   have enough to do to make sure that the trial presents evenly

25   and fairly and efficiently, and I try to do it under law as

F4MJUSA5                              Charge

1    best I can, but I have no opinion on the outcome.  That is your

2    decision.

3         If there are variations between what the lawyers have

4    said were the facts and what you recall to be the facts, your

5    recollection controls, not theirs.

6         Some of you took notes.  Those who took notes may use

7    them in deliberations, but they're not to prove a point to

8    anyone else.  They're only for the note-taker's guidance.  The

9    fact that a particular juror took notes and others didn't gives

10   the note-taker no greater importance than anyone else.  You are

11   equal, one to another, regardless of your level of education,

12   the manner of your speech, your job or anything else.

13        Nobody has a monopoly on intelligence or wisdom.  I

14   found that to be true, as I am sure all of you and at least

15   many of you have.  Wisdom does not come from years of

16   education.  Wisdom comes from patience, tolerance, good

17   listening, ability to present arguments.  That is the mix a

18   jury has.  Each of you is equal in that endeavor.

19        As you were told, the exhibits will be collected by

20   the attorneys and they will be available to give to you in your

21   deliberations.  If you want an exhibit, ask for it.  If your

22   recollection is faulty on any particular point that you find

23   interesting, ask for it to be given back to you.  There is a

24   process, it will take some time, but we'll make a photocopy of

25   what you need and eventually get it back to you for your

# PA-124

1   deliberations.

2          To report a verdict, it must be unanimous.  Whether it

3   is a verdict for the plaintiff or a verdict for the defendant,

4   it must be unanimous.  Your function is to weigh the evidence

5   and determine unanimously if the plaintiff has proved the case

6   and each element of the case by a preponderance based solely on

7   the evidence.

8          Each juror is entitled equally to his or her opinion.

9   Each should exchange views with all fellow jurors, for that is

10  the very essence of jury deliberations, to discuss and consider

11  the evidence, to listen to the arguments of fellow jurors, to

12  present your individual views, to consult with one another and

13  to reach agreement based solely and wholly on the evidence.

14         Each of you must decide the case for yourself after

15  consideration and listening attentively to all comments by

16  other jurors as they review the evidence with you.  You should

17  not hesitate to change an opinion if, after discussion with

18  your fellow jurors, their view appears to be correct and yours

19  does not, again because that is the purpose of exchanging views

20  in deliberations.

21         If you consider all of the evidence, listen patiently

22  to what other jurors say and remain with a conscientious view

23  that differs from the others, you should stick to your

24  conscientious conviction and not abandon it simply because

25  you're outnumbered.

1          Unanimity is not the same as majority or plurality.

2   Unanimity means that each juror, as an exercise of that juror's

3   conscientious conviction, comes to the same view, and then it

4   is expressed by the foreperson on the verdict sheet.

5          You begin deliberating when all the jurors are present

6   and able to listen to each other's point of view.

7   Deliberations cannot occur until all eight of you are present

8   and involved, so if the deliberations go onto another day or

9   two, they stop when one of you leaves, they resume when all of

10  you are together.  You come into the jury room, you remain in

11  the jury room and do your deliberations in the jury room, and

12  they begin when all of you are there and end when one of you

13  leaves.

14         If you have questions, your foreperson should write

15  the question on note paper that Ms. Jones will give you, put a

16  time and date on it and give it to the court security officer

17  to bring out to me.  I will share the note with the attorneys,

18  and together we'll agree or I'll rule on a response to you.

19         Each of your questions will be answered.  It may take

20  some time before the answer can be delivered.  If you have a

21  question about the evidence, you can't recall it, you can ask,

22  as I said, it will be copied and returned to you.

23         If you need an exhibit, ask for it and it will be sent

24  to you.  If there is some question about my instructions, ask

25  me to repeat them or elaborate on them, and with the help of

1    the attorneys, I'll do that.  It is our job to give you the law

2    and to help you in your deliberations in the way I mentioned.

3    You are the exclusive judges of the facts, and in that no one

4    may interfere or intervene.

5         When you reach a verdict, the foreperson will send a

6    note out which says the jury has reached a verdict.  It will

7    not tell us what the verdict is.  The verdict must be announced

8    in open court.  So when you reach a verdict, the foreperson

9    will sign and date the verdict sheet and keep it and then write

10   a note and say the jury has reached a verdict.

11        The jury will then come back into the room at my call.

12   The foreperson will then be asked to deliver the verdict sheet

13   for my inspection.  It will then be returned to the foreperson

14   to be read in open court and then shared with the lawyers.

15        The first piece of business that you will do is to

16   elect a foreperson.  By Custom of the Court, if there is no

17   election or by default, Juror No. 1, Ms. Blackburn, will be the

18   foreperson, but this is an issue for the jury, not anyone else.

19   The jury will decide who will be the foreperson.  The first

20   note will come out to me and announce who the foreperson is.

21        A foreperson has the job of keeping order in the jury

22   room and making sure that each juror has equal comfort and

23   equal convenience and equal motivation in speaking and in

24   listening.  It is a democratic process, and the foreperson

25   presides over that, neither interfering nor helping any person.

# PA-127

1          The foreperson's view is no less and no more than

2     anyone else.  The foreperson does not have more standing than

3     any other juror.  The foreperson is there to write the notes

4     and to regulate the procedure.

5          If you have difficulty with questions, I do not want

6     to know who is for and who is against anything.  I don't want

7     to know which juror is having trouble or not having trouble.

8     You are a jury together, and you will act together, and the

9     foreperson's job is to deliver the questions that each of you

10    has.  I do not need to know and do not want to know which juror

11    is asking which question.

12         One other thing.  The jury throughout has been given

13    instructions to keep an open mind as well as to be fair and

14    impartial and not discuss the case.  Now you will begin your

15    deliberations with a view of coming to a decision, and so the

16    deliberations will aid in that process, but you are a group

17    together.  You need to have confidence in one another.  You

18    need to share your thoughts candidly with one another, and that

19    means there has to be a certain trust by one with all the

20    others.

21         What you do after the case is not my concern.  It is

22    your concern, but you could pledge to one another that you will

23    respect each other's confidence even after you finish your work

24    in this Court because if nothing else, you need to speak and

25    you need to listen and you need to have trust in one another.

# PA-128

1    One element of trust is to pledge to one another that whatever

2    goes in the jury room will remain in the jury room and be

3    shared with no one else.  It is not a command of the law.  That

4    is just good sense which you can adopt or reject as you see

5    fit.

6           My law is "no" until the case is over, and until the

7    case is over what you say is secret, wholly unto yourself and

8    cannot be shared with anyone else.

9           Give me a few moments to convene the lawyers in the

10   robing room to see if there are any mistakes I made or

11   corrections they want to make, and we'll be back to you in just

12   a few minutes.  Please keep your seats.

13           (In the robing room)

14           THE COURT:  Any comments from the government?

15           MS. SCHOENBERGER:  No, your Honor.

16           THE COURT:  Any comments from the defense?

17           MR. FUTERFAS:  The only ones are very small, your

18   Honor, just two.

19           On Page 9, the bottom, the last line of the large

20   paragraph in the middle, I think your Honor said if at any

21   point then you may find Mr. Saavedra not liable, and I think

22   your Honor may wish to change that to must find him not liable.

23           THE COURT:  I did not say "must" with either Count 1

24   or Count 2.  I said "may" on both, and I said "may" for both

25   the government and the defense.  So if I follow what you say, I